# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MICHAEL MCCARTHY; WILLIAM R. BIEWENGA; LAURIE WARNER; TIMOTHY GALLIGAN; JIM SIMMONS; DAVID LANTAGNE; TROY CITY TACTICAL LLC; DON TOM GROUP LLC d/b/a PRECISION POINT FIREARMS; SHOOTING SUPPLY LLC; DOWNRANGE INC. d/b/a CAPE GUN WORKS; FIREARMS POLICY COALITION, INC.; COMMONWEALTH SECOND AMENDMENT, INC.; and SECOND AMENDMENT FOUNDATION, INC., | CIVIL ACTION NO. 1:20-cv-10701-DPW |
| Plaintiffs, | **PLAINTIFFS' BRIEF IN SUPPORT OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| -against- | |
| CHARLES D. BAKER, in his Official Capacity as Governor of the Commonwealth of Massachusetts and in his Individual Capacity; MONICA BHAREL MD, MPH, in her Official Capacity as Commissioner of the Massachusetts Department of Public Health and in her Individual Capacity; JAMISON GAGNON, in his Official Capacity as Commissioner of the Department of Criminal Justice Information Services and in his Individual Capacity; ALBERT F. DUPRE, in his Official Capacity as Chief of the Fall River Police Department and in his Individual Capacity; ROBERT F. RUFO, in his Official Capacity as Chief of the Woburn Police Department and in his Individual Capacity; KEITH A. PELLETIER, in his Official Capacity as Chief of the Westport Police Department; and MATTHEW SONNABEND, in his Official Capacity as Chief of the Barnstable Police Department and in his Individual Capacity, | |
| Defendants. | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ *ii*

**INTRODUCTION** ........................................................................................................... 1

**PERTINENT FACTS, STATUTES & REGULATIONS** ......................................................... 2

    A.    A Person Must Use a Licensed Retail Dealer to Purchase Ammunition and Must
           Normally Use a Licensed Retail Dealer to Purchase Firearms ....................................... 2

    B.    The COVID-19 Orders and the Closure of Retail Firearms and Ammunition Dealers .... 5

    C.    Other States Have Taken Far Less Drastic Approaches ................................................. 6

**ARGUMENT** ................................................................................................................. 8

    I)    The Plaintiffs are Likely to Succeed on the Merits ....................................................... 9

    II)    An Injunction is Needed to Prevent Irreparable Injury ................................................. 17

    III)    An Injunction Will Not Harm the Defendants ............................................................ 18

    IV)    The Protection of Constitutional Rights is in the Public Interest .................................. 20

**CONCLUSION** ............................................................................................................ 20

# TABLE OF AUTHORITIES

**Cases**

*American Civil Liberties Union v. Ashcroft*, 322 F.3d 240 (3d Cir. 2003),
  *aff'd*, 542 U.S. 656 (2004).................................................................................20

*Bateman v. Perdue*, 881 F. Supp. 2d 709 (E.D.N.C. 2012) .................................15-16

*Blount v. Redmond*, 649 F. Supp. 319 (D. Me. 1986)..............................................18

*Board of Airport Commissioners v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987)..........12

*Boston v. Super*, 531 F.3d 1 (1st Cir. 2008) ...........................................................9

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151 (1st Cir. 2004) ......18

*Corporate Technologies, Inc. v. Harnett*, 731 F.3d 6 (1st Cir. 2013) ........................18

*District of Columbia v. Heller*, 554 U.S. 570 (2008)........................................*passim*

*Elrod v. Burns*, 427 U.S. 347 (1976) ......................................................................18

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) .................................13, 18-19

*FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449 (2007) ...............................................14

*Forchion v. Intensive Supervised Parole*, 240 F. Supp. 2d 302 (D.N.J. 2003)...........20

*Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75 (1st Cir. 2009) ................................8

*Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2019)..................................................13-14

*Grace v. District of Columbia*, 187 F. Supp. 3d 124 (D.D.C. 2016)..........................18

*Hightower v. City of Boston*, 693 F.3d 61 (1st Cir. 2012) ........................................14

*Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837 (1st Cir. 1988) ........................20

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) .......................................................1

*McCullen v. Coakley*, 573 U.S. 464 (2014) ........................................................16-17

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ..................................9-10, 12, 20

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ...................................................15

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  700 F.3d 185 (5th Cir. 2012) ...............................................................................13

*National Socialist Party of America v. Skokie*, 432 U.S. 43 (1977)...........................12

*New Coram Wireless Services v. Sprintcom, Inc.*, 287 F.3d 1 (1st Cir. 2002).............9

*On Fire Christian Center, Inc. v. Fischer*, No. 3:20-CV-264, (W.D. Ky. Apr. 11, 2020)...........15

*Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670 (1st Cir. 1998)..............................9

*Reid v. Donelan*, 390 F. Supp. 3d 201 (D. Mass. 2019) ...........................................20

*Reno v. ACLU*, 521 U.S. 844 (1997) ......................................................................14

*Richmond v. Peraino*, 128 F. Supp. 3d 415 (D. Mass. 2015)......................................3

*Ross-Simons of Warwick, Inc. v. Baccarat*, 102 F.3d 12 (1st Cir. 1996)....................................18

*Rushia v. Town of Ashburnham*, 701 F.2d 7 (1st Cir. 1983) ......................................................18

*Silvester v. Becerra*, 138 S. Ct. 945 (2018)..............................................................................20

*Skokie v. Nat'l Socialist Party*, 373 N.E.2d 21, 69 Ill. 2d 605 (1978).........................................13

*Stilp v. Contino*, 613 F.3d 405 (3d Cir. 2010)..........................................................................18

*Teixeira v. County of Alameda*, 822 F.3d 1047 (9th Cir. 2016)..................................................11

*United States v. Carolene Products Co.*, 304 U.S. 144 (1938).....................................................13

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2009).................................................*passim*

*United States v. Playboy Entm't Group*, 529 U.S. 803 (2000).....................................................14

