# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MICHAEL MCCARTHY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -against- | ) | No. 1:20-cv-10701-DPW |
| | ) | |
| CHARLES D. BAKER, in his Official Capacity as Governor of the Commonwealth of Massachusetts and in his Individual Capacity, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## BRIEF OF PINK PISTOLS AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### LEAVE TO FILE GRANTED ON APRIL 22, 2020

David H. Thompson*
Peter A. Patterson*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com

Patrick Groulx
BBO # 673394
ISENBERG GROULX, LLC
368 W. Broadway, Suite 2
Boston, MA 02127
(857) 880-7889
patrick@i-gllc.com

*Pro hac vice* application forthcoming

*Attorneys for Pink Pistols*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

INTEREST OF AMICUS ............................................................................................1

INTRODUCTION .......................................................................................................1

ARGUMENT ..............................................................................................................4

I.     The Closure Order Violates the Second Amendment ...........................................4

     A.     Massachusetts' Ban Burdens Conduct Protected by the Second Amendment ........4

     B.     Because it Constitutes a Flat Ban on the Exercise of Second Amendment Rights, the Closure Order Is Categorically Unconstitutional ..................................9

     C.     Governor Baker's Ban on Firearm Purchases Fails Any Level of Heightened Constitutional Scrutiny ........................................................................................13

          1.     At a Minimum, Strict Scrutiny Should Apply ...........................................13

          2.     The Ban on Firearm Purchases Fails Even Intermediate Scrutiny ............14

CONCLUSION............................................................................................................20

**TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page**

*Andrews v. State*, 50 Tenn. 165 (1871) ...................................................................5

*Bateman v. Perdue*, 881 F. Supp. 2d 709 (E.D.N.C. 2012) ...............................13, 19

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002)...............................15

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986).............................14, 15

*Civil Rights Defense Firm, P.C. v. Wolf*, No. 63 MM 2020,
     2020 WL 1329008 (Pa. Mar. 22, 2020)....................................................10, 16, 19

*District of Columbia v. Heller*, 554 U.S. 570 (2008)..........................1, 2, 4, 5, 6, 7, 10, 11, 12, 14

*Duncan v. Becerra*, 265 F. Supp. 3d 1106 (S.D. Cal. 2017) ...........................................5

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ................................................4

*Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018) .................................................4, 12

*Grace v. District of Columbia*, 187 F. Supp. 3d 124 (D.D.C. 2016) ............................14

*Heller v. District of Columbia (Heller III)*, 801 F.3d 264 (D.C. Cir. 2015) ................15

*Illinois Ass'n of Firearms Retailers v. City of Chicago*,
     961 F. Supp. 2d 928 (N.D. Ill. 2014) .................................................................5

*Jackson v. City & Cty. of S.F.*, 746 F.3d 953 (9th Cir. 2014)........................................5

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*,
     138 S. Ct. 1719 (2018)..................................................................................14

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)..........................6, 8, 11, 13, 16, 17

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ................................................17, 18, 19

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) ...........................................1

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012).....................................................12

*Radich v. Guerrero*, 2016 WL 1212437 (D. N. Mar. I. Mar. 28, 2016) .........................5

*Ramirez v. Commonwealth*, 94 N.E.3d 809 (Mass. 2018)............................................12

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ..................................13

*Silveira v. Lockyer*, 328 F.3d 567 (9th Cir. 2003) ....................................................5

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)............................................5

*Valley Forge Christian Coll. v. Americans United for Separation
     of Church & State, Inc.*, 454 U.S. 464 (1982) .........................................................16

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) .............................12, 14

*Youngstown Sheet & Tube Co. v. Sawyer (Steel Seizure)*,
     343 U.S. 579 (1952).........................................................................................1

## Statutes

18 U.S.C. § 922(c) ............................................................................................10

18 U.S.C. § 922(t) ............................................................................................10

21 U.S.C. § 812 ...............................................................................................16

M.G.L. c.140, § 122B ......................................................................................11

M.G.L. c.140, § 123 .........................................................................................10

M.G.L. c.140, § 128A .......................................................................................11

## Other Authorities

*2017 Hate Crime Statistics: Incidents and Offenses*,
  FBI: UNIFORM CRIME REPORTING PROGRAM, https://bit.ly/39Pf4tj ...........................9

*2018 Hate Crime Statistics: Incidents and Offenses*,
  FBI: UNIFORM CRIME REPORTING PROGRAM, https://bit.ly/36A8TaP .......................9

*A Crisis of Hate: A Report on Homicides Against Lesbian, Gay, Bisexual and
  Transgender People,* NATIONAL COALITION OF ANTI-VIOLENCE PROGRAMS
  (2018), https://bit.ly/35FECWR .................................................................9

Alex Napoliello, *Gun Shops Are Now Considered Essential Businesses in N.J.,
  Gov. Murphy Says*, NJ.COM (Mar. 30, 2020), https://bit.ly/2RbH4Qq ...................19

Alexander Mallin & Luke Barr, *Police implement sweeping policy changes to prepare
  for coronavirus spread*, ABC NEWS, Mar. 18, 2020, https://abcn.ws/3bl7sij .........6

Asher Klein, *Boston Police Officer Dies of Coronavirus Complications After "Courageous
  Fight"*, NBC BOSTON, April 14, 2020, https://bit.ly/2xofwk9 ..........................7

Brody Levesque, *COVID-19 Factors in Hate Crimes Spike*,
  LOS ANGELES BLADE (March 27, 2020), https://bit.ly/3bdEcu8 ..........................9

Bureau of Alcohol, Tobacco, Firearms and Explosives, *List of Massachusetts Federal
  Firearms Licensees (FFLs)* (Dec. 2019), *available at* https://bit.ly/2Ka30r1 .......16

Chris Cillizza, *How Coronavirus has Sent Gun and Ammo Sales Through the Roof*,
  CNN, Mar. 25, 2020, https://cnn.it/2WID0dM ............................................8

