**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

```
_____
                                )
MICHAEL MCCARTHY, et al.,        )
                                )
        Plaintiffs,              )        CIVIL ACTION NO.
                                )        1:20-cv-10701-DPW
        v.                       )
                                )
CHARLES BAKER, et al.,           )
                                )
        Defendants.              )
_____ )
```

**GUN OWNERS ACTION LEAGUE, INC.' S AND NATIONAL RIFLE
ASSOCIATION OF AMERICA, INC.'S MOTION FOR LEAVE TO FILE BRIEF OF
AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' MOTON FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

The Gun Owners Action League, Inc. and National Rifle Association of America, Inc.

respectfully move for leave to file the attached amicus curiae brief in this case.

1.      The Gun Owners Action League, Inc. is a nonprofit corporation dedicated to

providing safe and responsible firearms ownership, marksmanship competition, and hunter safety

throughout Massachusetts. For over 40 years, GOAL has helped protect and preserve

Massachusetts citizens' Second Amendment rights, and the organization enjoys a membership of

more than 15,000. GOAL is the leading advocate in Massachusetts for its members, which

include gun owners, hunters, conservationists, as well as firearm and marksmanship clubs.

GOAL possesses a number of firearms related licenses, including a federal firearms license and

Massachusetts licenses to transfer or sell firearms and ammunition. GOAL and its members are

affected by the Governor Baker's COVID-19 Order No. 21 and the enforcement efforts by the

local police departments because it cannot transfer firearms and ammunition, and its members

cannot acquire firearms or ammunition from any licensed Massachusetts firearms or ammunition

retailer.

2.     The National Rifle Association of America ("NRA") is a nonprofit corporation, operating under § 501(c)(4) of the Internal Revenue Code. The NRA was incorporated in the state of New York in 1871. Its principal offices and place of business are located in Fairfax, VA. In Accordance with Article II of the NRA's bylaws, the NRA's purposes and objectives include "To protect and defend the Constitution of the United States, especially with reference to the God-given inalienable right of the individual American citizen guaranteed by such Constitution to acquire, possess … transfer ownership of, and enjoy the right to use, keep and bear arms, in order that the people may exercise their individual rights of … defense of family, person, and property." The NRA's membership includes roughly 5,000,000 individuals, many of whom reside in Massachusetts and are currently being harmed by Governor Baker's COVID-19 Order No. 21.

3.     Although the Federal Rules of Civil Procedure do not address amicus curiae participation in district courts, district courts possess the inherent authority to accept amicus briefs. *In re Bayshore Ford Truck Sales, Inc.*, 471 F.3d 1233, 1249 n.34 (11th Cir. 13 2006); *Students for Fair Admissions v. President & Fellows of Harvard Coll.,* No. 14-CV-14176-ADB, 2018 WL 9963511, at *1 (D. Mass. Oct. 3, 2018). Courts favor amicus briefs that are "'timely and useful.'" *U.S. ex rel. Gudur v. Deloitte Consulting LLP*, 512 F. Supp. 2d 920, 927 (S.D. Tex. 2007), *aff'd sub nom. U.S. ex rel. Gudur v. Deloitte & Touche*, No. 07-20414, 2008 WL 3244000 (5th Cir. Aug. 7, 2008) (citation omitted). No date has been set for filing amici,  but the injunction hearing is set for May 4, 2020, and the Defendants' opposition are due on April 27, 2020.  This proposed brief will be useful because amici thoroughly discuss the tiers of scrutiny that must be applied to Second Amendment claims.

4.     GOAL and NRA seek leave to file an amicus curiae brief to support the Plaintiffs'

challenge to the Governor's and to the local police departments' efforts to eliminate

Massachusetts' residents' access to firearms and ammunition during the Coronavirus outbreak.

Massachusetts citizens are constitutionally entitled to purchase and possess firearms for self-

defense, and a number of Plaintiffs have expressed a desire to purchase firearms to protect

themselves and their families in their homes during this extraordinary time. Others in

Massachusetts are like them: unable to access firearms retailers to exercise their Second

Amendment rights, which are acute during times such as this.

5.     The Governor's COVID-19 Orders seek to achieve necessary public health goals,

but the means selected to achieve those goals do not comply with individuals' Second

Amendment rights. GOAL and NRA request leave to submit the amicus brief to assist the Court

considering these issues on behalf of themselves and their members.

6.     No counsel for the parties authored this brief, nor did any party nor a party's

counsel contribute money to prepare the brief. Only the amicus curiae provided funds to prepare

the brief.

<div style="margin-left: 40%;">

Respectfully submitted,
GUN OWNERS ACTION LEAGUE, INC.,
NATIONAL RIFLE ASSOCIATION OF AMERICA,
INC.,
By their counsel,


 /s/ David R. Kerrigan
David R. Kerrigan, BBO# 550843
drkerrigan@KandSlegal.com
Kenney & Sams, P.C.
Southborough Executive Park
144 Turnpike Road
Southborough, MA 01772
508-490-8500

</div>

Dated:  April 26, 2020

LOCAL RULE 7.1 CERTIFICATE

Pursuant to Local Rule 7.1, I, David R. Kerrigan, counsel for Gun Owners' Action League, Inc. and National Rifle Association of America, Inc. hereby certify that I conferred with counsel for the Plaintiffs by telephone and for all Defendants by email on various dates the week of April 20 to address the filing of this motion.  When I made the request, I requested leave on behalf of GOAL only. Plaintiffs' counsel agreed to the filing of the motion, and counsel for the Commonwealth Defendants, and for Woburn, Westport, and Fall River, responded and indicated that they did not intend to oppose the motion.

        /s/  David R. Kerrigan
        David R. Kerrigan

## <u>CERTIFICATE OF SERVICE</u>

I, David R. Kerrigan, Esq., hereby certify that the foregoing document was filed through the ECF system and was served electronically to the registered attorneys of record.

Date: April 26, 2020        /s/  David R. Kerrigan
        David R. Kerrigan, Esq.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| MICHAEL MCCARTHY, *et al*., ) | |
| ) | |
| Plaintiffs, ) | CIVIL ACTION NO. |
| ) | 1:20-cv-10701-DPW |
| v. ) | |
| ) | |
| CHARLES BAKER, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**GUN OWNERS' ACTION LEAGUE'S AND NATIONAL RIFLE ASSOCIATION OF AMERICA'S PROPOSED AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS' REQUEST FOR TEMPORARY RESTRAINING ORDER AND FOR INJUNCTIVE RELIEF**

KENNEY & SAMS, PC.
David R. Kerrigan (BBO# 550843)
Kenney & Sams, P.C.
Southborough Executive Park
144 Turnpike Road
Southborough, MA 01772
508-490-8500
drkerrigan@KSlegal.com

Corporate disclosure statements .................................................................................. 3

Table of authorities ................................................................................................... 4

Introduction................................................................................................................ 1

INTEREST OF AMICUS CURIAE ............................................................................ 2

Background ................................................................................................................. 3

I.  Governor Baker Issued COVID-19 Order NO. 21, Which Does Not Allow Firearm
Retailers to Operate, Creating a Ban On Sales to Individuals In the Commonwealth..... 3

Argument ................................................................................................................... 5

I.  This Order Affects Core Second Amendment Rights, Preventing Citizens from purchasing
firearms in this State, and is categorically unconstitutional............................................ 6

II.  COVID-19 Order No. 21 Is Unconstitutional Under First Circuit Precedent. ................... 7

A.  COVID-19 Order No. 21 strikes at the core of the Second Amendment. ....................... 8

B.  The ban fails under strict scrutiny. ................................................................. 9

C.  The ban cannot be justified and survive intermediate scrutiny.................................... 11

III.  The Public Health Emergency Cannot Serve As a Basis To Trample Civil Rights. ........ 13

Conclusion .............................................................................................................. 14

## CORPORATE DISCLOSURE STATEMENTS

In accordance with Federal Rule of Civil Procedure 7.1(a), Amici submit the following Corporate Disclosure Statements:

Gun Owners Action League, Inc., is a non- profit corporation incorporated under the laws of the Commonwealth of Massachusetts.  GOAL is not publicly traded and has no parent corporation.  There is no publicly held corporation that owns 10 per cent or more of its stock.

The National Rifle Association of America is a nonprofit membership association, incorporated in the state of New York, under Section 501(c)(4) of the Internal Revenue Code. NRA is not publicly traded and has no parent corporation. There is no publicly held corporation that owns 10 percent or more of its stock.

# TABLE OF AUTHORITIES

**Cases**

*Andrews v. State*, 50 Tenn. 165 (1871)................................................................ 8

*Arizona Free Enter. Club's Freedom Club PAC v. Bennett,* 564 U.S. 721 (2011) ..................... 10

*Bateman v. Perdue*, 881 F. Supp. 2d 709 (E.D.N.C. 2012)........................................ 11

*District of Columbia v. Heller*, 554 U.S. 570 (2008)................................................ passim

*Doe v. Gonzales*, 500 F.Supp. 2d 379 (S.D.N.Y. 2007). ........................................... 14

*Elrod v. Burns*, 427 U.S. 347, 373 (1976) ...................................................... 6

*Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir. 2011) ............................................ 7

*Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018). .................................................. passim

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) ..................................................... 13

*Heller v. D.C.*, 670 F.3d 1244 (D.C. Cir. 2011) ................................................. 8

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015)..................................... 13

*Hightower v. City of Bos.*, 693 F.3d 61 (1st Cir. 2012) ........................................... 8

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013)............................. 6

*McCullen v. Coakley*, 573 U.S. 464 (2014) ..................................................... 11

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)............................................ 1, 9

*Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670 (1st Cir. 1998) ................................. 5

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ................................... 9

*Schenck v. Pro-Choice Network Of W. New York*, 519 U.S. 357 (1997)............................ 10

*Showtime Entertainment, LLC v. Mendon*, 769 F.3d 61 (1st Cir. 2014) .......................... 11

*Turner Broadcasting Sys., Inc. v. FCC,* 512 U.S. 622 (1994) ................................ 10, 12

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010)........................................... 7

*Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464 (1st Cir. 2009) ............................ 6

*Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7 (2008) ......................................... 5

*Wrenn v. D.C.*, 864 F.3d 650 (D.C. Cir. 2017). ................................................. 6

## INTRODUCTION

Gun Owners Action League, Inc. ("GOAL") and the National Rifle Association of America ("NRA") seek leave to file this amicus curiae brief in support of the Plaintiffs' challenge to the Governors' and to the local police departments' efforts to eliminate Massachusetts' residents' access to firearms and ammunition during the Coronavirus pandemic. Massachusetts citizens are constitutionally entitled to purchase and possess firearms for self-defense, and a number of Plaintiffs have expressed a desire to purchase firearms to protect themselves and their families in their homes during this extraordinary time. They, and many others in Massachusetts, are unable to access firearms and ammunition in retail stores to exercise their Second Amendment rights, which are acute during this extraordinary time when (a) alleged serious felons committed to pretrial detention and others already imprisoned are being released early; and (b) law enforcement and first responders' ability to prevent and respond to crime in certain circumstances will likely be directly affected by the virus.

