IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL MCCARTHY, *et al.*, | ) <br> ) |
| Plaintiffs, | ) CIVIL ACTION NO. <br> ) 1:20-cv-10701-DPW |
| v. | ) <br> ) |
| CHARLES BAKER, *et al.*, | ) <br> ) |
| Defendants. | ) <br> ) |

**GUN OWNERS' ACTION LEAGUE'S AND NATIONAL RIFLE ASSOCIATION OF AMERICA'S PROPOSED AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS' REQUEST FOR TEMPORARY RESTRAINING ORDER AND FOR INJUNCTIVE RELIEF**

**<u>LEAVE TO FILE GRANTED ON APRIL 27, 2020</u>**

KENNEY & SAMS, PC.
David R. Kerrigan (BBO# 550843)
Kenney & Sams, P.C.
Southborough Executive Park
144 Turnpike Road
Southborough, MA 01772
508-490-8500
drkerrigan@KSlegal.com

Corporate disclosure statements ................................................................................................ 3

Table of authorities ..................................................................................................................... 4

Introduction ................................................................................................................................. 1

INTEREST OF AMICUS CURIAE ............................................................................................ 2

Background ................................................................................................................................. 3

    I.    Governor Baker Issued COVID-19 Order NO. 21, Which Does Not Allow Firearm Retailers to Operate, Creating a Ban On Sales to Individuals In the Commonwealth. .... 3

Argument .................................................................................................................................... 5

    I.    This Order Affects Core Second Amendment Rights, Preventing Citizens from purchasing firearms in this State, and is categorically unconstitutional. ........................................... 6

    II.    COVID-19 Order No. 21 Is Unconstitutional Under First Circuit Precedent. .................... 7

        A.    COVID-19 Order No. 21 strikes at the core of the Second Amendment. ....................... 8

        B.    The ban fails under strict scrutiny. ................................................................................. 9

        C.    The ban cannot be justified and survive intermediate scrutiny. .................................... 11

    III.    The Public Health Emergency Cannot Serve As a Basis To Trample Civil Rights. ........ 13

Conclusion ................................................................................................................................ 14

**CORPORATE DISCLOSURE STATEMENTS**

In accordance with Federal Rule of Civil Procedure 7.1(a), Amici submit the following Corporate Disclosure Statements:

Gun Owners Action League, Inc., is a non- profit corporation incorporated under the laws of the Commonwealth of Massachusetts. GOAL is not publicly traded and has no parent corporation. There is no publicly held corporation that owns 10 per cent or more of its stock.

The National Rifle Association of America is a nonprofit membership association, incorporated in the state of New York, under Section 501(c)(4) of the Internal Revenue Code. NRA is not publicly traded and has no parent corporation. There is no publicly held corporation that owns 10 percent or more of its stock.

# TABLE OF AUTHORITIES

**Cases**

*Andrews v. State*, 50 Tenn. 165 (1871) ................................................................................... 8
*Arizona Free Enter. Club's Freedom Club PAC v. Bennett,* 564 U.S. 721 (2011) ................... 10
*Bateman v. Perdue*, 881 F. Supp. 2d 709 (E.D.N.C. 2012) ...................................................... 11
*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................................................ passim
*Doe v. Gonzales*, 500 F.Supp. 2d 379 (S.D.N.Y. 2007). .......................................................... 14
*Elrod v. Burns*, 427 U.S. 347, 373 (1976) ................................................................................. 6
*Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir. 2011) ............................................................. 7
*Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018). ................................................................ passim
*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) ............................................................................. 13
*Heller v. D.C.,* 670 F.3d 1244 (D.C. Cir. 2011) ........................................................................ 8
*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) .............................................. 13
*Hightower v. City of Bos.*, 693 F.3d 61 (1st Cir. 2012) ............................................................. 8
*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013) .................................... 6
*McCullen v. Coakley*, 573 U.S. 464 (2014) ............................................................................. 11
*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ............................................................. 1, 9
*Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670 (1st Cir. 1998) ............................................ 5
*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ................................................ 9
*Schenck v. Pro-Choice Network Of W. New York*, 519 U.S. 357 (1997) ................................. 10
*Showtime Entertainment, LLC v. Mendon*, 769 F.3d 61 (1st Cir. 2014) ................................. 11
*Turner Broadcasting Sys., Inc. v. FCC,* 512 U.S. 622 (1994) ............................................ 10, 12
*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) ............................................................ 7
*Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464 (1st Cir. 2009) .................................... 6
*Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7 (2008) ......................................................... 5
*Wrenn v. D.C.*, 864 F.3d 650 (D.C. Cir. 2017). ......................................................................... 6

