UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL MCCARTHY, et al., | |
| *Plaintiffs*, | CIVIL ACTION NO. 1:20-cv-10701-DPW |
| v. | (Leave to file granted on 4/23/2020) |
| CHARLES D. BAKER, in his Official Capacity as Governor of the Commonwealth of Massachusetts, et al., | |
| *Defendants*. | |

| | |
|---|---|
| CEDRONE, LLC d/b/a SHAWSHEEN FIREARMS, et al., | |
| *Plaintiffs*, | CIVIL ACTION NO. 1:20-cv-40041-DPW |
| v. | (Leave to file granted on 4/23/2020) |
| CHARLES DUANE BAKER, in his capacity as GOVERNOR OF THE COMMONWEALTH OF MASSACHUSETTS, et al., | |
| *Defendants*. | |

**DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFFS' MOTIONS FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

MAURA HEALEY
ATTORNEY GENERAL

Julia Kobick, BBO # 680194
Assistant Attorney General
Gary Klein, BBO # 560769
Special Assistant Attorney General
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2559
julia.kobick@mass.gov
gary.klein@state.ma.us

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................ 1

BACKGROUND ............................................................................. 2

   I.  Emergency Declaration and Characteristics of COVID-19 ........................ 2

   II.  State-Ordered Measures to Prevent COVID-19 Transmission ................... 3

   III. The Plaintiffs' Complaints .......................................................... 5

STANDARD OF REVIEW ................................................................. 6

ARGUMENT .................................................................................. 7

   I.  The Plaintiffs Fail to Establish a Likelihood of Success
      on the Merits of Any of Their Claims ........................................... 7

      A.  The COVID-19 Orders Comport with the Second Amendment ........... 7

            1.  Even If the COVID-19 Orders Implicate the Second
                Amendment, They Must Be Evaluated Under Intermediate
                Scrutiny Because They Do Not Heavily Burden the Core
                of the Second Amendment ........................................... 8

            2.  The COVID-19 Orders, as Applied to Gun Retailers, Are
                Substantially Related to the Government's Vital Interest in
                Preventing the Spread of COVID-19 ............................... 12

            3.  The Second Amendment Does Not Protect the
                Dealer Plaintiffs .................................................... 17

      B.  The COVID-19 Orders Comport with the Due Process Clause .......... 18

      C.  The *Cedrone* Plaintiffs' State Law Claim and Request for
         Damages Are Barred by the Eleventh Amendment ........................ 24

      D.  Any Claims for Damages Against the Defendants in Their
         Individual Capacities Are Barred by Qualified Immunity ................. 26

   II.  The Balance of Hardships and the Public Interest Strongly
      Favor Upholding the COVID-19 Orders ...................................... 27

CONCLUSION.......................................................................................................28

# TABLE OF AUTHORITIES

**Cases**

*Allied Structural Steel Co. v. Spannaus*,
438 U.S. 234 (1978).................................................................................................. 20-21

*Am. Grain Prod. Processing Inst. v. Dep't of Pub. Health*,
392 Mass. 309, 467 N.E.2d 455 (1984) ...........................................................27

*Andrus v. Allard*,
444 U.S. 51 (1979)..........................................................................................19

*Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*,
794 F.3d 168 (1st Cir. 2015).........................................................................6, 27

*Bateman v. Perdue*,
881 F. Supp. 2d 709 (E.D.N.C. 2012).............................................................12

*Bi-Metallic Investment Co. v. State Board of Equalization*,
239 U.S. 441 (1915)....................................................................................21, 23

*Boumediene v. Bush*,
553 U.S. 723 (2008).......................................................................................16

*Brandy v. Villanueva*,
No. 20-cv-02874-AB (C.D. Cal. April 6, 2020) ........................................12, 17

*Chief of Police of Shelburne v. Moyer*,
16 Mass. App. Ct. 543, 453 N.E.2d 461 (1983) .................................................25

*Clark v. Jeter*,
486 U.S. 456 (1988)........................................................................................12

*CommCan, Inc. v. Baker*,
No. 2084CV00808-BLS2, 2020 WL 1903822 (Mass. Super. Ct.
Apr. 16, 2020)..................................................................................................23

*Commonwealth v. Davis*,
369 Mass. 886, 343 N.E.2d 847 (1976) ...........................................................25

*Commonwealth v. Depina*,
456 Mass. 238, 922 N.E.2d 778 (2010) ...........................................................25

*Compagnie Francaise de Navigation a Vapeur v. Board of Health of State
of Louisiana*,
186 U.S. 380 (1902)................................................................................. 18-19, 21

*District of Columbia v. Heller,*
    554 U.S. 570 (2008)........................................................................................ 7, 8, 9, 17-18

*District of Columbia v. Wesby,*
    138 S. Ct. 577 (2018).............................................................................................26

*Edelman v. Jordan,*
    415 U.S. 651 (1974)...........................................................................................24, 25

*Eves v. LePage,*
    927 F.3d 575 (1st Cir. 2019) (en banc).................................................................26

*Ex parte Young,*
    209 U.S. 123 (1908)...........................................................................................24, 25

*Fitchburg Gas & Elec. Light Co. v. Department of Pub. Utils.,*
    467 Mass. 768, 7 N.E.3d 1045 (2014) ...................................................................19

*Florida Bar v. Went for It, Inc.,*
    515 U.S. 618 (1995)................................................................................................13

*Gallo v. U.S. Dist. Ct. for the Dist. of Arizona,*
    349 F.3d 1168 (9th Cir. 2003) ..........................................................................22, 23

*Garcia-Rubiera v. Fortuno,*
    665 F.3d 261 (1st Cir. 2011)...................................................................................22

*Gould v. Morgan,*
    907 F.3d 659 (1st Cir. 2018)............................................................. 8, 12-13, 16, 17

*Hafer v. Melo,*
    502 U.S. 21 (1991)..................................................................................................25

*Hightower v. City of Boston,*
    693 F.3d 61 (1st Cir. 2012).......................................................................................8

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010)...............................................................................................16, 17

*Home Building & Loan Ass'n v. Blaisdell,*
    290 U.S. 398 (1934)................................................................................................20

*Interport Pilots Agency Inc. v. Sammis,*
    14 F.3d 133 (2d Cir. 1994)................................................................................22, 23

*Jacobson v. Massachusetts*,
   197 U.S. 11 (1905)..................................................................................13, 20, 21

*L C & S, Inc. v. Warren Cty. Area Plan Comm'n*,
   244 F.3d 601 (7th Cir. 2001) ................................................................................22

*Lopez v. Massachusetts*,
   588 F.3d 69 1 (1st Cir. 2009))..............................................................................25

*Maysonet-Robles v. Cabrero*,
   323 F.3d 43 (1st Cir. 2003) ..................................................................................24

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997)................................................................................................6

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010)..........................................................................................7, 15

*McDougall v. Cty. of Ventura*,
   No. 20-cv-02927-CBM (C.D. Cal. March 31, 2020)......................................12, 17

*Minnesota State Board for Community Colleges v. Knight*,
   465 U.S. 271 (1984)..............................................................................................22

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, &
   Explosives*,
   700 F.3d 185 (5th Cir. 2012) ..................................................................................9

*Nieves-Marquez v. Puerto Rico*,
   353 F.3d 108 (1st Cir. 2003) ..................................................................................6

*Nken v. Holder*,
   556 U.S. 418 (2009)................................................................................................6

*O'Bradovich v. Village of Tuckahoe*,
   325 F.3d 413 (S.D.N.Y. 2004)..............................................................................22

*O'Brien v. Mass. Bay Transp. Auth.*,
   162 F.3d 40, 44 (1st Cir. 1998)............................................................................25

*Pennhurst State School & Hosp. v. Halderman*,
   465 U.S. 89 (1984)..........................................................................................24, 25

*Peoples Fed. Sav. Bank v. People's United Bank*,
   672 F.3d 1 (1st Cir. 2012)......................................................................................6

*Powell v. Tompkins*,
    783 F.3d 332 (1st Cir. 2015) ................................................................7

*Rosie D. v. Swift*,
    310 F.3d 230 (1st Cir. 2002) ...............................................................25

