# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL MCCARTHY; WILLIAM R. BIEWENGA; LAURIE WARNER; TIMOTHY GALLIGAN; JIM SIMMONS; DAVID LANTAGNE; TROY CITY TACTICAL LLC; DON TOM GROUP LLC d/b/a PRECISION POINT FIREARMS; SHOOTING SUPPLY LLC; DOWNRANGE INC. d/b/a CAPE GUN WORKS; FIREARMS POLICY COALITION, INC.; COMMONWEALTH SECOND AMENDMENT, INC.; and SECOND AMENDMENT FOUNDATION, INC., <br><br> Plaintiffs, <br><br> -against- <br><br> CHARLES D. BAKER, in his Official Capacity as Governor of the Commonwealth of Massachusetts and in his Individual Capacity; MONICA BHAREL MD, MPH, in her Official Capacity as Commissioner of the Massachusetts Department of Public Health and in her Individual Capacity; JAMISON GAGNON, in his Official Capacity as Commissioner of the Department of Criminal Justice Information Services and in his Individual Capacity; ALBERT F. DUPRE, in his Official Capacity as Chief of the Fall River Police Department and in his Individual Capacity; ROBERT F. RUFO, in his Official Capacity as Chief of the Woburn Police Department and in his Individual Capacity; KEITH A. PELLETIER, in his Official Capacity as Chief of the Westport Police Department; and MATTHEW SONNABEND, in his Official Capacity as Chief of the Barnstable Police Department and in his Individual Capacity, <br><br> Defendants. | CIVIL ACTION NO. 1:20-cv-10701-DPW <br><br><br> **PLAINTIFFS' REPLY** |

*-i-*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ............................................................................................................*ii*

**INTRODUCTION** ........................................................................................................................1

    I)    The COVID-19 Orders Strike at the Core of the Second Amendment .............................1

          A.    Walmart Doesn't Save the Day, and Neither do Private Sales .............................2

          B.    The Closure of Firearms and Ammunition Retailers Hits the Core,
                 not the Periphery, of the Right to Keep and Bear Arms .......................................4

    II)    There is No Substantial Fit .................................................................................................6

    III)    The Retailer Plaintiffs Have Standing ...............................................................................9

**CONCLUSION** ..........................................................................................................................10

## TABLE OF AUTHORITIES

**Cases**

*Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ............................................9

*Bateman v. Perdue*, 881 F. Supp. 2d 709 (E.D.N.C. 2012) ..........................................................6

*Caetano v. Massachusetts*, 577 U.S. ___, 136 S. Ct. 1027 (2016) ...............................................2

*Carey v. Population Servs., Int'l*, 431 U.S. 678 (1977) ..............................................................10

*Craig v. Boren*, 429 U.S. 190 (1976) ..........................................................................................10

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...............................................................2, 6

*Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018) ...........................................................................9

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) (*Heller III*) ................................5

*McCullen v. Coakley*, 573 U.S. 464 (2014) ..................................................................................7

*N.Y. State Rifle & Pistol Ass'n v. City of New York*, No. 18-280, slip op.
  (U.S. Apr. 28, 2020) ..................................................................................................................9

*National Rifle Association of America, Inc. v. BATFE*, 700 F.3d 185 (5th Cir. 2012) .............4-5

*Texeira v. County of Alameda*, 822 F.3d 1047 (9th Cir. 2016) ...........................................6, 9-10

*Tilley v. TJX Cos.*, 345 F.3d 34 (1st Cir. 2003) ............................................................................9

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2009) ...........................................................5

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ................................................................5, 9

*Watt v. Energy Action Educ. Found.,* 454 U.S. 151 (1981) ..........................................................9

**Other Authorities**

Brief for the States of New York, et al. in *In re: Abbott*, No. 20-50264
  (5th Cir. Apr. 3, 2020) ...............................................................................................................8

Erin Tiernan, *Lawmakers urge Baker to reconsider recreational marijuana shops
  closure amid pandemic*, Boston Herald, Apr. 8, 2020 ...........................................................3, 8

https://corporate.walmart.com/newsroom/2019/09/03/mcmillon-to-associates-
  our-next-steps-in-response-to-the-tragedies-in-el-paso-and-southaven ...................................2

https://www.theorywellness.org .....................................................................................................3

