# Exhibit N

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

LISA WALTERS, SECOND
AMENDMENT FOUNDATION, and
FIREARMS POLICY COALITION,
INC.,

   Plaintiffs,

v.

BRIAN KEMP,
in his official capacity as Governor of
The State of Georgia,
GARY VOWELL,
in his official capacity as Commissioner
of the Department of Public Safety and
Colonel of the Georgia State Patrol,
CHEROKEE COUNTY, GEORGIA, and
KEITH WOOD, in his official capacity
as Judge of the Probate Court of
Cherokee County,

   Defendants.

CIVIL ACTION FILE

No. 1:20-CV-1624-SCJ

## ORDER

This matter appears before the Court on Plaintiffs' Motion for Preliminary Injunction (Doc. No. [2]).[1] Plaintiffs argue that the suspension of processing Georgia Weapons License ("GWL") applications during the pendency of the current emergency violates their Second and Fourteenth Amendment rights.

Plaintiffs now seek an injunction (1) prohibiting Governor Kemp and Colonel Vowell from enforcing O.C.G.A. § 16-11-126 against Plaintiff Walters, Plaintiffs SAF and FPC's similarly situated members, and all similarly situated members of the public who are not prohibited from acquiring and possessing firearms under federal and state laws; and, or in the alternative, (2) requiring Defendants Wood and Cherokee County, and each of their respective employees, officers, agents, representatives, and those acting in concert or participation with them, to accept and process GWL applications and issue licenses to eligible applicants. Doc. No. [1], pp. 20–21, ¶¶ 59–61.

---

[1]      Plaintiffs moved for a temporary restraining order ("TRO") or, in the alternative, preliminary injunction. <u>See</u> Doc. No. [2]. However, at the April 27, 2020 hearing, Plaintiffs' counsel stated that because all Defendants had been served and entered an appearance, they would be moving only for a preliminary injunction. Doc. No. [35] (Hearing Transcript), Tr. 5:15–25.

2

## I.      BACKGROUND

### A. GWL Requirements

Georgia law does not require a GWL to possess a firearm in one's home, car, or place of business. O.C.G.A. § 16-11-126(a). In addition, unlicensed individuals may also carry in public (1) an unloaded or loaded long gun, provided any loaded long gun is carried openly, or (2) any handgun, provided it is enclosed in a case and unloaded. O.C.G.A. § 16-11-126(b), (c). Any person with a valid hunting or fishing license on his or her person, who is engaged in legal hunting, fishing, or sport shooting may carry a firearm without a GWL, provided the person has the permission of the owner of the land on which the activities are being conducted. O.C.G.A. § 16-11-126(f)(1). Individuals wishing to carry firearms beyond the exceptions listed in O.C.G.A. § 16-11-126(a)–(g) must obtain a GWL. O.C.G.A. § 16-11-126(h)(1). Failure to do so constitutes the offense of carrying a weapon without a license. O.C.G.A. § 16-11-126(h)(2).

State probate judges are statutorily tasked with processing and issuing GWLs. See O.C.G.A. § 16–11–129(a)(1). The statute requires probate judges to duly investigate each applicant before issuing a GWL to ensure they are qualified. See O.C.G.A. § 16–11–129(b), (c). As part of this investigation, "the

3

judge of the probate court shall require the applicant to proceed to an appropriate law enforcement agency in the county or to any vendor approved by the Georgia Bureau of Investigation" to be fingerprinted. O.C.G.A. § 16–11–129(c). In Cherokee County,

> The collection of the applicant's fingerprint is done on a "live scan" fingerprinting machine located in the Probate Court's file room by one of his employees in the Probate Court who is trained to perform such act. Judge Wood does not have a contract with any law enforcement agencies to collect fingerprints for GWL applications.
>
> . . . .
>
> An applicants' photograph is likewise taken in the file room of the Probate Court and is performed by one of Judge Wood's employees in the Probate Court who is trained to perform such act. In order to properly photograph an applicant, the employee sits approximately 3-4 feet from the applicant and takes the photograph using a USB computer camera attached to a desktop computer. The GWL applicant cannot wear a mask when his/her photograph is taken. A GWL applicant must then provide a signature on an electronic keypad using a common stylus available to all applicants.

Doc. No. [28], pp. 2–3.

4

### B. COVID-19 Emergency

On March 14, 2020, Governor Kemp declared a public health state of emergency due to the rapid spread of COVID-19. See Georgia Exec. Order 03.14.20.01 (March 14, 2020), https://gov.georgia.gov/document/2020-executive-order/03142001/download. The same day, Chief Justice Harold Melton of the Supreme Court of Georgia declared a state of judicial emergency. Doc. No. [28-6]. These declarations were "based on the continued transmission of COVID-19 throughout the State of Georgia in an effort to protect the health, safety, and welfare of all Georgia citizens and visitors." Doc. No. [33], p. 2.

Chief Justice Melton's order stated:

> To the extent feasible, courts should remain open to address essential functions, and in particular courts should give priority to matters necessary to protect health, safety, and liberty of individuals. Essential functions are subject to interpretation; however, some matters that fall into the essential function category are: (1) where an immediate liberty or safety concern is present requiring the attention of the court as soon as the court is available; (2) criminal court search warrants, arrest warrants, initial appearances, and bond reviews; (3) domestic abuse temporary protective orders and restraining orders; (4) juvenile court delinquency detention hearings and emergency removal matters; and (5) mental health commitment hearings.