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989).................................................................16

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)........................................8

## Statutes

18 U.S.C. § 921 ......................................................................................................................2

18 U.S.C. § 922 ......................................................................................................................4

26 U.S.C. § 5845.....................................................................................................................4

Chicago, Ill., Municipal Code § 8–20–040 ..............................................................................10

Chicago, Ill., Municipal Code § 8–20–050 ..............................................................................10

D.C. Code § 7-2502.01(a) (2001) ...........................................................................................9

D.C. Code § 7-2502.02 (2001) ...............................................................................................9

M.G.L. c. 140, § 121 ...........................................................................................................2-3

M.G.L. c. 140, § 122B ............................................................................................................3

M.G.L. c. 140, § 123 ..............................................................................................................4

M.G.L. c. 140, § 128 ..............................................................................................................3

M.G.L. c. 140, § 128A ............................................................................................................3

M.G.L. c. 140, § 129B ............................................................................................................3

M.G.L. c. 140, § 129C ............................................................................................................3

M.G.L. c. 140, § 131 ..............................................................................................................3

M.G.L. c. 140, § 131A ............................................................................................................3

M.G.L. c. 140, § 131P ............................................................................................................3

M.G.L. c. 269, § 10................................................................................................................3

N.C. Gen. Stat. § 14-288.7 ....................................................................................................15

N.C. Gen. Stat. § 14-288.12 ..................................................................................................15

N.Y.C. Admin. Code § 8-803 ................................................................................ 17

**Regulations**

27 C.F.R. § 478.96 ............................................................................................... 4

27 C.F.R. § 478.100 ............................................................................................. 4

**Executive (etc.) Orders**

Connecticut Executive Order 7N ........................................................................ 8

Delaware Tenth Modification of the Declaration of a State of Emergency ................. 8

Maine Essential Business Operations Definitions, Apr. 3, 2020 ................................. 7

Maryland Executive Order 20-03-30-01 ................................................................. 7

Massachusetts COVID-19 Order No. 13 ................................................................. 5

Massachusetts COVID-19 Order No. 21 ................................................................ 5-6

New Hampshire Emergency Order No. 17 ............................................................... 7

New Jersey Administrative Order 2020-6 ............................................................... 7

Ohio Dep't of Health Amended Director's Stay at Home Order ................................. 7

Pennsylvania Industry Operation Guidance (updated Apr. 1, 2020) ............................ 8

Rhode Island Executive Order No. 20-14 ............................................................... 7

Vermont Agency of Commerce & Community Development, Stay Home Stay Safe
   Sector Specific Guidance ................................................................................ 8

Virginia Executive Order Number 53 .................................................................... 7

West Virginia Executive Order No. 9-20 ................................................................ 7

**Other Authorities**

ATF Office of Enforcement Programs and Services, Permanent Brady Permit Chart ................. 4

Brief for the States of New York, et al. in *In re: Abbott*, No. 20-50264 (5th Cir. Apr. 3, 2020) .... 6

Christopher C. Krebs, CISA, Memorandum on Identification of Essential Critical
   Infrastructure Workers During COVID-19 Response (Mar. 28, 2020) ..................... 5

https://twitter.com/MassAGO/status/1245409864924442626 ................................... 6

Letter from ATF to Federal Firearms Licenses (Apr. 10, 2020) ................................. 4

Matt Murphy, *Baker reversed course on gun shop, range openings*,
   Lowell Sun, Apr. 2, 2020 ................................................................................. 6

Nik DeCosta-Klipa, *Charlie Baker adds the gun industry to list of essential services
   allowed to stay open in Massachusetts*, Boston.com, Apr. 1, 2020 ......................... 6

Winston Williams, *New Law Swells Chicago Pistol Registrations*, N.Y. Times,
   Apr. 9, 1982, at A16 ...................................................................................... 10

**INTRODUCTION**

The Commonwealth of Massachusetts has *entirely closed off* any and all means for law-abiding private citizens to acquire functional firearms for their defense. At the same time the Defendants took this action, they permitted numerous other retail businesses to continue their operations under limited conditions—meaning that this is not a situation where it is simply not possible to allow any retail businesses to continue operation. Rather, the Commonwealth has permitted the retailers of many other products—including alcohol, hardware, and office supplies—to continue distributing goods to the public.

The Defendants' actions have a particularly significant impact here, in the Commonwealth of Massachusetts, because it is impossible to obtain an operative firearm in Massachusetts without the assistance of a licensed gun dealer. Specifically, it is theoretically possible to obtain a gun without using a licensed dealer, but it is impossible to obtain ammunition without a licensed dealer. So, closing all gun stores, without exception, results in a situation where it is illegal to acquire an operative firearm for protection. Period.

To be sure, the COVID-19 outbreak is an existential threat that requires significant sacrifices and adjustments by all people. But no interest, no matter how compelling it may be, can justify the elimination of constitutional rights. *See Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905) (public emergencies cannot justify "a plain, palpable invasion of rights secured by the fundamental law"). The Defendants could not cite the seriousness of COVID-19 to justify bans on speech or reading, nor would COVID-19 justify convicting people of crimes without providing them with trials, or searching houses door-to-door without warrants. The Constitution imposes a floor the government cannot go beneath, and in crafting emergency orders to address threats, including very serious ones, the government cannot go too far.

Here, by completely prohibiting the acquisition of firearms, the government has gone too far—and this Court's relief is needed to remedy an irreparable injury that exists right now.

## PERTINENT FACTS, STATUTES & REGULATIONS

It is now impossible for a private citizen to purchase ammunition, and it is effectively impossible for most people to purchase a handgun, rifle or shotgun (hereinafter a "firearm"[1] or "gun"), in the Commonwealth of Massachusetts. As explained herein:

- Any person wishing to purchase ammunition in Massachusetts must use the services of a licensed dealer;

- A person wishing to purchase a firearm must normally use the services of a licensed dealer; and

- The person must appear at the dealer's licensed premises to complete the purchase of either a gun or ammunition.