Christina Hager, *Coronavirus Cases Double Among Mass. First Responders*,
  CBS BOSTON, April 10, 2020, https://cbsloc.al/2Vwcz92 ................................7

Christopher C. Krebs, Director, Cybersecurity & Infrastructure Security Agency, *Advisory
  Memorandum On Identification of Essential Critical Infrastructure Workers During
  COVID-19 Response* 6, U.S. DEP'T OF HOMELAND SECURITY (Mar. 28, 2020),
  https://bit.ly/2UWevY8 ..............................................................6

COVID-19 Order No. 13, on March 23, 2020,
  https://tinyurl.com/rog8pj7 ..............................................2, 3, 9, 10, 16

COVID-19 Order No. 21, https://tinyurl.com/ugg42dd ............................2, 10

Daniel Nass, *How Coronavirus Shutdown Orders are Affecting Gun Stores in Each State*, THE TRACE (Updated April 14, 2020), https://bit.ly/34EmMo8.................................................17

Danny McDonald, *The Coronavirus Pandemic is Changing How Some Mass. Authorities Process Certain Crimes*, BOSTON GLOBE (Mar. 18, 2020), https://bit.ly/3aed9O9...............6, 7

Deborah Becker, *So Far, More Than 300 Prisoners Released Due to COVID-19 Under Mass. High Court's Ruling*, WBUR NEWS, April 14, 2020, https://wbur.fm/2yjeNkk ...............................................................................7

Governor Tom Wolf, *Industry Operation Guidance* (Mar. 24, 2020), https://bit.ly/3bnifZl ...............................................................................................19

Kaitlyn Krasselt, *State Prisons Releasing Inmates Due to Coronavirus as Positive Tests Rise*, CT POST, April 6, 2020, https://bit.ly/3bksSwn.......................................................7

Kurtis Lee & Anita Chabria, *As the Coronavirus Pandemic Grows, Gun Sales are Surging in Many States*, L.A. TIMES, Mar. 16, 2020, https://lat.ms/39kNVNt ......................................7

Luke Money & Richard Winton, *Sheriff Suspends Efforts to Close L.A. Gun Stores Amid Coronavirus Restrictions*, L.A. TIMES (Mar. 25, 2020), https://lat.ms/2R33143 ....................19

MARATHON STRATEGIES, LIQUOR STORE DENSITY BY STATE 4 (2014), https://bit.ly/2KcN47E ...............................................................................15, 16

Matt Murphy, *Baker Reversed Course on Gun Shop, Range Openings*, LOWELL SUN, Apr. 2, 2020, https://bit.ly/2REgGin......................................................................3, 14

Matt Stout, *One Response to Coronavirus Anxiety in Mass.: Try to Buy a Gun for the First Time*, BOSTON GLOBE, April 14, 2020, https://bit.ly/2RH09Kj .......................................8

Maura Healey (@MassAGO), TWITTER (April 1, 2020, 12:57 PM), https://bit.ly/2K7rVeP............................................................................................3

National Shooting Sports Foundation, *NSSF-Adjusted NICS Background Checks for March 2020*, https://bit.ly/2KcsHXW.........................................................................8

Richard A. Oppel, Jr., *For Some Buyers With Virus Fears, the Priority Isn't Toilet Paper. It's Guns.*, NY TIMES, Mar. 16, 2020, https://nyti.ms/39gfRCc ...............................7, 8

U.S. Dept. of Justice, *Guidance Letter to ATF Federal Firearms Licensees* (Apr. 10, 2020), https://bit.ly/2Vop8mC ...............................................................18

## INTEREST OF AMICUS

Founded in Boston, Massachusetts in 2000, Pink Pistols is a shooting society that honors gender and sexual diversity and advocates the responsible use of firearms for self-defense. It represents members of the Lesbian, Gay, Bisexual or Transgender community ("LGBT"), who are disproportionately the victims of hate crimes and other types of violence, and its advocacy has been cited by the Supreme Court in watershed Second Amendment litigation. Its creed is that, "without self-defense, there are no gay rights." Although it is the largest LGBT self-defense organization in the world, with thousands of members and chapters throughout the United States (including a chapter in Massachusetts) and Canada, Pink Pistols is open to all without regard to gender identity or sexual orientation. Governor Baker's order closing gun stores throughout Massachusetts is an affront to Pink Pistols' mission and is particularly harmful to sexual minorities and members of other groups who are disproportionately likely to be subject to criminal violence.

## INTRODUCTION

The United States Constitution was designed to endure through "the various *crises* of human affairs." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 415 (1819). Those who wrote it "knew what emergencies were, knew the pressures they engender for authoritative action, knew, too, how they afford a ready pretext for usurpation." *Youngstown Sheet & Tube Co. v. Sawyer* (*Steel Seizure*), 343 U.S. 579, 650 (1952) (Jackson, J., concurring). And the rights and liberties safeguarded in the pages of the charter they wrote have force not only in times of peace and plenty, but also (perhaps especially) in times of crisis.

That is particularly true of the Second Amendment. The right to keep and bear arms safeguarded by that provision was "a *pre-existing* right"—"the natural right of resistance and self-preservation"—that predated the Amendment's adoption in 1791, and, indeed, predated

*government itself*, according to the political theory of the Founding. *District of Columbia v. Heller*, 554 U.S. 570, 592, 665 (2008). This right is especially important for sexual minorities, who are frequent targets of hate crimes and other acts of criminal violence. And during the present moment of unprecedented social disruption—when police forces are strained to the breaking point and prison inmates being released back onto the streets—its importance is at is zenith.