GOAL and NRA acknowledge and do not call into question the principal goal of the Governor's COVID-19 Order No. 21—to limit the spread of the coronavirus while allowing certain businesses deemed essential to remain open. Here, however, the means selected to achieve those goals are overboard and infringe individuals' Second Amendment rights. Few would consider an order to limit the spread of the virus that closed all newspaper distribution means in the state while allowing liquor stores to remain open to be legal. Yet, the Order has a similar effect: eliminating the ability for individuals to exercise a fundamental constitutional right while allowing similarly situated businesses, which are not constitutionally protected, to continue operations. As stated by the Supreme Court in *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010), the Second Amendment is not to be treated as a second-class right, but COVID-19 Order No.21 does just that.

The Governor's COVID-19 Order No. 21 is unconstitutional to the extent it prohibits firearm and ammunition purchases and transfers for what will be an indefinite period of time, and GOAL and NRA join the Plaintiffs' requests that the Court declare the Order invalid and to issue an injunction.

## INTEREST OF AMICUS CURIAE

The Gun Owners Action League, Inc. is a nonprofit corporation dedicated to providing safe and responsible firearms ownership, marksmanship competition, and hunter safety throughout Massachusetts. For over 40 years, GOAL has helped protect and preserve Massachusetts citizens' Second Amendment rights, and the organization enjoys a membership of more than 15,000. GOAL is the leading advocate in Massachusetts for its members, which include gun owners, hunters, conservationists, as well as firearm and marksmanship clubs. GOAL possesses a number of firearms related licenses, including a federal firearms license and Massachusetts licenses to transfer or sell firearms and ammunition. GOAL and its members are affected by Governor Baker's COVID-19 Order No. 21 and the enforcement efforts by the local police departments because it cannot transfer firearms and ammunition, and its members cannot acquire firearms or ammunition from any licensed Massachusetts firearm or ammunition retailer.

The National Rifle Association of America ("NRA") is a nonprofit corporation, operating under § 501(c)(4) of the Internal Revenue Code. The NRA was incorporated in the state of New York in 1871. Its principal offices and place of business are located in Fairfax, Virginia. In Accordance with Article II of the NRA's bylaws, the NRA's purposes and objectives include "To protect and defend the Constitution of the United States, especially with reference to the God-given inalienable right of the individual American citizen guaranteed by such Constitution to acquire, possess … transfer ownership of, and enjoy the right to use, keep and bear arms, in

order that the people may exercise their individual rights of … defense of family, person, and property." The NRA's membership includes roughly 5,000,000 individuals, many of whom reside in Massachusetts and are currently being harmed by Governor Baker's COVID-19 Order No. 21.

## BACKGROUND

### I.    Governor Baker Issued COVID-19 Order No. 21, Which Does Not Allow Firearm Retailers to Operate, Creating a Ban On Sales to Individuals In the Commonwealth.

Governor Baker's COVIID-19 Order No. 21 does not allow firearm dealers to open, prohibiting residents from purchasing firearms in violation of their Second Amendment rights.

In an effort to limit the spread of the novel Coronavirus, Governor Baker issued various emergency orders, including COVID-19 Order No. 13, which was followed by COVID-19 Order No. 21. Those orders seek to implement the stated goal of limiting gatherings and practicing social distancing by declaring certain so-called brick and mortar businesses to be essential, which in turn, allows the business to continue to operate. All other businesses "shall not re-open their bricks and mortar premises to workers customers, or the public before May 4, 2020." *See* Order No. 21, attached as Exhibit A.

To assist with making these determinations, the Governor drew from an updated guidance issued by the Federal Cybersecurity and Infrastructure Agency, which identified critical infrastructure during the COVID-19 response. According to COVID-19 Order No. 21, the Governor amended his previous Order No. 13 "to reflect the revised guidance of the Federal Cybersecurity and Infrastructure Security Agency ('CISA') and the additional services and functions that I, as Governor, have identified as essential to promote the public health and welfare of the Commonwealth."  Exhibit A, p.3.  CISA's guidance called for firearms retailers to be considered essential services: its updated list included "firearm or ammunition product

3

manufacturers, retailers, importers, distributors, and shooting ranges" as essential services. *See* Plaintiff's Memorandum pp. 5-6.

While the Governor originally included this language into the updated order, the amendment quickly met opposition from certain Massachusetts state officials and was deleted from the list of essential businesses. Attorney General Healey wrote on her Twitter account that "gun shops are NOT essential businesses during a public health emergency," citing as a reason a vague reference to "police officers, first responders and domestic violence victims."[1] The Governor also spoke to Speaker Deleo, and shortly after that, firearms retailers and shooting ranges were removed from the essential service list appearing as an attachment to COVID-19 Order No. 21.

The evidence produced by the Plaintiffs confirms that intentionally deleting firearm retailers from the essential business list means that the Commonwealth has banned them from operating. This is confirmed from the evidence produced by the Plaintiffs. For example, Michael Skidmore, the owner and manager of Troy City Tactical, LLC stated that the Fall River Police Department licensing officer informed him that the Governor's COVID-19 order deemed firearms dealers "non-essential" and must remain closed. Skidmore Declaration, ¶¶ 3-4. Mr. Skidmore was instructed that he could not open, and he learned that the Department of Criminal Justice Information Services ("DCJIS") issued a notice to police departments reinforcing the Governor's order that dealers must remain closed. Skidmore Declaration at ¶5.

---

[1] Granted, while it is proving to be an increasingly more common means of public officials' communication strategy, even the now 280 character tweet limit does not offer much ability to provide in depth legal or public health analysis. *See* screen shot of Twitter account of Maura Healey dated April 1, 2020, attached as Exhibit B.

Likewise, Christopher Kielty the owner of Don Tom Group, LLC d/b/a Precision Point became aware that the Governor's COVID-19 order deemed firearm retailers to be non-essential and that the DCJIS issued a notice to all police departments informing that the firearms dealers must remain closed. Kielty Declaration, ¶4. Toby Leary, the owner of Downrange, Inc. received a call from the Barnstable Board of Health on April 1, 2020, ordering him to shut down because of Governor Baker's COVID-19 order deeming firearms dealers to be non-essential businesses. Leary Declaration, ¶3. Mr. Leary actually received a copy of the notice issued by the DCJIS to police departments reinforcing the Governor's order. Leary Declaration, ¶5.

The shop owners' views that the Order acts as a ban are also confirmed by the police departments.  Jim Simmons, a single parent, stated that he wanted to purchase a firearm to protect his three children. Simmons Declaration, ¶4. He purchased a handgun from Shooting Supply in Westport, but when he went to pick it up on April 2, he was greeted by the police and threatened with arrest if he did not leave. Declaration, ¶8. These (and the other) declarations make clear that the Order acts as a ban, and the imminent threat of enforcement renders individuals unable to exercise their Second Amendment rights.

The Plaintiffs have described the regulatory overview of firearm purchases in the Commonwealth on pages 2-4 of their memorandum of law. It is illegal to sell ammunition or ammunition components for personal reloading purposes in Massachusetts without a license, and it is illegal for anyone other than a licensed dealer to sell firearms, with the limited exception for person to person transfers. Memorandum, pp. 2-4. As a result, this ban prevents individuals from purchasing firearms and ammunition in this state for however long the Order remains in effect.

## ARGUMENT

Amici agree that Plaintiffs are entitled to a preliminary injunction under the four-part test in *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). Amici focus on the likelihood-

of-success factor because it "is the touchstone of the preliminary injunction inquiry." *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st Cir. 1998) (citation omitted). That is especially true here, where the loss of a substantive, fundamental-constitutional right, even temporarily, is an irreparable injury. *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 484 (1st Cir. 2009); *Elrod v. Burns*, 427 U.S. 347, 373 (1976). And the balance of equities and the public's interest always favor upholding the Constitution. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013); *Wrenn v. D.C.*, 864 F.3d 650, 667 (D.C. Cir. 2017).

I.   **This Order Affects Core Second Amendment Rights, Preventing Citizens from Purchasing Firearms in this State, and is Categorically Unconstitutional.**

Blanket restrictions preventing access to firearms cannot withstand any level of scrutiny. In *Heller*, the Supreme Court considered whether a District of Columbia law banning handguns in the home passed constitutional muster under the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570 (2008). The Court found that the handgun ban "amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute." *Id*. at 628. As a result, the Court held that "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights," this ban fails constitutional muster. *Id*. at 628-629.

While the ban in *Heller* involved only one class of firearms, COVID-19 Order No. 21 goes much further. This order prevents individuals from having access to any firearms, including handguns, rifles, and shotguns, as well as ammunition, when they seek to protect themselves in their homes. This complaint and its accompanying affidavits describe how buyers holding the appropriate licenses cannot purchase firearms from any Massachusetts' dealers when they seek

the firearms to protect themselves in their homes when they may be more vulnerable.[2] Denying

access to these Plaintiffs and others like them is per se unconstitutional. The Court need not

engage in any interest balancing because the Constitution prohibits infringing rights in this

fashion. *See Heller*, 554 U.S. at 628. As the Seventh Circuit stated in *Ezell v. City of Chicago*:

"Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second

Amendment right—like the *handgun* bans at issue in those cases, which prohibited handgun

possession even in the home—are categorically unconstitutional." 651 F.3d 684, 603 (7th Cir.

2011); *Heller, 554 U.S.* at 628-35 ("We know of no other enumerated constitutional right whose

core protection has been subjected to a freestanding 'interest-balancing' approach."). This Court

should hold the same.