## INTRODUCTION

Gun Owners Action League, Inc. ("GOAL") and the National Rifle Association of America ("NRA") seek leave to file this amicus curiae brief in support the Plaintiffs' challenge to the Governors' and to the local police departments' efforts to eliminate Massachusetts' residents' access to firearms and ammunition during the Coronavirus pandemic. Massachusetts citizens are constitutionally entitled to purchase and possess firearms for self-defense, and a number of Plaintiffs have expressed a desire to purchase firearms to protect themselves and their families in their homes during this extraordinary time. They, and many others in Massachusetts, are unable to access firearms and ammunition in retail stores to exercise their Second Amendment rights, which are acute during this extraordinary time when (a) alleged serious felons committed to pretrial detention and others already imprisoned are being released early; and (b) law enforcement and first responders' ability to prevent and respond to crime in certain circumstances will likely be directly affected by the virus.

GOAL and NRA acknowledge and do not call into question the principal goal of the Governor's COVID-19 Order No. 21—to limit the spread of the coronavirus while allowing certain businesses deemed essential to remain open. Here, however, the means selected to achieve those goals are overboard and infringe individuals' Second Amendment rights. Few would consider an order to limit the spread of the virus that closed all newspaper distribution means in the state while allowing liquor stores to remain open to be legal. Yet, the Order has a similar effect: eliminating the ability for individuals to exercise a fundamental constitutional right while allowing similarly situated businesses, which are not constitutionally protected, to continue operations. As stated by the Supreme Court in *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010), the Second Amendment is not to be treated as a second-class right, but COVID-19 Order No.21 does just that.

The Governor's COVID-19 Order No. 21 is unconstitutional to the extent it prohibits firearm and ammunition purchases and transfers for what will be an indefinite period of time, and GOAL and NRA join the Plaintiffs' requests that the Court declare the Order invalid and to issue an injunction.

## INTEREST OF AMICUS CURIAE

The Gun Owners Action League, Inc. is a nonprofit corporation dedicated to providing safe and responsible firearms ownership, marksmanship competition, and hunter safety throughout Massachusetts. For over 40 years, GOAL has helped protect and preserve Massachusetts citizens' Second Amendment rights, and the organization enjoys a membership of more than 15,000. GOAL is the leading advocate in Massachusetts for its members, which include gun owners, hunters, conservationists, as well as firearm and marksmanship clubs. GOAL possesses a number of firearms related licenses, including a federal firearms license and Massachusetts licenses to transfer or sell firearms and ammunition. GOAL and its members are affected by Governor Baker's COVID-19 Order No. 21 and the enforcement efforts by the local police departments because it cannot transfer firearms and ammunition, and its members cannot acquire firearms or ammunition from any licensed Massachusetts firearm or ammunition retailer.

The National Rifle Association of America ("NRA") is a nonprofit corporation, operating under § 501(c)(4) of the Internal Revenue Code. The NRA was incorporated in the state of New York in 1871. Its principal offices and place of business are located in Fairfax, Virginia. In Accordance with Article II of the NRA's bylaws, the NRA's purposes and objectives include "To protect and defend the Constitution of the United States, especially with reference to the God-given inalienable right of the individual American citizen guaranteed by such Constitution to acquire, possess … transfer ownership of, and enjoy the right to use, keep and bear arms, in

order that the people may exercise their individual rights of … defense of family, person, and property." The NRA's membership includes roughly 5,000,000 individuals, many of whom reside in Massachusetts and are currently being harmed by Governor Baker's COVID-19 Order No. 21.