*RR Vill. Ass'n, Inc. v. Denver Sewer Corp.*,
    826 F.2d 1197 (2d Cir. 1987) ..............................................................22

*Rubin v. Coors Brewing Co.*,
    514 U.S. 475 (1995)...........................................................................13

*Silvester v. Harris*,
    843 F.3d 816 (9th Cir. 2016) ..........................................................9, 10

*Smith v. Avino*,
    91 F.3d 105 (11th Cir. 1996) ..............................................................21

*Teixeira v. Cty. of Alameda*,
    873 F.3d 670 (9th Cir. 2017) (en banc) ........................................17, 18

*Turner's Operations, Inc. v. Garcetti*,
    No. 20STCP01258 (Cal. Super. Ct. Apr. 15, 2020)...........................23

*United States v. Chafin*,
    423 Fed. App'x 342 (4th Cir. 2011) ...................................................17

*United States v. Chalk*,
    441 F.2d 1277 (4th Cir. 1971) ............................................................21

*United States v. Fla. E. Coast Ry. Co.*,
    410 U.S. 224 (1973)...............................................................21, 22, 23

*Will v. Mich. Dept. of State Police*,
    491 U.S. 58 (1989)..............................................................................24

*Worman v. Healey*,
    922 F.3d 26 (1st Cir. 2019) ..................................................................8

## Constitutional Provision and Statutes

U.S. Const., Art. I, § 10, cl. 1 (Contract Clause) ......................................20

U.S. Const., Amend. I ...............................................................................21

U.S. Const., Amend. II ....................................................................... *passim*

U.S. Const., Amend. XIV ........................................................................... *passim*

Article XVII of the Massachusetts Declaration of Rights .....................................24, 25

M.G.L. c. 13, §§ 44A-44D..........................................................................19

M.G.L. c. 13, §§ 67-69..............................................................................19

M.G.L. c. 13, § 92 ...................................................................................19

M.G.L. c. 13, § 96-97A .............................................................................19

M.G.L. c. 17, § 2A ................................................................................1, 2

M.G.L. c. 42, § 42 ...................................................................................19

M.G.L. c. 140, § 123 ............................................................................ 15-16

M.G.L. c. 140, § 128A...............................................................................10

M.G.L. c. 140, § 128B...............................................................................10

M.G.L. c. 140, § 129B...............................................................................10

M.G.L. c. 140, § 129B(3)............................................................................10

M.G.L. c. 140, § 131 ................................................................................10

M.G.L. c. 140, § 131(e) .............................................................................10

Mass. St. 1950, c. 639 ............................................................................1, 2

    § 7(g)............................................................................................23

    § 7(o)............................................................................................23

    § 7(p)............................................................................................23

**Miscellaneous**

U.S. Dep't of Homeland Security, Cybersecurity & Infrastructure Security
    Agency, Advisory Memorandum on Identification of Essential
    Critical Infrastructure Workers During COVID-19 Response
    (March 28, 2020) ..............................................................................15

**INTRODUCTION**

The United States of America is in the grips of a global pandemic caused by COVID-19, the disease caused by a highly infectious and novel coronavirus. For the first time in U.S. history, all fifty States are under a federal disaster declaration. Since February 2020, more than 50,000 Americans have died from COVID-19 and nearly 1 million have become infected. The U.S. death toll is far higher than that of any other country. In Massachusetts alone, more than 3,000 residents have died and more than 56,000 have been confirmed infected. Among the States, Massachusetts ranks third in total number of confirmed cases and fourth in total number of deaths; its death toll from COVID-19 exceeds the U.S. death toll from the September 11th terrorist attacks. At present, Massachusetts is in the midst of the surge of COVID-19 infections.

The most effective tool to combat the spread of COVID-19, according to public health officials, is social distancing. Consequently, state governments across the country have closed schools, banned gatherings, closed non-essential businesses, and advised people to remain in their homes until the worst phase of COVID-19 infection passes. Cities and towns nationwide have come to a standstill, as healthcare workers labor to care for the surge of COVID-19 patients. In Massachusetts, Governor Charles Baker and Public Health Commissioner Monica Bharel have ordered a range of measures to protect Massachusetts residents, in accordance the authority conferred on them by the Civil Defense Act, Mass. St. 1950, c. 639, and M.G.L. c. 17, § 2A.

The plaintiffs in this case bring suit to challenge one measure taken by Governor Baker to prevent further transmission of COVID-19—namely, his March 23, March 31, and April 28 Orders requiring all non-essential businesses to close until May 18 (hereinafter "COVID-19 Orders"). Despite the pandemic, the plaintiffs contend that the Constitution requires Governor Baker to keep gun stores open for the duration of the crisis. It does not. The COVID-19 Orders are not a

permanent ban on the sale of firearms or ammunition in Massachusetts; at most, they temporarily postpone the in-store sale of all kinds of products, including firearms, during the most acute phase of the crisis in Massachusetts. Consistent with the pressing health and safety needs of Massachusetts residents, this Court should deny the motions for a temporary restraining order and preliminary injunction because the plaintiffs have no likelihood of success on the merits of their claims and because the public interest weighs powerfully in favor of sustaining the Orders.

## BACKGROUND

### Emergency Declaration and Characteristics of COVID-19

On February 1, 2020, health officials identified the first presumptive positive case of COVID-19 in Massachusetts. Affidavit of Monica Bharel, M.D. ¶ 5 (hereinafter "Bharel Aff."). From then until early March, the number of cases in Massachusetts continued to rise. *Id.* ¶¶ 6-7. By March 10, when the Commonwealth had 91 cases, Governor Baker declared, in accordance with Mass. St. 1950, c. 639 and M.G.L. c. 17, § 2A, a State of Emergency in Massachusetts. Affidavit of Julia Kobick, Ex. A (hereinafter "Kobick Aff.").

The disease that prompted the declaration of emergency is caused by SARS-CoV-2, a coronavirus that, until recently, had not infected humans. A respiratory illness, COVID-19 causes mild symptoms in 81% of patients, including fever, cough, fatigue, and shortness of breath. Kobick Aff., Ex. B. About 14% of patients have severe cases, in which the infection has spread to over 50% of the lungs and patients experience pneumonia, labored breathing, and inadequate oxygen supply. *Id.* And about 5% of patients have critical cases, which can involve "respiratory failure, shock, or multiorgan system dysfunction." *Id.* Overall, 19% of patients with COVID-19 are hospitalized and 6% are admitted to the intensive care unit. *Id.* Between 3% and 17% of individuals infected with COVID-19 develop acute respiratory distress syndrome. *Id.* COVID-19 poses more

risk to older individuals and people with co-morbidities like heart disease, diabetes, and asthma. *Id.* Scientists studying COVID-19 have also learned that a significant percentage of people who are infected never develop symptoms. *Id.* These asymptomatic individuals nevertheless may spread the disease. *Id.* In addition, because the incubation period for the virus is up to 14 days, many pre-symptomatic people who are infected do not realize they have COVID-19 during the period when they may be infectious. *Id.*

According to public health officials, to prevent further transmission of the coronavirus, for which humans have no natural immunity, people must engage in social distancing—that is, deliberately maintaining physical distance from other people. Bharel Aff. ¶¶ 10, 14; Kobick Aff., Ex. C. Epidemiological projections of the death toll from COVID-19 are far lower with social distancing measures than without social distancing measures. Kobick Aff., Ex. D. Thus, to keep people healthy and prevent healthcare facilities from becoming overwhelmed with COVID-19 patients, public health leaders have implored government officials to close forums in which people gather together during the height of the pandemic. Bharel Aff. ¶¶ 10, 12-14.

## State-Ordered Measures to Prevent COVID-19 Transmission

In the weeks after Governor Baker declared an emergency in the Commonwealth, the number of residents with COVID-19 grew precipitously. Reflecting the consensus that COVID-19 was circulating in Massachusetts communities, Governor Baker issued a number of orders—restricting access to nursing homes, modifying Open Meeting Law requirements, and restricting hospital visitors—to begin implementing social distancing measures. Kobick Aff., Ex. E. On March 15, when there were 164 confirmed COVID-19 cases across 10 of the state's 14 counties, the Governor ordered all K-12 schools temporarily closed in Massachusetts, because the proximity of people in schools would spur more infection. Kobick Aff., Ex. F. And on March 18, the

Governor ordered all non-emergency childcare programs temporarily closed as well. Kobick Aff., Ex. G.