Kashmira Gander, *Dr. Fauci says "a real degree of normality" may come
  by November as New York COVID-19 ICU admissions dip for the first time*,
  Newsweek, Apr. 11, 2020 ..........................................................................................................4

**Rules**

Fed. R. Evid. 802 ............................................................................................................................2

**INTRODUCTION**

The Second Amendment does not secure a "limited" right, and the Defendants have offered no justification whatsoever for their decision to shut down the commercial channels by which its citizens can obtain arms and ammunition, while leaving all sorts of other business—which enjoy no constitutional protection—open. In this reply, the Plaintiffs respond to the Defendants' claims that their COVID-19 Orders impact only the periphery of the Second Amendment, their attempts to justify their burden, and their argument that the retailer Plaintiffs lack standing. We do not address the Defendants' arguments regarding the Due Process Clause and the Eleventh Amendment, as the instant Plaintiffs have not raised these claims, nor do we address the issue of qualified immunity, since this motion does not seek damages.

**I) The COVID-19 Orders Strike at the Core of the Second Amendment**

Plaintiffs' moving papers showed that the COVID-19 Orders strike at the very core of the Second Amendment because the ability to acquire arms and ammunition is part and parcel to the right to keep them. The laws that the Supreme Court overturned in *Heller* and *McDonald* were not laws that "banned" handguns per se, but were instead laws that prohibited: (1) acquiring them; and (2) putting ammunition in them. *See* Pl. Br. pp. 9-10. Defendants respond by contending (p. 7) that the COVID-19 Orders "do not impose anything close to a ban . . . and, at most, temporarily delay acquisition of guns." The Defendants claim (p. 7) that "the Second Amendment secures a limited right," and they characterize their ban on acquiring guns (p. 8) as a burden that does not impact the "core" of the Second Amendment, but instead only its "periphery." The Defendants analogize (pp. 9-10) to age restrictions on acquiring guns and to waiting periods associated with background checks or obtaining licenses. And finally, the Defendants attempt to lessen the blow of their ban by pointing out (p. 10) that licensed individuals can buy guns from other licensed individuals, and (p. 11) that Walmart remains open.

### A.     Walmart Doesn't Save the Day, and Neither do Private Sales

Defendants' evidence regarding the availability of ammunition at Walmart—an affiant's testimony that she placed calls and asked questions, offered to show the truth of the answers she received—is inadmissible hearsay. Fed. R. Evid. 802. And even were this disregarded, it omits an important detail—that Walmart does not sell handgun ammunition.[1] Indeed, as shown in the declarations submitted herewith, the Plaintiffs and others visited 10 of the 11 Walmarts that the Defendants cite in their brief—and were unable to find handgun ammunition at any of them. Moreover, as Massad Ayoob—a nationally renowned expert on armed self-defense—explains in his declaration, even if someone could find handgun ammunition in a Walmart, that ammunition would likely be unsuitable for self-defense. Dec. of Massad Ayoob, ¶¶ 5-10. Rather, suitable self-defense ammunition "is most likely to be found in local gun shops." *Id.* at ¶ 11. And, significantly, it is *handguns* that are "the quintessential self-defense weapon" and "the most popular weapon chosen by Americans for self-defense in the home." *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008); *see also Caetano v. Massachusetts*, 577 U.S. ___, 136 S. Ct. 1027, 1032 (2016). The unavailability of handgun ammunition means that the Plaintiffs remain unable to exercise the core of the Second Amendment's protections.

Setting this aside, it must be observed that the Defendants' claim that it is wholly lawful for Walmart to sell ammunition because it is also sells "essential" products smacks of duplicity. Two of the Plaintiffs in this action are licensed to operate as "manufacturers." Yet, even though the COVID-19 Orders designate "manufacturers" of firearms to be "essential,"[2] they were still ordered to shut down. *See* Dec. of Christopher Kielty (Doc. No. 17), ¶¶ 2, 5; Dec. of Toby Leary

---

[1] *See* https://corporate.walmart.com/newsroom/2019/09/03/mcmillon-to-associates-our-next-steps-in-response-to-the-tragedies-in-el-paso-and-southaven (last visited Apr. 29, 2020).
[2] *See* Doc. No. 62-8 at 3.