Doc. No. [26], p. 10. "To the extent court proceedings are held, they should be done in a manner to limit the risk of exposure, such as by videoconferencing, where possible." Id. at 11. In March of 2020, the Judicial Qualifications Commission ("JQC") issued a statement noting that any judge who failed to follow the Chief Justice's order could be subject to JQC action. Id. at 14.

On March 17, 2020, the Council of Probate Court Judges of Georgia ("the Council") issued a memorandum clarifying the effect of Chief Justice Melton's order on the state's probate courts. Doc. No. [26], pp. 16–17. The memorandum explicitly listed the issuance of GWLs as a non-essential function. Id. at 17. The memorandum also noted that Chief Justice Melton's order extended the deadline for renewals of existing GWLs, meaning GWLs set to expire during the pendency of the emergency will remain valid until the declaration of emergency is lifted. Id.

On or about March 14, 2020, after reviewing the COVID-19 Interim Guidelines for Businesses and Employers issued by the Centers for Disease Control ("CDC"), and in reliance upon his review of the above-mentioned judicial guidance, Judge Wood determined that "he could not allow the continued acceptance and processing of applications for GWLs while adequately

6

protecting the health and safety of his employees and visitors to the Probate Court and in compliance with the various orders and rules." Doc. No. [28], p. 6.

## C. Procedural History

Plaintiffs Lisa Walters, Second Amendment Foundation ("SAF"), and Firearms Policy Coalition, Inc. ("FPC") brought this action on March 16, 2020. Doc. No. [1]. Plaintiffs argue "because of Defendants' laws, orders, and enforcement of them, they cannot exercise" their "fundamental, constitutionally guaranteed right to carry loaded, operable handguns on their person, outside their homes, vehicles, and place of business, in public, for self-defense." Id., p. 2. Plaintiffs now seek an injunction (1) prohibiting Governor Kemp and Colonel Vowell from enforcing O.C.G.A. § 16-11-126 against Plaintiff Walters, Plaintiffs SAF and FPC's similarly situated members, and all similarly situated members of the public who are not prohibited from acquiring and possessing firearms under federal and state laws; and, or in the alternative, (2) requiring Judge Wood and Cherokee County, and each of their respective employees, officers, agents, representatives, and those acting in concert or participation with them, to accept and process GWL applications and issue licenses to eligible applicants. Doc. No. [1], pp. 20–21, ¶¶ 59–61.

7

Defendants Governor Kemp and Colonel Vowell ("the State Defendants") argue (1) Plaintiff Walters lacks standing against the State Defendants (Doc. No. [26], pp. 9–15); (2) Plaintiffs SAF and FPC lack organizational standing against the State Defendants (Doc. No. [26], pp. 16–21); (3) Plaintiffs' claims are barred by the Eleventh Amendment (Doc. No. [26], pp. 22–23); (4) to the extent Plaintiffs seek to hold the State Defendants liable for the alleged failure of the County Defendants, the claims are barred because the State Defendants have no control over the judiciary (Doc. No. [26], pp. 23–25); (5) Plaintiffs are not likely to prevail on the merits of their Second Amendment claims (Doc. No. [26], pp. 25–35); and (6) the remaining preliminary injunction factors do not weigh in favor of Plaintiffs (Doc. No. [26], pp. 35–37).

Defendants Cherokee County and Judge Wood ("the County Defendants") argue (1) Plaintiffs cannot demonstrate a likelihood of success on the merits (Doc. No. [28], pp. 14 –17); (2) Plaintiffs lack standing against them (Doc. Nos. [28], pp. 8–14; [29-1], pp. 5–9)); (3) Plaintiffs are not likely to suffer irreparable harm (Doc. No. [28], pp. 18–19); (4) the balancing of the equities does not weigh in favor of Plaintiffs (Doc. No. [28], pp. 19–20); (5) granting the injunction will harm the public interest (Doc. No. [28], pp. 20); (6) injunctive relief is barred because

8

Plaintiffs have an available state remedy (Doc. Nos. [27-1], p. 17; [29-1], pp. 17–19).[2]

## II.    STANDING

In response to the instant preliminary injunction motion, Defendants assert that both Plaintiff Walters and the organizational Plaintiffs lack standing to bring this action against them. Doc. Nos. [26], p. 9; [28], p. 10; [36]; [37], p. 3.

### A. Applicable Legal Standard

"Standing 'is the threshold question in every federal case, determining the power of the court to entertain the suit.'" CAMP Legal Def. Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1269 (11th Cir. 2006) (quoting Warth v. Seldin, 422 U.S. 490, 499 (1975)). Article III of the United States Constitution limits the courts to hearing actual "Cases" and "Controversies." U.S. Const. Art. III § 2; see also Lujan v. Defs. of Wildlife, 504 U.S. 555, 559–60 (1992). Overall, the standing

_____

[2]     Some of these arguments are contained in Cherokee County and Judge Wood's Motions to Dismiss. See Doc. Nos. [27]; [29]. However, because issues of standing are relevant to the current motion for preliminary injunction, see CAMP Legal Def. Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1269 (11th Cir. 2006) (quoting Warth v. Seldin, 422 U.S. 490, 499 (1975)) ("Standing 'is the threshold question in every federal case, determining the power of the court to entertain the suit.'"), and because Cherokee County and Judge Wood incorporated those arguments by reference into their response to Plaintiffs' pending motion, see Doc. No. [28], p. 10, the Court will consider them here.

requirement arising out of Article III seeks to uphold separation-of-powers principles and "to prevent the judicial process from being used to usurp the powers of the political branches." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013). Standing is typically determined by analyzing the plaintiff's situation as of the time the complaint is filed, and subsequent events do not alter standing. Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1275 (11th Cir. 2003) (collecting authorities); Johnson v. Bd. of Regents of Univ. of Ga., 263 11 F.3d 1234, 1267 (11th Cir. 2001); Charles H. Wesley Educ. Found., Inc. v. Cox, 408 F.3d 1349, 1352 n.3 (11th Cir. 2005).