It has accordingly become impossible to purchase ammunition, and extremely difficult to purchase a firearm, because the COVID-19 Orders require dealers to "close their physical workplaces and facilities ('brick-and-mortar premises') to workers, customers, and the public."

### A.    A Person Must Use a Licensed Retail Dealer to Purchase Ammunition and Must Normally Use a Licensed Retail Dealer to Purchase Firearms

Various overlapping state and federal laws regulate the purchase and possession of firearms and ammunition. In Massachusetts, a person who seeks to exercise their right to keep arms by purchasing a firearm or ammunition must obtain prior authorization from local police authorities. A Firearms Identification card ("FID") authorizes a person to purchase a rifle or

---

[1] We use the term "firearm" to refer to any type of ordinary handgun, rifle or shotgun, which is the definition contained in federal law. *See* 18 U.S.C. § 921(a)(3). However, the Court should be aware that Massachusetts law generally defines the term "firearm" to include handguns, but not to include ordinary rifles and shotguns. *See* M.G.L. c. 140, § 121.

shotgun, while a License to Carry ("LTC") authorizes a person to purchase a handgun, rifle or a shotgun. *See* M.G.L. c. 140, § 129C.[2] To obtain either a FID or LTC, a person must submit fingerprints to the designated "licensing authority" (their local police chief) and pass a background check investigation, and they must also provide documentation of firearms safety training. *See* M.G.L. c. 140, §§ 129B(1)-(2), 131(d)-(e), 131P(a); *see also id.* § 121 ("licensing authority" definition). Police cannot issue a FID or LTC to any person who, *inter alia*, has been convicted of a felony or of certain misdemeanors, is subject to a restraining order or an arrest warrant or is under the minimum age (21 years for a LTC and 15-18 years for a FID). *See id.* §§ 129B(1)(i)-(ii), (iv)-(v), (vii)-(viii), 131(d)(i)-(ii), (iv), (vi)-(vii). Either a FID or LTC is valid for up to six years. *See id.* §§ 129B(9); 131(i).

It is also illegal to purchase or possess ammunition in the absence of a FID or LTC. *See id.* §§ 129B-129C; M.G.L. c. 269, § 10(h)(1). And significantly, it is illegal to "sell ammunition in the commonwealth unless [one is] duly licensed" by local police authorities. *See* M.G.L. c. 140, § 122B. With respect to guns, the general rule is that it is illegal if anyone other than a licensed dealer "sells, rents or leases a firearm, rifle, shotgun or machine gun." *Id.* § 128. There is an exception that allows a licensed gun owner to sell up to four guns to another licensed gun owner during a calendar year, but this exception does not apply to sales of ammunition. *See id.* § 128A.

---

[2] A provision of Massachusetts law also authorizes police chiefs to issue a "permit to purchase, rent or lease a firearm" to a person who meets the requirements for obtaining a LTC. *See* M.G.L. c. 140, § 131A. A permit to purchase does not authorize possession outside one's home. *See* M.G.L. c. 269, § 10(a). Because of the requirement that licensed retail dealers conduct business at their premises (discussed *infra*), this permit statute is essentially vestigial. In any event, a person seeking a permit under § 131A would need to meet the same requirements as a person seeking a LTC. *See Richmond v. Peraino*, 128 F. Supp. 3d 415, 417 (D. Mass. 2015).

Furthermore, Massachusetts law prohibits licensed dealers from transferring either firearms or ammunition without "the in-person presentation of the required [FID or LTC] card." *Id.* § 123. In addition, federal law requires licensed dealers to conduct a background check using the National Instant Criminal Background Check System "before the completion of" a firearm transfer. *See* 18 U.S.C. § 922(t)(1)-(2). Like Massachusetts, federal law requires a purchaser to "appear in person at the licensee's business premises" in order to complete that background check and purchase. *See* 27 C.F.R. § 478.96(b).[3] There are exceptions from the federal background check requirements, but none have any application to an individual attempting to purchase a gun in Massachusetts. *See* 18 U.S.C. § 922(t)(3).[4]

The Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") recently issued guidance that clarifies that licensed dealers can transact business within social distancing guidelines. Specifically, licensed dealers can transfer firearms "on any part of the business premises, including the exterior of the brick-and-mortar structure." *See* Letter from ATF to Federal Firearms Licenses (Apr. 10, 2020), *available at* https://tinyurl.com/uyj2dsy (last visited Apr. 14, 2020). Thus, a licensed dealer can do business "through a drive-up or walk-up window

---

[3] Federal law permits dealers to perform transfers at gun shows, *see* 27 C.F.R. § 478.100, but the COVID-19 Orders eliminate this option because they prohibit gatherings of more than 10 people.
[4] There are three exceptions to the federal background check requirement. One applies where a purchaser has a state-issued "license or permit" that meets certain requirements. *See* 18 U.S.C. § 922(t)(3)(A). Massachusetts gun licenses do not meet these requirements. *See* ATF Office of Enforcement Programs and Services, Permanent Brady Permit Chart, *available at* https://tinyurl.com/y82p2t6v (last visited Apr. 14, 2020). A second exception applies where the federal government has approved a transfer under the National Firearms Act ("NFA"), which governs things like machineguns, howitzers and short-barreled shotguns, not "ordinary" rifles, shotguns and handguns. *See* 18 U.S.C. § 922(t)(3)(B); 26 U.S.C. § 5845(a) ("firearm" definition for NFA purposes). Finally, a third exception applies in "extremely remote" areas where there is "an absence of telecommunications facilities" and the Attorney General "has certified that compliance . . . is impracticable." *See* 18 U.S.C. § 922(t)(3)(C). None apply in Massachusetts.

or doorway" or "from a temporary table or booth located in a parking lot or other exterior location on the licensee's property." *Id.*

    **B.**    **The COVID-19 Orders and the Closure of Retail Firearms and Ammunition Dealers**

    Governor Baker issued COVID-19 Order No. 13 on March 23, 2020 ("Order No. 13"). *See* https://tinyurl.com/rog8pj7 (last visited Apr. 14, 2020). Citing guidance from the federal Cybersecurity and Infrastructure Security Agency ("CISA") that identified "critical infrastructure sectors," Order No. 13 included a list of "essential" services that was "based on federal guidance and amended to reflect the needs of Massachusetts' unique economy." *See* Order No. 13, Exhibit A, *available at* https://tinyurl.com/tk5czzo (last visited Apr. 12, 2020). That list did not include firearms retailers, but it did include "the manufacturing of materials and products needed for . . . emergency services, and the defense industrial base," *id.* at 8, which left some room for licensed firearm manufacturers to continue sales.