The Second Amendment right protects, at a minimum, the right of a law-abiding individual to acquire *at least some* firearm and ammunition for use in the home for self-defense. But Governor Baker's Order Assuring Continued Operation of Essential Services In the Commonwealth, Closing Certain Workplaces, and Prohibiting Gatherings of More Than 10 People ("Closure Order"), adopted and enforced in response to the global COVID-19 pandemic, prohibits that conduct.[1] Under that Order, all firearm retailers in the State must remain closed—and by law, law-abiding citizens generally may not purchase a firearm or ammunition without making a trip to a licensed brick-and-mortar retailer. The Closure Order thus, by its text and by its necessary effect, flatly and indefinitely prohibits the retail sale of firearms and ammunition anywhere in the State. It is difficult to imagine a restriction more completely antithetical to the Second Amendment's protections.

Amicus does not question the severity of the threat posed by the global COVID-19 outbreak, or the need to take extraordinary measures to contain the virus. But the submission that a blanket order closing all firearm retailers is necessary to protect public health is simply false. Indeed, the federal government disagrees, as it has designated firearm retailers to be essential critical infrastructure during the COVID-19 crisis. The necessity of closing gun stores is further

---

[1] Governor Baker issued the Closure Order, COVID-19 Order No. 13, on March 23, 2020. *See* https://tinyurl.com/rog8pj7. He issued an order extending it on March 31. *See* COVID-19 Order No. 21, https://tinyurl.com/ugg42dd. An exhibit lists businesses deemed essential. *See* Exhibit A, COVID-19 Essential Services (Updated March 31, 2020), https://tinyurl.com/ta7qylx.

belied by the text of the Closure Order. While that Order contains no exemption for firearm retailers, it *does* contain myriad exceptions for other retail establishments—including liquor stores, garden centers, and marijuana dispensaries. The potential risk to public health posed by these exempted establishments *dwarfs* that of firearm retailers—liquor stores alone outnumber firearm stores in Massachusetts by a factor of nearly 5 to 1. Like these far-more numerous and far-less critical establishments, firearm retailers could and would remain open on a limited basis, while taking every available measure to eliminate the spread of the coronavirus, without posing any significant threat to public health and safety.

It is utterly fanciful to acknowledge that the exempted retailers can safely keep their doors open but then insist that all firearm stores must close in the name of public health. Indeed, the motivation behind the exclusion of firearm retailers is evidently nothing more than antipathy to lawful gun ownership. After an earlier version of the list of essential services *did* include firearm retailers, Attorney General Maura Healey objected on Twitter that "Gun shops and shooting ranges are NOT essential businesses during a public health emergency. We cannot undermine the safety of our police officers, first responders, and domestic violence victims." Maura Healey (@MassAGO), TWITTER (April 1, 2020, 12:57 PM), https://bit.ly/2K7rVeP. At roughly the same time, House Speaker Robert DeLeo—a sponsor of multiple recent anti-gun bills who has made gun control "one of [his] signature issues"—called Governor Baker to object to the continued operation of firearm retailers. Matt Murphy, *Baker Reversed Course on Gun Shop, Range Openings*, LOWELL SUN, Apr. 2, 2020, https://bit.ly/2REgGin. Hours later, Governor Barker reversed course and removed firearm retailers from the list of essential services. *Id.*

The Second Amendment *does not* permit Governor Baker to ban all firearm sales in the State based on the *rejection* of the very policy choice that the Second Amendment enshrines in our

highest law: that "the right of law-abiding, responsible citizens to use arms in defense of hearth and home" must be "elevate[d] above all other interests." *Heller*, 554 U.S. at 635. This Court should enjoin Governor Baker's infringement of Second Amendment rights.

## ARGUMENT

## II. **The Closure Order Violates the Second Amendment.**

The First Circuit has established "a two-step approach for analyzing . . . Second Amendment" claims. *Gould v. Morgan*, 907 F.3d 659, 668 (1st Cir. 2018). "[T]he court first asks whether the challenged law burdens conduct that falls within the scope of the Second Amendment's guarantee." *Id*. at 668-69. If it does, "the court then must determine what level of scrutiny is appropriate and must proceed to decide whether the challenged law survives that level of scrutiny." *Id*. The first prong is a threshold inquiry into whether the challenged conduct is protected by the right to keep and bear arms. Here, the answer to that threshold inquiry is plain: if the Second Amendment protects any conduct, it protects the right to purchase an operative firearm for lawful self-defense (and the ammunition needed to operate it). The Closure Order's flat ban on the exercise of this right is unconstitutional under any standard that could conceivably apply.

## D. **Massachusetts' Ban Burdens Conduct Protected by the Second Amendment.**

The Second Amendment "protect[s] an individual right to use arms for self-defense," taking "off the table" any "absolute prohibition of handguns held and used for self-defense in the home." *Heller*, 554 U.S. at 616, 636. As federal courts have repeatedly recognized, that unassailable "right to possess firearms for protection implies . . . corresponding right[s]" without which "the core right wouldn't mean much." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (addressing right to train with firearms). And the right to keep and bear arms would mean little indeed without the corresponding right *to acquire arms in the first place*. Indeed, if the core right to possess a firearm "operable for the purpose of immediate self-defense," *Heller*, 554 U.S.

at 635, "is to have any meaning," *Radich v. Guerrero*, 2016 WL 1212437, at *7 (D. N. Mar. I. Mar. 28, 2016), it necessarily "must also include the right to *acquire* a firearm"—making the right of acquisition the "*most fundamental* prerequisite of legal gun ownership," *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930, 938 (N.D. Ill. 2014). Accordingly, "prohibiting the commercial sale of firearms . . . would be untenable under *Heller*." *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010).

Likewise, "without bullets, the right to bear arms would be meaningless." *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014). Accordingly, the courts have uniformly held that "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them." *Id.* (quotation marks omitted); *see also Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1117 (S.D. Cal. 2017), *aff'd*, 742 Fed. App'x 218 (9th Cir. 2018).