## II.      COVID-19 Order No. 21 Is Unconstitutional Under First Circuit Precedent.

Alternatively, Order No. 21 fails under the two-step approach that the First Circuit

formally adopted to resolve Second Amendment claims. First, the Court needs to determine

"whether the challenged law burdens conduct that falls within the scope of the Second

Amendment's guarantee." *Gould v. Morgan*, 907 F. 3d 659, 668-669 (1st Cir. 2018). "This is a

backward-looking inquiry, which seeks to determine whether the regulated conduct 'was

understood to be within the scope of the right at the time of ratification.'" *Id*. at 669. (quoting

*United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010)). If the conduct falls within the scope

of Second Amendment protections, the Court then needs to determine what level of scrutiny to

---

[2] Recent events in another state indicate that their concerns may be well founded. For example, Arlington Heights Illinois man fought off one intruder and shot and killed another with a firearm he owned after the two men broke into his home on April 7, 2020. After physically fighting off one intruder, the homeowner was able to get his gun and shoot the second intruder who was pointing a gun at his wife and two children. *See* Chicago Tribune article, dated April 7, 2020 attached as Exhibit C.

apply to the challenged law and whether the law survives that level of scrutiny. 907 F. 3d at 669.[3]

### A.  COVID-19 Order No. 21 strikes at the core of the Second Amendment.

There can be only one conclusion here: the challenged conduct falls within the scope of the Second Amendment. The Second Amendment protects citizens' fundamental right to bear arms in the home for self-defense. District of Columbia v. Heller, 554 U.S. 570, 628 (2008); see also Gould v. Morgan, 907 F.3d 659. It takes "off the table" any "absolute prohibition of handguns held and used for self-defense in the home." Heller, 554 U.S. at 616, 636. The First Circuit "identified the core of the Second Amendment right as 'the possession of operative firearms for use in defense of the home' by responsible, law-abiding individuals." Gould, 907 F.3d at 671 (citing Hightower v. City of Bos., 693 F.3d 61, 65 (1st Cir. 2012)). And there can be no right to "keep" or "bear" arms without the ability to acquire them and the ammunition that is essential to their use. Therefore, any restriction that "make[s] it considerably more difficult for a person lawfully to acquire and keep a firearm … for the purpose of self-defense in the home" strikes "the 'core lawful purpose' protected by the Second Amendment." Heller v. D.C., 670 F.3d 1244, 1255 (D.C. Cir. 2011) (emphasis added) (quoting Heller, 554 U.S. at 630). That has been the settled law in this country for a century and a half. Andrews v. State, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them . . . and to purchase and provide ammunition suitable for such arms.").

---

[3] Last week, two judges on the Fifth Circuit voiced their support for retiring the two-step approach and adopting an "approach focused on the Second Amendment's text and history." *United States v. McGinnis*, No. 19-10197, 2020 WL 1918718, at *10 (5th Cir. Apr. 21, 2020) (Duncan, & Jones, J. concurring) (collecting authorities). Amici agree with this approach. But like the Judges Duncan and Jones, Amici recognize that the two-step approach is binding.

The record in this case establishes that the plaintiffs and other GOAL and NRA members are now unable to purchase firearms in the Commonwealth to use to protect them in their homes. This harm is not imagined nor is it theoretical: it constitutes ongoing and continuing constitutional harm. Multiple plaintiffs stated that they have Licenses to Carry or Firearms Identification Cards and wish to purchase a firearm now, but they have been told that they cannot do so at this time. For example, Laurie Warner lives near Cape Cod National seashore, and she has seen an increase in trespassers on her property. Warner Declaration, ¶4. Worried that her home will be broken into, she contacted Cape Cod Gun Works to purchase a shotgun and was informed that the state had shut it down. Warner Declaration, ¶7.  Because she does not know anyone who can sell her a shotgun, she is unable to purchase a firearm in the Commonwealth. Timothy Galligan recently obtained an LTC and wishes to purchase firearm to protect him and his teenage son.  Galligan Declaration, ¶4. He contacted Troy City Tactical in Fall River and was informed that he could not obtain a firearm from them. Id., ¶8. He, too, does not know any person who is willing to sell him a firearm. Galligan Declaration, ¶9. Other declarations recount similar desires to protect themselves during this remarkable time.

**B.  The ban fails under strict scrutiny.**

Having met the first prong of the two-part test, the Court next needs to determine what standard of review is appropriate for the COVID-19 Orders.

The Supreme has held that "strict judicial scrutiny [is] required" whenever a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). And the right to keep arms was deemed "among those fundamental rights necessary to our system of ordered liberty" by "those who drafted and ratified the Bill of Rights." *McDonald v. City of Chicago*, 561 U.S. 742, 768, 778 (2010). Applying anything but strict scrutiny would be relegating the Second Amendment to

"a second-class right," which the Supreme Court expressly forbade. *Id*. at 780; *see also Heller,* 554 U.S. at 634 (comparing the Second Amendment to the First).

First Circuit precedent also requires that the Court apply strict scrutiny. "A law or policy that burdens conduct falling within the core of the Second Amendment requires a correspondingly strict level of scrutiny, whereas a law or policy that burdens conduct falling outside the core of the Second Amendment logically requires a less demanding level of scrutiny." *Gould*, 907 F.3d at 671. And here, COVID-19 Order No. 21 strikes at the "core of the Second Amendment right":  "'the possession of operative firearms for use in defense of the home' by responsible, law-abiding individuals." *Id.* at 671 (citation omitted). It is undeniable that strict scrutiny must apply here.

Strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Arizona Free Enter. Club's Freedom Club PAC v. Bennett,* 564 U.S. 721, 734 (2011) (citations and quotations omitted).

The government does have a legitimate interest in public safety. *Schenck v. Pro-Choice Network Of W. New York*, 519 U.S. 357, 375–76 (1997). But recitation of that interest alone is not enough to satisfy the first prong of strict scrutiny. *Turner Broadcasting Sys., Inc. v. FCC,* 512 U.S. 622, 644 (1994) (plurality)). The government "must demonstrate that the recited harms are real, not merely conjectural, and that *the regulation will in fact alleviate these harms in a direct and material way*." *Id*. (collecting authorities) (emphasis added).

Defendants cannot demonstrate that closing firearm retailers will directly or materially alleviate the harms posed by COVID-19. Any alleviation of the spread of COVID-19 from closing firearm retailers is speculative, at best. Plaintiffs and others can abide by all social distancing and workforce requirements for the operation of essential businesses.  Accordingly,

Defendants cannot demonstrate that the closure of retail firearms businesses furthers a compelling interest.

Moreover, the closure of all retail firearms businesses is not narrowly tailored. That was the problem that the *Bateman* court had with North Carolina's emergency-declaration statute that prohibited citizens from lawfully acquiring a firearm during an emergency—it was not tailored in any manner whatsoever, let alone narrowly. *Bateman v. Perdue*, 881 F. Supp. 2d 709, 716 (E.D.N.C. 2012). The statute did not "target dangerous individuals or dangerous conduct." *Id*. It did not "impose reasonable time, place and manner restrictions" like a "curfew to allow the exercise of Second Amendment rights during circumscribed times." *Id*. The statute "excessively intrude[d] upon plaintiffs' Second Amendment rights by effectively banning them (and the public at large) from engaging in conduct that is at the very core of the Second Amendment at a time when the need for self-defense may be at its very greatest." *Id*. (citing *Heller*, 554 U.S. at 795). COVID-19 Order No. 21 at issue here is indistinguishable from the statute at issue in *Bateman* and must fail under strict scrutiny.

### *C.* **The ban cannot be justified and survive intermediate scrutiny.**

Even if the Court concludes that intermediate scrutiny applies, the order still does not pass constitutional muster. To be sustained under intermediate scrutiny, the Defendants "must show that the order, as implemented, "substantially relates to one or more important governmental interests." *Gould*, 907 F.3d at 637. Intermediate scrutiny further demands that restrictions of constitutionally protected conduct must be "narrowly tailored" and possess a "close fit between ends and means." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). Narrow tailoring requires that the means by which a government advances their interest must focus on the source of the evils ""without at the same time banning or significantly restricting a substantial quantity of speech [or conduct] that does not create the ... evils.'" *Showtime Entertainment, LLC*

*v. Mendon*, 769 F.3d 61, 81 (1st Cir. 2014) (citations omitted). In other words, when "the burden imposed by [a regulation] is congruent to the benefits it affords[, the regulation] is narrowly tailored." *Turner Broad. Sys., Inc.*, 520 U.S. at 215–16). To carry this burden, the government must not only present evidence, but "substantial evidence" drawn from "reasonable inferences" that actually support its proffered justification. *Id*. at 195. Defendants cannot meet this burden here.

There must be a link between closing these stores versus other businesses allowed to remain open—there must be a justification to treat them differently from businesses. But there are several problems with linking firearms sales and the Order's goals. First, the deprivation of rights does not fit the stated interest when there are a large number and variety of businesses which are allowed to function but are not protected by the constitution. Businesses can remain open and workers can produce cabinets, fixtures, and building materials for homes. Home builders, HVAC technicians, and electricians can safely perform work. Hardware stores are deemed essential and remain open.  Other retailers such as liquor stores can apparently operate safely and remain open, selling products which were constitutionally banned in this country for 13 years. Massachusetts residents can still go to a number of drive-up restaurant services to obtain their favorite food choices.  And yet, firearms stores can offer the very same public health protections to their employees and customers, but they have somehow been determined to be more likely to transmit the virus. In addition, the justification breaks down because firearm stores are allowed to sell to police officers.[4] If those sales can be done safely, there is no reason to eliminate firearm sales to other members of the public. Finally, this justification must fail when

---

[4] COVID-19 Order No. 21, Exhibit A, under the Law Enforcement, Public Safety and Other First Responder Category and deems essential workers who maintain or supply equipment supporting law enforcement emergency services and workers supporting the operation of firearms or ammunition distributors.

there is no way to know if the inability to purchase firearms period will end on May 4, June 4 or last indefinitely. There may be another wave of closures and an even lengthier deprivation of rights looming. Intermediate scrutiny does not allow such disparate treatment and lack of connection between the stated interest and constitutional deprivation.

When the purpose of the order is to prevent the spread of COVID-19, not to delay securing firearms, the inability to exercise one's Second Amendment rights for an unknown period while allowing other businesses to operate serves no legitimate purpose. *See Heller v. District of Columbia*, 801 F.3d at 264, 280 (D.C. Cir. 2015) (Evidence to support limitation of purchasing one firearm per 30 day period did not fit the theories advanced in support of the limitation, and the prohibition was not constitutional.)