## BACKGROUND

**I. Governor Baker Issued COVID-19 Order No. 21, Which Does Not Allow Firearm Retailers to Operate, Creating a Ban On Sales to Individuals In the Commonwealth.**

Governor Baker's COVIID-19 Order No. 21 does not allow firearm dealers to open, prohibiting residents from purchasing firearms in violation of their Second Amendment rights.

In an effort to limit the spread of the novel Coronavirus, Governor Baker issued various emergency orders, including COVID-19 Order No. 13, which was followed by COVID-19 Order No. 21. Those orders seek to implement the stated goal of limiting gatherings and practicing social distancing by declaring certain so-called brick and mortar businesses to be essential, which in turn, allows the business to continue to operate. All other businesses "shall not re-open their bricks and mortar premises to workers customers, or the public before May 4, 2020." *See* Order No. 21, attached as Exhibit A.

To assist with making these determinations, the Governor drew from an updated guidance issued by the Federal Cybersecurity and Infrastructure Agency, which identified critical infrastructure during the COVID-19 response. According to COVID-19 Order No. 21, the Governor amended his previous Order No. 13 "to reflect the revised guidance of the Federal Cybersecurity and Infrastructure Security Agency ('CISA') and the additional services and functions that I, as Governor, have identified as essential to promote the public health and welfare of the Commonwealth." Exhibit A, p.3. CISA's guidance called for firearms retailers to be considered essential services: its updated list included "firearm or ammunition product

manufacturers, retailers, importers, distributors, and shooting ranges" as essential services. *See* Plaintiff's Memorandum pp. 5-6.

While the Governor originally included this language into the updated order, the amendment quickly met opposition from certain Massachusetts state officials and was deleted from the list of essential businesses. Attorney General Healey wrote on her Twitter account that "gun shops are NOT essential businesses during a public health emergency," citing as a reason a vague reference to "police officers, first responders and domestic violence victims."[1] The Governor also spoke to Speaker Deleo, and shortly after that, firearms retailers and shooting ranges were removed from the essential service list appearing as an attachment to COVID-19 Order No. 21.

The evidence produced by the Plaintiffs confirms that intentionally deleting firearm retailers from the essential business list means that the Commonwealth has banned them from operating. This is confirmed from the evidence produced by the Plaintiffs. For example, Michael Skidmore, the owner and manager of Troy City Tactical, LLC stated that the Fall River Police Department licensing officer informed him that the Governor's COVID-19 order deemed firearms dealers "non-essential" and must remain closed. Skidmore Declaration, ¶¶ 3-4. Mr. Skidmore was instructed that he could not open, and he learned that the Department of Criminal Justice Information Services ("DCJIS") issued a notice to police departments reinforcing the Governor's order that dealers must remain closed. Skidmore Declaration at ¶5.

---

[1] Granted, while it is proving to be an increasingly more common means of public officials' communication strategy, even the now 280 character tweet limit does not offer much ability to provide in depth legal or public health analysis.  *See* screen shot of Twitter account of Maura Healey dated April 1, 2020, attached as Exhibit B.

Likewise, Christopher Kielty the owner of Don Tom Group, LLC d/b/a Precision Point became aware that the Governor's COVID-19 order deemed firearm retailers to be non-essential and that the DCJIS issued a notice to all police departments informing that the firearms dealers must remain closed. Kielty Declaration, ¶4. Toby Leary, the owner of Downrange, Inc. received a call from the Barnstable Board of Health on April 1, 2020, ordering him to shut down because of Governor Baker's COVID-19 order deeming firearms dealers to be non-essential businesses. Leary Declaration, ¶3. Mr. Leary actually received a copy of the notice issued by the DCJIS to police departments reinforcing the Governor's order. Leary Declaration, ¶5.

The shop owners' views that the Order acts as a ban are also confirmed by the police departments.  Jim Simmons, a single parent, stated that he wanted to purchase a firearm to protect his three children. Simmons Declaration, ¶4. He purchased a handgun from Shooting Supply in Westport, but when he went to pick it up on April 2, he was greeted by the police and threatened with arrest if he did not leave. Declaration, ¶8. These (and the other) declarations make clear that the Order acts as a ban, and the imminent threat of enforcement renders individuals unable to exercise their Second Amendment rights.