By March 23, Massachusetts had 646 confirmed COVID-19 cases, including 5 deaths, with 13 of 14 counties impacted. Kobick Aff., Ex. H. That day, Governor Baker issued COVID-19 Order No. 13, the first order challenged in this case. The Order authorized essential services—like those involved in distribution of food, provision of medical care, and law enforcement—to continue operating, but required all other businesses to close temporarily until April 7. *Id.* Businesses spanning diverse sectors of the economy, from bookstores, to barbershops, to clothing stores, and, as relevant here, gun retailers, were not included among the list of essential services. The Order also prohibited gatherings of more than 10 people anywhere in the Commonwealth, including in houses of worship and for community, civic, personal, or other events. *Id.*

In the week following COVID-19 Order No. 13, the number of COVID-19 cases and deaths in Massachusetts rose exponentially. Kobick Aff., Ex. I. By March 31, confirmed cases in the Commonwealth numbered 5,752, with 56 deaths. *Id.* That day, Governor Baker issued COVID-19 Order No. 21, which extended until May 4 the closure of businesses that do not provide essential services and the prohibition on gatherings of more than 10 people. *Id.* Attached to the Order was an updated version of Exhibit A, which identifies COVID-19 Essential Services. *See* Kobick Aff., Ex. J. As before, gun retailers were not listed on Exhibit A. *Id.*

By April 10, one month after the emergency declaration, the Commonwealth had more than 20,000 confirmed cases of COVID-19, and 599 residents had died from the disease. Kobick Aff., Ex. K. Between April 15 and April 28, while Massachusetts has been in the midst of the surge of COVID-19 infections, the Department of Public Health reported more than 1,500 confirmed new cases every day. Kobick Aff., Ex. L. And from April 9 until April 28, there have been more

than 100 deaths from COVID-19 every day. *Id.* As of the filing of this brief, on April 28, a staggering 56,462 Massachusetts residents have been confirmed infected with COVID-19 and 3,003 Massachusetts residents have died from the disease. *Id.* This may be a significant undercount of the number of cases and deaths in Massachusetts. Kobick Aff., Ex. M.

Reflecting the ongoing existence of the surge of COVID-19 infections in the Commonwealth, Governor Baker ordered on April 21 that all K-12 schools in the Commonwealth remain closed for the duration of the school year, and that all non-emergency childcare centers remain closed until June 29. *See* Kobick Aff., Exs. R, S. And on April 28, the day of the filing of this brief, Governor Baker issued COVID-19 Order No. 30, which further extended the temporary closure of non-essential businesses and the prohibition on gatherings of more than 10 people for two additional weeks, until May 18. *See* Kobick Aff., Ex. T. The list of Essential Services on Exhibit A remains unchanged. *Id.* Though the Commonwealth remains in the midst of the surge of COVID-19 cases, the data shows that the social distancing measures taken by the State are beginning to flatten the infection curve. *See* Kobick Aff., Ex. L; Kobick Aff., Ex. U.

**The Plaintiffs' Complaints**

Both sets of plaintiffs filed suit to challenge the COVID-19 Orders, as applied to gun retailers, on April 9, 2020. The plaintiffs in the *McCarthy* matter include four gun retailers ("dealer plaintiffs"), six individuals ("individual plaintiffs"), and three gun advocacy organizations. McCarthy Amended Complaint ("McCarthy Compl.") ¶¶ 8-20. Naming Governor Baker, Commissioner Bharel, Department of Criminal Justice Information Services Commissioner Jamison Gagnon, and four police chiefs as defendants, the *McCarthy* plaintiffs allege that the temporary closure of gun stores violates the Second Amendment of the U.S. Constitution. *See* McCarthy Compl. ¶¶ 21-23, 28-33, 73-77. On April 14, the *McCarthy* plaintiffs moved for a

temporary restraining order or preliminary injunction.

The plaintiffs in the *Cedrone* matter include 10 gun retailers and a shooting range ("dealer plaintiffs"), two individuals, and a gun advocacy organization. Cedrone Compl. ¶¶ 1-14. Naming Governor Baker and Attorney General Maura Healey as defendants, the *Cedrone* plaintiffs allege that the temporary closure of gun stores violates the Second Amendment and Due Process Clause of the Fourteenth Amendment, as well as Article XVII of the Massachusetts Declaration of Rights. *See* Cedrone Compl. ¶¶ 68-103. On April 15, the *Cedrone* plaintiffs filed an *ex parte* motion for a temporary restraining order. The following day, this Court ordered the *McCarthy* and *Cedrone* matters consolidated, scheduled a hearing on the motions for May 4, 2020, denied the *Cedrone* plaintiffs' motion without prejudice, and deferred consideration of their request for interlocutory injunctive relief to the upcoming hearing.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012). "To obtain a preliminary injunction, the plaintiffs bear the burden of demonstrating (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003). The last two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The first factor—likelihood of success on the merits—is the "'sine qua non' of a preliminary injunction." *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 173 (1st Cir. 2015) (citations omitted). "[T]he movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

6

## ARGUMENT

The plaintiffs cannot establish a likelihood of success on their claims because the COVID-19 Orders are wholly consistent with the Second Amendment and the Due Process Clause. The Orders do not impose anything close to a ban on the exercise of Second Amendment rights. Rather, they permit the ongoing lawful usage of guns by those residents who own guns and, at most, temporarily delay acquisition of guns by licensed residents who do not own guns. And the Due Process Clause does not demand that the government give firearms dealers notice and a hearing before orders of general application and future effect, like the COVID-19 Orders, are issued to contain a pandemic. The balance of equities favors upholding the Orders, as any short-term harm the plaintiffs may suffer is far outweighed by the overwhelming imperative to protect Massachusetts residents during the worst public health crisis in a century. For the same reason, the public interest weighs strongly in favor of keeping the Orders in place to prevent further transmission of COVID-19 in Massachusetts.

I.     **THE PLAINTIFFS FAIL TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF ANY OF THEIR CLAIMS.**

    A.     **The COVID-19 Orders Comport with the Second Amendment.**

The COVID-19 Orders, as applied to temporarily require closure of gun retailers, are entirely consistent with the Second Amendment. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Supreme Court held that the Second Amendment secures a limited right, incorporated against the States, for law-abiding, responsible citizens to possess a firearm in the home for self-defense. *See Powell v. Tompkins*, 783 F.3d 332, 347 (1st Cir. 2015). The Court stressed, however, that the right "secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626.

Like other courts of appeals, the First Circuit has adopted a two-step test for assessing

Second Amendment claims. *See Gould v. Morgan*, 907 F.3d 659, 668-69 (1st Cir. 2018), *cert. petn. filed* (No. 18-1272). A court must "first ask whether the challenged law burdens conduct that is protected by the Second Amendment," and if it does, the court "then must determine what level of scrutiny is appropriate and must proceed to decide whether the challenged law survives that level of scrutiny." *Worman v. Healey*, 922 F.3d 26, 33 (1st Cir. 2019), *cert. petn. filed* (No. 19-404). In applying the framework, the First Circuit often assumes, without deciding, that the challenged restriction burdens constitutionally protected conduct and should, therefore, be tested under some level of constitutional scrutiny. *See, e.g.*, *id.* at 36; *Gould*, 907 F.3d at 670. Here, this Court should adopt the First Circuit's approach and assume, without deciding, that the COVID Orders implicate Second Amendment rights. It should then review those Orders under, at most, intermediate scrutiny and uphold them under that standard.

### 1. Even If the COVID-19 Orders Implicate the Second Amendment, They Must Be Evaluated Under Intermediate Scrutiny Because They Do Not Heavily Burden the Core of the Second Amendment.

In *Gould*, the First Circuit held that "the appropriate level of scrutiny must turn on how closely a particular law or policy approaches the core of the Second Amendment right and how heavily it burdens that right." 907 F.3d at 670-71. "[L]aws that burden the periphery of the Second Amendment right but not its core" are subject to "intermediate scrutiny," not strict scrutiny. *Id.* at 672. The court further held that the "core" of the Second Amendment is "'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" *Id.* (quoting *Heller*, 554 U.S. at 635). Laws and regulations that affect other aspects of firearms possession are "distinct from this core interest emphasized in *Heller*." *Hightower v. City of Boston*, 693 F.3d 61, 72 (1st Cir. 2012).