(Doc. No. 19), ¶¶ 2-6. This is also true of Defendants' claim (p. 11 n.5) that there is a distinction between "distributors," who remain available to satisfy the demands of law enforcement, and "retailers" that must close. Chief Farnsworth does not have personal knowledge of the practices of *every* law enforcement agency in the Commonwealth. *See* Dec. of Jeff Farnsworth (Doc. No. 61-2), ¶ 11. Moreover, the contention that retail dealers like the Plaintiffs do not supply law enforcement is wrong. The declarations of Mark Bouchard, Michael Skidmore and Toby Leary, submitted herewith, show just that the Plaintiff retailers do indeed supply law enforcement.[3]

If the rationale the Defendants have now put forth holds water, then logically, the Plaintiffs' grievance could be resolved if licensed gun retailers would just start selling beer or dog food. In any event, in connection with the dismissal of the Police Chief Defendants, the remaining parties stipulated that the COVID-19 Orders "require the closure of licensed retailers of firearms in the Commonwealth . . . and further, that this conclusion does not depend on any interpretation of the Orders by the Defendant Police Chiefs." Doc. No. 57-1 at 1-2. We have no explanation for why this does not also hold true for Walmart.

And as to private sales, the Plaintiffs do not dispute that it is legally possible for an individual to buy a gun (but not ammunition) from another licensed individual—but the Defendants have mischaracterized things by suggesting (p. 10 & n.2) that the Plaintiffs "concede" that this is a realistic option. Rather, the Plaintiffs have testified that they "do not personally know an individual who is willing and able to sell me a firearm at this time," "do not

---

[3] This is also not how the Defendants have otherwise interpreted the COVID-19 Orders. For example, many marijuana dispensaries sell for both medical and non-medical use. *See, e.g.,* https://www.theorywellness.org (last visited Apr. 29, 2020). But the COVID-19 Orders designate only medical sales as "essential," *see* Doc. No. 62-8 at ¶ 2, and the Defendants have steadfastly refused to allow dispensaries to make recreational sales on the side, *see* Erin Tiernan, *Lawmakers urge Baker to reconsider recreational marijuana shops closure amid pandemic*, Boston Herald, Apr. 8, 2020, *available at* https://tinyurl.com/y8clhx42 (last visited Apr. 29, 2020).

feel comfortable risking possible infection with the COVID-19 virus by purchasing a used firearm from a stranger," and as a result, are "unable to purchase or otherwise acquire a firearm[.]" Dec. of Michael McCarthy (Doc. No. 10), ¶¶ 9-11.[4] This argument also overlooks the obvious—that the individual Plaintiffs are all people who do not already own guns, and who are not realistically in a position to make determinations about what types of guns would serve their needs without input from others—the service a gun store provides.

> B. **The Closure of Firearms and Ammunition Retailers Hits the Core, not the Periphery, of the Right to Keep and Bear Arms**

Contrary to the Defendants' claims, the fact that the restrictions at issue will someday come to an end does not spare them from meaningful constitutional review. Preliminarily, it is unclear when this will even occur. Dr. Anthony Fauci says that things are unlikely to begin returning to normal until the fall, although no one really knows for sure. *See* Kashmira Gander, *Dr. Fauci says "a real degree of normality" may come by November as New York COVID-19 ICU admissions dip for the first time*, Newsweek, Apr. 11, 2020, *available at* https://tinyurl.com/rbw6j9m (last visited Apr. 29, 2020).