To establish standing, a plaintiff must show three things:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan, 504 U.S. at 560–61 (internal quotations, citations, and alterations omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." Id. at 561.

Organizations, like individuals, can also establish standing to sue. See Arcia v. Fla Sec'y of State, 772 F.3d 1335, 1341–42 (11th Cir. 2014) (describing two different theories under which an organization can demonstrate standing — associational and diversion-of-resources). To establish associational standing, an organization must prove that is members "would otherwise have standing to sue in their own right." Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 181 (2000). Under the diversion-of-resources theory, an organization has standing to sue "when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." Arcia, 772 F.3d at 1341.

**B. Plaintiff Walters**

Defendants assert that Plaintiff Walters cannot demonstrate standing for two reasons. First, they argue that she cannot show an injury in fact because any alleged fear of arrest or prosecution under O.C.G.A. § 16-11-126 is "speculative and not reasonable in light of state law prohibiting law enforcement officers from

11

detaining [her] to inquire about her permit." Doc. No. [26], p. 12; see also Doc. No. [37], p. 8; O.C.G.A. § 16-11-137(b) ("A person carrying a weapon shall not be subject to detention for the sole purpose of investigating whether such person has a [GWL].").[3] Second, they argue that she cannot show a causal connection between her alleged injuries and their conduct.[4]

The State Defendants contend that Plaintiff Walters' alleged injury is not "fairly traceable" to their conduct as opposed to the action of a third party. Doc. No. [26], p. 14. More specifically, the State Defendants characterize the relief Plaintiff Walters seeks against them in the instant motion (*i.e.*, temporarily enjoining the enforcement of O.C.G.A. § 16-11-126 during the pendency of this state of emergency) as flowing from Judge Wood's decision to temporarily suspend processing GWL applications—not from any action taken by them. Id. at p. 15.

---

[3]     The Court is sensitive to Plaintiffs' argument that this position essentially suggests that Plaintiffs "should just go and violate [O.C.G.A. § 16-11-126], commit a crime, because [the police] won't catch you." Doc. No. [35], Tr. 11:17–22. The Court does not read this argument to make such a suggestion, but it clarifies that under no circumstances is the Court suggesting that individuals should violate O.C.G.A. § 16-11-126 by carrying loaded handguns in public without a GWL.

[4]     Judge Wood, however, does not appear to contest Plaintiffs' standing on this basis. See Doc. No. [35], Tr. 51:5–13.

In the Complaint, Plaintiff Walters alleges that Governor Kemp is the chief executive officer of the State of Georgia and conservator of the peace throughout the state, thereby making him obligated to ensure that the laws of Georgia are faithfully executed. Doc. No. [1], ¶ 7. She further alleges that Colonel Vowell, as Chief Executive of the Department of Public Safety and Colonel of the Georgia State Patrol, is charged with overseeing, implementing, and otherwise executing the State of Georgia's regulatory scheme, laws, and enforcement policies, practices, and customs, including but not limited to O.C.G.A. § 16-11-126. Id. ¶ 8. Additionally, at the April 27, 2020 hearing on the instant motion, counsel for Plaintiff Walters appeared to argue that these allegations serve as a sufficient basis for proving a causal connection between her injury and their conduct. Doc. No. [35], Tr. 12:13–19.

These allegations standing alone, however, are inadequate to establish traceability. See Jacobson v. Florida Secretary of State, ___ F.3d ___, 2020 WL 2049076, at *10 (11th Cir. Apr. 29, 2020). In Jacobson, the Eleventh Circuit held that the plaintiff-voters lacked standing to sue the Secretary of State over a law that governs the order in which candidates appear on the ballot in Florida's general elections. Id. Notably, the Jacobson court found that the Secretary's

13

"general election authority" and responsibility for the administration of various election statutes was insufficient to establish causation. Id. Rather, the Jacobson court emphasized that the Supervisors—county election officials independent of the Secretary—are responsible for placing the candidates on the ballot in accordance with Florida law. Id. Thus, the Jacobson court found that "[b]ecause the Supervisors are independent officials not subject to the Secretary's control, their actions to implement the ballot statute may not be imputed to the Secretary for purposes of establishing traceability." Id.; see also id. ("In the absence of any evidence that the Secretary controls ballot order, the voters and organizations likewise cannot rely on the Secretary's general election authority to establish traceability.").

Similarly, aside from the State Defendants' general enforcement authority, Plaintiff Walters fails to point to any specific conduct or wrongdoing by the State Defendants such that her alleged injuries can fairly be traced back to them. Her grievances in the instant motion appear to be directed at Judge Wood's independent decision to currently suspend the processing of GWL applications during the pendency of this state of emergency—a decision in which there is no evidence that the State Defendants played any role in. Moreover, Plaintiff Walters

14

fails to explain what exactly the State Defendants "did wrong" and how exactly they can "trace their injuries to [their] 'conduct.'" <u>Lewis v. Governor of Alabama</u>, 944 F.3d 1287, 1296 (11th Cir. 2019) (en banc). Accordingly, the Court finds that Plaintiff Walters has failed to demonstrate standing to pursue her claims against the State Defendants.