    Five days later, CISA issued updated guidance regarding the designation of essential services. *See* Christopher C. Krebs, CISA, Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response (Mar. 28, 2020), *available at* https://tinyurl.com/qrxz6zv (last visited Apr. 14, 2020). And this guidance included "Workers supporting the operation of firearm or ammunition product manufacturers, retailers, importers, distributors, and shooting ranges," as essential. *Id.* Three days later, on March 31, 2020, Governor Baker extended the term of Order No. 13 to at least May 4, 2020 (from an original expiry of April 7, 2020). *See* COVID-19 Order No. 21 ("Order No. 21"), *available at* https://tinyurl.com/ugg42dd (last visited Apr. 14, 2020). At the same time, Governor Baker published an updated list of "essential" services that reflected the updated CISA guidance and included "firearm or ammunition product manufacturers, retailers, importers, distributors, and

shooting ranges," verbatim to the CISA guidance. *See* Nik DeCosta-Klipa, *Charlie Baker adds the gun industry to list of essential services allowed to stay open in Massachusetts*, Boston.com, Apr. 1, 2020, *available at* https://tinyurl.com/sy2vpsb (last visited Apr. 14, 2020).

In response, Attorney General Maura Healey objected on Twitter that "Gun shops and shooting ranges are NOT essential businesses during a public health emergency. We cannot undermine the safety of our police officers, first responders, and domestic violence victims." https://twitter.com/MassAGO/status/1245409864924442626 (last visited Apr. 14, 2020).[5] After House Speaker Robert DeLeo called to protest, Governor Baker removed the language allowing "retailers" and "shooting ranges." *See* Matt Murphy, *Baker reversed course on gun shop, range openings*, Lowell Sun, Apr. 2, 2020, *available at* https://tinyurl.com/w5jtzvo (last visited Apr. 14, 2020); *see also* Exhibit A, COVID-19 Essential Services at p. 2, *available at* https://tinyurl.com/ta7qylx (last visited Apr. 14, 2020). As detailed in the declarations submitted herewith, the Defendants then began to actively notified licensed retailers (including licensed manufacturers) that they could not continue doing business. As it stands, Order No. 19 allows people to purchase alcohol, office supplies and hardware, but it precludes the retail sale of firearms and ammunition. *See id.*

**C.  Other States Have Taken Far Less Drastic Approaches**

A number of states have now adopted essential-service designations that designate retailers of firearms and ammunition as "essential" on the same terms as other essential businesses. These include (but are not limited to) Maine, Maryland, New Hampshire, Ohio, Rhode Island, Virginia and West Virginia. *See* Maine Essential Business Operations Definitions,

---

[5] At about the same time, the Attorney General joined an amicus brief in the Fifth Circuit that cited her "general commitment to safeguarding the constitutional right to reproductive self-determination recognized and reaffirmed by the Supreme Court over decades." *See* Brief for the States of New York, et al. at p. 2 in *In re: Abbott*, No. 20-50264 (5th Cir. Apr. 3, 2020).

Apr. 3, 2020[6] ("Federal Firearms Licensee"); Maryland Executive Order 20-03-30-01[7] at ¶ IV(a) (deferring to CISA's designation of critical infrastructure); New Hampshire Emergency Order No. 17, Exhibit A at p. 10 ("gun and related products (including associated retail)"); Ohio Dep't of Health Amended Director's Stay at Home Order[8] at ¶ 12(q) ("firearm and ammunition suppliers and retailers"); Rhode Island Executive Order No. 20-14[9] at ¶ 4 ("firearms stores"); West Virginia Executive Order No. 9-20[10] at ¶ 3(r) ("firearm and ammunition suppliers and retailers"); *see also* Virginia Executive Order Number 53[11] at ¶ 6 ("any brick and mortar retail business not listed in paragraph 5 may continue to operate but must limit all in-person shopping to no more than 10 patrons per establishment").

Still other states have exempted firearms and ammunition retailers from closure, but only to the extent necessary to allow regulated transactions to take place. For example, the State of New Jersey had mandated the closure of all firearms retailers as non-essential, but—in apparent response to litigation brought by Plaintiff Second Amendment Foundation, Inc.—issued an updated directive that allowed firearms retailers to remain open for "completing the portions of a sale or transfer that must be conducted in-person under state and/or federal law and for the purpose of product maintenance and repair services," but only by appointment. *See* New Jersey Administrative Order 2020-6[12] at ¶ 3(a)-(b). The States of Connecticut, Delaware, Pennsylvania and Vermont have also all taken similar approaches—permitting licensed dealers to continue the portion of their operations that must be completed in person. *See* Connecticut Executive Order

---

[6] *Available at* https://tinyurl.com/vs522su (last visited Apr. 14, 2020).
[7] *Available at* https://tinyurl.com/w6vprfm (last visited Apr. 14, 2020).
[8] *Available at* https://tinyurl.com/vbpwp2 (last visited Apr. 14, 2020).
[9] *Available at* https://tinyurl.com/r2awbmm (last visited Apr. 14, 2020).
[10] *Available at* https://tinyurl.com/rf4kh65 (last visited Apr. 14, 2020).
[11] *Available at* https://tinyurl.com/symbatp (last visited Apr. 14, 2020).
[12] *Available at* https://tinyurl.com/yxxxl4kg (last visited Apr. 14, 2020).