These conclusions are consistent with the traditional understanding and practices of the People of this Nation, as "[t]he right to keep arms, necessarily involves the right to purchase them . . . and to purchase and provide ammunition suitable for such arms." *Andrews v. State*, 50 Tenn. 165, 178 (1871); *Heller*, 554 U.S. at 583 n.7 ("What law forbids the veriest pauper, if he can raise a sum sufficient for the purchase of it, from mounting his Gun on his Chimney Piece . . . ?" (quoting SOME CONSIDERATIONS ON THE GAME LAWS 54 (1796)). The Second Amendment thus protects the right to purchase an operative firearm and the ammunition needed to operate it.

The Second Amendment right is especially important in times of national crisis and social upheaval. "The Second Amendment is a doomsday provision," *Silveira v. Lockyer*, 328 F.3d 567, 570 (9th Cir. 2003) (Kozinksi, J., dissenting from denial of rehearing en banc), and in this time of crisis Americans across the Nation are preparing for the worst by acquiring arms for the defense of themselves and their families. The right to self-defense is "the *central component* of the [Second

Amendment] right," *Heller*, 554 U.S. at 599, and it is "a basic right, recognized by many legal systems from ancient times to the present day," *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010). Indeed, the right to self-protection and self-preservation was viewed at the Founding as a *natural* right—one that predates government and is necessarily reserved to the people when government is established. *See Heller*, 554 U.S. at 593–94 (citing, e.g., 1 BLACKSTONE'S COMMENTARIES 139, 140 (1765)). The importance of the right to self-defense is shown in sharp relief in times of national emergency, such as the present COVID-19 pandemic, when ordinary social routines, practices, and safeguards begin to break down.  It therefore is not surprising that the United States Department of Homeland Security has classified employees of firearm retailers as "essential critical infrastructure workers." *See* Christopher C. Krebs, Director, Cybersecurity & Infrastructure Security Agency, *Advisory Memorandum On Identification of Essential Critical Infrastructure Workers During COVID-19 Response* 6, U.S. DEP'T OF HOMELAND SECURITY (Mar. 28, 2020), https://bit.ly/2UWevY8.

The COVID-19 outbreak, and our society's response, have upended social life as we know it, calling into question basic governmental functions and protections that are ordinarily taken for granted. Across the country, for example, police departments have been forced to "make[ ] major operational changes in preparation for the continued spread of coronavirus, as they face potential strains in resources and staffing without precedent in modern American history." Alexander Mallin & Luke Barr, *Police implement sweeping policy changes to prepare for coronavirus spread*, ABC NEWS, Mar. 18, 2020, https://abcn.ws/3bl7sij. Those measures include reducing police response to certain types of crimes and announcements that certain criminal laws will simply not be enforced at the present time. *Id.* In Massachusetts, "the district attorney's office for the state's most populous county is calling for arrests to be made only when there is no other option, and the head of State

Police is directing troopers to increase reliance on court summonses and mailed citations for some offenses." Danny McDonald, *The Coronavirus Pandemic is Changing How Some Mass. Authorities Process Certain Crimes*, BOSTON GLOBE (Mar. 18, 2020), https://bit.ly/3aed9O9. Dozens of police officers in Massachusetts have already been infected by COVID-19, and "[c]oronavirus has hit Boston Police especially hard." Christina Hager, *Coronavirus Cases Double Among Mass. First Responders*, CBS BOSTON, April 10, 2020, https://cbsloc.al/2Vwcz92; *see also* Asher Klein, *Boston Police Officer Dies of Coronavirus Complications After "Courageous Fight"*, NBC BOSTON, April 14, 2020, https://bit.ly/2xofwk9. To make matters worse, many States have taken the extraordinary and unprecedented step of *releasing* inmates into the public, due to the coronavirus outbreak. Massachusetts alone has released hundreds of inmates from prison. Deborah Becker, *So Far, More Than 300 Prisoners Released Due to COVID-19 Under Mass. High Court's Ruling*, WBUR NEWS, April 14, 2020, https://wbur.fm/2yjeNkk. Neighboring states also are releasing inmates. *See, e.g.*, Kaitlyn Krasselt, *State Prisons Releasing Inmates Due to Coronavirus as Positive Tests Rise*, CT POST, April 6, 2020, https://bit.ly/3bksSwn.

The importance of safeguarding "the natural right of resistance and self-preservation," *Heller*, 554 U.S. at 594, has never been higher than during this extraordinary moment of social upheaval and unprecedented strain on government resources. Indeed, hundreds of thousands of Americans across the Nation have come to the same conclusion: "Gun sales are surging in many U.S. states, especially in those hit hardest by the coronavirus—California, New York and Washington," Kurtis Lee & Anita Chabria, *As the Coronavirus Pandemic Grows, Gun Sales are Surging in Many States*, L.A. TIMES, Mar. 16, 2020, https://lat.ms/39kNVNt, with dealers reporting "an unusually high proportion of sales . . . to first-time gun buyers," Richard A. Oppel, Jr., *For Some Buyers With Virus Fears, the Priority Isn't Toilet Paper. It's Guns.*, NY TIMES, Mar.

16, 2020, https://nyti.ms/39gfRCc. Some ammunition retailers have seen an increase of sales of over 1,000%. Chris Cillizza, *How Coronavirus has Sent Gun and Ammo Sales Through the Roof*, CNN, Mar. 25, 2020, https://cnn.it/2WID0dM. And federal background checks have surged by at least 36%, to a level higher than "all but two other months since [the FBI] started performing the queries in the late 1990s." Oppel, Jr., *Some Buyers*, NY TIMES, *supra*. Indeed, an industry trade group analysis that sought to screen out background checks for non-purchase purposes such as obtaining a carry license found an *80.4%* increase in federal background checks in March 2020 compared to March 2019. *See* National Shooting Sports Foundation, *NSSF-Adjusted NICS Background Checks for March 2020*, https://bit.ly/2KcsHXW. Firearm-related background checks in Massachusetts hit an all-time high on March 20, and in a recent Suffolk University/Boston Globe poll, 1 in 7 non-gun-owners reported that they now wished they owned a firearm. Matt Stout, *One Response to Coronavirus Anxiety in Mass.: Try to Buy a Gun for the First Time*, BOSTON GLOBE, April 14, 2020, https://bit.ly/2RH09Kj. As Americans across the country are demonstrating, the basic, fundamental right of armed self-defense—necessarily including the right to acquire firearms and ammunition—has never been more important than it is today.