### III.   The Public Health Emergency Cannot Serve As a Basis To Trample Civil Rights.

The state of emergency that exists in the Commonwealth does not justify the constitutional infringement hoisted upon Massachusetts residents by COVID-19 Order No. 21. To be sure, there are strong interests at stake embodied by the COVID-19 orders. They are designed to limit the spread of a virus which is stressing medical systems to the limit and invading nursing homes here and in other states. But Courts must be vigilant to ensure that the emergency cannot and should not be used as an opportunity to chip away at rights protected since the Bill of Rights were adopted. "The Constitution is best preserved by reliance on standards tested over time and insulated from the pressures of the moment." *Hamdan v. Rumsfeld*, 548 U.S. 557, 637 (2006) (Breyer, J. Concurring).

These are real, not imagined concerns. Legal history has seen its healthy share of constitutional infringements in the name of emergencies, and the legal harm, not the public health harm, lasts far longer than the emergency. GOAL and the NRA, on behalf of themselves

and their members, ask the Court to consider the words of the United States District Court for the

Southern District of New York when discussing the Patriot Act and its provisions authorizing

letters requesting information from wire and electronic communications service providers:

> These concerns may be readily dismissed as protesting too much, as conjuring a remote, unduly alarmist parade of horrors. But those who are inclined, for the risk of the moment, to give chance a chance by wagering against the improbable, should consult history for its guidance as to what the roll of the dice may hold in predictable situations. The past is long, and so is the future we want to protect. But too often memory is short. The pages of this nation's jurisprudence cry out with compelling instances illustrating that, called upon to adjudicate claims of extraordinary assertions of executive or legislative or even state power, such as by the high degree of *deference* to the executive that the Government here contends § 3511(b) demands of the courts, when the judiciary lowers its guard on the Constitution, it opens the door to far-reaching invasions of liberty. *See, e.g., Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944)*; *Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896)*. These examples, however few in number, loom large in proportions of the tragic ill-effects felt in the wake of the courts' yielding fundamental ground to other branches of government on the constitutional role the judiciary must play in protecting the fundamental freedoms of the American people.

*Doe v. Gonzales*, 500 F.Supp. 2d 379, 414 (S.D.N.Y. 2007).

CONCLUSION

For these reasons, GOAL and NRA ask that the Court find that COVID-19 Order No. 21

acts as an unconstitutional ban on firearms and is invalid. The injunctive relief should enter.

> Respectfully submitted,
> GUN OWNERS ACTION LEAGUE, INC.,
> NATIONAL RIFLE ASSOCIATION OF AMERICA, INC.
> By their counsel,
>
>  /s/ David R. Kerrigan
> David R. Kerrigan, BBO# 550843
> drkerrigan@KSlegal.com
> Kenney & Sams, P.C.
> Southborough Executive Park
> 144 Turnpike Road
> Southborough, MA 01772
> 508-490-8500

Dated:  April 26, 2020

## **CERTIFICATE OF SERVICE**

I, David R. Kerrigan, Esq., hereby certify that the foregoing document was filed through

the ECF system and was served electronically to the registered attorneys of record.


Date: April 26, 2020                                    /s/  David R. Kerrigan
                                                        David R. Kerrigan, Esq.

# Exhibit A



OFFICE OF THE GOVERNOR
**COMMONWEALTH OF MASSACHUSETTS**
STATE HOUSE • BOSTON, MA  02133
(617) 725-4000

**CHARLES D. BAKER**
GOVERNOR

**KARYN E. POLITO**
LIEUTENANT GOVERNOR

### ORDER EXTENDING THE CLOSING OF CERTAIN WORKPLACES AND THE PROHIBITION ON GATHERINGS OF MORE THAN 10 PEOPLE

COVID-19 Order No. 21

Extending the Operation of COVID-19 Order No. 13

**WHEREAS,** on March 10, 2020, I, Charles D. Baker, Governor of the Commonwealth of Massachusetts, acting pursuant to the powers provided by Chapter 639 of the Acts of 1950 and Section 2A of Chapter 17 of the General Laws, declared that there now exists in the Commonwealth of Massachusetts a state of emergency due to the outbreak of the 2019 novel Coronavirus ("COVID-19");

**WHEREAS,** on March 11, 2020, the COVID-19 outbreak was characterized as a pandemic by the World Health Organization;

**WHEREAS,** the number of presumptive positive and confirmed cases of COVID-19 continues to rise exponentially in the Commonwealth.  As of March 30, 2020, the Department of Public Health had reported 5,752 cases of COVID-19, including 56 deaths, with all counties in the Commonwealth impacted;

**WHEREAS,** the Department of Public Health continues to urge all residents of the Commonwealth to limit activities outside of the home and to practice social distancing at all times to limit the spread of this highly contagious and potentially deadly virus;

**WHEREAS,** on March 19, 2020, the Federal Cybersecurity and Infrastructure Security Agency issued guidance to assist States with identifying critical infrastructure sectors whose workers provide services and functions that are essential to maintain in order to support a strong response to the COVID-19 pandemic;

**WHEREAS,** on March 23, 2020, I issued an Order that designated COVID-19 Essential Services, temporary closed the bricks-and-mortar premises of businesses and organizations that do not provide COVID-19 Essential Services, and prohibited gatherings of more than 10 people;

♺ PRINTED ON RECYCLED PAPER

**WHEREAS,** on March 28, 2020, the Federal Cybersecurity and Infrastructure Security Agency issued updated guidance on the identification of critical infrastructure sectors during the COVID-19 Response;

**WHEREAS,** as Governor, I have identified additional services and functions that likewise are essential to promote the public health and welfare of the Commonwealth, and therefore it is imperative to ensure that workers providing critical services and functions in these State and Federally designated sectors may continue to work to ensure community resilience and continuity of response efforts; and

**WHEREAS,** sections 7, 8, and 8A of Chapter 639 of the Acts of 1950 authorize the Governor, during the effective period of a declared emergency, to exercise any and all authority over persons and property necessary or expedient for meeting a state of emergency, including but not limited to authority over public assemblages in order to protect the health and safety of persons, transportation and travel by any means or mode, regulating the sale of articles of food and household articles, and policing, protection, and preservation of public and private property;

**NOW, THEREFORE,** I hereby order the following:

The provisions of the March 23, 2020 Order Assuring Continued Operation of Essential Services in the Commonwealth, Closing Certain Workplaces, and Prohibiting Gatherings of More than 10 People ("COVID-19 Order No. 13") are hereby extended until May 4, 2020. Accordingly, all businesses and other organizations that do not provide COVID-19 Essential Services shall not re-open their bricks-and-mortar premises to workers, customers, or the public before May 4, 2020.

Gatherings of more than 10 people also remain prohibited until May 4, 2020.

Effective at 12:00 noon on April 1, 2020, Exhibit A of the previously issued COVID-19 Order No. 13 is hereby replaced with the attached, updated Exhibit A of even date with this Order to reflect the revised guidance of the Federal Cybersecurity and Infrastructure Security Agency and the additional services and functions that I, as Governor, have identified as essential to promote the public health and welfare of the Commonwealth.

The Commissioner of Public Health shall continue to issue guidance as necessary and subject to my approval to implement the terms of COVID-19 Order No. 13.

The Massachusetts Department of Transportation, in consultation with the Division of Capital and Asset Management and Maintenance, shall issue guidance and enforcement procedures for the safe operation of public works construction sites, consistent with the terms of Exhibit A of COVID-19 Order No. 13.

The Department of Public Health, along with any board of health or authorized agent pursuant to G. L. c. 111, § 30, shall continue to enforce the terms of COVID-19 Order No. 13 and implementing guidance issued under the authority of that Order as here amended.

In addition, I renew my directive to the Commissioner of Public Health to act under the authority of G. L. c. 17, § 2A and G. L. c. 111, § 6 or any other appropriate authority to supplement the terms of COVID-19 Order No. 13 in the event she determines additional measures are required to ensure that its terms are observed.

This Order is effective immediately and shall remain in effect until May 4, 2020 unless further extended.

Given in Boston at 1:31 PM this 31st day of March, two thousand and twenty

CHARLES D. BAKER
GOVERNOR
Commonwealth of Massachusetts

## COVID-19 ESSENTIAL SERVICES

### EXHIBIT A OF THE ORDER OF THE GOVERNOR ASSURING CONTINUED OPERATION OF ESSENTIAL SERVICES IN THE COMMONWEALTH, CLOSING CERTAIN WORKPLACES AND PROHIBITING GATHERINGS OF MORE THAN 10 PEOPLE

### As updated March 31, 2020

Governor Charlie Baker's emergency order requiring that all businesses and organizations that do not provide "COVID-19 Essential Services" close their physical workplaces and facilities to workers, customers and the public will be extended until May 4. Businesses and organizations not on the list of essential services are encouraged to continue operations through remote means that do not require workers, customers, or the public to enter or appear at the brick-and-mortar premises closed by the order. This order also prohibits gatherings of more than 10 people until May 4th.

The Administration updated the "COVID-19 Essential Services" list today, which is based on federal guidance that was updated earlier this week. The new list will go into effect tomorrow, April 1, at noon. While these businesses are designated as essential, they are urged to follow social distancing protocols for workers in accordance with guidance from the Department of Public Health (DPH).