The Plaintiffs have described the regulatory overview of firearm purchases in the Commonwealth on pages 2-4 of their memorandum of law. It is illegal to sell ammunition or ammunition components for personal reloading purposes in Massachusetts without a license, and it is illegal for anyone other than a licensed dealer to sell firearms, with the limited exception for person to person transfers. Memorandum, pp. 2-4. As a result, this ban prevents individuals from purchasing firearms and ammunition in this state for however long the Order remains in effect.

## ARGUMENT

Amici agree that Plaintiffs are entitled to a preliminary injunction under the four-part test in *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). Amici focus on the likelihood-

of-success factor because it "is the touchstone of the preliminary injunction inquiry." *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st Cir. 1998) (citation omitted). That is especially true here, where the loss of a substantive, fundamental-constitutional right, even temporarily, is an irreparable injury. *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 484 (1st Cir. 2009); *Elrod v. Burns*, 427 U.S. 347, 373 (1976). And the balance of equities and the public's interest always favor upholding the Constitution. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013); *Wrenn v. D.C.*, 864 F.3d 650, 667 (D.C. Cir. 2017).

I. **This Order Affects Core Second Amendment Rights, Preventing Citizens from Purchasing Firearms in this State, and is Categorically Unconstitutional.**

Blanket restrictions preventing access to firearms cannot withstand any level of scrutiny. In *Heller*, the Supreme Court considered whether a District of Columbia law banning handguns in the home passed constitutional muster under the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570 (2008). The Court found that the handgun ban "amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute." *Id*. at 628. As a result, the Court held that "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights," this ban fails constitutional muster. *Id*. at 628-629.

While the ban in *Heller* involved only one class of firearms, COVID-19 Order No. 21 goes much further. This order prevents individuals from having access to any firearms, including handguns, rifles, and shotguns, as well as ammunition, when they seek to protect themselves in their homes. This complaint and its accompanying affidavits describe how buyers holding the appropriate licenses cannot purchase firearms from any Massachusetts' dealers when they seek

6

the firearms to protect themselves in their homes when they may be more vulnerable.[2] Denying access to these Plaintiffs and others like them is per se unconstitutional. The Court need not engage in any interest balancing because the Constitution prohibits infringing rights in this fashion. *See Heller*, 554 U.S. at 628. As the Seventh Circuit stated in *Ezell v. City of Chicago*: "Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right—like the *handgun* bans at issue in those cases, which prohibited handgun possession even in the home—are categorically unconstitutional." 651 F.3d 684, 603 (7th Cir. 2011); *Heller, 554 U.S.* at 628-35 ("We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach."). This Court should hold the same.

## II.     COVID-19 Order No. 21 Is Unconstitutional Under First Circuit Precedent.

Alternatively, Order No. 21 fails under the two-step approach that the First Circuit formally adopted to resolve Second Amendment claims. First, the Court needs to determine "whether the challenged law burdens conduct that falls within the scope of the Second Amendment's guarantee." *Gould v. Morgan*, 907 F. 3d 659, 668-669 (1st Cir. 2018). "This is a backward-looking inquiry, which seeks to determine whether the regulated conduct 'was understood to be within the scope of the right at the time of ratification.'" *Id*. at 669. (quoting *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010)). If the conduct falls within the scope of Second Amendment protections, the Court then needs to determine what level of scrutiny to

---

[2] Recent events in another state indicate that their concerns may be well founded. For example, Arlington Heights Illinois man fought off one intruder and shot and killed another with a firearm he owned after the two men broke into his home on April 7, 2020. After physically fighting off one intruder, the homeowner was able to get his gun and shoot the second intruder who was pointing a gun at his wife and two children. *See* Chicago Tribune article, dated April 7, 2020 attached as Exhibit C.

apply to the challenged law and whether the law survives that level of scrutiny. 907 F. 3d at 669.[3]