The COVID-19 Orders, as applied here, fall outside the core of the Second Amendment because they do not heavily burden the right of law-abiding, responsible individuals to use arms

in defense of hearth and home. The Orders do not prohibit any category of individuals from using or possessing guns. Any Massachusetts resident who lawfully owns a firearm, shotgun, or rifle may still use that gun for self-defense, in any lawful manner. Nor do the Orders heavily burden the right of law-abiding, responsible citizens who do not own guns to acquire a gun for self-defense. The Supreme Court has never interpreted the Second Amendment to guarantee a right to acquire a firearm on demand or at the precise moment the plaintiff wishes. Rather, *Heller* explained that "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful." 554 U.S. at 626-27 & n. 26. Thus, courts have upheld under intermediate scrutiny laws that mandate waiting periods between the purchase of a firearm and the acquisition of a firearm, because such laws "d[o] not place a substantial burden on Second Amendment rights." *Silvester v. Harris*, 843 F.3d 816, 827 (9th Cir. 2016). Courts have likewise upheld under intermediate scrutiny laws that impose up to a three-year delay on the ability of persons under 21 to purchase a gun, because "[t]he temporary nature of the burden reduces its severity." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 206-07 (5th Cir. 2012) (explaining that such laws "regulate commercial sales through an age qualification with temporary effect," and therefore "resemble presumptively lawful regulatory measures" that do "not trigger strict scrutiny").

The COVID-19 Orders fall squarely into this category of presumptively lawful firearms regulation: they temporarily postpone in-store sales of firearms while the public health imperative to maintain social distancing is most acute. *See* Bharel Aff. ¶¶ 10-14. They are not close to the indefinite and "total ban on handguns" struck down in *Heller*. 554 U.S. at 576. Instead, like waiting period laws and laws that require individuals to be 21 to purchase firearms, the Orders temporarily delay firearms acquisition. People like the individual plaintiffs will still be able to buy firearms,

rifles, or shotguns when the COVID-19 Orders expire and gun retailers reopen; they simply cannot acquire those weapons from a gun retailer immediately. *See Silvester*, 843 F.3d at 827 ("Before the age of superstores and superhighways, most folks could not expect to take possession of a firearm immediately upon deciding to purchase one.").[1]

Moreover, as the individual *McCarthy* plaintiffs concede,[2] if any licensed Massachusetts resident[3] wishes to obtain a gun for self-defense immediately, that person may acquire one through a private purchase. *See* Declaration of Michaela Dunne (hereinafter "Dunne Decl.") ¶ 20. In such transactions, both the transferor and transferee must have a license to carry or FID card; must not fall into any category of individuals disqualified from licensure by M.G.L. c. 140, §§ 129B and 131; and must report the transaction on the online Massachusetts Gun Transaction Portal. *See* M.G.L. c. 140, §§ 128A and 128B.[4] Few private purchases should be necessary for the duration of

---

[1] Indeed, delay has always been inherent in the process of acquiring a weapon: even for individuals who are already licensed to carry, a gun purchase may be delayed by the background check process or by the time it takes for a distributor or manufacturer to ship the gun that has been purchased. *See* Declaration of Michaela Dunne ¶ 19.

[2] *See* McCarthy Decl. ¶ 9; Biewenga Decl. ¶ 8; Warner Decl. ¶ 9; Galligan Decl. ¶ 9; Simmons Decl. ¶ 11; Lantagne Decl. ¶ 11.

[3] Unlicensed Massachusetts residents must apply for a license to carry or FID card with their local licensing authorities. *See* M.G.L. c. 140, §§ 129B, 131. The licensing authority has 40 days to approve or disapprove of the application. *See* M.G.L. c. 140, §§ 129B(3); 131(e). The entire process of obtaining a license to carry or FID card, and then acquiring a firearm, rifle, or shotgun, can take up to 90 days. Declaration of Michaela Dunne ¶ 17.

[4] The Massachusetts Gun Transaction Portal is accessible online at https://mircs.chs.state.ma.us/fa10/action/home?app_context=home&app_action=presentHome. The individual *McCarthy* plaintiffs attest that they do not personally know anyone who is willing and able to sell them a firearm or shotgun at this time. *See* McCarthy Decl. ¶ 9; Biewenga Decl. ¶ 8; Warner Decl. ¶ 9; Galligan Decl. ¶ 9; Simmons Decl. ¶ 11; Lantagne Decl. ¶ 11. But there are, of course, methods, including online advertisement, for identifying sellers who wish to sell a gun privately, even if the seller is not previously known to the would-be buyer. The individual plaintiffs also attest that they "do not feel comfortable risking possible infection with the COVID-19 virus by purchasing a used firearm [or shotgun] from a stranger." *See* McCarthy Decl. ¶ 10; Biewenga Decl. ¶ 9; Warner Decl. ¶ 10; Galligan Decl. ¶ 10; Simmons Decl. ¶ 12; Lantagne Decl. ¶ 12. If true, those concerns should prevent each of the individual plaintiffs from feeling comfortable

the COVID-19 Orders, however, because the evidence shows that, since Governor Baker declared the state of emergency, crime in Massachusetts—including crimes like home invasions and looting—has not increased and, if anything, has decreased. *See* Declaration of Chief Jeff Farnsworth ¶¶ 8-9. Thus, there is less necessity for firearms and shotguns that may be used for self-defense during the period of emergency.[5]

The plaintiffs make much of their allegation that even if they could obtain a firearm or shotgun through a private purchase, they cannot buy ammunition while the COVID-19 Orders are in effect. *See* McCarthy Pltfs' Br. 1-2, 9, 11, 14. But they are simply wrong. Some licensed ammunition dealers remain open in the Commonwealth because, due to their sales of other inventory like food and pharmacy products, they are designated as providing essential services under the COVID-19 Orders. *See* Dunne Decl. ¶ 21. For example, at least 11 Walmart stores in Massachusetts have such licenses and are currently selling ammunition. *See* Affidavit of Marlee Greer ¶ 3. These Walmart stores are spread across the state, in Danvers, Fairhaven, Framingham, Gardner, Hadley, Hudson, Orange, Pittsfield, Plymouth, Wareham and West Boylston. *Id.* ¶ 4. Any licensed resident of Massachusetts, like the individual plaintiffs, could buy ammunition at these stores.

---

buying a firearm from a stranger *at a gun retailer*, too. Notably, none of the individual plaintiffs attest that they have a prior relationship with employees of any gun retailers, including any of the dealer plaintiffs.

[5] The amicus brief filed by the National Shooting Sports Foundation makes the novel argument, an argument not advanced by the plaintiffs, that gun retailers qualify as Essential Services under Exhibit A to the COVID-19 Orders because "they provide firearms and ammunition to law enforcement and other public safety personnel, including private security, that are used to protect Massachusetts' citizens," and "[m]ost law enforcement agencies and their officers obtain firearms and ammunition from their local federally licensed firearm retailer." Br. of the National Shootings Sports Foundation as Amicus Curiae, at 10. The evidence shows, however, that "[d]uring the Covid-19 epidemic, Police Departments have access to the guns and ammunition they need either in their own supplies or by placing orders with distributors. Distributors of guns and ammunition remain open under the Governor's Emergency Order." Declaration of Chief Jeff Farnsworth ¶ 11.

In light of these realities, the COVID-19 Orders do not heavily burden the right of law-abiding, responsible citizens to use arms in defense of hearth and home. At most, this Court, like other courts facing the same issue, should review the plaintiffs' Second Amendment claims under intermediate constitutional scrutiny. *See* In-Chambers Order Re Ex Parte Application for Temporary Restraining Order (Dkt. Nos. 9, 10), at 2, *McDougall v. Cty. of Ventura*, No. 20-cv-02927-CBM (C.D. Cal. March 31, 2020) (Kobick Aff., Ex. N) (applying intermediate scrutiny); [In Chambers] Order <u>Denying</u> Plaintiffs' Ex Parte Application for a Temporary Restraining Order (Dkt. No. 14), at 5, *Brandy v. Villanueva*, No. 20-cv-02874-AB (C.D. Cal. April 6, 2020) (Kobick Aff., Ex. O) (same).[6]

**2.    The COVID-19 Orders, as Applied to Gun Retailers, Are Substantially Related to the Government's Vital Interest in Preventing the Spread of COVID-19.**

In applying intermediate scrutiny, a court must ask whether the challenged enactment is "substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). The test requires "substantial deference to the predictive judgments" of the governmental actor, and the fit between the enactment and the government's interest need not be "perfect."