Moving on, the Fifth Circuit's decision in *National Rifle Association of America, Inc. v. BATFE*, 700 F.3d 185 (5th Cir. 2012), does not, as Defendants would have it (p. 9) stand for the proposition that "[c]ourts have . . . upheld under intermediate scrutiny laws that impose up to a three-year delay[.]" Rather, the issue in this case was "the ability of 18-to-20-year-olds to purchase handguns from FFLs" (*i.e.* licensed detailers), and the court's primary conclusion was that this restriction was likely "outside the Second Amendment's protection." *Id.* at 203. "[I]n an abundance of caution," the court reviewed the age restriction anyway and found intermediate

---

[4] *See also* Dec. of William Biewenga (Doc. No. 11) at ¶¶ 8-10; Dec. of Laurie Warner (Doc. No. 12) at ¶¶ 9-11; Dec. of Timothy Galligan (Doc. No. 13) at ¶¶ 9-11; Dec. of Jim Simmons (Doc. No. 14) at ¶¶ 11-13; Dec. of David Lantagne (Doc. No. 15) at ¶¶ 11-13.

scrutiny appropriate because the restriction "does not disarm an entire community, but instead prohibits commercial handgun sales to 18-to-20-year-olds—a discrete category." *Id.* at 205. Thus, the focus of the court's focus was on the breadth of people impacted, rather than on how long the burden would last.

Perhaps more to the point, delay is not acceptable for the sake of delay. Defendants' appeal to the delays that can attend the completion of background checks or license investigations (pp. 9-10 & n.3) are inapposite because these are not the burdens that are at issue in this case. These delays are the unavoidable secondary effect of the regulatory decision to vet gun purchasers in advance. And when the public safety justification underlying these burdens ceases to exist, so too does the permissibility of the delay. In *Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) (*Heller III*), the D.C. Circuit upheld a requirement to register guns, which included a background investigation, *see id.* at 273-78, but it struck down a restriction on acquiring more than one handgun in a 30-day period because there was no "substantial evidence" that it "'promotes a substantial governmental interest that would be achieved less effectively absent the regulation,'" *id.* at 280 (*quoting Ward v. Rock Against Racism*, 491 U.S. 781, 782-83 (1989)) (other quotations omitted). A delay is not justified merely because it will someday end.

This much is irreducible: The Second Amendment prevents the Defendants from precluding the keeping of arms, and the direct holding of *Heller* and *McDonald* is that bans on acquiring them are flatly unconstitutional. Because the Defendants' actions preclude people from acquiring both arms and ammunition, they strike at the very core of protection. A right to keep arms ultimately means nothing in the absence of lawful and adequate channels to acquire them. *See United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2009) ("prohibiting the

commercial sale of firearms . . . would be untenable under *Heller*"); *accord Texeira v. County of Alameda*, 822 F.3d 1047, 1057 (9th Cir. 2016).

**II)  There is No Substantial Fit**

For just this reason, Plaintiffs' moving papers showed that a prospective ban on acquiring guns is invalid, as *Heller* stated, "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Heller*, 554 U.S. at 628-29; *see* Pl. Br. pp. 9-11. And on the other hand, if a tiered standard of scrutiny is appropriate, then it must be a strict one, for the burden at issue here "prohibits law abiding citizens from purchasing and transporting to their homes firearms and ammunition needed for self-defense." *Bateman v. Perdue*, 881 F. Supp. 2d 709, 715 (E.D.N.C. 2012); *see* Pl. Br. pp. 15-16. Defendants respond by contending (p. 8) that intermediate scrutiny is appropriate because the burden here "fall[s] outside the core." And the Defendants (p. 12) relegate *Bateman*—the most on-point decision cited to this Court—to a footnote, instead attempting to place reliance on in-chambers orders that denied ex parte temporary restraining order motions. Obviously, these short orders, which do not reflect full briefing, have little precedential value.

The Defendants also disclaim any notion of narrow tailoring, instead asserting (p. 16) that all they need is a "substantial fit" with an important government interest. The argument tacitly concedes that the Defendant's decision to close gun and ammunition retailers, while leaving a plethora of other businesses free to operate, cannot survive any form of judicial review that, whatever its label, has any actual teeth. If COVID-19 is too dangerous to let constitutionally protected forms of commerce continue their operations, then it is definitely too dangerous to allow things like pet supply stores, liquor stores, and car dealerships—which enjoy no constitutional protection whatsoever—to continue.