Cherokee County also contends that Plaintiff Walters' alleged injury is not traceable back to it. Doc. No. [28], p. 10. Rather, it maintains that the decision to suspend the processing of GWL applications was made by Judge Wood alone. <u>Id.</u> More specifically, Cherokee County states that Georgia counties lack the authority to accept or issue GWLs, as that power is granted exclusively to the probate judges of each county pursuant to O.C.G.A. § 16-11-129(a)(1). <u>Id.</u> at p. 12. As probate judges are considered "county officers" whose offices are created by Article IX, Sec. I, Para. III of the Georgia Constitution, they are not employees of the county and thus not subject to the county's authority regarding the manner in which they perform their duties. <u>Id.</u> (citing <u>Griffies v. Coweta Cty.</u>, 272 Ga. 506, 507, 530 S.E.2d 718, 719–20 (2000)). Consequently, Cherokee County states that it cannot direct Judge Wood on the manner in which he performs his statutorily

authorized duties—including the issuance or suspension of processing GWL applications. Id. at p. 13.

At the April 27, 2020 hearing on the instant motion, counsel for Plaintiff Walters stated that Cherokee County was named as a party to this lawsuit in order to "cover [their] bases." See Doc. No. [35], Tr. 16:19–25. Counsel further acknowledged that they could "adjust the defendants accordingly" upon figuring out who is responsible for the alleged injury and that, for purposes of the instant motion, the Court could "put that to the side right now." Id. Considering these statements alongside Cherokee County's persuasive argument that it lacks authority to accept or issue GWLS, the Court finds that Plaintiff Walters has failed to demonstrate standing to pursue her claims against Cherokee County.

Plaintiffs have, however, sufficiently traced their alleged injury to Judge Wood—a conclusion Judge Wood does not contest. See Doc. No. [28], p. 11 ("The decision to suspend acceptance and processing of GWL applications was Judge Wood's decision, and Judge Wood's decision alone."). Thus, the Court will assume, for purposes of this Order, that Plaintiff Walters has standing against Judge Wood.

16

C. <u>Organizational Plaintiffs</u>

Defendants assert that the organizational Plaintiffs (FPC and SAF) cannot demonstrate standing under either the associational theory or diversion-of-resources theory.

### 1. *Associational Standing*

To establish associational standing, an organization must first prove that its members "would otherwise have standing to sue in their own right." <u>Friends of the Earth, Inc.</u>, 528 U.S. at 181. Here, both FPC and SAF contend they have standing based on injuries suffered by Plaintiff Walters and other similarly situated members. As discussed *supra*, however, Plaintiff Walters does not have standing to sue in her own right because she has failed to show a causal connection between her alleged injuries and the State Defendants' or Cherokee County's conduct. Accordingly, both FPC and SAF cannot establish standing against those Defendants based on the associational theory. Because the Court is assuming Plaintiff Walters has standing against Judge Wood, however, FPC and SAF would also have associational standing against Judge Wood.

## 2. *Diversion of Resources*

Under the diversion-of-resources theory, an organization has standing to sue "when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." Arcia, 772 F.3d at 1341. Here, the organizational Plaintiffs rely upon declarations from Brandon Combs, President of FPC, and Alan Gottlieb, Executive Vice President of SAF, to demonstrate standing under a diversion-of-resources theory. See Doc. Nos. [2-2]; [2-4]. The declarations contain identical allegations that their respective organization "has and continues to expend and divert resources, and has been and continues to be adversely and directly harmed, because of Defendants' laws and orders, and their enforcement policies, orders, practices, customers, and actions challenged herein."[5] Doc. Nos. [2-2], ¶ 20; [2-4], ¶ 11.

These allegations alone, however, are insufficient to support a diversion-of-resources theory of standing. Aside from their conclusory allegations that they

---

[5] Moreover, at the April 27, 2020 hearing on the instant motion, counsel for the organizational Plaintiffs argued that both RAF and FPC have spent significant time researching and talking to their members about how to comply with Georgia law given the current suspension of processing GWL applications. See Doc. No. [35], Tr. 19:4–16. Counsel nevertheless stated that for purposes of the instant motion, associational standing alone is sufficient. Id. at 19:17–20.

18

have diverted resources as a result of Defendants' conduct, both FPC and SAF fail to explain *how* their day-to-day operations have been impacted or whether the areas where resources have allegedly diverted to were not in fact already part of their normal operations. See, e.g., Fla. State Conference of NAACP v. Browning, 522 F.3d 1153, 1166 (11th Cir. 2008) (finding that the organizational plaintiffs had standing because they would "divert personnel and time" from other activities as a result of the defendant's conduct). Based on the proffered declarations, the Court does not know what activities, if any, might be impaired by the organizations' decision to "expend and divert resources" as a result of Defendants' conduct. See Jacobson, 2020 WL 2049076, at *9 (stating that the organizational plaintiffs failed to explain what activities they would divert resources *away from* in order to spend additional resources on combatting ballot position bias). Accordingly, both FPC and SAF have failed to establish standing premised on the diversion-on-resources theory.

19

### III. <u>SOVERIGN IMMUNITY</u>

#### A. <u>State Defendants</u>

In their response brief, the State Defendants assert that Plaintiffs' claims against them are barred by the Eleventh Amendment of the United States Constitution. Doc. No. [26], p. 22.

Because Plaintiffs lack standing to sue the State Defendants, this Court has no occasion to consider the Eleventh Amendment/*Ex Parte* Young arguments raised by the State Defendants. <u>See</u> <u>Jacobson</u>, 2020 WL 2049076, at *11–12 (finding no occasion to consider whether a state officer was a proper defendant under *Ex Parte* Young after an earlier conclusion that plaintiffs lacked standing to sue the state officer).