7N at ¶ 3(a)[13] (exempting "certain regulated retail transactions, including purchase, sale, and transfer of firearms, ammunition, and their components or supplies, [which] requires the customer's presence inside the business"); Delaware Tenth Modification of the Declaration of a State of Emergency[14] at ¶ 3(g) ("sales of firearms, ammunition, and other goods directly related to responsible firearm storage and maintenance, by appointment only"); Pennsylvania Industry Operation Guidance (updated Apr. 1, 2020)[15] ("to complete only the portions of a sale/transfer that must be conducted in-person under the law"); Vermont Agency of Commerce & Community Development, Stay Home Stay Safe Sector Specific Guidance[16] (allowing "limited in-person operations" because "state and federal law require firearm sales to occur through in-person transactions").

## ARGUMENT

Equitable relief is necessary to prevent irreparable injury, and the Plaintiffs readily meet the standards for preliminary equitable relief. As the Court is aware, preliminary equitable relief turns on the application of four factors: (1) the likelihood of success on the merits; (2) the likelihood of irreparable injury in the absence of an injunction; (3) the balance of equities; and (4) the public interest. *See, e.g., Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). The first two factors are the most important, *see Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79 (1st Cir. 2009) (citation omitted), and the probability of success on the merits is often the "touchstone" consideration, *see Boston v. Super*, 531 F.3d 1, 11

---

[13] *Available at* https://tinyurl.com/vw8do2g (last visited Apr. 14, 2020).
[14] *Available at* https://tinyurl.com/u8fw333 (last visited Apr. 14, 2020).
[15] *Available at* https://tinyurl.com/rd237xa (last visited Apr. 14, 2020).
[16] *Available at* https://tinyurl.com/rmsndwd (last visited Apr. 14, 2020).

(1st Cir. 2008) (*quoting Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st Cir. 1998));
*see also New Coram Wireless Services v. Sprintcom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).

 The Plaintiffs plainly meet the first two factors because categorical bans on acquiring
functional arms are flatly unconstitutional, and because the denial of a constitutional right to
engage in protected conduct is irreparable *per se*. After this, the remaining two factors weigh
decisively in favor of equitable relief. Put simply, irreparable injury exists now, and it will
continue to exist unless and until this Court grants relief.

### I)   The Plaintiffs are Likely to Succeed on the Merits

 The Plaintiffs are likely to succeed on the merits because categorical bars on the ability to
acquire functional firearms are *per se* unconstitutional. Under the COVID-19 Orders, the
Defendants have entirely closed off the ability to obtain ammunition, and they have nearly closed
off the ability to obtain firearms. Significantly, it was laws that broadly precluded the ability to
acquire arms for defense that the Supreme Court overturned in *District of Columbia v. Heller*,
554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

 In *Heller*, the Supreme Court invalidated a District of Columbia law that substantively
provided that "the registration of handguns is prohibited." *Heller*, 554 U.S. at 575. Specifically,
the District of Columbia Code made it illegal to, *inter alia*, "possess" a gun in the absence of a
"registration certificate," D.C. Code § 7-2502.01(a) (2001), and it then provided that "[a]
registration certificate shall not be issued for a . . . [p]istol not validly registered to the current
registrant in the District prior to September 24, 1976," *id.* § 7-2502.02(a)(4). The Court's
conclusion was that "[a]ssuming that [the petitioner] is not disqualified from the exercise of
Second Amendment rights, the District must permit him to register his handgun[.]" *Heller*, 554
U.S. at 635. Furthermore, the District's law was unconstitutional without regard to the standard

of scrutiny. "Under any of the standards of scrutiny that we have applied to enumerated constitutional rights," a ban on handguns "would fail constitutional muster." *Id.* at 628-29.

In *McDonald*, the Supreme Court likewise overturned a Chicago law that "prohibits registration of most handguns, thus effectively banning handgun possession by almost all private citizens who reside in the City." *Id.* at 750. Specifically, Chicago made it illegal to "possess . . . any firearm unless [a] person is the holder of a valid registration certificate," Chicago, Ill., Municipal Code § 8–20–040(a) (2009), and it then simultaneously provided that "[n]o registration certificate shall be issued for any . . . handguns," *id.* § 8–20–050(c). Finding the Second Amendment applicable against state and local governments, the Court reversed the lower court decisions that had granted the city's motion to dismiss. *McDonald*, 561 U.S. at 791.

While there is some debate about the full import of the decisions in *Heller* and *McDonald*, this much is irreducible: The local laws that the Court invalidated were not, strictly speaking, laws that completely "banned" handguns. Rather, they were laws that prohibited people from acquiring additional handguns. People remained free to keep handguns they had registered in the District of Columbia before 1976, and in the City of Chicago before 1982.[17] The restrictions that the Court found invalid "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights," *Heller*, 554 U.S. at 628, were laws that prohibited otherwise eligible individuals from *acquiring* handguns. It is those laws that, under *Heller* and *McDonald*, are *per se* unconstitutional. And this is exactly what the Defendants here have done:

---

[17] Notably, many Chicago residents made it a point to acquire handguns before the city's ban went into force in 1982. *See* Winston Williams, *New Law Swells Chicago Pistol Registrations*, N.Y. Times, Apr. 9, 1982, at A16, *available at* https://tinyurl.com/yx2fe9ot (last visited Apr. 14, 2020).

They have foreclosed any ability to acquire ammunition, and they have largely foreclosed the ability to acquire firearms.