The Closure Order's burden on Second Amendment rights is particularly harmful for LGBT individuals, who desperately need effective means to protect themselves from targeted, pervasive violence. In fact, the Supreme Court has acknowledged that the right to self-defense is particularly important for vulnerable populations. In *McDonald*, the Court cited Pink Pistols' amicus brief to note that the Secondment Amendment provides vulnerable groups the means to protect themselves when law enforcement cannot do so. *McDonald*, 561 U.S. at 790 n.33. Among such communities are sexual minorities—whether lesbian, gay, or transgender—who are especially susceptible to predatory violence based on discriminatory animus.

Discrimination against LGBT individuals is rampant, a fact highlighted by the appalling number of hate crimes perpetrated against this group every year. In 2018, the reported number of hate crimes targeting the LGBT community totaled 1,347, an increase of nearly 10% from the 1,217 reported in 2017. *See 2017 Hate Crime Statistics: Incidents and Offenses*, FBI: Uniform Crime Reporting Program, https://bit.ly/39Pf4tj; *2018 Hate Crime Statistics: Incidents and Offenses*, FBI: Uniform Crime Reporting Program, https://bit.ly/36A8TaP. These alarming totals are unlikely to provide the full picture, as many hate crimes go unreported. And the current environment only *increases* the threat from hate crimes. *See* Brody Levesque, *COVID-19 Factors in Hate Crimes Spike*, Los Angeles Blade (March 27, 2020), https://bit.ly/3bdEcu8.

In 2016, there were 77 reports of hate-violence-related homicides of LGBT people—the highest number ever recorded and more than triple the death toll for the year before. *See A Crisis of Hate: A Report on Homicides Against Lesbian, Gay, Bisexual and Transgender People,* National Coalition of Anti-Violence Programs (2018) at 6, https://bit.ly/35FECWR. There also "appears to be a trend of targeting queer, bi, or gay cisgender men for violence, robbery and homicides" by setting traps for them, through personal ads and online dating applications. *Id.* at 10. Transgender Americans are also increasingly targeted: the National Coalition of Anti-Violence Programs "collected information on 27 hate-violence related homicides of transgender and gender non-conforming people" in 2017—a 42% increase over 2016. *Id.* at 7.

### E. Because it Constitutes a Flat Ban on the Exercise of Second Amendment Rights, the Closure Order Is Categorically Unconstitutional.

The plain text and necessary function of the Closure Order is to impose a flat, categorical ban on the exercise of the constitutionally protected right to purchase firearms and ammunition. By its plain language, the Closure Order requires that "[a]ll businesses and other organizations that do not provide COVID-19 Essential Services shall close their physical workplaces and facilities

('brick-and-mortar premises') to workers, customers, and the public." Closure Order at 2. The Closure Order originally was set to expire on April 7, but it has now been extended to May 4—and it may be extended again at Governor Baker's discretion. *See* COVID-19 Order No. 21 at 2. The enumerated, subjective list of "essential" businesses does not include firearm retailers (though it does include exceptions for such establishments as "liquor stores" and "licensed medical marijuana retailers"). *See* COVID-19 Order No. 13, Exhibit A, COVID-19 Essential Services.

While the closure of brick-and-mortar retail establishments may not cut off Massachusetts citizens' supplies to other necessities, given the availability of e-commerce and delivery services, the same is not true for firearm sales, given the legal requirements that any firearm purchase must be conducted in person and on the retailer's premises. *See* 18 U.S.C. § 922(c), (t); M.G.L. c.140, § 123. As a Pennsylvania judge has explained, "[u]nlike the vast majority of other items, the sale and transfer of firearms sold at retail cannot be completed merely by way of telecommunication and mailing under existing law." *Civil Rights Defense Firm, P.C. v. Wolf*, No. 63 MM 2020, 2020 WL 1329008, at *2 (Pa. Mar. 22, 2020) (Wecht, J., concurring in part and dissenting in part). The Closure Order's application to firearm retailers thus, by necessary operation of law, has the effect of completely banning retail firearm sales within the state as long as the Order is in effect.

The scope of this ban is total. It applies to the purchase of *any type* of firearm—including handguns, "the quintessential self-defense weapon," *Heller*, 554 U.S. at 629—and it bars their purchase by *any person*—even law-abiding citizens who have obtained the licenses required by state law. And the ban prevents law-abiding citizens from purchasing firearms even for the purpose of self-defense in the home—the place "where the need for defense of self, family, and property is most acute." *Id.* at 628. The Closure Order's application to firearm retailers thus amounts to the

following: a flat ban on the retail purchase of *any* firearm, by *any* person, *anywhere* in the state.[2] It is harder to imagine a more direct, frontal assault on the Second Amendment.

Given that Governor Baker has prohibited law-abiding citizens from acquiring an operative firearm, *Heller* makes the next analytical steps clear. Because the Second Amendment "elevates" the core right to self-defense "above all other interests," infringements upon this "core protection" must be held unconstitutional categorically, not "subjected to a freestanding 'interest-balancing' approach." *Id.* at 634–35. Governor Baker's prohibition on the right of law-abiding citizens to acquire arms for the purpose of self-defense is just such an infringement of core Second Amendment conduct. Accordingly, it is flatly unconstitutional.