## HEALTHCARE / PUBLIC HEALTH

- Workers who perform critical clinical research, development, and testing needed for COVID-19 response.
- Healthcare providers and Caregivers including physicians, dentists, psychologists, mid-level practitioners, nurses and assistants, infection control and quality assurance personnel, pharmacists, physical and occupational therapists and assistants, social workers, optometrists, speech pathologists, chiropractors, other providers of mental and behavioral health care, peer support and recovery coach workers, personal care attendants, home health aides and home care workers, and diagnostic and therapeutic technicians and technologists.
- Hospital and laboratory personnel (including accounting, administrative, admitting and discharge, engineering, epidemiological, source plasma and blood donation, food service, housekeeping, medical records, information technology and operational technology, nutritionists, sanitarians, respiratory therapists, etc.).
- Workers in other medical and biomedical facilities (including Ambulatory Health and Surgical, Blood Banks, Medical Clinics, Community Mental Health Centers, Comprehensive Outpatient rehabilitation, Methadone/OBOT  Clinics, 24 hour Diversionary and Residential Behavioral Health Providers, End Stage Renal Disease, Health Departments, Home Health care, Hospices, Hospitals, Rest Homes, Assisted Living Residences, Nursing Care Facilities, Organ Pharmacies, Procurement Organizations, Psychiatric Residential, Residential Treatment Schools, Rural Health Clinics and Federally Qualified Health Centers, State Hospitals, licensed medical marijuana retailers, and retail facilities specializing in medical good and supplies).
- Manufacturer workers for health manufacturing  (including biotechnology companies), materials and parts suppliers, logistics and warehouse operators, distributors of medical equipment (including those who test and repair), personal protective equipment (PPE), isolation barriers, medical gases, pharmaceuticals (including companies and institutions involved in the research and development, manufacture, distribution, warehousing, and supplying of pharmaceuticals, biotechnology therapies, and medical devices, diagnostics, equipment and services) (including materials used in radioactive drugs), dietary supplements, blood and blood products, vaccines,

COVID-19 Essential Services

testing materials, laboratory supplies, cleaning, sanitizing, disinfecting or sterilization supplies, and tissue and paper towel products.
- Public health / community health workers, including those who compile, model, analyze and communicate public health information.
- Blood and plasma donors and the employees of the organizations that operate and manage related activities.
- Workers who manage health plans, billing, and health information, who cannot practically work remotely.
- Workers who conduct community-based public health functions, conducting epidemiologic surveillance, compiling, analyzing and communicating public health information, who cannot practically work remotely.
- Workers performing information technology and cybersecurity functions at healthcare and public health facilities, who cannot practically work remotely.
- Workers performing security, incident management, and emergency operations functions at or on behalf of healthcare entities including healthcare coalitions, who cannot practically work remotely.
- Pharmacy employees necessary to maintain uninterrupted prescription filling.
- Workers performing mortuary funeral, cremation, burial, cemetery, and related services, including at funeral homes, crematoriums, cemeteries, and coffin makers.
- Workers who coordinate with other organizations to ensure the proper recovery, handling, identification, transportation, tracking, storage, and disposal of human remains and personal effects; certify cause of death; and facilitate access to mental/behavioral health services to the family members, responders, and survivors of an incident.

**LAW ENFORCEMENT, PUBLIC SAFETY, AND OTHER FIRST RESPONDERS**
- Public, private, and voluntary personnel (front line and management) in emergency management, law enforcement, fire and rescue services, emergency medical services, and private security, to include public and private hazardous material responders, air medical service providers (pilots and supporting technicians), corrections, and search and rescue personnel.
- 911 call center employees (including telecommunicators, dispatchers and managers) and Public Safety Answering Points and other police communication facilities who can't perform their duties remotely.
- Fusion Center employees.
- Workers – including contracted vendors -- who maintain, manufacture, or supply equipment and services supporting law enforcement emergency service and response operations (to include electronic security and life safety security personnel).
- Workers supporting the manufacturing of safety equipment and uniforms for law enforcement, public safety personnel, and first responders.
- Workers supporting the operation of firearm or ammunition product manufacturers, importers, and distributors.
- Public agency workers responding to abuse and neglect of children, elders, and dependent adults.
- Workers who support weather disaster / natural hazard mitigation and prevention activities.
- Security staff to maintain building access control and physical security measures.

**FOOD AND AGRICULTURE**
- Workers supporting groceries, pharmacies, convenience stores, farmers markets and farm stands, nurseries, greenhouses, garden centers, and agriculture supply stores, and other retail

COVID-19 Essential Services

(including unattended and vending) that sells human food, animal/pet food and pet supply, and beverage products (including liquor stores), including retail customer support service and information technology support staff necessary for online orders, pickup and delivery.

- Restaurant carry-out and quick serve food operations, including dark kitchen and food prep centers, and carry-out and delivery food employees.
- Food manufacturer employees and their supplier employees—to include those employed in food ingredient production and processing facilities; livestock, poultry, seafood slaughter facilities; pet and animal feed processing facilities; human food facilities producing by-products for animal food; beverage production facilities; and the production of food packaging.
- Farmers, farm workers, and agribusiness support services to include those employed in auction and sales: grain and oilseed handling, processing and distribution; animal food, feed, and ingredient production, packaging, and distribution; manufacturing, packaging, and distribution of veterinary drugs; truck delivery and transport; farm and fishery labor needed to produce our food supply domestically and for export.
- Farmers, farm workers, support service workers, and their supplier employees to include those engaged in producing and harvesting field crops; commodity inspection; fuel ethanol facilities; biodiesel and renewable diesel facilities; storage facilities; and other agricultural inputs.
- Employees and firms supporting the distribution of food, feed, and beverage and ingredients used in these products, including warehouse workers, vendor- managed inventory controllers and blockchain managers.
- Workers supporting the sanitation and pest control of all food manufacturing processes and operations from wholesale to retail.
- Employees in cafeterias used to feed employees, particularly employee populations sheltered against COVID-19.
- Food service workers in residential schools with students who are unable to leave campus
- Workers in animal diagnostic and food testing laboratories in private industries and in institutions of higher education.
- Government, private, and non-governmental organizations' workers essential for food assistance programs (including school breakfast and lunch programs) and government payments.
- Employees of companies engaged in the production, storage, transport, and distribution of chemicals, medicines, vaccines, and other substances used by the food and agriculture industry, including seeds, pesticides, herbicides, fertilizers, minerals, enrichments, and other agricultural production aids.
- Animal agriculture workers to include those employed in veterinary health (including those involved in supporting emergency veterinary or livestock services); raising of animals for food; animal production operations; livestock markets; slaughter and packing plants, manufacturers, renderers, and associated regulatory and government workforce.
- Transportation supporting animal agricultural industries, including movement of animal medical and reproductive supplies and materials, animal vaccines, animal drugs, feed ingredients, feed, and bedding, live animals, animal by-products, and deceased animals for disposal.
- Workers who support sawmills and the manufacture and distribution of fiber and forest products, including, but not limited to timber, paper, and other wood and fiber products.
- Employees engaged in the manufacture and maintenance of equipment and other infrastructure necessary for agricultural production and distribution.
- Organizations and workers responsible for the care and custody of animals, pets and livestock

**ENERGY**

COVID-19 Essential Services

- Workers supporting the energy sector, regardless of the energy source (including but not limited to nuclear, fossil, hydroelectric, or renewable), segment of the system, or infrastructure the worker is involved in, or who are needed to monitor, operate, engineer, and maintain the reliability, safety, environmental health, and physical and cyber security of the energy system.
- Energy/commodity trading/scheduling/marketing functions, who can't perform their duties remotely.
- IT and OT technology for essential energy sector operations including support workers, customer service operations; energy management systems, control systems, and Supervisory Control and Data Acquisition SCADA systems, and energy sector entity data centers; cybersecurity engineers; and cybersecurity risk management.
- Workers supporting the energy sector through renewable energy infrastructure or energy efficiency projects (including, but not limited to wind, solar, biomass, hydrogen, ocean, geothermal, and/or hydroelectric), including those supporting construction, manufacturing, transportation, permitting, operation/maintenance, monitoring, and logistics.
- Workers and security staff involved in nuclear re-fueling operations.
- Providing services related to energy sector fuels (including, but not limited, petroleum (crude oil), natural gas, propane, natural gas liquids, other liquid fuels, nuclear, and coal), supporting the mining, processing, manufacturing, construction, logistics, transportation, permitting, operation/maintenance, security, waste disposal and storage, and monitoring of support for resources.
- Environmental remediation/monitoring, limited to immediate critical needs technicians.
- Manufacturing and distribution of equipment, supplies, and parts necessary to maintain production, maintenance, restoration, and service at energy sector facilities (across all energy sector segments).

**Electricity industry:**
- Workers who maintain, ensure, or restore, or are involved in the reliable development, transportation, fuel procurement, expansion, or operation of the generation, transmission, and distribution of electric power, including call centers, utility workers, engineers, retail electricity, constraint maintenance, and fleet maintenance technicians- who cannot perform their duties remotely.
- Workers at coal mines, production facilities, and those involved in manufacturing, transportation, permitting, operation/maintenance and monitoring at coal sites which is critical to ensuring the reliability of the electrical system.
- Workers who produce, process, ship and handle coal used for power generation and manufacturing.
- Workers needed for safe and secure operations at nuclear generation to include but not limited to, the broader nuclear supply chain, parts to maintain nuclear equipment, fuel manufacturers and fuel components used in the manufacturing of fuel.
- Workers at renewable energy infrastructure (including, but not limited to wind, solar, biomass, hydrogen, geothermal, and/or hydroelectric), including those supporting construction, manufacturing, transportation, permitting, operation/maintenance, monitoring, and logistics.
- Workers at generation, transmission, and electric black start facilities.
- Workers at Reliability Coordinator, Balancing Authorities, and primary and backup Control Centers, including but not limited to independent system operators, regional transmission organizations, and local distribution control centers.
- Mutual assistance personnel which may include workers from outside of the state or local jurisdiction.
- Vegetation management and traffic control for supporting those crews.

COVID-19 Essential Services

- Environmental remediation/monitoring workers limited to immediate critical needs technicians.
- Instrumentation, protection, and control technicians.
- Essential support personnel for electricity operations.
- Generator set support workers such as diesel engineers used in power generation including those providing fuel.

**Petroleum industry:**
- Workers for onshore and offshore petroleum drilling operations; platform and drilling construction and maintenance; transportation (including helicopter operations), maritime transportation, supply, and dredging operations; maritime navigation; well stimulation, intervention, monitoring, automation and control, extraction, production; processing; waste disposal, and maintenance, construction, and operations.
- Workers for crude oil, petroleum and petroleum product storage and transportation, including pipeline, marine transport, terminals, rail transport, storage facilities and racks and road transport for use as end-use fuels such as gasoline, diesel fuel, jet fuel, and heating fuels or feedstocks for chemical manufacturing.
- Petroleum and petroleum product security operations center employees and workers who support maintenance and emergency response services.
- Petroleum and petroleum product operations control rooms/centers and refinery facilities.
- Retail fuel centers such as gas stations and truck stops, and the distribution systems that support them.
- Supporting new and existing construction projects, including, but not limited to, pipeline construction.

**Natural Gas, Natural Gas Liquids (NGL), Propane, and other liquid fuels:**
- Workers who support onshore and offshore drilling operations, platform and drilling construction and maintenance; transportation (including helicopter operations); maritime transportation, supply, and dredging operations; maritime navigation; natural gas and natural gas liquid production, processing, extraction, storage and transportation; well intervention, monitoring, automation and control; waste disposal, and maintenance, construction, and operations.
- Transmission and distribution pipeline workers, including compressor stations and any other required, operations maintenance, construction, and support for natural gas, natural gas liquid, propane, and other liquid fuels.
- Natural gas, propane, natural gas liquids, and other liquid fuel processing plants, including construction, maintenance, and support operations.
- Natural gas processing plants workers, and those that deal with natural gas liquids.
- Workers who staff natural gas, propane, natural gas liquids, and other liquid fuel security operations centers, operations dispatch and control rooms/centers, and emergency response and customer emergencies (including leak calls) operations.
- Drilling, production, processing, refining, and transporting natural gas for use as end-use fuels, feedstocks for chemical manufacturing, or use in electricity generation.
- Dispatch and control rooms and emergency response and customer emergencies, including propane leak calls.
- Propane gas service maintenance and restoration, including call centers.
- Propane, natural gas liquids, and other liquid fuel distribution centers.
- Propane gas storage, transmission, and distribution centers.
- Supporting new and existing construction projects, including, but not limited to, pipeline construction.