### A. COVID-19 Order No. 21 strikes at the core of the Second Amendment.

There can be only one conclusion here: the challenged conduct falls within the scope of the Second Amendment. The Second Amendment protects citizens' fundamental right to bear arms in the home for self-defense. District of Columbia v. Heller, 554 U.S. 570, 628 (2008); see also Gould v. Morgan, 907 F.3d 659. It takes "off the table" any "absolute prohibition of handguns held and used for self-defense in the home." Heller, 554 U.S. at 616, 636. The First Circuit "identified the core of the Second Amendment right as 'the possession of operative firearms for use in defense of the home' by responsible, law-abiding individuals." Gould, 907 F.3d at 671 (citing Hightower v. City of Bos., 693 F.3d 61, 65 (1st Cir. 2012)). And there can be no right to "keep" or "bear" arms without the ability to acquire them and the ammunition that is essential to their use. Therefore, any restriction that "make[s] it considerably more difficult for a person lawfully to acquire and keep a firearm … for the purpose of self-defense in the home" strikes "the 'core lawful purpose' protected by the Second Amendment." Heller v. D.C., 670 F.3d 1244, 1255 (D.C. Cir. 2011) (emphasis added) (quoting Heller, 554 U.S. at 630). That has been the settled law in this country for a century and a half. Andrews v. State, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them . . . and to purchase and provide ammunition suitable for such arms.").

---

[3] Last week, two judges on the Fifth Circuit voiced their support for retiring the two-step approach and adopting an "approach focused on the Second Amendment's text and history." *United States v. McGinnis*, No. 19-10197, 2020 WL 1918718, at *10 (5th Cir. Apr. 21, 2020) (Duncan, & Jones, J. concurring) (collecting authorities). Amici agree with this approach. But like the Judges Duncan and Jones, Amici recognize that the two-step approach is binding.

The record in this case establishes that the plaintiffs and other GOAL and NRA members are now unable to purchase firearms in the Commonwealth to use to protect them in their homes. This harm is not imagined nor is it theoretical: it constitutes ongoing and continuing constitutional harm. Multiple plaintiffs stated that they have Licenses to Carry or Firearms Identification Cards and wish to purchase a firearm now, but they have been told that they cannot do so at this time. For example, Laurie Warner lives near Cape Cod National seashore, and she has seen an increase in trespassers on her property. Warner Declaration, ¶4. Worried that her home will be broken into, she contacted Cape Cod Gun Works to purchase a shotgun and was informed that the state had shut it down. Warner Declaration, ¶7. Because she does not know anyone who can sell her a shotgun, she is unable to purchase a firearm in the Commonwealth. Timothy Galligan recently obtained an LTC and wishes to purchase firearm to protect him and his teenage son. Galligan Declaration, ¶4. He contacted Troy City Tactical in Fall River and was informed that he could not obtain a firearm from them. Id., ¶8. He, too, does not know any person who is willing to sell him a firearm. Galligan Declaration, ¶9. Other declarations recount similar desires to protect themselves during this remarkable time.

**B.  The ban fails under strict scrutiny.**

Having met the first prong of the two-part test, the Court next needs to determine what standard of review is appropriate for the COVID-19 Orders.

The Supreme has held that "strict judicial scrutiny [is] required" whenever a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). And the right to keep arms was deemed "among those fundamental rights necessary to our system of ordered liberty" by "those who drafted and ratified the Bill of Rights." *McDonald v. City of Chicago*, 561 U.S. 742, 768, 778 (2010). Applying anything but strict scrutiny would be relegating the Second Amendment to

9

"a second-class right," which the Supreme Court expressly forbade. *Id*. at 780; *see also Heller*, 554 U.S. at 634 (comparing the Second Amendment to the First).

First Circuit precedent also requires that the Court apply strict scrutiny. "A law or policy that burdens conduct falling within the core of the Second Amendment requires a correspondingly strict level of scrutiny, whereas a law or policy that burdens conduct falling outside the core of the Second Amendment logically requires a less demanding level of scrutiny." *Gould*, 907 F.3d at 671. And here, COVID-19 Order No. 21 strikes at the "core of the Second Amendment right": "'the possession of operative firearms for use in defense of the home' by responsible, law-abiding individuals." *Id.* at 671 (citation omitted). It is undeniable that strict scrutiny must apply here.

Strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Arizona Free Enter. Club's Freedom Club PAC v. Bennett,* 564 U.S. 721, 734 (2011) (citations and quotations omitted).