---

[6] Contrary to the plaintiffs' contention, any burden on Second Amendment rights imposed by the COVID-19 Orders is not remotely comparable to the burden at issue in *Bateman v. Perdue*, 881 F. Supp. 2d 709 (E.D.N.C. 2012). *See* McCarthy Pltfs' Br. at 15-16. That case involved a statute that prohibited all North Carolina residents from transporting or possessing off their property any dangerous weapon, including any firearm, during a state of emergency. *Id.* at 711-12. The district court struck down the statute under strict scrutiny because the law prohibited "law abiding citizens from purchasing and transporting to their homes firearms and ammunition needed for self-defense," and further authorized government officials to "outright ban the possession, transportation, sale, purchase, storage or use of dangerous firearms and ammunition during a declared state of emergency—even within one's home." *Id.* at 715-16. Thus, the statute burdened the core right protected by the Second Amendment. *Id.* at 716. The COVID-19 Orders, as described, do not disturb the ability of licensed Massachusetts residents to carry or possess any firearm previously owned for self-defense and, at most, temporarily delay the ability of residents to purchase new firearms.

*Gould*, 907 F.3d at 673-74. The government can justify the fit between the statute and government interest "by reference to studies and anecdotes . . . or even . . . based solely on history, consensus, and simple common sense." *Florida Bar v. Went for It, Inc.*, 515 U.S. 618, 628 (1995) (internal quotation marks and citations omitted).

The COVID-19 Orders easily withstand intermediate scrutiny. The governmental interest advanced by the Orders—the protection of the public health from a highly contagious and fatal disease that has caused a global pandemic of unprecedented scale—is compelling. *See, e.g.*, *Rubin v. Coors Brewing Co.*, 514 U.S. 475, 485 (1995) (the government "has a significant interest in protecting the health, safety, and welfare of its citizens"); *Jacobson v. Massachusetts*, 197 U.S. 11, 26-30 (1905) (upholding compulsory vaccination amidst smallpox outbreak because fundamental rights, like those of liberty and bodily autonomy, may be restricted in order to promote the public health of all community members). And the temporary closure of gun retailers is substantially related to that interest. COVID-19, a "contagious strain of coronavirus that aggressively spreads by person-to-person transmission," is commonly spread through "respiratory droplets produced when an infected person coughs or sneezes." Bharel Aff. ¶ 10. Because of this manner of transmission, public health experts stress that it "is imperative that individuals in the Commonwealth—until the crisis is over—practice social distancing measures where possible and avoid congregating in larger groups in confined spaces." *Id.* ¶ 14. As the Centers for Disease Control and Prevention has explained, social distancing is "the best way to reduce the spread of" COVID-19. Kobick Aff., Ex. C. Social distancing requires that people "[o]nly leav[e] home for essential errands such as going to the grocery store or pharmacy" and "[m]aintai[n] a distance at all times of 6 feet or more from others when [they] have to leave . . . home for essential trips." Bharel Aff. ¶ 14. Remaining apart from other individuals, even those who appear healthy, is vital

because people infected with the coronavirus may be pre-symptomatic or asymptomatic, but still spread the virus to others. *See* Kobick Aff., Ex. B.

Operation of non-essential businesses, like gun retailers, is inconsistent with the imperative to practice social distancing in order to stem the spread of COVID-19. Gun retailers, like the bookstores, clothing stores, hair salons, and other businesses affected by the COVID-19 Orders, typically have many customers that pass through their doors each day. *See* Dunne Decl. ¶¶ 12-13. Even small gun stores sell multiple guns a day, and "for every visit to a gun store that results in a sale, there are many other customer visits" that take place. *Id.* In addition, gun stores in Massachusetts "typically" have "cramped retail spaces, regardless of the overall size of the building." Affidavit of Zorran Atanasovski ("Atanasovski Aff.") ¶ 6; *see also* Dunne Decl. ¶ 11 (gun stores in Massachusetts are "often quite crowded"). State officials who visit gun retailers report that "[i]n many cases, close contact" between customers and employees is "unavoidable due to the size of the store." Dunne Decl. ¶ 11. In addition, the "display racks [a]re often placed in close proximity to each other, which constrict[s] the walkable space, making aisles and walkways quite narrow." Atanasovski Aff. ¶ 6. Thus, it is difficult to practice social distancing inside gun stores, like other commercial establishments, where Massachusetts residents converge.

The COVID-19 Orders do not uniquely burden gun retailers. Businesses across the economic spectrum, as well as K-12 schools and non-emergency childcare centers, are all temporarily closed in order to reduce the spread of COVID-19. Closure of some of these institutions, like bookstores and schools, may implicate constitutional rights, but the health and welfare of the Massachusetts citizenry depend on these temporary closures. It bears emphasis that Massachusetts is in the midst of the surge of COVID-19 infections and deaths. *See* Bharel Aff. ¶ 12; Kobick Aff., Ex. L. It is particularly important that residents and businesses in Massachusetts

take all measures to prevent transmission during this acute phase of the crisis. Public health officials have concern that, during the surge, "there is potential for the Commonwealth's health care facilities, including its hospitals, to become seriously strained and possibly overburdened by the needs of sick COVID-19 patients." Bharel Aff. ¶ 13. The Commonwealth's interest in maintaining public health and welfare—including the health and welfare of healthcare workers and others operating essential services—is substantially related to the temporary closure of businesses, like gun retailers, that might be the site of ongoing COVID-19 transmission.

The fact that other States have designated firearms retailers as essential does not cast doubt on the constitutionality of the COVID-19 Orders. *See* McCarthy Pltfs' Br. at 6-8, 15. The Supreme Court has made clear that the Second Amendment does not eliminate States' "ability to devise solutions to social problems that suit local needs and values"; rather, it permits "state and local experimentation with reasonable firearms regulations." *McDonald*, 561 U.S. at 785 (internal quotation marks and alterations omitted). The pattern of transmission in COVID-19 outbreak illustrates the wisdom of that approach: as the State with the third highest number of cases and fourth highest death toll, Massachusetts justifiably has imposed tighter social distancing requirements than less impacted States. The federal Advisory Memorandum on which the plaintiffs rely likewise recognizes that States will face different circumstances. *See* McCarthy Pltfs' Br. at 5. Thus, the memorandum stresses that it "is advisory in nature"; that "[i]t is not, nor should it be considered, a federal directive or standard"; and that "[i]ndividual jurisdictions should add or subtract essential workforce categories based on their own requirements and discretion."[7]

---

[7] *See* U.S. Dep't of Homeland Security, Cybersecurity & Infrastructure Security Agency, Advisory Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response (March 28, 2020) (Kobick Aff., Ex. Q). Furthermore, Massachusetts law does not permit licensed gun retailers to make product sales outside their physical premises. *See* M.G.L. c. 140, § 123, cl. 15 ("[A]ll licensees shall maintain a permanent place of business that is

Moreover, the plaintiffs are wrong to suggest that, when applying intermediate scrutiny, this Court must look for less restrictive alternatives to the Governor's action or inquire whether the COVID-19 Orders are narrowly tailored. *See McCarthy Pltfs' Br.* at 15-17. The First Circuit has made clear that, in cases involving Second Amendment claims analyzed under intermediate scrutiny, the government's "chosen means need not be narrowly tailored to achieve its ends: the fit between the asserted governmental interests and the means chosen . . . to advance them need only be substantial in order to withstand intermediate scrutiny." *Gould*, 907 F.3d at 674.