And indeed, the Defendants' attempt to distinguish gun and ammunition retailers from the services they have deemed "essential" (p. 14) fails miserably. It may be true that many gun stores are relatively small and "cramped," but then, so are many gas stations, delis and bodegas—all of which enjoy "essential" status. There is no "fit" with this objective because the Defendants have not closed down only the gun and ammunition retailers that are "cramped," nor have they otherwise done anything to target this concern, like limiting the number of people in stores, or requiring layout changes. It may also be true that, "'for every visit to a gun store that results in a sale, there are many other customer visits' that take place," but again, there is no fit. The Defendants have not sought to limit browsing in gun stores by, for example, requiring appointments, or limiting in-person transactions that do not involve guns or ammunition. (Moreover, Ms. Dunne's declaration to this effect reflects her observations during times of normalcy, not during the present—when the vast majority of people are staying at home.)

The Plaintiffs' moving papers discussed *McCullen v. Coakley*, 573 U.S. 464 (2014), at length, as did two of the amicus curiae briefs. There, the Court applied intermediate scrutiny to the Commonwealth's legislative decision to increase the protest "buffer" at abortion clinics from 6 feet to 35 feet. *See id.* at 471. The Court's intermediate scrutiny analysis looked to both the justification for increasing the buffer from the previous limit, as well as the legislative approaches other jurisdictions had taken. *See id.* at 487-93; *see also* Pl. Br. at 16-17.

Defendants simply ignore *McCullen*, tacitly conceding that the burdens at issue here could never survive this sort of analysis. First, there is no dispute that Governor Baker designated firearms retailers as "essential," but then changed the designation after the Attorney General and House Speaker contacted him to voice their opinion that it was necessary to curb the right to keep and bear arms in order to protect police officers and domestic partners. *See* Pl. Br.

at 6. *The Defendants never provide any explanation for this change of policy.* There is no fit. And as the Plaintiffs showed in their moving papers, the substantial majority of other jurisdictions—including all other jurisdictions in New England—have not found it necessary to close down commercial channels for acquiring arms and ammunition wholesale. *See id.* at 6-8. The Defendants offer no explanation whatsoever for why the Commonwealth of Massachusetts is different. Again, there is no fit.

Rather than addressing these issues, the Defendants attempt (pp. 3-5, 9-10, 13-15, 28) to begin and end analysis with their claimed desire to limit social interactions as much as possible. But it's far from clear that their approach actually fits this goal. Licensed individuals are free to travel to other states to purchase rifles and shotguns—and closing stores in Massachusetts means that people are likely to do just that. Notably, the State of Texas recently cited COVID-19 to justify placing restrictions on access to abortions, and in that context, the Massachusetts Attorney General joined an amicus brief arguing that the "abortion ban is likely to encourage interstate travel that increases the risks of COVID-19 transmission." *See* Brief for the States of New York, et al. at p. 19 in *In re: Abbott*, No. 20-50264 (5th Cir. Apr. 3, 2020).[5] That brief also argued, correctly, that it is "mistaken[ to] rely on cases involving physical property or commercial interests that have no import here, where a personal liberty interest" is implicated. *Id.* at 20.

The only consideration that has any actual degree of fit with the actions the Defendants have taken is the desire to suppress the right to keep and bear arms. And just as it is improper for the State of Texas to use COVID-19 to justify laying restrictions on a constitutional right that some of its political leaders disfavor, it is likewise improper for the Commonwealth of

---

[5] Notably, Governor Baker cited the interest in reducing interstate travel to justify the decision to close recreational marijuana stores. *See* Erin Tiernan, *Lawmakers urge Baker, supra* note 3.

Massachusetts to use COVID-19 to do the same thing here. As the Plaintiffs have already explained, there is no legitimate government interest in suppressing the exercise of constitutional rights. *See* Pl. Br. at 12-13; *see also, e.g., N.Y. State Rifle & Pistol Ass'n v. City of New York*, No. 18-280, slip op. at *31 (U.S. Apr. 28, 2020) (Alito, J., dissenting) ("Once it is recognized that a reasonable opportunity to practice is part of the very right recognized in *Heller*, what this justification amounts to is a repudiation of part of what we held in that decision.").