#### B. <u>Judge Wood and Cherokee County</u>

In their briefing and arguments at the April 27, 2020 hearing, Judge Wood and Cherokee County assert various immunity defenses based on their pending Motions to Dismiss (Doc. Nos. [27]; [29]). These Defendants also request that this Court rule on those motions before ruling on the instant motion. Due to the expedited nature of injunctive relief process, there has not been sufficient time for Plaintiffs to adequately respond to the pending Motions to Dismiss.

20

Accordingly, the Court will defer ruling on the County Defendants' immunity defenses until Plaintiffs have responded to their Motions to Dismiss.

### IV.   PRELIMINARY INJUNCTION

While the Court has held that Plaintiffs lack standing against the State Defendants and Cherokee County, it is assuming for purposes of this Order that they do have standing against Judge Wood. Plaintiffs have requested a preliminary injunction requiring Judge Wood to resume accepting and processing GWL applications. See Doc. Nos. [35], 32:5–11; [1], p. 21, ¶ 61. Thus, the Court will address the four preliminary injunction factors as they apply to Plaintiffs' Second and Fourteenth Amendment claims.

The Court considers four factors when deciding whether to issue a TRO or preliminary injunction pursuant to Federal Rule of Civil Procedure 65: (1) whether there is a substantial likelihood of success on the merits; (2) whether the TRO or preliminary injunction is necessary to prevent irreparable injury; (3) whether the threatened injury outweighs the harm that the TRO or preliminary injunction would cause to the non-movant; and (4) whether the TRO or preliminary injunction would be adverse to the public interest. Parker v. State Bd. of Pardons and Paroles, 275 F.3d 1032, 1034–35 (11th Cir. 2001). Injunctive relief

21

is an extraordinary and drastic remedy and should not be granted unless the movant clearly establishes the burden of persuasion as to each of these four factors. Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000).

## A. Likelihood of Success on the Merits

For the following reasons, the Court finds that Plaintiffs have failed to show that they have an ultimate likelihood of success on the merits of their Second and Fourteenth Amendment claims.

### 1. Second Amendment Claim

Plaintiffs argue that "law-abiding member[s] of [the] community . . . have a fundamental, constitutionally guaranteed right to carry loaded, operable handguns on their person, in public, and outside the limited confines of their homes, cars, and workplaces for self-defense." Doc. No. [2-1], p. 1. They argue that "Defendants' laws, orders, and enforcement of them" have precluded them from exercising that fundamental right. Id. The Court finds that Plaintiffs cannot establish any such fundamental right.

In District of Columbia v. Heller, 554 U.S. 570 (2008), the Supreme Court held for the first time that the Second Amendment creates an individual right to

keep and bear arms. [6] <u>Heller</u> clearly holds that laws banning "handgun possession in the home" are unconstitutional. <u>See</u> <u>id.</u> at 635 ("In sum, we hold that the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense."). As the Eleventh Circuit has noted, the <u>Heller</u> Court "went to great lengths to emphasize the special place that the home—an individual's private property—occupies in our society." <u>GeorgiaCarry.Org, Inc. v. Georgia</u>, 687 F.3d 1244, 1259 (11th Cir. 2012) (citing <u>Heller</u>, 554 U.S. at 628–29). However, <u>Heller</u> did not define the extent to which the Second Amendment may protect individuals seeking to carry firearms outside the home and in public.

As this Court noted in its recent order in <u>Carter et al v. Kemp et al</u>, No. 1:20-cv-1517-SCJ (N.D. Ga. Mar. 20, 2020), ECF No. 35, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." <u>United States v. Rozier</u>, 598 F.3d 768, 770 (11th Cir. 2010) (quoting <u>Heller</u>, 554 U.S. at 626). "It is

_____

[6]     <u>McDonald v. City of Chicago, Ill.</u>, 561 U.S. 742 (2010) later incorporated the Second Amendment against the states via the due process clause of the Fourteenth Amendment.

23

not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." <u>Heller</u>, 554 U.S. at 571. In fact, the <u>Heller</u> Court was careful to explain that

> nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

554 U.S. at 626–27. The Court identified this as a "non-exhaustive" list of "presumptively lawful regulatory measures." <u>Id.</u> at 627 n.26. Thus, in at least some circumstances, the state may constitutionally restrict an individual's ability to bear arms outside the home.

Like most circuits, the Eleventh Circuit has derived from <u>Heller</u> a "two-step inquiry" to address Second Amendment claims: "first, we ask if the restricted activity is protected by the Second Amendment in the first place; and then, if necessary, we would apply the appropriate level of scrutiny." <u>GeorgiaCarry.Org v. Georgia</u>, 687 F.3d 1244, 1261 n.34 (11th Cir. 2012). Thus, the Court must first decide whether Plaintiffs have a likelihood of success on the

merits of their claim that the Second Amendment encompasses a fundamental right to carry loaded handguns in public.

Plaintiffs have not pointed to any binding case law which established the existence of such a right.[7] For example, they quote Caetano v. Massachusetts, ___ U.S. ___, 136 S. Ct. 1027 (2016) (Alito, J., concurring), arguing:

> "If the fundamental right of self-defense does not protect" Plaintiff Walters and others like her, who wish to carry a handgun in public defense of themselves and their families during these times of societal challenge and unrest, "then the safety of all Americans is left to the mercy of state authorities who may be more concerned about disarming the people than about keeping them safe."