Indeed, the Court of Appeals for the Third Circuit has recognized that the Second Amendment cannot tolerate a prohibition on the commercial sale of guns. In *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2009), the court evaluated the import of *Heller* and, particularly, of three examples of regulations that the Court had explained it did not intend "to cast doubt on." *See id.* at 91-92 (*quoting Heller*, 554 U.S. at 626). Those were "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 91 (*quoting Heller*, 554 U.S. at 626-27). The Third Circuit concluded, pertinently, that "[c]ommercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment" because if so "it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. *Such a result would be untenable under Heller.*" *Id.* at 92 n.8 (emphasis added). And notably, the Court of Appeals for the Ninth Circuit agrees that "a total prohibition on the commercial sale of firearms" is "'untenable under *Heller.*'" *Teixeira v. County of Alameda*, 822 F.3d 1047, 1057 (9th Cir. 2016) (*quoting Marzzarella*, 614 F.3d at 92 n.8). But this is exactly what the Commonwealth of Massachusetts has done: It has created a "total prohibition on the commercial sale of firearms."

The Commonwealth's denial of the ability to acquire ammunition is independently significant because it precludes individuals from using firearms for their defense. The Court in *Heller* emphasized that "the core lawful purpose" of the Second Amendment is "self-defense." *Heller*, 554 U.S. at 630; *see also id.* at 592, 599; *United States v. Rene E.*, 583 F.3d 8, 11 (1st

Cir. 2009) (*quoting Heller*, 554 U.S. at 592, 630). The Court was also emphatic about this in *McDonald*, where it described *Heller* as having "held that individual self-defense is 'the *central component*' of the Second Amendment right." *McDonald*, 561 U.S. at 767 (*quoting Heller*, 554 U.S. at 599) (emphasis in source); *see also id.* at 767-68, 780, 787. But prohibiting the purchase of ammunition makes it impossible for someone to actually use a firearm for their protection. Indeed, and significantly, the Court in *Heller* struck down not just the District of Columbia's ban on registering new handguns, but also its ban on keeping loaded guns at home. That prohibition "makes it impossible for citizens to use arms for the core lawful purpose of self-defense and is hence unconstitutional," the Court explained. *Heller*, 554 U.S. at 571. Thus, the Commonwealth would not be free to prohibit the purchase of ammunition any more than it would be free to limit people to purchasing only plastic replicas of actual guns.

The restrictions that the Defendants have imposed here are invalid for the same reasons that the laws in *Heller* and *McDonald* were invalid—and indeed, just as the Third Circuit and the Ninth Circuit have already articulated. These restrictions are invalid *per se* because they prohibit something that may not be prohibited—the exercise of constitutional rights deemed fundamental—and it is not necessary to resort to tiers of scrutiny to evaluate them. One notable example is *Board of Airport Commissioners v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987), where the Court struck down an LAX airport policy that prohibited (literally) all "First Amendment activities" on LAX property. *See id.* at 575. The unanimous Court declined to address the standard of review, explaining simply that "no conceivable governmental interest would justify such an absolute prohibition of speech." *Id.*

Another pertinent example is *National Socialist Party of America v. Skokie*, 432 U.S. 43 (1977), where the Supreme Court summarily overturned a lower court decision that had enjoined

a neo-Nazi group from parading through a town. *See id.* at 44; *see also Heller*, 554 U.S. at 635.

Few would dispute that a (substantially Jewish) community has compelling public safety reasons

for trying to stop a neo-Nazi group from parading, displaying swastikas and distributing

literature—but these safety reasons were insufficient to override the enumerated right of free

speech. *See Skokie v. Nat'l Socialist Party*, 373 N.E.2d 21, 22, 69 Ill. 2d 605, 609-10 (1978)

(background facts). The Court's decision in *Heller* cited *Skokie* and explained that there, the

Court had refused to "apply an 'interest-balancing' approach to the prohibition of a peaceful neo-

Nazi march through Skokie." *Heller*, 554 U.S. at 635. There is no exception in "the freedom-of-

speech guarantee that the people ratified . . . for the expression of extremely unpopular and

wrong-headed views. *The Second Amendment is no different.*" *Id.* (emphasis added).

There, as here, a flat prohibition on the exercise of an enumerated constitutional right is

unconstitutional on its face. No amount of interest-balancing will remove a right from the

Constitution. Laws that simply preclude protected activities do not require standards of scrutiny.

To be sure, most decisions addressing burdens on the right to keep and bear arms use the

tiered scrutiny approach that has its genesis in the Supreme Court's well known *Carolene*

*Products* footnote. *See United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938)

(suggesting a "more exacting judicial scrutiny" "when legislation appears on its face to be within

a specific prohibition of the Constitution, such as those of the first ten Amendments"). The First

Circuit has ruled that "the appropriate level of scrutiny must turn on how closely a particular law

or policy approaches the core of the Second Amendment right and how heavily it burdens that

right." *Gould v. Morgan*, 907 F.3d 659, 670 (1st Cir. 2019) (*citing Nat'l Rifle Ass'n of Am., Inc.*

*v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 195 (5th Cir. 2012); *Ezell*

*v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011)). Specifically, "[a] law or policy that

burdens conduct falling within the core of the Second Amendment requires a correspondingly strict level of scrutiny, whereas a law or policy that burdens conduct falling outside the core of the Second Amendment logically requires a less demanding level of scrutiny." *Id.*

The "core" Second Amendment right that the First Circuit referenced in *Gould* was "'the possession of operative firearms for use in defense of the home' by responsible, law-abiding individuals." *Id.* (*quoting Hightower v. City of Boston*, 693 F.3d 61, 72 (1st Cir. 2012)). And that is just where the COVID-19 Orders at issue here strike—they preclude law-abiding citizens from obtaining operative firearms to use in defense of the home. For without the ability to *obtain* arms and ammunition, the right to *keep* them for defense is illusory and meaningless. Thus, should this Court apply a tiered standard of scrutiny, it must be a strict one.

Under a strict scrutiny approach, a law must be "'narrowly tailored to serve a compelling state interest.'" *Marzzarella*, 614 F.3d at 99 (*quoting FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 465 (2007)). "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Entm't Group*, 529 U.S. 803, 813 (2000) (*citing Reno v. ACLU*, 521 U.S. 844, 873 (1997)). The law is presumed to invalid, with "the government bear[ing] the burden of rebutting that presumption." *Marzzarella*, 614 F.3d at 99 (*citing Playboy*, 529 U.S. at 817). The burden at issue here—a categorical ban on the acquisition of operative arms by the law-abiding—cannot be sustained under this standard.