*Heller* requires *per se* invalidation of bans that strike at the heart of the Second Amendment. In *Heller*, the Supreme Court declined the invitation to analyze the ban on the right to keep arms at issue there under "an interest-balancing inquiry" based on the "approach . . . the Court has applied . . . in various constitutional contexts, including election-law cases, speech cases, and due process cases," *id.* at 689–90 (Breyer, J., dissenting), ruling instead that the right to keep and bear arms was "elevate[d] above all other interests" the moment that the People chose to enshrine it in the Constitution's text, *id.* at 635 (majority opinion). And in *McDonald*, the Court reaffirmed that *Heller* had deliberately and "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." 561 U.S. at 785 (plurality opinion). This reasoning applies equally to the ban at issue here.

---

[2] It is theoretically possible for a licensed citizen to purchase a firearm from another non-dealer licensed firearm owner (who may sell up to four firearms a year in this manner), *see* M.G.L. c.140, § 128A, but there is no reason to believe that this is a meaningful source of firearms available for purchase. What is more, because *ammunition* may only be purchased from a licensed seller, *see* M.G.L. c.140, § 122B, even if a person were able to obtain a firearm in this manner it would not be of any use without the ammunition needed to use it for self-defense.

The flat unconstitutionality of Massachusetts's ban on purchasing firearms and ammunition under *Heller* is reinforced by subsequent Supreme Court precedent. In *McDonald*, the Supreme Court described *Heller*'s holding as a simple syllogism: having "found that [the Second Amendment] right applies to handguns," the Court therefore "concluded" that "citizens must be permitted to use handguns for the core lawful purpose of self-defense." 561 U.S. at 767–68 (quotation marks and brackets omitted). Then, in *Caetano*, the Court summarily and unanimously reversed a decision of the Massachusetts Supreme Judicial Court that had departed from this approach in upholding a ban on stun guns. The Massachusetts court got the message: "Having received guidance from the Supreme Court in *Caetano II*, we now conclude that stun guns are 'arms' within the protection of the Second Amendment. Therefore, under the Second Amendment, the possession of stun guns may be regulated, but not absolutely banned." *Ramirez v. Commonwealth*, 94 N.E.3d 809, 815 (Mass. 2018). In like manner, Massachusetts' attempt to ban its citizens from even acquiring firearms and ammunition is an option that the Second Amendment simply takes "off the table." *Heller*, 554 U.S. at 636.

While the First Circuit generally requires restrictions on Second Amendment rights to be scrutinized under "an appropriate level of scrutiny," *Gould*, 907 F.3d at 670, such scrutiny is not necessary or appropriate here, where the restriction in question is a flat, categorical ban on the acquisition of *any* firearms or ammunition by *anyone*. That is why other circuits that have adopted a tiers-of-scrutiny analysis as the default form of analysis for most Second Amendment challenges continue to apply *Heller*'s categorical approach to " 'complete prohibition[s]' of Second Amendment rights." *Wrenn v. District of Columbia*, 864 F.3d 650, 665 (D.C. Cir. 2017) (quoting Heller, 554 U.S. at 629); *see also Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (striking down ban on carrying arms categorically despite circuit precedent applying levels-of-scrutiny

analysis in other Second Amendment cases). The Closure Order operates as just such a "compete prohibition," and it thus must be struck down categorically.

> ### F. Governor Baker's Ban on Firearm Purchases Fails Any Level of Heightened Constitutional Scrutiny.
>
> ### 3. At a Minimum, Strict Scrutiny Should Apply.

Even if this Court concludes that Governor Baker's ban on the purchase of firearms and ammunition is not *categorically* unconstitutional, the ban must be subjected to the highest level of constitutional scrutiny. As the Supreme Court has explained, "strict judicial scrutiny [is] required" whenever a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). And the right to bear arms is not only specifically enumerated in the constitutional text; it was also counted "among those fundamental rights necessary to our system of ordered liberty" by "those who drafted and ratified the Bill of Rights." *McDonald*, 561 U.S. at 768, 778. Applying anything less than strict scrutiny would relegate the Second Amendment to "a second-class right." *Id.* at 780 (plurality).

This conclusion is in accord with precedent. In *Bateman v. Perdue*, the U.S. District Court for the Eastern District of North Carolina analyzed the constitutionality of North Carolina emergency declaration laws that, in part, "forbade the sale or purchase of firearms and ammunition" during a state of emergency. 881 F. Supp. 2d 709, 712 (E.D.N.C. 2012). While the challenged statutes applied only during declared emergencies and were "limited in duration," because they "prohibit[ed] law abiding citizens from purchasing and transporting to their homes firearms and ammunition needed for self-defense," the court concluded that they "str[uck] at the very core of the Second Amendment" and were "at the 'far end of the spectrum of infringement on protected Second Amendment rights.' " *Id.* at 715–16 (quoting *Marzzarella*, 614 F.3d at 97). It accordingly applied strict scrutiny. *Id.* at 716. This Court should do the same.

### 4.    The Ban on Firearm Purchases Fails Even Intermediate Scrutiny.

Ultimately, determining the correct standard of scrutiny is immaterial, because Governor Baker's ban is unconstitutional under any potentially applicable level of scrutiny. Because "rational basis" review is unavailable in the Second Amendment context, *see Heller* 554 U.S. at 628 n.27, the challenge must at a minimum be decided under intermediate scrutiny.

i.    That is so, first, as a matter of law. The exclusion of firearm retailers from the list of "essential services" was apparently motivated by the *specific purpose* of *suppressing Second Amendment rights*. After briefly *including* firearm retailers on the list of essential services, Governor Baker reversed course because anti-gun state officials objected, raising a familiar litany of concerns about gun violence that have *nothing to do whatsoever* with the coronavirus pandemic. *See* https://bit.ly/2K7rVeP; Matt Murphy, *Baker Reversed Course on Gun Shop*, *supra*. And the motivation behind the shutdown of firearm stores is plain even apart from this history. The Closure Order does not apply to places of worship, and it confers "essential service" status on such establishments as liquor stores and marijuana dispensaries. The only conceivable purpose for drawing these irrational distinctions is hostility to citizens exercising Second Amendment rights.