Exhibit A updated as of 3/31/20

COVID-19 Essential Services

- Ethanol and biofuel production, refining, and distribution.
- Workers in fuel sectors (including, but not limited to nuclear, coal, and gas types and liquid fuels) supporting the mining, manufacturing, logistics, transportation, permitting, operation/maintenance, and monitoring of support for resources.

**Steam workers:**
- Workers who support steam distribution companies' provision of district heating and any electric generation
- Workers who support steam distribution companies' dispatch and control rooms and emergency response and customer emergencies, including steam leak calls
- Workers who support steam distribution companies' service maintenance and restoration, including call centers
- Workers who support steam distribution companies' storage, transmission, and distribution centers

**WATER AND WASTEWATER**
Employees needed to operate and maintain public and private drinking water and wastewater/drainage infrastructure, including:
- Operational staff at water authorities.
- Operational staff at community water systems.
- Operational staff at wastewater treatment facilities.
- Workers repairing water and wastewater conveyances and performing required sampling or monitoring, including field staff.
- Operational staff for water distribution and testing.
- Operational staff at wastewater collection facilities.
- Operational staff and technical support for SCADA Control systems.
- Chemical and equipment suppliers to water and wastewater systems and personnel protection.
- Workers who maintain digital systems infrastructure supporting water and wastewater operations.

**TRANSPORTATION AND LOGISTICS**
- Employees supporting or enabling transportation functions, including truck drivers, bus drivers, dispatchers, maintenance and repair technicians, warehouse workers, truck stop and rest area workers, Registry of Motor Vehicle (RMV) employees, towing/recovery services, roadside assistance workers, intermodal transportation personnel, and workers who maintain and inspect infrastructure (including those that require cross-jurisdiction travel).
- Workers supporting the distribution of food, pharmaceuticals (including materials used in radioactive drugs) and other medical materials, fuels, chemicals needed for water or water treatment and energy
- Workers, including contracted vendors, engaged in the maintenance and operation of essential highway infrastructure, including roads, bridges, and tunnels (e.g., traffic operations centers and moveable bridge operators).
- Employees of firms providing services, supplies, and equipment that enable warehouse and operations, including cooling, storing, packaging, and distributing products for wholesale or retail sale or use. Includes cold- and frozen-chain logistics for food and critical biologic products.

Exhibit A updated as of 3/31/20

COVID-19 Essential Services

- Mass transit, freight and passenger rail workers, including contracted vendors, providing transit services and/or performing critical or routine maintenance to rail or mass transit infrastructure or equipment.
- Employees supporting personal and commercial transportation services – including taxis, delivery services, vehicle rental services, bicycle maintenance and car-sharing services, and transportation network providers.
- Workers responsible for operating and dispatching passenger, commuter and freight trains public transportation and buses and maintaining rail and transit infrastructure and equipment.
- Maritime transportation workers, including dredgers, port workers, mariners, ship crewmembers, ship pilots and tug boat operators, equipment operators (to include maintenance and repair, and maritime-specific medical providers), ship supply, chandler, and repair companies.
- Workers including truck drivers, railroad employees and contractors, maintenance crew, and cleaners supporting transportation of chemicals, hazardous, medical, and waste materials to support critical infrastructure, capabilities, functions, and services, including specialized carriers, crane and rigging industry workers.
- Bus drivers and workers who provide or support intercity, commuter and charter bus service in support of other essential services or functions.
- Automotive repair, maintenance, and transportation equipment manufacturing and distribution facilities (including those who repair and maintain electric vehicle charging stations).
- Workers who respond to and clear traffic crashes, including contracted vendors and dispatchers
- Transportation safety inspectors, including hazardous material inspectors and accident investigator inspectors.
- Manufacturers and distributors (to include service centers and related operations) of packaging materials, pallets, crates, containers, and other supplies needed to support manufacturing, packaging staging and distribution operations.
- Postal, parcel, courier, last-mile delivery, and shipping and related workers, to include private companies.
- Workers who support moving and storage services
- Employees who repair and maintain motor vehicles, subway and rail vehicles, rolling stock, buses, aircraft, rail equipment, marine vessels, bicycles, and the equipment and infrastructure that enables operations that encompass movement of cargo and passengers.
- Air transportation employees, including air traffic controllers and maintenance personnel, ramp workers, aviation and aerospace safety, security, and operations personnel and accident investigations.
- Workers, including contracted vendors, who support the operation, distribution, maintenance, and sanitation, of air transportation for cargo and passengers, including flight crews, maintenance, airport operations, those responsible for cleaning and disinfection, and other on- and off- airport facilities workers.
- Workers supporting transportation via inland waterways such as barge crew, dredging, river port workers for essential goods.
- Workers critical to rental and leasing of vehicles and equipment that facilitate continuity of operations for essential workforces and other essential travel.
- Warehouse operators, including vendors and support personnel critical for business continuity (including HVAC & electrical engineers; security personnel; and janitorial staff) and customer service for essential functions.

**PUBLIC WORKS AND INFRASTRUCTURE SUPPORT SERVICES**

COVID-19 Essential Services

- Support to ensure the effective removal, storage, and disposal of residential and commercial solid waste, recycling, and hazardous waste, including landfill operations.
- Workers who support the operation, inspection, and maintenance of essential dams, locks and levees.
- Workers who support the inspection and maintenance of aids to navigation, and other government provided services that ensure continued maritime commerce.
- Licensed site clean-up professionals and other workers addressing hazardous spills, waste sites, and remediation.
- Workers who support the operation, maintenance and public safety of parks, forests, reservations, conservation restrictions, wildlife management areas, water supply protection lands, and other critical natural resources and open space for passive recreation.
- Workers who support storm clean-up operations (e.g., foresters).

## COMMUNICATIONS AND INFORMATION TECHNOLOGY
**Communications:**
- Maintenance of communications infrastructure- including privately owned and maintained communication systems- supported by technicians, operators, call -centers, wireline and wireless providers, cable service providers, satellite operations, Internet Exchange Points, Points of Presence, Network Access Points, back haul and front haul facilities, and manufacturers and distributors of communications equipment.
- Government and private sector employees (including government contractors) with work related to undersea cable infrastructure and support facilities, including cable landing sites, beach manhole vaults and covers, submarine cable depots and submarine cable ship facilities.
- Government and private sector employees (including government contractors) supporting Department of Defense internet and communications facilities.
- Workers who support radio, television, newspaper and media service, including, but not limited to front-line news reporters, studio, and technicians for newsgathering, and reporting, and publishing news.
- Network Operations staff, engineers and/or technicians to include IT managers and staff, HVAC & electrical engineers, security personnel, software and hardware engineers, and database administrators that manage the network or operate facilities.
- Engineers, technicians and associated personnel responsible for infrastructure construction and restoration, including contractors for construction and engineering of fiber optic cables, buried conduit, small cells, other wireless facilities, and other communications sector-related infrastructure. This includes construction of new facilities and deployment of new technology as these are required to address congestion or customer usage due to unprecedented use of remote services.
- Installation, maintenance and repair technicians that establish, support or repair service as needed.
- Central office personnel to maintain and operate central office, data centers, and other network office facilities, critical support personnel assisting front line employees.
- Customer service and support staff, including managed and professional services as well as remote providers of support to transitioning employees to set up and maintain home offices, who interface with customers to manage or support service environments and security issues, including payroll, billing, fraud, logistics, and troubleshooting.
- Workers providing electronic security, fire, monitoring and life safety services, and to ensure physical security, cleanliness and safety of facilities and personnel, including temporary licensing waivers for security personnel to work in other States or Municipalities.

COVID-19 Essential Services

- Dispatchers involved with service repair and restoration.
- Retail customer service personnel at critical service center locations for onboarding customers, distributing and repairing equipment and addressing customer issues in order to support individuals' remote emergency communications needs, supply chain and logistics personnel to ensure goods and products are on-boarded to provision these front-line employees.
- External Affairs personnel to assist in coordinating with local, state and federal officials to address communications needs supporting COVID-19 response, public safety, and national security.

**Information Technology:**
- Workers who support command centers, including, but not limited to Network Operations Command Centers, Broadcast Operations Control Centers and Security Operations Command Centers.
- Data center operators, including system administrators, HVAC & electrical engineers, security personnel, IT managers and purchasers, data transfer solutions engineers, software and hardware engineers, and database administrators, for all industries (including financial services).
- Workers who support client service centers, field engineers, and other technicians and workers supporting critical infrastructure, as well as manufacturers and supply chain vendors that provide hardware and software, support services, research and development, and information technology equipment (to include microelectronics and semiconductors), and HVAC and electrical equipment for critical infrastructure, and test labs and certification agencies that qualify such equipment (to include microelectronics, optoelectronics, and semiconductors) for critical infrastructure, including data centers.
- Workers needed to preempt and respond to cyber incidents involving critical infrastructure, including medical facilities, SLTT governments and federal facilities, energy and utilities, and banks and financial institutions, securities/other exchanges, other entities that support the functioning of capital markets, public works, critical manufacturing, food & agricultural production, transportation, and other critical infrastructure categories and personnel, in addition to all cyber defense workers (who can't perform their duties remotely).
- Suppliers, designers, transporters and other workers supporting the manufacture, distribution and provision and construction of essential global, national and local infrastructure for computing services (including cloud computing services and telework capabilities), business infrastructure, financial transactions/services, web-based services, and critical manufacturing.
- Workers supporting communications systems and information technology- and work from home solutions- used by law enforcement, public safety, medical, energy, public works, critical manufacturing, food & agricultural production, financial services, education, and other critical industries and businesses.
- Employees required in person to support Software as a Service businesses that enable remote working, performance of business operations, distance learning, media services, and digital health offerings, or required for technical support crucial for business continuity and connectivity.