The government does have a legitimate interest in public safety. *Schenck v. Pro-Choice Network Of W. New York*, 519 U.S. 357, 375–76 (1997). But recitation of that interest alone is not enough to satisfy the first prong of strict scrutiny. *Turner Broadcasting Sys., Inc. v. FCC,* 512 U.S. 622, 644 (1994) (plurality)). The government "must demonstrate that the recited harms are real, not merely conjectural, and that *the regulation will in fact alleviate these harms in a direct and material way*." *Id*. (collecting authorities) (emphasis added).

Defendants cannot demonstrate that closing firearm retailers will directly or materially alleviate the harms posed by COVID-19. Any alleviation of the spread of COVID-19 from closing firearm retailers is speculative, at best. Plaintiffs and others can abide by all social distancing and workforce requirements for the operation of essential businesses. Accordingly,

Defendants cannot demonstrate that the closure of retail firearms businesses furthers a compelling interest.

Moreover, the closure of all retail firearms businesses is not narrowly tailored. That was the problem that the *Bateman* court had with North Carolina's emergency-declaration statute that prohibited citizens from lawfully acquiring a firearm during an emergency—it was not tailored in any manner whatsoever, let alone narrowly. *Bateman v. Perdue*, 881 F. Supp. 2d 709, 716 (E.D.N.C. 2012). The statute did not "target dangerous individuals or dangerous conduct." *Id*. It did not "impose reasonable time, place and manner restrictions" like a "curfew to allow the exercise of Second Amendment rights during circumscribed times." *Id*. The statute "excessively intrude[d] upon plaintiffs' Second Amendment rights by effectively banning them (and the public at large) from engaging in conduct that is at the very core of the Second Amendment at a time when the need for self-defense may be at its very greatest." *Id*. (citing *Heller*, 554 U.S. at 795). COVID-19 Order No. 21 at issue here is indistinguishable from the statute at issue in *Bateman* and must fail under strict scrutiny.

### C. The ban cannot be justified and survive intermediate scrutiny.

Even if the Court concludes that intermediate scrutiny applies, the order still does not pass constitutional muster. To be sustained under intermediate scrutiny, the Defendants "must show that the order, as implemented, "substantially relates to one or more important governmental interests." *Gould*, 907 F.3d at 637. Intermediate scrutiny further demands that restrictions of constitutionally protected conduct must be "narrowly tailored" and possess a "close fit between ends and means." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). Narrow tailoring requires that the means by which a government advances their interest must focus on the source of the evils "'without at the same time banning or significantly restricting a substantial quantity of speech [or conduct] that does not create the … evils.'" *Showtime Entertainment, LLC*

11

*v. Mendon*, 769 F.3d 61, 81 (1st Cir. 2014) (citations omitted). In other words, when "the burden imposed by [a regulation] is congruent to the benefits it affords[, the regulation] is narrowly tailored." *Turner Broad. Sys., Inc.*, 520 U.S. at 215–16). To carry this burden, the government must not only present evidence, but "substantial evidence" drawn from "reasonable inferences" that actually support its proffered justification. *Id*. at 195. Defendants cannot meet this burden here.

There must be a link between closing these stores versus other businesses allowed to remain open—there must be a justification to treat them differently from businesses. But there are several problems with linking firearms sales and the Order's goals. First, the deprivation of rights does not fit the stated interest when there are a large number and variety of businesses which are allowed to function but are not protected by the constitution. Businesses can remain open and workers can produce cabinets, fixtures, and building materials for homes. Home builders, HVAC technicians, and electricians can safely perform work. Hardware stores are deemed essential and remain open.  Other retailers such as liquor stores can apparently operate safely and remain open, selling products which were constitutionally banned in this country for 13 years. Massachusetts residents can still go to a number of drive-up restaurant services to obtain their favorite food choices.  And yet, firearms stores can offer the very same public health protections to their employees and customers, but they have somehow been determined to be more likely to transmit the virus. In addition, the justification breaks down because firearm stores are allowed to sell to police officers.[4] If those sales can be done safely, there is no reason to eliminate firearm sales to other members of the public. Finally, this justification must fail when

---

[4] COVID-19 Order No. 21, Exhibit A, under the Law Enforcement, Public Safety and Other First Responder Category and deems essential workers who maintain or supply equipment supporting law enforcement emergency services and workers supporting the operation of firearms or ammunition distributors.

there is no way to know if the inability to purchase firearms period will end on May 4, June 4 or last indefinitely. There may be another wave of closures and an even lengthier deprivation of rights looming. Intermediate scrutiny does not allow such disparate treatment and lack of connection between the stated interest and constitutional deprivation.