The aforementioned evidence amply establishes the substantial fit between the government's interest in preventing transmission of COVID-19 and the temporary closure of gun retailers. And in times of crisis, like now, deference to the government's decisions about how to best promote public health is particularly warranted. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 33 (2010) (noting, in a First Amendment case, that "evaluation of the facts by the Executive, like Congress's assessment, is entitled to deference"); *Gould*, 907 F.3d at 676 (when applying intermediate scrutiny to Second Amendment claims, "courts must defer to [the government's] choices among reasonable alternatives"). Unlike members of the executive branch, "'neither the Members of th[e Supreme] Court nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people.'" *Holder*, 561 U.S. at 34 (quoting *Boumediene v. Bush*, 553 U.S. 723, 797 (2008)). Thus, especially when addressing "fraught issues," like management of a novel virus that is sickening and killing tens of thousands of Massachusetts residents, "'when it comes to collecting evidence and drawing factual inferences

---

not a residence or dwelling wherein all transactions described in this section shall be conducted and wherein all records required to be kept under this section shall be so kept."). Thus, the guidance from the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives on which the plaintiffs rely, which concerns gun transactions that may occur outside a gun retailer's place of business in other States, is inconsistent with Massachusetts law. *See McCarthy Pltfs' Br.* at 4-5.

in this area, the lack of competence on the part of the courts is marked and respect for the Government's conclusions is appropriate.'" *Gould*, 907 F.3d at 676 (quoting *Holder*, 561 U.S. at 34).

This Court should, accordingly, conclude that the plaintiffs are not likely to succeed in their Second Amendment challenge to the COVID-19 Orders. *See* In-Chambers Order Re Ex Parte Application for Temporary Restraining Order (Dkt. Nos. 9, 10), *McDougall v. Cty. of Ventura*, No. 20-cv-02927-CBM (C.D. Cal. March 31, 2020) (Kobick Aff., Ex. N) (denying motion for a temporary restraining order that asserted Second Amendment challenge to temporary gun store closure because of COVID-19); [In Chambers] Order <u>Denying</u> Plaintiffs' Ex Parte Application for a Temporary Restraining Order (Dkt. No. 14), *Brandy v. Villanueva*, No. 20-cv-02874-AB (C.D. Cal. April 6, 2020) (Kobick Aff., Ex. O) (same).

### 3.     The Second Amendment Does Not Protect the Dealer Plaintiffs.

The Second Amendment claim asserted by the dealer plaintiffs also fails for an independent reason: "the Second Amendment does not confer a freestanding right, wholly detached from any customer's ability to acquire firearms, upon a proprietor of a commercial establishment to sell firearms." *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) (en banc); *accord United States v. Chafin*, 423 Fed. App'x 342, 344 (4th Cir. 2011). The Supreme Court in *Heller* explained that the Second Amendment guarantees an "*individual* right to *possess* and *carry* weapons in case of confrontation." 554 U.S. at 592 (emphasis added); *see also id.* at 635 (the Second Amendment protects "the right of law-abiding, responsible *citizens* to *use* arms in defense of hearth and home" (emphasis added)). Nowhere does *Heller* suggest that the Second Amendment guarantees *retailers* a right to *sell* weapons. Indeed, to the extent *Heller* addresses the "commercial sale of arms" at all, it states that laws imposing "conditions and qualifications" on such sales are "presumptively

lawful." *Id.* at 626-27 & n. 26. There is likewise no textual or historical basis upon which to suggest that the Second Amendment protects a right to sell firearms. *See Teixeira*, 873 F.3d at 683-87 (conducting exhaustive textual and historical analysis of the Second Amendment). Thus, to the extent the dealer plaintiffs contend that the COVID-19 Orders impinge upon a purported constitutional right to sell firearms, that claim cannot succeed as a matter of law.

### B.  The COVID-19 Orders Comport with the Due Process Clause.

In Count I and the second Count IV of the *Cedrone* Complaint, the dealer plaintiffs separately claim that the COVID-19 Orders deprived them of constitutionally protected property—namely, their licenses to sell firearms—without notice and an opportunity to contest the Orders. Cedrone Compl. ¶¶ 68-72, 95-103. As a threshold matter, no gun dealer's license has been revoked by the Orders; the dealers are simply prohibited from opening their stores during the emergency period. In any event, the procedural due process claim must be rejected for two independent reasons: it is foreclosed by Supreme Court precedent, and it is otherwise inconsistent with the rule that no individualized process is due when government conduct is legislative in nature, rather than adjudicative in nature.

First, the Supreme Court considered and rejected a similar procedural due process claim over a century ago in a case involving circumstances comparable to the COVID-19 epidemic. The case, *Compagnie Francaise de Navigation a Vapeur v. Board of Health of State of Louisiana*, arose out of a board of health's order quarantining a ship whose passengers had sailed from a country that was previously a source of yellow fever outbreaks in Louisiana. 186 U.S. 380, 381-83 (1902). The company that owned the ship sued, contending, among other things, that the quarantine deprived it of "property without due process of law." *Id.* at 387. The Court rejected the claim, explaining that, if accepted, the theory would "strip the government, whether state or

national, of all power to enact regulations protecting the health and safety of the people, or, what is equivalent thereto, necessarily amounts to saying that such laws when lawfully enacted cannot be enforced against person or property without violating the Constitution." *Id.* at 393. In the Court's view, "the contention demonstrate[d] its own unsoundness." *Id.* Even though the company had a property interest in its ship, no process was required before the board could lawfully quarantine the ship in service of public health. *Id.* So too here. Even if the plaintiffs have a property interest in their licenses to sell firearms,[8] they are not entitled to process before the government may temporarily order closure of their businesses in order to prevent the spread of a deadly virus.

Application of the *Compagnie Francaise* rule is equally necessary in the context of the COVID-19 pandemic. If the dealer plaintiffs could state a procedural due process claim based on the alleged temporary deprivation of their licenses to sell guns, so could every other licensed business in Massachusetts. Those licensed, for example, by the Board of Registration of Architects, M.G.L. c. 13, §§ 44A-44D; or the Board of Registration Cosmetology and Barbering, M.G.L. c. 42, § 42; or the Board of Registration of Landscape Architects, M.G.L. c. 13, §§ 67-69; or the Board of Registration of Real Estate Appraisers, M.G.L. c. 13, § 92; or the Board of Registration of Home Inspectors, M.G.L. c. 13, § 96-97A, could all bring claims contending, like the plaintiffs,

---

[8] As indicated above, the COVID-19 Orders to not deprive the *Cedrone* dealer plaintiffs of their licenses to sell guns in Massachusetts. And to the extent the *Cedrone* dealer plaintiffs contend that they have a property interest in their expectation of future profits, which has been temporarily affected by the Orders, that is not a constitutionally protected property interest. *See Andrus v. Allard*, 444 U.S. 51, 66-67 (1979) ("[P]erhaps because of its very uncertainty, the interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests"; "[r]egulations that bar trade in certain goods have been upheld against claims of unconstitutional taking."); *Fitchburg Gas & Elec. Light Co. v. Department of Pub. Utils.*, 467 Mass. 768, 783, 7 N.E.3d 1045, 1057 (2014) ("[A] regulated company must anticipate that its profit levels can be . . . reduced by changes in government regulation. There is no constitutional entitlement to maximum profits.") (citations and internal quotation marks omitted).

19

that they were entitled to notice and a hearing before Governor Baker could issue the COVID-19

Orders. *See* Cedrone Compl. ¶ 69. Businesses without licenses might likewise assert that they, too,

were entitled to notice and a hearing before the Governor could issue the Orders, based on other

alleged property interests. *Compagnie Francaise* makes clear that the Due Process Clause does

not require government officials to take such time-consuming steps before acting on an emergency

basis to stem a public health crisis.

The Supreme Court has adopted a similar rule across constitutional claims. In *Jacobson v.

Massachusetts*, it rejected a due process challenge to a compulsory vaccination law. 197 U.S. at

25-30. Even though the plaintiff had a liberty interest in bodily autonomy, the Court explained, "it

[i]s a fundamental principle that persons and property are subjected to all kinds of restraints and

burdens in order to secure the general comfort, health, and prosperity of the state.'" *Id.* at 26.