Finally, it is true that the court in *Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018), said that "a legislature's chosen means need not be narrowly tailored," *id.* at 674, but this must be placed in context. Most significantly, the court had already found that the conduct at issue— carrying guns in public—was outside the "core" of protection. *See id.* at 671. Whatever labels one might use, the intermediate scrutiny test requires that the government "leave open ample alternative channels for" protected conduct. *Ward*, 491 U.S. at 790 (quotation and citations omitted). If a court has already concluded that conduct lies outside the core, then the need to ensure that channels for that conduct remain open dissipates. This is not the case here, where the Defendants' actions directly implicate core conduct.

**III) The Retailer Plaintiffs Have Standing**

One final matter is the Defendants' reliance on *Texeira v. County of Alameda*, 822 F.3d 1047 (9th Cir. 2016), to argue (pp. 17-18) that the Second Amendment affords no protection to retailers of firearms. Preliminarily, it is well established that that there is no need to address an organization's standing when it is clear that the remaining Plaintiffs have standing. *See Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981); *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977); *see also Tilley v. TJX Cos.*, 345 F.3d 34, 36 (1st Cir. 2003). Since that is the case here, judicial economy favors ignoring the issue.

But should the Court choose to address it, the fact is that the Ninth Circuit's *Texeira* decision does not stand for the broad proposition that the Defendants attempt to attach to it. That case concerned the application of zoning restrictions to a *single* firearm retailer, rather than a burden that prohibits *all* firearms retailers from conducting business. *See Texeira*, 873 F.3d at 673-76. There was accordingly no connection to any individual's right to acquire a firearm because individuals could still visit other licensed retail dealers. *See id.* at 682. And as one of the judges observed, "the Second Amendment must contemplate the right to sell firearms if citizens are to enjoy the core, fundamental right to own and possess them in their homes." *See id.* at 693 (J. Tallman, concurring in part and dissenting in part). Here, in marked contrast, the COVID-19 Orders apply to all dealers, and their import is to wholly prohibit the commercial sale of firearms and ammunition. Just as vendors of contraceptives and beer have standing to challenge laws and policies that unconstitutionally impinge the right of their customers to purchase their products, *see Carey v. Population Servs., Int'l*, 431 U.S. 678, 689 (1977); *Craig v. Boren*, 429 U.S. 190, 192-93 (1976), the retailer Plaintiffs here likewise have standing.

## CONCLUSION

The Supreme Court has conclusively rejected the proposition that "the right recognized in *Heller* [is] a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees[.]" *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010). This is true whether the Defendants approve of this policy choice or not. Their decision to close off all commercial channels by which their citizens can obtain arms and ammunition cannot be justified in light of their concomitant decision to allow numerous other retailers to remain open—and particularly where, as here, they have offered no justification that stands up to any sort of searching review.

Dated: April 30, 2020

                                        Respectfully submitted,

                                        THE PLAINTIFFS,

                                        By their attorneys,

                                        /s/ David D. Jensen
                                        David D. Jensen, Esq.
                                        Admitted *Pro Hac Vice*
                                        David Jensen & Associates
                                        33 Henry Street
                                        Beacon, New York 12508
                                        Tel: 212.380.6615
                                        Fax: 917.591.1318
                                        david@djensenpllc.com

                                        J. Steven Foley
                                        BBO # 685741
                                        Law Office of J. Steven Foley
                                        100 Pleasant Street #100
                                        Worcester, MA 01609
                                        Tel: 508.754.1041
                                        Fax: 508.739.4051
                                        JSteven@attorneyfoley.com

                                        Jason A. Guida
                                        BBO # 667252
                                        Principe & Strasnick, P.C.
                                        17 Lark Avenue
                                        Saugus, MA 01960
                                        Tel: 617.383.4652
                                        Fax: 781.233.9192
                                        jason@lawguida.com