Doc. No. [2-1], p. 2 (quoting 136 S. Ct. at 1033). However, Caetano addressed whether a stun gun was the kind of weapon protected by the Second Amendment—it makes no mention of loaded handguns, or a right to carry them in public. Id. at 1027 (examining "whether a stun gun is the type of weapon contemplated by Congress in 1789 as being protected by the Second Amendment").

---

[7]     Plaintiffs cite to Moore v. Madigan, 702 F.3d 933 (7th Cir. 2012) to support their contention that the Second Amendment encompasses a right to carry handguns in public. Even if that case did acknowledge such a right, it is not binding on this Court.

Plaintiffs also attempt to cite <u>Heller</u> and <u>McDonald</u> to support their argument. For example, they argue that the Supreme Court has "recognized the handgun as 'the quintessential self-defense weapon' in America, and that 'citizens must be permitted to use handguns for the core lawful purpose of self-defense.'" (citing <u>Heller</u>, 554 U.S. at 629; <u>McDonald</u>, 561 U.S. at 767–68). However, the cited paragraph of <u>Heller</u> goes on to say:

> There are many reasons that a citizen may prefer a handgun for *home defense*: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police. Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense *in the home*, and a complete prohibition of their use is invalid.

554 U.S. at 629 (emphasis added). The cited portion of <u>McDonald</u> reaffirms that "'the need for defense of self, family, and property is most acute' *in the home*," and thus the Second Amendment applies "to handguns because they are 'the

26

most preferred firearm in the nation to keep and use for *protection of one's home and family.*'" 561 U.S. at 767 (emphasis added).[8]

The Eleventh Circuit precedent cited by Plaintiffs is similarly unavailing. The Eleventh Circuit has consistently recognized that "[a]t its 'core,' . . . the Second Amendment protects the 'right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" <u>United States v. Focia</u>, 869 F.3d 1269, 1285 (11th Cir. 2017) (quoting <u>Heller</u>, 554 U.S. at 634-35); <u>see also</u> <u>GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers</u>, 788 F.3d 1318, 1323 (11th Cir. 2015) ("In <u>Heller</u>, the Court held for the first time that the Second Amendment 'codified a pre-existing individual right to keep and bear arms,' for the ' core lawful purpose

---

[8]   Plaintiffs' quotations conveniently omit language tying the core of the fundamental right of self-defense to protection of the home and family throughout their brief. For example, Plaintiffs state: "'Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense [], and a complete prohibition of their use is invalid.'" Doc. No. [2-1], pp. 13–14 (citing <u>Heller</u>, 554 U.S. at 629). The omitted part of that sentence is "in the home." 554 U.S. at 629. Similarly, Plaintiffs argue <u>Heller</u> and <u>McDonald</u> establish "that citizens must be permitted 'to use [handguns] for the core lawful purpose of self-defense.'" Doc. No. [2-1], p. 12 (citing <u>McDonald</u>, 561 U.S. at 767–68 (quoting <u>Heller</u>, 554 U.S. at 630)). But that holding in <u>Heller</u> clearly applied to "the District's requirement (as applied to respondent's handgun) that firearms *in the home* be rendered and kept inoperable at all times," which the Court held "makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional." <u>Heller</u>, 554 U.S. at 630.

of self-defense,' *at least in the home*.") (emphasis added) (internal citations omitted).

Plaintiffs argue that "[c]ategorical bans like the one at issue here—which deny Plaintiffs the right to carry in their person loaded, operable handguns for self-defense outside their homes—are absolutely unconstitutional." Doc. No. [2-1], p. 11. But Georgia's licensing requirement can hardly be characterized as a "categorical ban"—under normal circumstances, it operates to ensure qualified individuals can carry weapons in public, as the process involves no discretion. See O.C.G.A. § 16–11–129(a)(1) ("The judge of the probate court of each county *shall*, on application under oath, on payment of a fee of $30.00, and on investigation of the applicant pursuant to subsections (b) and (d) of this Code section, issue a weapons carry license or renewal license . . . ."). And even during the limited pendency of the public health emergency, Plaintiffs retain other options for carrying firearms in public.[9]

---

[9]    The Court also notes that it remains unclear whether the public places Plaintiff Walters wishes to carry a weapon to allow firearms on the premises. As the Eleventh Circuit has held, "[a]n individual's right to bear arms as enshrined in the Second Amendment, whatever its full scope, certainly must be limited by the equally fundamental right of a private property owner to exercise exclusive dominion and control over its land." GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1265 (11th Cir.

As this Court noted in <u>Carter</u>, under state law, Plaintiff Walters is free to carry her loaded firearm without a license at her home, in her car, and at her place of business. Plaintiff Walters may also possess a loaded long gun without a license if carried openly and fully exposed. Likewise, Plaintiff Walters' right to carry a handgun outside of her home, car, or business is only curtailed to the extent that the handgun must be in a case and unloaded. Because all these options remain available to Plaintiff Walters, the inability to obtain a GWL during the limited pendency of the state of emergency "does not gut the plaintiff's general right to keep and bear arms in self-defense." <u>GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs</u>, 788 F.3d 1318, 1326 (11th Cir. 2015).

Certainly, <u>Heller</u> makes clear that "banning from the home the most preferred firearm in the nation to 'keep' and use for protection of one's home and family" would fail "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights . . . ." 554 U.S. at 628–29. The challenged restriction here is not nearly so burdensome. Because Plaintiffs cannot establish

---

2012); <u>see also</u> O.C.G.A. § 16-11-126(d) "[P]rivate property owners or persons in legal control of private property through a lease, rental agreement, licensing agreement, contract, or any other agreement to control access to such private property shall have the right to exclude or eject a person who is in possession of a weapon or long gun on their private property . . . .").