Concededly, preventing the spread of a pandemic illness is a compelling government interest. But nothing makes a blanket ban on the acquisition of guns and ammunition "necessary" to achieve that interest—and moreover, a blanket closure is very plainly not narrowly tailored. If the State can establish conditions that safely permit people to purchase alcohol, hardware, and office supplies, then it can establish conditions that safely permit people to come onto the

premises of gun stores and receive delivery of firearms and ammunition. There is no reason for this arbitrary treatment, let alone one that could withstand the rigors of heightened constitutional scrutiny. *See On Fire Christian Center, Inc. v. Fischer*, No. 3:20-CV-264, slip op. at 12 (W.D. Ky. Apr. 11, 2020) (restraining prohibition on drive-in church services in light of the fact that the city is "not prohibiting a multitude of other non-religious drive-ins and drive-throughs—including, for example, drive-through liquor stores"). Indeed, the fact that so many other states have exempted firearms retailers from their closure orders, or at least allowed them to continue essential operations under restrictive conditions, only underscores the fact that the Commonwealth's approach is not narrowly tailored. *Cf. Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012) ("There is no suggestion that some unique characteristic of criminal activity in Illinois justifies the state's taking a different approach from the other 49 states.").

One instructive decision is *Bateman v. Perdue*, 881 F. Supp. 2d 709 (E.D.N.C. 2012), which concerned North Carolina laws providing that made it illegal "to transport or possess off [one's] own premises any dangerous weapon" during a state of emergency. *See id.* at 711 (*quoting* N.C. Gen. Stat. § 14-288.7 (repealed)). They also allowed government officials to prohibit or restrict "the possession, transportation, sale, purchase, storage, and use of dangerous weapons and substances." *See id.* (*quoting* N.C. Gen. Stat. § 14-288.12(b) (repealed)). The court concluded that even though the "state of emergency" prohibitions "may be limited in duration," they "strip peaceable, law abiding citizens of the right to arm themselves in defense of hearth and home, striking at the very core of the Second Amendment." *Id.* at 716. Thus, those laws, "much like those involved in *Heller*, are at the 'far end of the spectrum of infringement on protected Second Amendment rights.'" *Id.* (*quoting Marzzarella*, 614 F.3d at 97).

The court accordingly applied a strict scrutiny standard of review. *See id.* at 715. The court found that while there was a compelling interest in public safety and crime prevention, the state-of-emergency restrictions were not narrowly tailored to serve that interest. *See id.* at 716. Specifically, "[t]hey do not target dangerous individuals or dangerous conduct. Nor do they seek to impose reasonable time, place and manner restrictions by, for example, imposing a curfew to allow the exercise of Second Amendment rights during circumscribed times." *Id.* Rather, they "effectively ban[]" the public "from engaging in conduct that is at the very core of the Second Amendment *at a time when the need for self-defense may be at its very greatest.*" *Id.* (*citing Heller*, 554 U.S. at 595) (emphasis added). The court accordingly had no choice but to conclude that the restrictions were invalid as-applied. *Id.*

Indeed, while it should be clear that intermediate scrutiny does not apply to broad preclusions on core conduct, the COVID-19 Orders would not pass even review under this level of scrutiny. The decision in *McCullen v. Coakley*, 573 U.S. 464 (2014), is instructive, as it shows the importance of narrow tailoring considerations in the intermediate scrutiny context. There, the Court declined to apply strict scrutiny to a Massachusetts law that created a 35 foot perimeter around the entrances of abortion clinics because the restriction was content-neutral. *See id.* at 478-85. But even though strict scrutiny did not apply, and the government thus did not need to use the "'least restrictive or least intrusive means of' serving the government's interests," the restriction still needed to be "narrowly tailored." *Id.* at 486 (*quoting Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989)). And specifically, the requirement of narrow tailoring meant that the law could not "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* (*quoting Ward*, 491 U.S. at 799). To determine whether the law went too far, the Court looked first to the scheme that had previously been in place. *See*

*id.* at 487-90. The Court then considered other states' laws, finding it significant that "no other State [had] a law that creates fixed buffer zones around abortion clinics," although there were some localities that did. *See id.* at 490 & n.6. The Court next looked at other Massachusetts laws, as well as federal laws and some local laws, to find additional regulatory alternatives. *See id.* at 490-93. Notably, New York City's restriction was both smaller (15 feet) and more circumscribed in that it prohibited "follow[ing] and harass[ing]" within the perimeter, not just "standing." *See id.* at 491 (quoting N.Y.C. Admin. Code § 8-803(a)(3)). All of this led to the conclusion that the 35 foot buffer was unconstitutional because it "burden[ed] substantially more speech than necessary to achieve the Commonwealth's asserted interests." *Id.* at 490. This same analysis is fatal to the Commonwealth's attempt to close off the means for its citizens to acquire functional arms for their defense. It is obvious that effective options are available that would avoid unnecessarily burdens on the right to keep and bear arms.

As the Supreme Court itself recognized in *Heller*, "[w]e know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach. The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Heller*, 554 U.S. at 634. So, while the forced closure of all gun retailers in the Commonwealth would fail to pass constitutional muster under a standard-of-scrutiny based review, the reality is that any standard of review would be inappropriate to use because a blanket ban on obtaining arms is unconstitutional without regard to the interests cited.