That purpose is flatly illegitimate. *Cf. Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018). Attempting to nakedly suppress the number of guns owned by law-abiding citizens is "not a permissible strategy"—even if used as a means to the further end of increasing public safety. *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 148 (D.D.C. 2016), *aff'd sub nom. Wrenn v. District of Columbia*, 864 F.3d 650. That conclusion follows directly from the Supreme Court's precedents in the secondary-effects area of free speech doctrine.

The Supreme Court has held that government restrictions on certain types of expressive conduct are subject to merely intermediate scrutiny even though they are content-based. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–51 (1986). But this lesser scrutiny applies only

so long as the *purpose and effect* of the restrictions is to reduce the negative "secondary effects" of the expression—such as the increased crime that occurs in neighborhoods with a high concentration of adult theaters—rather than to suppress the expression itself. *Id.* at 49. As Justice Kennedy's controlling opinion in *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002), makes clear, the government may not rely on the proposition "that it will reduce secondary effects by reducing speech in the same proportion." *Id.* at 449.

Courts have applied similar reasoning in the Second Amendment context. For instance, in *Heller v. District of Columbia (Heller III)*, the D.C. Circuit struck down the District of Columbia's prohibition on registering more than one pistol per month. 801 F.3d 264, 280 (D.C. Cir. 2015). The District defended that ban as designed to "promote public safety by limiting the number of guns in circulation," based on its theory "that more guns lead to more gun theft, more gun accidents, more gun suicides, and more gun crimes." *Id.* But the court rejected that theory because "taken to its logical conclusion, that reasoning would justify a total ban on firearms kept in the home." *Id*. In other words, the government may not adopt a law with the design and direct effect of limiting the quantity of conduct protected by the Second Amendment.

ii.      Second, the Closure Order also fails heightened scrutiny because it suffers from an utter lack of tailoring. That is shown by its exemptions. While the firearm retailers necessary to assure the exercise of Plaintiffs' fundamental constitutional rights are not deemed "essential retail businesses," under the Order, Governor Baker *has* included exemptions for a variety of establishments, including "licensed medical marijuana retailers," "convenience stores," "liquor stores," "garden centers," and "places of worship." By sheer numbers alone, these establishments pose a threat to public health that is multiples greater than any threat posed by firearm retailers: there are approximately 1,900 liquor stores in Massachusetts, MARATHON STRATEGIES, LIQUOR

STORE DENSITY BY STATE 4 (2014), https://bit.ly/2KcN47E, for example, and thousands of houses

of worship, compared to 349 licensed gun dealers, Bureau of Alcohol, Tobacco, Firearms and

Explosives, *List of Massachusetts Federal Firearms Licensees (FFLs)* (Dec. 2019), *available at*

https://bit.ly/2Ka30r1. Moreover, there is no constitutional right to a six-pack of beer. And medical

marijuana facilities operate in violation of federal law. *See* 21 U.S.C. § 812. Yet the retail

establishments vending these goods have been deemed "essential," even while firearm retailers—

which enable the right to self-defense protected by the Second Amendment—have not.

Indeed, banning the purchase of firearms and ammunition is far less justifiable than many

other products exempted by the Closure Order, such as home improvement goods or pet supplies.

In the internet economy, those types of goods are readily available online—without the need to

travel to one of the brick and mortar shops exempted by the Order. *See Civil Rights Defense Firm*,

2020 WL 1329008, at *2 (Wecht, J., concurring in part and dissenting in part) (noting that "the

vast majority of other items" can be purchased "by way of telecommunication and mailing under

existing law."). Firearms, by contrast, can only be purchased in person in Massachusetts.

Other of the Closure Order's exemptions, while perhaps justifiable on their own terms,

show that Governor Baker has erected a hierarchy of constitutional values—with the Second

Amendment relegated to the bottom rung. The Order allows "places of worship" and "news and

media operations" to remain open—presumably out of concern that banning these activities would

raise First Amendment concerns. By failing to show similar solicitude to the right to keep and bear

arms, Massachusetts has in effect imposed an impermissible "hierarchy of constitutional values,"

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S.

464, 484 (1982)—in direct contravention of the Supreme Court's instruction that the Second

Amendment may not be treated "as a second-class right, subject to an entirely different body of

16

rules than the other Bill of Rights guarantees," *McDonald*, 561 U.S. at 780 (plurality opinion).

Where a challenged law is drastically under-inclusive in this way—failing to regulate activity that, by the Government's own account of the interest justifying the law, ought to be regulated *a fortiori*—that raises serious doubts about whether the challenged restriction is necessary. Amicus does not doubt the seriousness of the threat posed by the COVID-19 pandemic. But if—as Massachusetts has concluded—these public-health interests may be served while allowing PetSmart and Total Wine & More to keep their doors open, it simply cannot be maintained that firearm retailers must be closed in the name of public health and safety.