## OTHER COMMUNITY- , EDUCATION- OR GOVERNMENT-BASED OPERATIONS AND ESSENTIAL FUNCTIONS
- Workers to ensure continuity of building functions, including but not limited to security and environmental controls (e.g., HVAC), the manufacturing and distribution of the products required for these functions, and the permits and inspections for construction supporting essential infrastructure.

COVID-19 Essential Services

- Local and state inspectors and administrative support of inspection services who are responsible for the inspection of elevators, escalators, lifts, buildings, plumbing and gas fitting, electrical work, and other safety related professional work
- Elections personnel to include both public and private sector elections support.
- Federal, State, and Local, Tribal, and Territorial employees who support Mission Essential Functions and communications networks.
- Trade Officials (FTA negotiators; international data flow administrators).
- Employees necessary to maintain news and media operations across various media.
- Employees supporting Census 2020.
- Weather forecasters.
- Workers at places of worship
- Workers who maintain digital systems infrastructure supporting other critical government operations.
- Workers who support necessary credentialing, vetting and licensing operations for critical infrastructure workers including holders of Commercial Drivers Licenses.
- Workers who are critical to facilitating trade in support of the national, state and local emergency response supply chain.
- Educators and staff supporting emergency childcare programs and residential schools for students with severe disabilities, and public and private K-12 schools, colleges, and universities for purposes of facilitating distance learning, provision of school meals and other essential student support functions, and essential administrative functions necessary to maintain continuity of operations.
- Scientific researchers in higher education completing in-process research to ensure health and safety and to prevent the loss of essential data
- Workers who support the design, production and distribution of educational materials or technologies for the use of educators or students in distance learning during the state of emergency
- Staff at government offices who perform title search, notary, and recording services in support of mortgage and real estate services and transactions.
- Residential and commercial real estate services, including settlement services.
- Workers supporting essential maintenance, manufacturing, design, operation, inspection, security, and construction for essential products, services, and supply chain and COVID-19 relief efforts.
- Critical government workers, as defined by the employer and consistent with Continuity of Operations Plans
- Workers that provide services for or determine eligibility for public benefits such as subsidized health care, food and feeding programs, residential and congregate care programs, shelter, in-home supportive services, child welfare, juvenile justice programs, adult protective services and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals (including family members)
- Workers in sober homes
- Professional services (such as legal, accounting and tax preparation) and payroll and employee benefit services when necessary to assist in compliance with legally mandated activities and critical sector services or where failure to provide such services during the time of the order would result in significant prejudice
- Commercial retail stores that supply essential sectors, including convenience stores, pet supply stores, auto supplies and repair, hardware and home improvement, and home appliance retailers

Exhibit A updated as of 3/31/20

COVID-19 Essential Services

- Workers and instructors supporting academies or training facilities and courses or assessments for the purpose of graduating or certifying, during the duration of the state of emergency, healthcare personnel, cadets, and other workers who are critical to the ongoing response to COVID-19

**CRITICAL MANUFACTURING**
- Workers necessary for the manufacturing of metals (including steel and aluminum), industrial minerals, semiconductors, materials and products needed for medical supply chains, and for supply chains associated with transportation, energy, communications, information technology, food and agriculture, chemical manufacturing, nuclear facilities, wood products, commodities used as fuel for power generation facilities, the operation of dams, water and wastewater treatment, processing and reprocessing of solid waste, emergency services, and the defense industrial base. Additionally, workers needed to maintain the continuity of these manufacturing functions and associated supply chains, and workers necessary to maintain a manufacturing operation in warm standby.
- Workers necessary for the manufacturing of materials and products needed to manufacture medical equipment and personal protective equipment (PPE).
- Workers necessary for mining and production of critical minerals, materials and associated essential supply chains, and workers engaged in the manufacture and maintenance of equipment and other infrastructure necessary for mining production and distribution.
- Workers who produce or manufacture parts or equipment that supports continued operations for any essential services and increase in remote workforce (including computing and communication devices, semiconductors, and equipment such as security tools for Security Operations Centers (SOCs) or datacenters).

**HAZARDOUS MATERIALS**
- Workers who manage hazardous materials associated with any other essential activity, including but not limited to healthcare waste (medical, pharmaceuticals, medical material production), testing operations (laboratories processing test kits), and energy (nuclear facilities) Workers at nuclear facilities, workers managing medical waste, workers managing waste from pharmaceuticals and medical material production, and workers at laboratories processing tests Workers who support hazardous materials response and cleanup.
- Workers who maintain digital systems infrastructure supporting hazardous materials management operations.

**FINANCIAL SERVICES**
- Workers who are needed to provide, process and maintain systems for processing, verification, and recording of financial transactions and services, including payment, clearing, and settlement; wholesale funding; insurance services; consumer and commercial lending; and capital markets activities).
- Workers who are needed to maintain orderly market operations to ensure the continuity of financial transactions and services.
- Workers who are needed to provide business, commercial, and consumer access to bank and non-bank financial services and lending services, including ATMs, lending and money transmission, and to move currency, checks, securities, and payments (e.g., armored cash carriers).

Exhibit A updated as of 3/31/20

COVID-19 Essential Services

- Workers who support financial operations and those staffing call centers, such as those staffing data and security operations centers, managing physical security, or providing accounting services.
- Workers supporting production and distribution of debit and credit cards.
- Workers providing electronic point of sale support personnel for essential businesses and workers.

## CHEMICAL
- Workers supporting the chemical and industrial gas supply chains, including workers at chemical manufacturing plants, workers in laboratories, workers at distribution facilities, workers who transport basic raw chemical materials to the producers of industrial and consumer goods, including hand sanitizers, food and food additives, pharmaceuticals, paintings and coatings, textiles, building materials, plumbing, electrical, and paper products.
- Workers supporting the safe transportation of chemicals, including those supporting tank truck cleaning facilities and workers who manufacture packaging items.
- Workers supporting the production of protective cleaning and medical solutions, personal protective equipment, disinfectants, fragrances, and packaging that prevents the contamination of food, water, medicine, among others essential.
- Workers supporting the operation and maintenance of facilities (particularly those with high risk chemicals and/ or sites that cannot be shut down) whose work cannot be done remotely and requires the presence of highly trained personnel to ensure safe operations, including plant contract workers who provide inspections.
- Workers who support the production and transportation of chlorine and alkali manufacturing, single-use plastics, and packaging that prevents the contamination or supports the continued manufacture of food, water, medicine, and other essential products, including glass container manufacturing.

## DEFENSE INDUSTRIAL BASE
- Workers who support the essential services required to meet national security commitments to the federal government and U.S. Military. These individuals include, but are not limited to, space and aerospace; mechanical and software engineers (various disciplines), manufacturing/production workers; IT support; security staff; security personnel; intelligence support, aircraft and weapon system mechanics and maintainers; and sanitary workers who maintain the hygienic viability of necessary facilities.
- Personnel working for companies, and their subcontractors, who perform under contract or sub-contract to the Department of Defense, as well as personnel at government-owned/contractor-operated and government-owned/government-operated facilities, and who provide materials and services to the Department of Defense, including support for weapon systems, software systems and cybersecurity, defense and intelligence communications and surveillance, space systems and other activities in support of our military, intelligence and space forces.

## COMMERCIAL FACILITIES
- Workers who support the supply chain of building materials from production through application/installation, including cabinetry, fixtures, doors, cement, hardware, plumbing, electrical, heating/cooling, refrigeration, appliances, paint/coatings, and employees who provide services that enable repair materials and equipment for essential functions.
- Workers supporting ecommerce through distribution, warehouse, call center facilities, and other essential operational support functions.

COVID-19 Essential Services

- Workers in hardware and building materials stores, consumer electronics, technology and appliances retail, and related merchant wholesalers and distributors - with reduced staff to ensure continued operations.
- Workers distributing, servicing, repairing, installing residential and commercial HVAC systems, boilers, furnaces and other heating, cooling, refrigeration, and ventilation equipment.

**RESIDENTIAL/SHELTER FACILITIES AND SERVICES**
- Workers in dependent care services, in support of workers in other essential products and services.
- Workers who support food, shelter, and social services, and other necessities of life for needy groups and individuals, including in-need populations and COVID-19 responders (including travelling medical staff).
- Workers in animal shelters.
- Workers responsible for the leasing of residential properties and RV facilities to provide individuals and families with ready access to available housing.
- Workers at hotels, motels, inns, and other lodgings providing overnight accommodation, but only to the degree those lodgings are offered or provided to accommodate the COVID-19 Essential Workforce, other workers responding to the COVID-19 public health emergency, and vulnerable populations
- Workers responsible for handling property management, maintenance, and related service calls who can coordinate the response to emergency "at-home" situations requiring immediate attention, as well as facilitate the reception of deliveries, mail, and other necessary services.
- Workers performing services in support of the elderly and disabled populations who coordinate a variety of services, including health care appointments and activities of daily living.

**HYGIENE PRODUCTS AND SERVICES**
- Workers who produce hygiene products.
- Workers in laundromats, laundry services, and dry cleaners.
- Workers providing personal and household goods repair and maintenance.
- Workers providing disinfection services, for all essential facilities and modes of transportation, and supporting the sanitation of all food manufacturing processes and operations from wholesale to retail.
- Workers necessary for the installation, maintenance, distribution, and manufacturing of water and space heating equipment and its components.
- Support required for continuity of services, including commercial disinfectant services, janitorial/cleaning personnel, and support personnel functions that need freedom of movement to access facilities in support of front-line employees.

**CONSTRUCTION-RELATED ACTIVITIES**
- Workers such as plumbers, electricians, exterminators, builders, contractors, HVAC Technicians, landscapers, inspectors and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences, businesses and buildings such as hospitals, health care facilities, senior living facilities, and any temporary construction required to support COVID-19 response.
- Workers – including contracted vendors - who support the operation, inspection, maintenance and repair of essential public works facilities and operations, including roads and bridges, water and sewer, laboratories, fleet maintenance personnel, construction of critical or strategic infrastructure, traffic signal maintenance, emergency location services for buried utilities, and

COVID-19 Essential Services

maintenance of digital systems infrastructure supporting public works operations. Critical or strategic infrastructure includes public works construction including construction of public schools, colleges and universities and construction of state facilities, including leased space, managed by the Division of Capital Asset Management; airport operations; water and sewer; gas, electrical, nuclear, oil refining and other critical energy services; roads and highways; public transportation; steam; solid waste and recycling collection and removal; and internet and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services)

- Workers who support infrastructure, such as by road and line clearing and utility relocation, to ensure the availability of and access to needed facilities, transportation, energy and communications.
- Workers performing housing construction related activities, including construction of mixed-use projects that include housing, to ensure additional units can be made available to combat the Commonwealth's existing housing supply shortage.
- Workers supporting the construction of housing, including those supporting government functions related to the building and development process, such as inspections, permitting and plan review services that can be modified to protect the public health, including allowing qualified private third-party inspections accountable to government agencies).