When the purpose of the order is to prevent the spread of COVID-19, not to delay securing firearms, the inability to exercise one's Second Amendment rights for an unknown period while allowing other businesses to operate serves no legitimate purpose. *See Heller v. District of Columbia*, 801 F.3d at 264, 280 (D.C. Cir. 2015) (Evidence to support limitation of purchasing one firearm per 30 day period did not fit the theories advanced in support of the limitation, and the prohibition was not constitutional.)

### III. The Public Health Emergency Cannot Serve As a Basis To Trample Civil Rights.

The state of emergency that exists in the Commonwealth does not justify the constitutional infringement hoisted upon Massachusetts residents by COVID-19 Order No. 21. To be sure, there are strong interests at stake embodied by the COVID-19 orders. They are designed to limit the spread of a virus which is stressing medical systems to the limit and invading nursing homes here and in other states. But Courts must be vigilant to ensure that the emergency cannot and should not be used as an opportunity to chip away at rights protected since the Bill of Rights were adopted. "The Constitution is best preserved by reliance on standards tested over time and insulated from the pressures of the moment." *Hamdan v. Rumsfeld*, 548 U.S. 557, 637 (2006) (Breyer, J. Concurring).

These are real, not imagined concerns. Legal history has seen its healthy share of constitutional infringements in the name of emergencies, and the legal harm, not the public health harm, lasts far longer than the emergency. GOAL and the NRA, on behalf of themselves

and their members, ask the Court to consider the words of the United States District Court for the Southern District of New York when discussing the Patriot Act and its provisions authorizing letters requesting information from wire and electronic communications service providers:

> These concerns may be readily dismissed as protesting too much, as conjuring a remote, unduly alarmist parade of horrors. But those who are inclined, for the risk of the moment, to give chance a chance by wagering against the improbable, should consult history for its guidance as to what the roll of the dice may hold in predictable situations. The past is long, and so is the future we want to protect. But too often memory is short. The pages of this nation's jurisprudence cry out with compelling instances illustrating that, called upon to adjudicate claims of extraordinary assertions of executive or legislative or even state power, such as by the high degree of *deference* to the executive that the Government here contends § 3511(b) demands of the courts, when the judiciary lowers its guard on the Constitution, it opens the door to far-reaching invasions of liberty. *See, e.g., Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944); Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896)*. These examples, however few in number, loom large in proportions of the tragic ill-effects felt in the wake of the courts' yielding fundamental ground to other branches of government on the constitutional role the judiciary must play in protecting the fundamental freedoms of the American people.

*Doe v. Gonzales*, 500 F.Supp. 2d 379, 414 (S.D.N.Y. 2007).

## CONCLUSION

For these reasons, GOAL and NRA ask that the Court find that COVID-19 Order No. 21 acts as an unconstitutional ban on firearms and is invalid. The injunctive relief should enter.

Respectfully submitted,
GUN OWNERS ACTION LEAGUE, INC.,
NATIONAL RIFLE ASSOCIATION OF AMERICA, INC.
By their counsel,

 /s/ David R. Kerrigan
David R. Kerrigan, BBO# 550843
drkerrigan@KSlegal.com
Kenney & Sams, P.C.
Southborough Executive Park
144 Turnpike Road
Southborough, MA 01772

Dated:  April 27, 2020                508-490-8500

15

## CERTIFICATE OF SERVICE

I, David R. Kerrigan, Esq., hereby certify that the foregoing document was filed through the ECF system and was served electronically to the registered attorneys of record.

Date: April 27, 2020                              /s/ David R. Kerrigan
                                                  David R. Kerrigan, Esq.