"Upon the principle of self-defense, of paramount necessity," the Court continued, "a community

has the right to protect itself against an epidemic of disease which threatens the safety of its

members." *Id.* at 27. Because the compulsory vaccination law had a "real or substantial relation to

the protection of the public health and the public safety," it comported with the Fourteenth

Amendment. *Id.* at 31. Similarly, the Court held that the Contract Clause was not violated by a

foreclosure moratorium law "enacted to provide relief for homeowners threatened with

foreclosure" during the Great Depression, even though "the legislation conflicted directly with

lenders' contractual foreclosure rights." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 242

(1978) (discussing *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934)). The law was

constitutional because the government "had declared in the Act itself that an emergency need for

the protection of homeowners existed," the "law was enacted to protect a basic societal interest,

not a favored group," "the relief was appropriately tailored to the emergency that it was designed

to meet [and] the imposed conditions were reasonable," and the "legislation was limited to the duration of the emergency." *Id.* As in *Compagnie Francaise* and *Jacobson*, the Court held that asserted constitutional rights must yield to emergency actions taken by the State to protect the health of the citizenry. The same result should obtain here. *See also Smith v. Avino*, 91 F.3d 105, 109 (11th Cir. 1996) (rejecting arguments that curfew imposed after Hurricane Andrew infringed upon plaintiffs' freedom of movement and right to travel because "governing authorities must be granted the proper deference and wide latitude necessary for dealing with an emergency"); *United States v. Chalk*, 441 F.2d 1277, 1280 (4th Cir. 1971) (upholding curfew, prohibition on possession of dangerous weapons away from one's home, and other restrictions against First Amendment, overbreadth, and right to travel challenges, while observing the "broad discretion necessary for the executive to deal with an emergency situation" (internal quotations and citation omitted)).

The dealer plaintiffs' due process claim also fails for second, and independent, reason: because the COVID-19 Orders are prospective rules of general application, they are not subject to the notice and hearing requirements of the Due Process Clause. For purposes of procedural due process claims, the Supreme Court has long drawn a distinction between "proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases, on the other." *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973). Dating to its decision in *Bi-Metallic Investment Co. v. State Board of Equalization*, the Court has held that "[w]here a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption." 239 U.S. 441, 445 (1915). In such contexts, individual due process rights—including notice and a right to be heard—do not attach. *See id.* at 445-46.

Thus, the question whether process rights attach turns on whether government conduct affecting an allegedly protected property interest "is legislative or adjudicative in nature." *Garcia-Rubiera v. Fortuno*, 665 F.3d 261, 272 (1st Cir. 2011); *see also Interport Pilots Agency Inc. v. Sammis*, 14 F.3d 133, 142 (2d Cir. 1994) ("Official action that is legislative in nature is not subject to the notice and hearing requirements of the due process clause."). Government action is legislative in nature when it "has general application and look[s] to the future." *Interport Pilots,* 14 F.3d at 142 (internal quotation marks omitted); *accord L C & S, Inc. v. Warren Cty. Area Plan Comm'n*, 244 F.3d 601, 604 (7th Cir. 2001) ("Not the motive or stimulus, but the generality and consequences, of an enactment determine whether it is really legislation or really something else."). On the other hand, government action is adjudicative in nature when it is "designed to adjudicate disputed facts in particular cases." *Fla. E. Coast Ry.*, 410 U.S. at 245; *accord Interport Pilots*, 14 F.3d at 143; *O'Bradovich v. Village of Tuckahoe*, 325 F.3d 413, 429-30 (S.D.N.Y. 2004). Like statutes, governmental orders, rules, and regulations may be, and often are, legislative in nature because they adopt general rules that are not aimed at particular cases or parties. *See, e.g.*, *Gallo v. U.S. Dist. Ct. for the Dist. of Arizona*, 349 F.3d 1168, 1182-83 (9th Cir. 2003) (court rules that changed attorney licensing standards are legislative in nature); *Interport Pilots*, 14 F.3d at 142-44 (policy statement by a state board is legislative rather than adjudicative in nature); *RR Vill. Ass'n, Inc. v. Denver Sewer Corp.*, 826 F.2d 1197, 1204-05 (2d Cir. 1987) (citing *Minnesota State Board for Community Colleges v. Knight*, 465 U.S. 271, 284 (1984), for the proposition that a "policy decision by [an] executive agency would be legislative action").

Here, the COVID-19 Orders are legislative in nature and are not, therefore, subject to the notice and hearing requirements of the Due Process Clause. Through the Civil Defense Act, the Legislature delegated the Governor authority, during a declared of state emergency, to take "any

and all" action "relative to," among other things, the "sale of articles of food and household articles"; "[a]ssemblages . . . in order to protect the physical safety of persons or property"; and the "[v]ariance of the terms and conditions of licenses, permits or certificates of registration issued by the commonwealth or any of its agencies." Mass. St. 1950, c. 639, §§ 7(g), (o), (p); *see CommCan, Inc. v. Baker*, No. 2084CV00808-BLS2, 2020 WL 1903822, at \*7 (Mass. Super. Ct. Apr. 16, 2020) (COVID-19 Orders are authorized by Sections 7(g), (o), and (p) of the Civil Defense Act). Acting pursuant to that authority, Governor Baker issued orders of general applicability across the Commonwealth that require the temporary closure of all non-essential businesses and organizations during the height of COVID-19 infection. *See* Kobick Aff., Exs. H, I, T. The Orders, which apply across all economic sectors, adopt "policy-type rules or standards"; they are not "designed to adjudicate disputed facts in particular cases." *Fla. E. Coast Ry.*, 410 U.S. at 245. Moreover, they "affec[t] a large number of people, as opposed to targeting a small number of individuals based on individual factual determinations." *Gallo*, 349 F.3d at 1182. And they "appl[y] prospectively, and d[o] not seek to impose any retroactive penalty." *Interport Pilots*, 14 F.3d at 143. The COVID-19 Orders thus meet all the criteria for governmental action that is legislative, rather than adjudicative in nature. Indeed, applying these same standards, the California Superior Court recently rejected a virtually identical procedural due process challenge to the temporary closure of gun retailers in California due to COVID-19; the court reasoned that the California order "has the character of a legislative decision" under the *Bi-Metallic* progeny because the "order imposes broad restrictions across massive sectors of the . . . economy to slow the spread of the novel coronavirus." Notice of Ruling on Ex Parte Application, at 8, *Turner's Operations, Inc. v. Garcetti*, No. 20STCP01258 (Cal. Super. Ct. Apr. 15, 2020) (Kobick Aff., Ex. P).

    For all of these reasons, the *Cedrone* dealer plaintiffs are not likely to succeed on the merits

of their procedural due process claim.

### C. **The *Cedrone* Plaintiffs' State Law Claim and Request for Damages Are Barred by the Eleventh Amendment.**

In the first Count IV, the *Cedrone* plaintiffs also contend that the COVID-19 Orders violate Article XVII of the Massachusetts Declaration of Rights. Cedrone Compl. ¶¶ 90-94. And in several separate paragraphs of the Complaint, the plaintiffs demand compensatory and punitive damages. *Id.* ¶¶ 71, 72, 76, 77. But both the state-law claim and the damages requests are barred by the Eleventh Amendment to the United States Constitution and, accordingly, cannot succeed on the merits.

The Eleventh Amendment bars lawsuits in federal court against unconsenting States. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974). The Eleventh Amendment also bars official-capacity suits against state officials because "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. . . . As such, it is no different from a suit against the State itself." *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989). As state officials sued in their official capacities only, *see* Cedrone Compl. p. 1 (case caption), the Governor and Attorney General share in the Eleventh Amendment immunity of the Commonwealth. *See Will*, 491 U.S. at 71; *Maysonet-Robles v. Cabrero*, 323 F.3d 43, 48-49 (1st Cir. 2003).