29

a Second Amendment right to carry loaded handguns in public, the Court need not decide what level of scrutiny would apply.

### 2. *Fourteenth Amendment Claim*

Plaintiffs' Complaint does not clearly state whether they are bringing a substantive or procedural due process claim. Plaintiffs argue that, by preventing them "from exercising their right to bear loaded, operable handguns for self-defense outside the home and in public generally," Defendants have violated "fundamental rights guaranteed by the Second and Fourteenth Amendments." Doc. No. [2-1], p. 7. Because Plaintiffs' Fourteenth Amendment count implicates the core of the Second Amendment constitutional right, the Court will construe it as a substantive due process claim. See Palko v. Connecticut, 302 U.S. 319, 325 (1937) (noting the substantive component of the clause protects those rights that are "fundamental," that is, rights that are "implicit in the concept of ordered liberty").

The Supreme Court has recognized only a limited number of substantive due process rights. See Washington v. Glucksberg, 521 U.S. 702, 720 (1997) (noting that "in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the rights to

marry; to have children; to direct the education and upbringing of one's children; to marital privacy; to use contraception; to bodily integrity; and to abortion"). The Court has instructed that, where the claimed substantive due process right "is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." United States v. Lanier, 520 U.S. 259, 272, n.7 (1997) (citing Graham v. Connor, 490 U.S. 386, 395 (1989)).

Thus, Plaintiffs cannot claim any broader protection of the right to bear arms by the Fourteenth Amendment than is afforded by the Second Amendment itself. Because Plaintiffs do not have a likelihood of success on the merits of their Second Amendment claim, they lack a likelihood of success on the merits of their Fourteenth Amendment claim as well.

### B. Irreparable Injury

"[A] showing of irreparable injury is the *sine qua non* of injunctive relief." Siegel, 234 F.3d at 1176. Plaintiffs argue that "[t]he deprivation of constitutionally protected individual liberty, even temporarily, constitutes irreparable injury." Doc. No. [2-1], p. 14. While this is certainly true of some constitutional rights, this

Court can find no binding authority which establishes the Second Amendment triggers *per se* irreparable harm.

A violation of the First Amendment satisfies the irreparable harm requirement without any further showing. See, e.g., Elrod v. Burns, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); Cate v. Oldham, 707 F.2d 1176, 1188 (11th Cir. 1983) ("It is well settled that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction."). However, this is not true of all constitutional rights. Siegel, 234 F.3d at 1177–78 ("Plaintiffs also contend that a violation of constitutional rights always constitutes irreparable harm. Our case law has not gone that far, however."). Even if Plaintiffs were likely to succeed on their Second Amendment claim, neither the Eleventh Circuit nor the Supreme Court has held that the Second Amendment's protections are of the sort that, when violated, trigger a presumption of irreparable harm.

The Court finds that Plaintiffs will not be irreparably harmed for two reasons. First, as discussed *supra*, Plaintiffs retain lawful options for possessing weapons at home, in their cars, and even publicly without a GWL. Second, the

judicial state of emergency is temporary, and is currently set to expire on May 13.[10] There is nothing in the record to suggest that the probate judges will not resume processing GWL applications when the state of emergency is lifted, and it becomes safe to do so.

Additionally, Plaintiffs have not shown that there is no other available remedy at law—a prerequisite to establishing irreparable injury. <u>Alabama v. U.S. Army Corps of Engineers</u>, 424 F.3d 1117, 1127 (11th Cir. 2005). Because an injunction is an extraordinary remedy, "it is available not simply when the legal right asserted has been infringed, but only when the legal right has been infringed by an injury for which there is no adequate legal remedy and which will result in irreparable injury if the injunction does not issue." <u>Id.</u>

Notably, O.C.G.A. §16-11-129(j) provides, in part, that

> When an applicant is otherwise denied a license, temporary renewal license, or renewal license and contends that he or she is qualified to be issued a license, temporary renewal license, or renewal license, the

---

[10]     Though, the Court notes that Chief Justice Melton recently announced his intention to extend that expiration. <u>See</u> Bill Rankin, Georgia Statewide Judicial Emergency to be Extended to June 12, ATL. J. CONST., May 4, 2020, https://www.ajc.com/news/local/georgia-statewide-judicial-emergency-extended-june/xLWjtzJRu5h1adSoJgrISJ/.

> applicant may bring an action in mandamus or other
> legal proceeding in order to obtain such license.

Id. The County Defendants argued at the April 27 hearing that the proper legal avenue in this case is an action for a writ of mandamus in state court. Doc. No. [35], Tr. 55:8–14; see also O.C.G.A. § 9-6-20 ("[W]henever from any cause, a defect of legal justice would ensue from a failure to perform or from improper performance [of an official duty], the writ of mandamus may issue to compel a due performance . . . .)". Plaintiffs responded that filing for a state writ of mandamus would be "futile" because "the judicial conference has basically endorsed" the suspension of GWL processing. Id., Tr. 13:25–14:03.

The Court disagrees with Plaintiffs. As the Court noted in oral argument, while that is the position of the Council of Probate Court Judges of Georgia, the state Superior Courts, where a mandamus action would be filed, have made no such endorsement. See Brown v. Johnson, 251 Ga. 436, 436, 306 S.E.2d 655, 656 (1983) (Generally, the superior courts of this state have the power, in proper cases, to issue process in the nature of mandamus, prohibition, specific performance, quo warranto, and injunction . . . .").