**II)   An Injunction is Needed to Prevent Irreparable Injury**

Like the First Amendment, the Second Amendment secures the right to engage in affirmative conduct—to (for example) speak, exercise a religion or keep and bear arms. *Cf. Marzzarella*, 614 F.3d at 89 n.4 ("[W]e look to other constitutional areas for guidance in

evaluating Second Amendment challenges. We think the First Amendment is the natural

choice."). As such, a deprivation of Second Amendment rights is an injury that, by its very

nature, is irreparable. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First

Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable

injury."); *Ezell*, 651 F.3d at 699. People are entitled to enjoy their constitutional rights in fact,

not through the fiction of a compensatory money damages judgment. *See Ezell*, 651 F.3d at 699

("Infringements of this right cannot be compensated by damages."). Moreover, this is not a

situation where there is merely a possibility that rights will be infringed in the future. Rather, the

Plaintiffs in this case have all "altered [their] behavior" to avoid engaging in protected conduct.

*See Blount v. Redmond*, 649 F. Supp. 319, 332 (D. Me. 1986) (*quoting Rushia v. Town of

Ashburnham*, 701 F.2d 7, 10 (1st Cir. 1983)).

Thus, the only real issue is whether there is probable success on the merits of the

constitutional claim, for if there is, then any injury will be irreparable. *See Stilp v. Contino*, 613

F.3d 405, 409 (3d Cir. 2010); *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 149 (D.D.C.

2016). And as demonstrated *supra*, Plaintiffs' probability of success on the merits is

overwhelming, as a categorical ban on acquiring arms is flatly unconstitutional. Thus, the injury

that Plaintiffs suffer—and will continue to suffer in the absence of an injunction—is irreparable.

### III)   An Injunction Will Not Harm the Defendants

The issue for this consideration is "the balance of relevant impositions, *i.e.*, the hardship

to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction

issues." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004)

(*quoting Ross-Simons of Warwick, Inc. v. Baccarat*, 102 F.3d 12, 14 (1st Cir. 1996)); *see also

Corporate Technologies, Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013) ("the balance of hardships

as between the parties"). This Court's injunction will only apply to individuals who have already

obtained FIDs and/or LTCs from local police authorities. And as previously explained, those authorities had a legal obligation to investigate applications and to refuse licensure to unsafe or disqualified individuals. Thus, anyone who is able to purchase a firearm following this Court's order will have gone through, and passed, a substantial vetting process that is focused on whether their possession of firearms would be contrary to the public interest.[18] Allowing these people to purchase firearms notwithstanding the Defendants' attempts to ban gun and ammunition sales will not undercut the Commonwealth's overarching goal in vetting gun purchasers in advance. Furthermore, the Plaintiffs would still have to undergo *another* background check—the federal background check required at the point of sale—in order to actually take possession of a firearm. Of course, the Commonwealth cannot rely on the existence of civilian gun ownership as a "harm" because the decision was already made—over 200 years ago—to protect this activity.

Notably, in *Ezell* the City of Chicago argued that the balance of equities was against injunctive relief (in the form of an order requiring the city to allow gun ranges) because there were no regulations in place that would govern the operation of ranges in the city. See *Ezell*, 651 F.3d at 710. The court rejected this argument, explaining that "[*p*]*roperly regulated* firing ranges . . . should not pose significant threats to public health and safety." *Id.* (emphasis added). Indeed, any claimed need for additional laws and regulations would not be a basis for denying an injunction, as legislative bodies retain their ability to adopt such regulations. *See id.* at 711.

This is equally the case here, where multiple other states impose "shelter at home"-type restrictions to address COVID-19, but have been able to craft proposals that did not totally

---

[18] We do not mean to suggest that a state *without* a licensing or permitting system for the acquisition of guns would be free to close off all legal channels for the acquisition of guns. Rather, we wish to highlight that, on the facts presented here, the people who would benefit are people who have already passed background checks and have to pass yet another background check for the transfer of a firearm.

foreclose access to firearms retailers. Indeed, just about every other state in this region of the country has seen fit to permit firearms purchases to take place under at least some set of conditions—meaning that it is not a situation where the activity cannot be properly regulated.

### IV)  The Protection of Constitutional Rights is in the Public Interest

If the Plaintiffs' claim is meritorious, then *ipso facto* a preliminary injunction in support of that claim is in the public interest. *See Hyde Park Partners, L.P. v. Connolly*, 839 F.2d 837, 853 (1st Cir. 1988). "[T]he public interest supports requiring the Government to obey the Constitution[.]" *Reid v. Donelan*, 390 F. Supp. 3d 201, 227 (D. Mass. 2019). "[P]ublic interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005). "[N]either the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law." *American Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003), *aff'd*, 542 U.S. 656 (2004). If the COVID-19 Orders and practice at issue appear to be unconstitutional—as they do—then it is in the public interest to enjoin their enforcement.

## CONCLUSION

In 2010, the Supreme Court proclaimed that the Second Amendment was not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald*, 561 U.S. at 780. More recently, Justice Thomas lamented that lower courts have "general[ly] fail[ed] to afford the Second Amendment the respect due an enumerated constitutional right." *Silvester v. Becerra*, 138 S. Ct. 945, 945 (2018) (Thomas, J., dissenting from denial of certiorari). Plaintiffs have clearly demonstrated they are likely to prevail on the merits, and currently face irreparable injury, for the actions of the Defendants strike at the very core of their Second Amendment rights.

For the foregoing reasons, Plaintiffs respectfully ask that this Court grant their motion.

Dated:  April 14, 2020

Respectfully submitted,

THE PLAINTIFFS,

By their attorneys,


 /s/ David D. Jensen
David D. Jensen, Esq.
Admitted *Pro Hac Vice*
David Jensen & Associates
33 Henry Street
Beacon, New York 12508
Tel:  212.380.6615
Fax:  917.591.1318
david@djensenpllc.com

J. Steven Foley
BBO # 685741
Law Office of J. Steven Foley
100 Pleasant Street #100
Worcester, MA 01609
Tel: 508.754.1041
Fax: 508.739.4051
JSteven@attorneyfoley.com

Jason A. Guida
BBO # 667252
Principe & Strasnick, P.C.
17 Lark Avenue
Saugus, MA 01960
Tel: 617.383.4652
Fax: 781.233.9192
jason@lawguida.com


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on April 14, 2020.

 /s/ David D. Jensen
David D. Jensen