The Closure Order's utter lack of tailoring is brought into sharp relief by the coronavirus-related emergency orders that *have* exempted firearm dealers. Over 40 States in the Nation have issued shutdown orders. But unlike Massachusetts, all but a handful of those states also acted to safeguard their citizens' constitutional rights, carefully carving out firearm retailers from the scope of the shutdown. *See* Daniel Nass, *How Coronavirus Shutdown Orders are Affecting Gun Stores in Each State*, THE TRACE (Updated April 14, 2020), https://bit.ly/34EmMo8. Governor Baker cannot plausibly show that an exception for firearm stores is consistent with public health necessities in jurisdictions such as Illinois, New Jersey, Oregon, New Hampshire, Rhode Island, and Connecticut, but not in Massachusetts.

iii.     The Closure Order's application to firearm retailers also is unconstitutional under any meaningful form of scrutiny because of the ready availability of less constitutionally restrictive means of pursuing the same ends. Even under intermediate scrutiny, a challenged restriction cannot burden substantially more constitutionally protected conduct than necessary to achieve the State's interest. *McCullen v. Coakley*, 134 S. Ct. 2518, 2540 (2014). In *McCullen*, for example, the U.S. Supreme Court struck down a Massachusetts "buffer zone" law forbidding certain types of speech

outside of abortion clinics, reasoning that the State had failed to show that measures substantially less restrictive than such an extreme prophylactic measure were not just as "capable of serving its interests." *Id.* at 494. Massachusetts' law, the Court noted, was "truly exceptional," and the State was able to "identify no other State with a law" that was comparable, raising the "concern that the Commonwealth has too readily forgone options that could serve its interests just as well." *Id.* at 490. And even in the context of intermediate scrutiny, the Court concluded, the State must "show[ ] that it seriously undertook to address the problem with less intrusive tools readily available to it," or at the least, "that it considered different methods that other jurisdictions have found effective." *Id.* at 494. This requirement, the Court explained, "prevents the government from too readily sacrificing speech for efficiency." *Id* at 490. (brackets and quotation marks omitted).

Governor Baker's ban on firearm sales flunks intermediate scrutiny under the same reasoning. While Massachusetts concluded that less intrusive measures could safeguard public health in the context of pet stores and liquor stores, it did not similarly exempt firearm retailers— even though many other States have included such an exception. And even apart from a simple exemption, as in *McCullen*, there are other, far less-restrictive means available for achieving the State's professed goals. Massachusetts could have, for example, (1) limited the number of people allowed in a firearm store at any one time to maintain social distancing; and (2) mandated enhanced sanitizing procedures for firearm retailers that remained open. What is more, the ATF has confirmed that licensed firearm dealers may conduct firearm sales through a drive-up or walk-up window, further minimizing the in-person contact required to purchase a firearm. *See* U.S. Dept. of Justice, *Guidance Letter to ATF Federal Firearms Licensees* (Apr. 10, 2020), https://bit.ly/2Vop8mC. Employing these methods may be less simple than a flat ban. But while nakedly suppressing constitutionally protected conduct "is sometimes the path of least resistance,"

intermediate scrutiny's tailoring requirement is designed precisely to "prevent[ ] the government from too readily sacrificing [constitutional rights] for efficiency." *McCullen*, 573 U.S. at 486 (brackets and quotation marks omitted).

A similar lack of tailoring formed the basis of the *Bateman* court's invalidation of North Carolina's emergency laws. Rather than "target[ing] dangerous individuals or dangerous conduct," or "imposing a curfew… the laws excessively intrude[d] upon plaintiffs' Second Amendment rights by effectively banning them (and the public at large) from engaging in conduct that is at the very core of the Second Amendment at a time when the need for self-defense may be at its very greatest." 881 F. Supp. 2d at 716. Justice Wecht's opinion in *Civil Rights Defense Firm* likewise homed in on available avenues for "avoiding an impermissible intrusion upon a fundamental constitutional right," reasoning that "just as the Governor has permitted restaurants to offer take-out service but restricted dine-in options, the Governor may limit the patronage of firearm retailers to the completion of the portions of a transfer that must be conducted in-person." *Civil Rights Defense Firm*, 2020 WL 1329008, at *2 (Wecht, J., concurring in part and dissenting in part). Justice Wecht's reasoning was so compelling that the Governor of Pennsylvania responded by reversing course and exempting firearm dealers from the scope of his earlier shutdown order. Governor Tom Wolf, *Industry Operation Guidance* (Mar. 24, 2020), https://bit.ly/3bnifZl. Other jurisdictions that initially failed to exempt firearm retailers have also reconsidered that course of action. *See* Alex Napoliello, *Gun Shops Are Now Considered Essential Businesses in N.J., Gov. Murphy Says*, NJ.COM (Mar. 30, 2020), https://bit.ly/2RbH4Qq; Luke Money & Richard Winton, *Sheriff Suspends Efforts to Close L.A. Gun Stores Amid Coronavirus Restrictions*, L.A. TIMES (Mar. 25, 2020), https://lat.ms/2R33143.

The Second Amendment requires no less in Massachusetts. It is not enough to show that

the COVID-19 outbreak represents an urgent public health crisis. Rather, to sustain the Closure Order's application to firearm retailers, the Government must show that its ban on firearm sales is necessary to protect public health: (1) even though it has allowed other retail establishments, such as liquor stores, marijuana dispensaries, and garden centers to remain open, and (2) even though a variety of measures are available to protect the public health *while allowing* law-abiding Massachusetts citizens to continue to exercise their Second Amendment rights.

The bottom line is this. If gun stores adopt reasonable, tailored social-distancing measures and enhanced sanitation, Governor Baker simply cannot show that his outright *ban* on firearm sales is necessary to advance public safety. That ban therefore violates the Second Amendment.

## CONCLUSION

For the foregoing reasons, the Court should enjoin the enforcement of the Closure Order against firearm and ammunition retailers.

Dated: April 17, 2020                          Respectfully submitted,

David H. Thompson*                                 s/Patrick Groulx
Peter A. Patterson*                                Patrick Groulx
COOPER & KIRK, PLLC                                BBO # 673394
1523 New Hampshire Avenue, N.W.                    ISENBERG GROULX, LLC
Washington, D.C. 20036                             368 W. Broadway, Suite 2
(202) 220-9600                                     Boston, MA 02127
(202) 220-9601 (fax)                               (857) 880-7889
dthompson@cooperkirk.com                           patrick@i-gllc.com

*Pro hac vice* application forthcoming

*Attorneys for Pink Pistols*