If the function of your business is not listed above, but you believe that it is essential or it is an entity providing essential services or functions, you may request designation as an essential business.

Requests by businesses to be designated an essential function should only be made if they are NOT covered by the guidance.

To request designation as an essential business, please click here: https://www.mass.gov/forms/essential-service-designation-request

Any questions can be directed to covid19.biz@mass.gov.

Exhibit A updated as of 3/31/20

# Exhibit B



# Exhibit C



**ARLINGTON HEIGHTS**   **SUBURBS**

# Man charged in death of alleged accomplice in brazen daytime home invasion, Arlington Heights police say

By KAREN ANN CULLOTTA
PIONEER PRESS   |   APR 07, 2020

A Tennessee man is facing murder charges in connection with a brazen daytime Arlington Heights home invasion that left the suspect's accomplice shot dead by the homeowner, authorities said Tuesday.

Bradley J. Finnan, 38, of Chattanooga, Tenn., was charged Tuesday with felony murder and home invasion after allegedly being one of two armed men who tricked their way into a home Saturday afternoon in the 2400 block of North Evergreen Avenue, a house authorities said the pair had targeted.



Finnan was ordered held in Cook County Jail without bail following a bond hearing Tuesday at the courthouse in Rolling Meadows.



Bradley J. Finnan, 38, of Chattanooga, Tennessee, was charged with murder on April 6, 2020, in connection with a home invasion in Arlington Heights, that left the other suspect dead of a gunshot wound.(Arlington Heights Police / Pioneer Press)

Police said Finnan and an accomplice, Larry D. Brodacz, 58, of Buffalo Grove, **who was shot to death by a male resident during the home invasion**, intended to rob the homeowners at gunpoint in what investigators said was a planned crime and not a random act of violence.

According to court records obtained from the Cook County state's attorney's office, Brodacz and Finnan's crime scheme was hatched in part to coincide with the state's stay-at-home order issued by Gov. J.B. Pritzker last month to help prevent the spread of the novel coronavirus.

[Most read] New coronavirus cases hit daily high, but Gov. J.B. Pritzker gives hints on what might reopen as he weighs stay-at-home extension »

Brodacz and Finnan, who had met through their work as car salesmen, arrived at the Arlington Heights home in Brodacz's 2016 Lexus, walking up to the front door wearing baseball hats, gloves and surgical-type face masks, according to the court documents.

Ads by Teads

From the moment the two approached the stately, two-story home, the crime was recorded by the residents' home surveillance video camera, with the video later posted anonymously on a website known for its sensational content, authorities said.

As the pair approached the house, which was was occupied by a 50-year-old man, his 48-year-old wife and their two children, ages 11 and 14, the home's Ring doorbell video camera shows Finnan holding a bag later found to contain zip ties and a blowtorch, court records show.

After Brodacz tries the doorknob, knocks and sees the Ring camera, he can be heard telling Finnan not to look at the camera, before ringing the bell, court documents show.



Warning: Graphic language. Home surveillance video shows a home invasion incident in Arlington Heights on April 4, 2020. (Arlington Heights Police Department)

The homeowner allegedly told police he heard a knock at the door and the doorbell ring and, believing it was his landscapers, he opened the door, authorities said. Then, Brodacz and Finnan pushed their way inside, according to authorities.

[Most read] Coronavirus in Illinois updates: Here's what's happening Thursday with COVID-19 in the Chicago area »

Telling the man they were police officers, Brodacz and Finnan then allegedly pulled weapons from their pockets, prompting a struggle between the male homeowner and Finnan, with the fight ending in the front of the home, before Finnan fled the scene, according to authorities.

The wife told police she heard screaming and saw two men with guns in her foyer, according to authorities. She ran upstairs to the home's second floor, with Brodacz chasing her, authorities said.

Reaching the bedroom where her children were, Brodacz broke through the closed door, grabbed the couple's son and daughter, pushed them down on a bed and pointed his gun at them, police said.

When their mother tried to intervene, police said Brodacz pointed his gun at her and pushed her to the floor, where she pleaded with him not to shoot them.

Brodacz left the room when he heard the man calling out his wife's name inside of the home, according to authorities. Meanwhile, the man had gotten his wife's gun from the master bedroom, police said.

[Most read] Column: A tale of two governors: Fearless Pritzker and Wimpy Kemp »

While in the master bedroom, Brodacz hit the man in the back of the head with some kind of blunt object, one he told police he thought was a gun. The two struggled and the male homeowner fired his wife's gun but didn't hit Brodacz, police said.

ADVERTISEMENT

At some point during the struggle, Brodacz lost his gun but pulled a knife from his waistband, the man told police.

Authorities said that as Brodacz advanced on the man, armed with the knife, the man used his wife's gun to shoot Brodacz in the abdomen. Police said the couple's 14-year-old called 911.

Brodacz was pronounced dead at the scene and the Cook County medical examiner's office later ruled the death a homicide.

Arlington Heights police arrived shortly after Finnan fled, and found the wife in front of the family's home, screaming that her husband was fighting someone with a gun inside of the house.

[Most read] Pedestrians complain runners are passing too close on Chicago sidewalks during the pandemic. How risky is that, and should they wear face masks? »

The quiet neighborhood on the north side of the village was soon teaming with law enforcement, including a SWAT team, and officers with the Northern Illinois Police Alarm System and the Major Case Assistance Team.

Arlington Heights police officers found in the home's master bedroom two 9mm cartridge cases, a knife, a .25 caliber semi-automatic handgun loaded with seven, .25 caliber rounds, and the wife's 9mm handgun.

Finnan, who had left te home in Brodacz's Lexus, was found by police early Sunday morning at his mother's home in Rockford.

Finnan allegedly told police he knew Brodacz through previous employment at a car dealership, and after Brodacz told him about the plan to rob the house, he boarded a bus in Tennessee and headed to Buffalo Grove.

LATEST ARLINGTON HEIGHTS

Mother of Wheeling High School student who died raises questions on COVID-19 testing, diagnosis, after school district announces

death
APR 21, 2020

Park Ridge, Des Plaines mayors call for face coverings to be worn in stores, public transport
APR 21, 2020

Suburban schools cope with cancellation of spring sports: 'I'm filled with sadness.'
APR 21, 2020

Bored at home? Check out these local virtual events.
APR 20, 2020

College sports, academics a balancing act for top performers: 'I never wanted to sacrifice one for the other.'
APR 20, 2020

According to police, Finnan said Brodacz — who authorities said had previously been charged with crimes including home invasions dating back to the 1980s — claimed to have seen about $200,000 in cash in boxes in the man's home around 20 years ago and thought money might still be there.

[Most read] Coronavirus in Illinois updates: Officials report 2,049 more known COVID-19 cases, a new single-day high Pritzker attributes in part to increase in testing »

Under Illinois' felony murder law, homicide charges can be filed when someone is killed during the course of a crime even if the death was caused by someone else and the person charged with murder did not intend for the person to die.

*kcullotta@chicagotribune.com*

*Twitter @kcullotta*

Karen Ann Cullotta

Karen Ann Cullotta is a suburban reporter covering education, municipal government and human interest stories. A graduate of the Medill School of Journalism at Northwestern University, when Karen's not reporting, she can usually be found cooking Italian food, digging in her vegetable garden and hanging out with her family.

Taboola Feed

If You Can Qualify for Any Credit Card, These Are the Top 6
NERDWALLET | SPONSORED

If You Like to Play, this City-Building Game is a Must-Have. No Install.
FORGE OF EMPIRES | SPONSORED

Forbes calls this "a new bar in hearing aid technology"
EARGO HEARING AIDS | SPONSORED

The Hottest Trends in Men's Fashion

Celebrity Trainer: "Muscle Loss in Seniors is Real, But It Doesn't Have to Be"

POWER BLENDS | SPONSORED

CHICAGO TRIBUNE

Gov. J.B. Pritzker to extend Illinois' stay-at-home order, school closings through end of April

CHICAGO TRIBUNE

When will the coronavirus outbreak peak in Illinois? Here are some projections.

By JONATHON BULLINGTON, LISA SCHENCKER

OS ORLANDO SENTINEL

# Pictures: Bike Week in Daytona Beach

# Continue to celebrate Earth Day from home

MICROSOFT IN CULTURE | SPONSORED

# Massachusetts: Say Bye To Expensive Solar Panels If You Own A Home In Southborough

ENERGY BILL CRUNCHER SOLAR QUOTES | SPONSORED

CHICAGO TRIBUNE

Gov. J.B. Pritzker, Chicago Mayor Lori Lightfoot rip into Jared Kushner over federal medical supply stockpile comments

CHICAGO TRIBUNE

Lightfoot says Illinois' stay-at-home order 'a long way away' from being phased out in the city; Pritzker says 'solution isn't coming tomorrow, or next week or next month'

By GREGORY PRATT, JAMIE MUNKS

ADVERTISEMENT

## You May Like

Sponsored Links by Taboola

**Face Masks For Children Finally Avilable In Southborough**
Child Face Mask

**8 Reasons Why Outdoorsmen Are Buying Bamboo**
Duck Camp Outdoor Goods

**How do you stay close to your customers while a pandemic pulls you apart?**
Salesforce

**Randy Jackson: "This Drink Is Like A Powerwash For Your Gut"**
Unify Health Labs Multi-GI 5 Supplement

ADVERTISEMENT

**Wedding Invitations: Heart Wreath Wedding Inv...**

▲

$2.39    -42%

▼

Wedding Invitations: Br...   Wedding Invitations: Et...   Wedding Invitations: Di...   Save the Cards: Shimm...

Wedding Invitations: M...   Wedding Invitations: P...   Wedding Invitations: Fl...   Save the Date Cards: Heart ...

RSVP Cards: Brushed Bota...   Wedding Invitations: L...   RSVP Cards: Lavish Lines ...   Personalized Postage Sta...

# Newsletters

## Subscribe here



| | | |
|---|---|---|
| About us | Privacy Policy |
| Terms of Service | Do Not Sell My Info |
| Archives | Contact us |
| Coupons | Best Reviews |
| Local print ads | Tribune Web Notifications |
| TAG disclosure | FAQ |
| Media kit | |

Copyright © 2020, Chicago Tribune