The Eleventh Amendment likewise prohibits claims in federal court against state officials based on alleged violations of state law. *Pennhurst*, 465 U.S. at 106. As the Supreme Court has explained, "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Id.* The Court thus held that the narrow exception to Eleventh Amendment immunity established in *Ex parte*

*Young*, 209 U.S. 123 (1908)—which authorizes suits for prospective injunctive relief against state officials based on ongoing violations of *federal* law—is "inapplicable in a suit against state officials on the basis of *state* law." *Pennhurst*, 465 U.S. at 106 (emphasis added). And the Court also held that the doctrine applies as readily to "state-law claims brought into federal court under pendent jurisdiction." *Id.* at 121; *accord Lopez v. Massachusetts*, 588 F.3d 69, 73 n. 1 (1st Cir. 2009); *O'Brien v. Mass. Bay Transp. Auth.*, 162 F.3d 40, 44 (1st Cir. 1998). Under this principle, this Court lacks jurisdiction over the state-law claim asserted in the first Count IV of the *Cedrone* Complaint, and the *Cedrone* plaintiffs thus have no likelihood of success on the merits of the claim.[9]

The *Cedrone* plaintiffs' requests for compensatory and punitive damages are likewise barred by the Eleventh Amendment. Their Second Amendment and due process claims only fall within this Court's jurisdiction because of the *Ex Parte Young* exception to Eleventh Amendment immunity, which allows official-capacity claims for prospective *injunctive* relief against state officials based on alleged violations of federal law. *See Rosie D. v. Swift*, 310 F.3d 230, 234 (1st Cir. 2002). That exception does not, however, permit claims for monetary damages against state officials sued in their official capacities. *See Hafer v. Melo*, 502 U.S. 21, 25-27 (1991); *Edelman*, 415 U.S. at 663-65, 675-77. The caption of the *Cedrone* Complaint appears to name the Governor and Attorney General in their official capacities only, and the paragraphs identifying the Governor and Attorney General as defendants do not mention personal-capacity claims. *See* Cedrone Compl.

---

[9] In any event, the claim under Article XVII of the Massachusetts Declaration of Rights cannot succeed on the merits. Article XVII "was intended to provide for the common defense and does not guarantee an individual right to keep and bear arms." *Commonwealth v. Depina*, 456 Mass. 238, 252, 922 N.E.2d 778, 790 (2010) (citing *Commonwealth v. Davis*, 369 Mass. 886, 888, 343 N.E.2d 847 (1976)). Thus, "[t]here is no right under art. 17 of the Declaration of Rights of the Massachusetts Constitution for a private citizen to keep and bear arms." *Chief of Police of Shelburne v. Moyer*, 16 Mass. App. Ct. 543, 547, 453 N.E.2d 461 (1983).

¶¶ 15-16. Thus, the *Cedrone* plaintiffs' demands for compensatory or punitive damages cannot succeed on the merits because they are foreclosed by the Eleventh Amendment.

> ### D. Any Claims for Damages Against the Defendants in Their Individual Capacities Are Barred by Qualified Immunity.

Finally, to the extent any of the plaintiffs assert claims for damages against the state defendants in their individual capacities,[10] those claims cannot succeed on the merits because the defendants are shielded by qualified immunity. Under the qualified immunity doctrine, government officials sued in their individual capacities "are immune from damages claims" unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Eves v. LePage*, 927 F.3d 575, 582-83 (1st Cir. 2019) (en banc) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)). Here, as described, the plaintiffs have not established that the defendants violated a federal statutory or constitutional right, and they certainly have not demonstrated a violation of any right that was clearly established in March 2020. To meet that burden, the plaintiffs would have had to "demonstrate that the law was sufficiently clear [such] that every reasonable official would understand that what he is doing is unlawful." *Eves*, 927 F.3d at 583 (internal quotation marks omitted). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Id.* (internal quotation marks omitted). As described, there is no existing precedent establishing that it violates either the Second Amendment or the Due Process Clause to temporarily order the closure of firearms retailers in

---

[10] Paragraphs 21 through 23 of the *McCarthy* Complaint name Governor Baker, Commissioner Bharel, and Commissioner Gagnon in their individual and official capacities, and the Prayer for Relief requests nominal damages. *See* McCarthy Compl. ¶¶ 21-23 & p. 16. Although the *Cedrone* Complaint appears to assert only official-capacity claims, paragraphs 72 and 77 of the *Cedrone* Complaint do request punitive damages based on allegations that Governor Baker and Attorney General Healey, "acting both individually, collectively, and in their official capacity have deliberately disregarded" the Department of Homeland Security's Advisory Memorandum. Cedrone Compl. ¶¶ 72, 77; *see also supra*, at 15 (describing the Advisory Memorandum).

order to prevent the spread of a novel and highly contagious virus that is ravaging Massachusetts communities. Qualified immunity therefore shields the defendants from any damages claims asserted in these lawsuits.

## II.   THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST STRONGLY FAVOR UPHOLDING THE COVID-19 ORDERS.

When, as here, "the moving party cannot demonstrate that [they are] likely to succeed [on the merits], the remaining factors become matters of idle curiosity." *Arborjet*, 794 F.3d at 173. The plaintiffs here have failed to establish that they are likely to prevail on any of their claims, so that should end the analysis.

Nevertheless, to the extent this Court considers the other factors, the balance of hardships and the public interest weigh decisively against the interlocutory relief requested by the plaintiffs. During these unprecedented times, the dealer plaintiffs are no doubt experiencing economic hardship, like so many other businesses in the Commonwealth. But the economic harm they allege is diminished by the temporary nature of the COVID-19 Orders and by the plaintiffs' own declarations. The firearms and shotguns the plaintiffs wish to sell or purchase are not perishable, and therefore could be sold or purchased once the COVID-19 Orders terminate or if the plaintiffs were to ultimately prevail on the merits. *See Am. Grain Prod. Processing Inst. v. Dep't of Pub. Health*, 392 Mass. 309, 327-28, 467 N.E.2d 455, 468-69 (1984) (no irreparable harm from emergency regulations banning the sale of adulterated products because the regulations did "not require the destruction of adulterated products," which had "a shelf life of one to four years," so the products could be sold "if the plaintiff were to prevail on the merits"). Moreover, the individual *McCarthy* plaintiffs' declarations undermine the urgency they claim in wishing to acquire a gun. They all attest that they do "not feel comfortable risking possible infection with the COVID-19 virus by purchasing a used firearm [or shotgun] from a stranger." McCarthy Decl. ¶ 10; Biewenga

Decl. ¶ 9; Warner Decl. ¶ 10; Galligan Decl. ¶ 10; Simmons Decl. ¶ 12; Lantagne Decl. ¶ 12. Because none of the individual plaintiffs has attested that the employees of any firearms retailer are *not* strangers, the individual plaintiffs must likewise feel uncomfortable risking possible infection with COVID-19 by conducting an in-store firearms transaction. That concern is well founded: while the Commonwealth is experiencing the worst phase of this crisis, preservation of the public health requires that Massachusetts residents limit in-person commercial interactions in order to reduce transmission of COVID-19.

Issuance of an injunction against enforcement of the COVID-19 Orders would put the health and safety of Massachusetts residents in immediate jeopardy. The public interest in preventing the continued spread of COVID-19 among Massachusetts residents, with attendant hospitalizations and deaths, is paramount. During the ongoing surge of COVID-19 cases and deaths in Massachusetts, it is imperative that Massachusetts residents continue to practice social distancing in order to slow the rate of transmission. Limiting commercial transactions to the fullest extent possible is a critical part of social distancing. Given the magnitude of the public health crisis, preliminary injunctive relief in favor of the plaintiffs would be contrary to the public interest.

## CONCLUSION

For the foregoing reasons, this Court should deny the plaintiffs' motions for a temporary restraining order or preliminary injunction.

Respectfully submitted,

CHARLES D. BAKER, Governor of the
Commonwealth of Massachusetts; MONICA
BHAREL, MD, MPH, Commissioner of the
Department of Public Health; JAMISON
GAGNON, Commissioner of the Department of
Criminal Justice Information Services; and
MAURA HEALEY, Attorney General of the
Commonwealth of Massachusetts,

By their attorney,

MAURA HEALEY
ATTORNEY GENERAL

/s/ Julia E. Kobick
Julia E. Kobick (BBO No. 680194)
Assistant Attorney General
Gary Klein (BBO No. 560769)
Special Assistant Attorney General
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2559
Julia.Kobick@mass.gov
Gary.Klein@state.ma.us

Dated: April 28, 2020

## CERTIFICATE OF SERVICE

I certify that this document, filed through the Court's ECF system, will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Julia E. Kobick
Julia E. Kobick
Assistant Attorney General