Because Plaintiffs have not sought a writ of mandamus at the state court level and been denied one, they cannot argue seeking the remedy explicitly provided for in the licensing statute would be a futile exercise.[11]

## C. Balancing of the Harms

Plaintiffs' Motion does not address in detail the second two preliminary injunction factors. Instead, they argue, "a much stronger showing on one or more of the necessary factors lessens the amount of proof required for the remaining factors." Doc. No. [2-1], pp. 6–7 (quoting Georgia Gazette Pub. Co. v. U.S. Dept. of Defense, 562 F.Supp. 1004, 1008 (S.D. Ga. 1983)). However, because the Court finds Plaintiffs have not shown a likelihood of success on the merits of their Second and Fourteenth Amendment claims, it will address the other factors.

Plaintiffs are asking this Court to enter an order (1) prohibiting enforcement of a duly enacted criminal statute,[12] and (2) forcing a county probate

---

[11]    Importantly, a state court would not be constrained by the Eleventh Amendment or Pennhurst in ordering relief against Judge Wood. "The [Eleventh]Amendment thus is a specific constitutional bar against hearing . . . claims that otherwise would be within the jurisdiction of the *federal* courts." 465 U.S. at 120 (emphasis added).

[12]    During oral argument, Plaintiffs' counsel argued that the Governor does have the power to suspend enforcement of provisions of the criminal code. He pointed to Governor Kemp's suspension of Georgia's anti-masking statute as evidence that the same could be done for the GWL requirement. Doc. No. [35], Tr. 15:1–6.

35

judge to issue licenses pursuant to state law. Standing and immunity infirmities aside, this is drastic relief, and Plaintiffs have not cited to any cases where a Court has issued such an order.

Clearly the state and county have a considerable public health interest in curtailing normal activities to stop the exponential spread of a deadly virus. Defendants cite to <u>Jacobson v. Massachusetts</u>, 197 U.S. 11 (1905) to justify the challenged action in this case. <u>See</u> Doc. Nos. [26], pp. 26–28; [28], pp. 19–20. Plaintiffs argue that <u>Jacobson</u> is not controlling. Doc. No. [35], Tr. 26:10–22. The Court agrees that the Eleventh Circuit's two-step test, derived from the <u>Heller</u> and <u>McDonald</u> cases, controls the analysis of Plaintiffs' constitutional claims. <u>See</u> discussion *supra*. It also agrees with the State Defendants, however, that <u>Jacobson</u> is instructive as a kind of "overlay"—an extra layer of analysis which applies during public health crises. <u>See</u> Doc. No. [35], Tr. 46:6–11. Thus, it is relevant in analyzing whether the threatened injury outweighs the harm that the preliminary injunction would cause to Defendants.

<u>Jacobson</u> instructs that, while states may exercise their inherent authority to protect the public health in an emergency, the state action (1) must bear a substantial relation to the public health objective, and (2) must not constitute a

36

"plain, palpable" invasion of a fundamental right. 197 U.S. at 30. The Court finds the challenged action does bear a substantial relation to the protection of the public health—Judge Wood suspended GWL applications because his staff cannot process them without running afoul of social distancing guidelines. In Cherokee County,

> The Probate Court facilities are relatively small and there is limited space available for employees and visitors, such as applicants for GWL's and individuals appearing in Probate Court for other purposes. The limited space available in the Probate Court does not allow for the state-mandated social distancing rules to be followed. Further, the Probate Court lacks funds or resources to construct screens or other physical barriers that would serve to reduce the risk of spreading the coronavirus. Personal protective equipment such as masks and gloves, etc. are only available in limited supply for Probate Court employees.

Doc. No. [28], p. 4 (internal citations omitted).

Plaintiffs argue that it is Defendants' burden—specifically, Judge Wood's—to show that there is not a less-restrictive response, meaning, a way to process the applications and still enforce social distancing. This would be true if the Court were applying strict scrutiny. But, as Jacobson notes, where the challenged action was made in response to a public health crisis, "[t]he mode or manner in which those results are to be accomplished is within the discretion of

37

the state," so long as there is no plain, palpable invasion of a constitutional right. 197 U.S. at 25. Because Plaintiffs have failed to show a likelihood of success on the merits of their Second Amendment claim, there is no "plain, palpable" invasion of any fundamental right.

### D. <u>Public Interest</u>

Plaintiffs argue that, because police are prohibited from detaining someone solely to determine whether they have a GWL, the state's interest in enforcing O.C.G.A. § 16-11-126 is "almost zero." Doc. No. [35], Tr. 21:1–8 ("Because the only people this law would stop from getting a permit are the same people committing those other offenses anyway, right?"). But of course, the public has an interest in ensuring unqualified individuals do not have loaded handguns in public, whether or not they actually commit some other criminal offense. See <u>Hertz v. Bennett</u>, 294 Ga. 62, 67, 751 S.E.2d 90, 94 (2013) ("The goal [of the licensing requirement] is to protect the safety of individuals who are in public places, which has been identified as a substantial government interest."). Even if Plaintiffs were correct, they have not addressed the interest the citizens of Cherokee County and employees of the probate court have in seeing social distancing enforced. See <u>Jacobson</u>, 197 U.S. at 27 ("Upon the principle of self-

38

defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members.").

## V.   CONCLUSION

For the forgoing reasons, the Court concludes that Plaintiffs lack standing to seek the requested relief against the State Defendants and Cherokee County and have not shown that they are entitled to a preliminary injunction against Judge Wood. Plaintiffs' Motion for Preliminary Injunction (Doc. No. [2]) is therefore **DENIED**.

**IT IS SO ORDERED** this 5th day of May, 2020.


s/Steve C. Jones
**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**

39