**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| MICHAEL MCCARTHY, et al., | ) CIVIL ACTION NO. |
|  | ) 1:20-cv-10701-DPW |
| Plaintiffs, | ) |
|  | ) |
| -against- | ) |
|  | ) |
| CHARLES D. BAKER, et al., | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

**McCARTHY PLAINTIFFS' MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**......................................................................................................*ii*

**INTRODUCTION** ...................................................................................................................1

**PERTINENT FACTS, STATUTES & EXECUTIVE ORDERS** ...........................................2

**ARGUMENT** ..........................................................................................................................7

    I)    Defendants Have Not Shown that Another Lockdown "Could Not Reasonably be Expected to Recur"..................................................................................................7

    II)   And as to the Issues of Damages and Attorney's Fees . . ...............................................13

**CONCLUSION** .......................................................................................................................14

# TABLE OF AUTHORITIES

**Cases**

*ACLU of Mass. v. U.S. Conf. of Catholic Bishops*, 705 F.3d 44 (1st Cir. 2013)............. 7, 9-10, 12

*Beers v. Barr*, ___ U.S. ___ (No. 19-864) ................................................................. 13

*Brown v. Rico*, 613 F.3d 44(1st Cir. 2010) ................................................................. 8

*Castagna v. Jean*, 955 F.3d 211 (1st Cir. 2020)........................................................... 14

*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982) .............................. 8, 13

*Colo. River Water Cons. Dist. v. United States*, 424 U.S. 800 (1976) ........................... 7

*Conservation Law Foundation v. Evans*, 360 F.3d 21 (1st Cir. 2004) ......................... 12

*D.H.L. Assocs., Inc. v. O'Gorman*, 199 F.3d 50 (1st Cir. 1999) ................................. 13

*District of Columbia v. Wesby*, 583 U.S. ___, 138 S. Ct. 577 (2018) ......................... 13

*Eves v. LePage*, 927 F.3d 575 (1st Cir. 2019) (en banc) ............................................. 13

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ................. 8

*Kan. Judicial Watch v. Stout*, 653 F.3d 1230 (10th Cir. 2011) ................................... 14

*KG Urban Enters., LLC v. Patrick*, 969 F. Supp. 2d 52 (D. Mass. 2013) .................... 9

*Mangual v. Rotger-Sabat*, 317 F.3d 45 (1st Cir. 2003) ........................................... 7, 9

*New England Regional Council of Carpenters v. Kinton*, 284 F.3d 9 (1st Cir. 2002) ........... 12-13

*New York State Rifle & Pistol Ass'n v. City of New York*, No.18-280,
590 U.S. ___ (Apr. 27, 2020) ..................................................................................... 8

*People Against Police Violence v. Pittsburgh*, 520 F.3d 226 (3d Cir. 2008).............. 14

*Ragsdale v. Turnock*, 841 F.2d 1358 (7th Cir. 1988) ................................................ 11

*Ramirez v. Sanchez*, 438 F.3d 92 (1st Cir. 2006) ........................................................ 9

*Select Milk Producers, Inc. v. Johanns*, 400 F.3d 939 (D.C. Cir. 2005) .................... 14

*Spencer v. Kemna*, 523 U.S. 1 (1998)......................................................................... 12

*Town of Portsmouth v. Lewis*, 813 F.3d 54 (1st Cir. 2016) ...................................... 8-9

*Tri-City Cmty. Action Program, Inc. v. City of Malden*, 680 F. Supp. 2d 306
(D. Mass. 2010) ....................................................................................................... 14

*United States Parole Comm'n v. Geraghty*, 445 U.S. 388 (1980) ............................... 7

*United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199 (1968)...................... 1, 7-8

*United States v. Reid*, 369 F.3d 619 (1st Cir. 2004) ................................................... 12

*United States v. W.T. Grant Co.*, 345 U.S. 629 (1953)................................................. 7

*Vacchio v. Ashcroft*, 404 F.3d 663 (2d Cir. 2005)..................................................... 14

*Young v. City of Chicago*, 202 F.3d 1000 (7th Cir. 2000) .......................................... 14

**Statutes**

M.G.L. c. 17, § 2A ..................................................................................2

Mass. Acts 1950 c. 639, § 7 ....................................................................2

Mass. Acts 1950 c. 639, § 8 ....................................................................2

**Other Authorities**

Charles D. Baker, Press Release (May 11, 2020).....................................4

Charles D. Baker, Press Release (May 18, 2020).....................................5

Dasia Moore, *With reopening comes the threat of a second wave of COVID-19,
scientists warn*, Boston Globe, May 25, 2020.........................................6

Lena H. Sun, *CDC director warns second wave of coronavirus is likely to be even
more devastating*, Washington Post, Apr. 21, 2020 ...............................6

Marc Fortier, *Experts Warn of Second Wave of Coronavirus in Mass.*,
NBC Boston, May 26, 2020 ..................................................................6

Petitions for Writ of Certiorari in *Brennan v. Dawson*, ___ U.S. ___
(No. 18-913) (Jan. 11, 2019) ...............................................................14

Petitions for Writ of Certiorari in *Baxter v. Bracey*, ___ U.S. ___
(No. 18-1287) (Apr. 8, 2019) ..............................................................14

Petitions for Writ of Certiorari in *Corbitt v. Vickers*, ___ U.S. ___
(No. 19-679) (Nov. 22, 2019)..............................................................14

Reopening Advisory Board, Four-Phase Approach to Reopening Massachusetts (May 11, 2020)4

**Executive Orders**

Charles D. Baker, COVID-19 Order No. 13, Order Assuring Continued Operation of
Essential Services in the Commonwealth, Closing Certain Workplaces, and
Prohibiting Gatherings of More Than 10 People (Mar. 23, 2020) ...................................*passim*

Charles D. Baker, COVID-19 Order No. 21, Order Extending the Closing of Certain ................3

Charles D. Baker, COVID-19 Order No. 30, Order Further Extending the Closing
of Certain Workplaces and the Prohibition on Gatherings of More than 10 People
(Apr. 28, 2020) ....................................................................................3

Charles D. Baker, COVID-19 Order No. 32, Order Temporarily Extending COVID-19
Order No. 13 (May 15, 2020)................................................................3

Charles D. Baker, COVID-19 Order No. 33, Order Implementing a Phased Reopening
of Workplaces and Imposing Workplace Safety Measures to Address COVID-19
(May 18, 2020) .................................................................................4-5

Charles D. Baker, COVID-19 Order No. 35, Order Clarifying the Progression of the
Commonwealth's Phased Workplace Re-Opening Plan and Authorizing Certain
Re-Opening Preparations at Phase II Workplaces (Jun. 1, 2020)................................5

Exec. Order No. 591, Declaration of a State of Emergency to Respond to COVID-19
   (Mar. 10 , 2020) ............................................................................................................ 2, 10

# INTRODUCTION

Contrary to Defendants' claim, Governor Baker's essential services shutdown order (COVID-19 Order No. 13) has not "expired on its own terms." Rather, when the Baker administration permitted "Phase I" services to begin reopening, Governor Baker *eliminated* the original shutdown order's expiration date, instead making the order effective until the end of the declared state of emergency. This means that the essential services lockdown will resume being the controlling COVID-19 order at any moment that Defendants find it necessary to terminate whatever reopening phase is then in place.

What's more important than Order No. 13's technical expiration date is the overarching reality that COVID-19 is not over, nor is it close to being over. Rather, as Governor Baker has himself acknowledged, the Commonwealth may well need to revert to earlier levels of restrictions if public health metrics dictate in the future. And certainly, it is no secret that public health officials are warning of a second wave of infection that may be as bad as, or even worse than, the conditions that necessitated the original lockdown back in March.

Plaintiffs dedicate most of this brief to rebutting the Defendant's claim that the commencement of phased reopening renders this case moot. This case is not moot because there is a significant possibility that another lockdown will occur—and if it does, nothing but this Court's ruling will prevent the Defendants from resuming their mandate that firearms and ammunition retailers, as well as shooting ranges, must close. It is not "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968), and thus, the case is not moot.

After explaining this, we briefly address the issues of damages and attorney's fees.

## PERTINENT FACTS, STATUTES & EXECUTIVE ORDERS

Governor Baker declared a state of emergency on March 10, 2020 "effective immediately and . . . in effect until notice is given, pursuant to [his] judgment, that the STATE OF EMERGENCY no longer exists." Exec. Order No. 591, Declaration of a State of Emergency to Respond to COVID-19 (Mar. 10 , 2020).[1] Invoking the powers of Chapter 639 of the Acts of 1950 (the "Civil Defense Act") and Section 2A of Chapter 17 of the General Laws, Governor Baker said he would "from time to time issue recommendations, directives, and orders as circumstances may require." *Id.* The Civil Defense Act gives the Governor broad authority to (among other things) "exercise any and all authority over persons and property necessary or expedient for meeting said state of emergency," Mass. Acts 1950 c. 639, § 7, and to do so "by the issuance or promulgation of executive orders or general regulations, or by instructions . . . by a writing signed by the governor and filed in the office of the state secretary," *id.* § 8.

As we all know, on March 23, 2020 Governor Baker ordered all businesses and organizations to "close their physical workplaces and facilities ('brick-and-mortar premises') to workers, customers, and the public" unless they provided a service deemed "essential." *See* COVID-19 Order No. 13 at p. 2, ¶ 2 (Mar. 23, 2020).[2] The list of essential services included things ranging from food and medication to alcohol, hardware and laundry services, but it did not include the retail sale of firearms and ammunition. *See id.* at Exhibit A[3] pp. 1-3, 8. This original

---

[1] The Declaration is Exhibit A to the Declaration of J. Kobick (Apr. 28, 2020), Doc. No. 62-1.
[2] Charles D. Baker, COVID-19 Order No. 13, Order Assuring Continued Operation of Essential Services in the Commonwealth, Closing Certain Workplaces, and Prohibiting Gatherings of More Than 10 People (Mar. 23, 2020), *available at* https://www.mass.gov/doc/march-23-2020-essential-services-and-revised-gatherings-order/download (last visited Jun. 5, 2020).
[3] *See* Dec. of T. MacCormack (May 1, 2020), Doc. No. 69, Attachment 1.

shut-down order (Order No. 13) was set to expire on April 7, 2020, "unless further extended." *See id.* at p. 5.

On March 31, 2020, Governor Baker issued a new executive order providing that Order No. 13 was "extended until May 4, 2020," and otherwise, updating the list of essential services. *See* COVID-19 Order No. 21 at p. 2 (Mar. 31, 2020).[4] On April 28, 2020, Governor Baker issued another order directing that "COVID-19 Order No. 13[ was] hereby extended until May 18, 2020." *See* COVID-19 Order No. 30 (Apr. 28, 2020).[5] It was during the pendency of this extension, on May 7, 2020, that this Court issued its preliminary injunction against the ongoing closure of firearms and ammunition retailers. *See* Amended Preliminary Injunction Order (Doc. No. 92).[6] On May 15, 2020, after this took place, Governor Baker issued another executive order providing, pertinently, that "COVID-19 Order No. 13 is hereby extended to . . . May 19, 2020." *See* COVID-19 Order No. 32 (May 15, 2020).[7]

During this time, the Commonwealth began taking steps to begin re-opening some of the shut-down business and organizations. On May 11, 2020, Governor Baker announced the basic

---

[4] Charles D. Baker, COVID-19 Order No. 21, Order Extending the Closing of Certain Workplaces and the Prohibition on Gatherings of More Than 10 People (Mar. 31, 2020), *available at* https://www.mass.gov/doc/march-31-2020-essential-services-extension-order/download (last visited Jun. 5, 2020).

[5] Charles D. Baker, COVID-19 Order No. 30, Order Further Extending the Closing of Certain Workplaces and the Prohibition on Gatherings of More than 10 People (Apr. 28, 2020), *available at* https://www.mass.gov/doc/signed-second-extension-of-essential-services-order/download (last visited Jun. 5, 2020).

[6] The Court declined to grant relief on the issue of shooting ranges, but it invited the submission of additional papers. *See* Transcript at p. 28:14-21 (Doc. No. 93). At the time of the May 7 hearing, only the plaintiffs in *Cedrone, LLC, et al. v. Baker, et al.*, No. 1:20-cv-40041, had challenged the closure of shooting ranges. The Plaintiffs in the matter at bar later raised the issue in an amended pleading. *See* Second Amended Complaint (Doc. No. 99).

[7] Charles D. Baker, COVID-19 Order No. 32, Order Temporarily Extending COVID-19 Order No. 13 (May 15, 2020), *available at* https://www.mass.gov/doc/may-15-2020-24-hour-extension-order/download (last visited Jun. 5, 2020).

details of a four-phase "Reopening" plan. *See* Charles D. Baker, Press Release (May 11, 2020).[8]

The announcement included a presentation from an appointed panel. *See* Reopening Advisory

Board, Four-Phase Approach to Reopening Massachusetts (May 11, 2020).[9] That presentation

explained that "Phase 1: Start" would involve "Limited industries resume operations with severe

restrictions," and that in both "Phase 2: Cautious" and "Phase 3: Vigilant," "Additional

industries [would] resume operations" with restrictions, capacity limits and guidance. *See id.*

However, significantly, the presentation also cautioned that "If public health metrics fall below

thresholds, may move back to a prior phase." *Id.* The graphic included two sets of arrows

showing "Potential reversion if public health worsens." *Id.* Both sets of arrows ended back at

"Current state: Stay at home." *See id.*

One week later, Governor Baker issued an order putting Phase 1 in motion. *See* COVID-

19 Order No. 33 (May 18, 2020).[10] The order explained that "improving public health data

permits a carefully phased relaxation of certain restrictions that COVID-19 Order No. 13 has

placed on businesses and other organizations," but it cautioned "that any adjustment can only be

maintained or expanded on the basis of continuing improvements in the public health data, and

further provided that any adjustment must reflect the reality that the Commonwealth remains in

the midst of a public health emergency[.]" *Id.* at p. 2. The order directed that the "businesses and

other organizations that are included within the Phase I categories below are permitted to operate

from their physical workplaces and facilities ('brick-and-mortar premises') and may open those

---

[8] Exhibit 1 to Dec. of David D. Jensen (Jun. 5, 2020), submitted herewith.
[9] Exhibit 2 to Dec. of D. Jensen (Jun. 5, 2020), submitted herewith.
[10] Charles D. Baker, COVID-19 Order No. 33, Order Implementing a Phased Reopening of
Workplaces and Imposing Workplace Safety Measures to Address COVID-19 (May 18, 2020),
*available at* https://www.mass.gov/doc/may-18-2020-re-opening-massachusetts-order/download
(last visited Jun. 5, 2020).

premises to workers, customers, and the public" within pertinent guidelines. *Id.* at ¶ 1. And

significantly, "Firearms retailers and shooting ranges" were included as a Phase I category. *See*

*id.* However, the order continued to provide that unless business provided "Essential Services as

defined in COVID-19 Order No. 13" or fell within one of the Phase I categories, it "may not

open their brick-and-mortar premises." *Id.* at p. 6, ¶ 5. Finally, and significantly, the order

provided that Order No. 13—the original shut-down order from March 23, 2020—would

"remain in effect until rescinded or until the state of emergency is ended, whichever occurs

first." *Id.* at p. 8.

At the same time he issued the Phase I order, Governor Baker delivered a press release in

which he explained that the goal of the phased approach was "avoiding a resurgence of COVID-

19 that could overwhelm the state's health care system and erase the progress made so far."

Charles D. Baker, Press Release (May 18, 2020).[11] The press release cautioned that "[i]f public

health data trends are negative, specific industries, regions, and/or the entire Commonwealth

may need to return to an earlier phase." *Id.*

One of Governor Baker's most recent COVID-19 orders, related to preparations for

"Phase II," reiterates that the "Phase I" order "authorized the re-opening of certain brick-and-

mortar premises designated as 'Phase I' workplaces . . . and . . . otherwise further extended the

period in which COVID-19 Order No. 13 will continue to restrict the operations of businesses

and organizations that do not provide Essential Services or that have not been designated as

Phase I workplaces." COVID-19 Order No. 35 at p. 2 (Jun. 1, 2020).[12] It likewise continues to

---

[11] Exhibit 3 to Dec. of D. Jensen (Jun. 5, 2020), submitted herewith.
[12] Charles D. Baker, COVID-19 Order No. 35, Order Clarifying the Progression of the
Commonwealth's Phased Workplace Re-Opening Plan and Authorizing Certain Re-Opening
Preparations at Phase II Workplaces (Jun. 1, 2020), *available at*

caution that "any adjustment can only be maintained or expanded on the basis of continuing improvements in the public health data, and further provided that any adjustment must reflect the reality that the Commonwealth remains in the midst of a public health emergency[.]" *Id.*

And indeed, in this reality there remains a significant possibility that COVID-19 will resurge—and that it will be necessary to return to earlier levels of restriction. Aside from the reservations that Governor Baker's office has itself made, many others have expressly acknowledged the substantial risk of a "second wave" recurrence that could overshadow the "first" one. CDC Director Robert Redfield, for example, has said that "[t]here's a possibility that the assault of the virus on our nation next winter will actually be even more difficult than the one we just went through." Lena H. Sun, *CDC director warns second wave of coronavirus is likely to be even more devastating*, Washington Post, Apr. 21, 2020.[13] The Boston Globe has written that "[b]uilt into Governor Charlie Baker's reopening plan is something epidemiologists caution is not just possible but perhaps even likely: a return to the severe lockdowns of April and most of May." *See* Dasia Moore, *With reopening comes the threat of a second wave of COVID-19, scientists warn*, Boston Globe, May 25, 2020;[14] *see also* Marc Fortier, *Experts Warn of Second Wave of Coronavirus in Mass.*, NBC Boston, May 26, 2020[15] ("Gov. Charlie Baker said when he announced his reopening plan a little over a week ago that it would depend heavily on whether the numbers continue to trend in the same positive direction that it has for the last few weeks. He also said the state could revert to tighter restrictions if things do get worse.").

---

https://www.mass.gov/doc/executive-order-preparing-for-phase-ii-reopening/download (last visited Jun. 5, 2020).
[13] Exhibit 4 to Dec. of D. Jensen (Jun. 5, 2020), submitted herewith.
[14] Exhibit 5 to Dec. of D. Jensen (Jun. 5, 2020), submitted herewith.
[15] Exhibit 6 to Dec. of D. Jensen (Jun. 5, 2020), submitted herewith.

**ARGUMENT**

There is no dispute that there was a "live" controversy when Plaintiffs filed their Complaint and their Amended Complaint, when the Court issued its preliminary injunction against the closure of retailers, and when the Plaintiffs filed their Second Amended Complaint challenging the closure of shooting ranges. Federal courts have "the virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colo. River Water Cons. Dist. v. United States*, 424 U.S. 800, 817 (1976). Thus, to establish that subsequent events have rendered the case moot, Defendants must meet the "heavy" burden of showing that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Mangual v. Rotger-Sabat*, 317 F.3d 45, 60 (1st Cir. 2003) (*quoting United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953), and *Concentrated Phosphate*, 393 U.S. at 203, respectively). Indeed, mootness can be more difficult to establish than standing, as mootness is effectively "the doctrine of standing set in a time frame." *See id.* at 61 (*quoting United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (internal quotation omitted)). Defendants—who do nothing but point to the current state of "Phase I" affairs and then assert, repeatedly, that a return to "lockdown" is "speculative"—do not come close to making this showing.

**I) Defendants Have Not Shown that Another Lockdown "Could Not Reasonably be Expected to Recur"**

It is well established that a defendant's "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave 'the defendant free to return to his old ways.'" *Concentrated Phosphate*, 393 U.S. at 203 (*quoting W. T. Grant*, 345 U.S. at 632 (alterations omitted)). Furthermore, the First Circuit has rejected the proposition that "the voluntary cessation doctrine has less application" when the defendant is a government actor. *See ACLU of Mass. v. U.S. Conf. of Catholic Bishops*, 705 F.3d 44, 56 n.10 (1st Cir. 2013).

Rather, the question is whether it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (*quoting Concentrated Phosphate*, 393 U.S. at 203).

While a government defendant's policy change can sometimes result in a case becoming moot, a review of two "guidepost" cases shows why the "change" at issue here—the move to Phase I restrictions from the previous essential services restrictions—does not render this controversy moot. The first guidepost is *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982), where the municipal defendant amended its ordinance to omit the language at issue during the pendency of the appeal, *see id.* at 287-88. The Supreme Court ruled that the case was not moot because "the city's repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated." *Id.* at 289; *see also Brown v. Rico*, 613 F.3d 44, 49 (1st Cir. 2010).

The second guidepost is *Town of Portsmouth v. Lewis*, 813 F.3d 54 (1st Cir. 2016), where the state legislature enacted a law that repealed the tolls that were at issue in the case, *see id.* at 57. The First Circuit observed that while "the Supreme Court has not hesitated to invoke the voluntary cessation exception when considering the conduct of private, municipal, and administrative defendants, . . . it has consistently and summarily held that a new state statute moots a case, without engaging in further inquiry." *Id.* at 59 (citations omitted).[16] Judge Gorton summarized the state of the law by explaining that a government defendant fails to show that its conduct could not be expected to recur when its showing "boils down to 'trust us' and does not

---

[16] In *New York State Rifle & Pistol Ass'n v. City of New York*, No.18-280, 590 U.S. ___ (Apr. 27, 2020), the New York legislature amended state law to preclude local licensing officials from engaging in the practice at issue there, *see id.* slip op. at 1.

offer an assurance that defendants lack the power to reinstate the offending conduct." *See KG Urban Enters., LLC v. Patrick*, 969 F. Supp. 2d 52, 58 (D. Mass. 2013).

The situation presented here is not even close, for here, the Defendants do not even say, "trust us." To the contrary, the Defendants have explicitly stated that it may be necessary to return to previous levels of restriction, depending on what public health metrics indicate. Moreover, the Defendants have not done anything to change the status quo that Plaintiffs complained of at the outset of this case. That is, the Defendants included retailers and ranges within the Phase I category—but they did nothing to change the fact that the list of "essential" services omits them. Thus, if the Commonwealth reverts to Order No. 13's essential services lockdown, then nothing but this Court's ruling will protect retailers and ranges from closure.

Defendants, recognizing the pertinence of the voluntary cessation doctrine, dedicate several pages of their briefing (pp. 11-15) to disclaiming it.[17] Defendants rely primarily (pp. 11-14) on *ACLU of Massachusetts v. U.S. Conference of Catholic Bishops* and *Town of Portsmouth v. Lewis*, but both are readily and properly distinguished. To begin with, *Town of Portsmouth v. Lewis* is the second "guidepost" decision discussed above—where the state legislature had

---

[17] Defendants also disclaim the application of capable-of-repetition standing because, according to them (p. 11), Plaintiffs "cannot establish a 'reasonable expectation' or 'demonstrated probability' that Governor Baker will issue a future order temporarily closing gun retailers and shooting ranges in order to protect public health from another severe outbreak of the coronavirus." This gets things backwards in two ways. The first is that it is the party raising the claim of mootness—the Defendants—that has the burden of showing that the injury is now unlikely to recur. *See, e.g., Ramirez v. Sanchez*, 438 F.3d 92, 100 (1st Cir. 2006) (*citing Mangual*, 317 F.3d at 61). The second is that the problem with capable-of-repetition standing is not, on the facts presented here, the unlikelihood of recurrence—as Defendants acknowledge by, among other things, leaving the state of emergency declaration and Order No. 13 in place. Instead, it is the fact that pandemic disease outbreaks are not the sorts of "exceptional situations" that intrinsically have a "duration too short to be fully litigated prior to its cessation or expiration." *ACLU of Mass.*, 705 F.3d at 57. Both the 1918 "Spanish" flu pandemic and the 2009 H1N1 pandemic, for example, came in waves.

enacted a law that precluded the conduct complained of. *See Town of Portsmouth*, 813 F.3d at 58. This case is clearly inapposite here, where (as discussed) neither the General Court nor the Governor have taken action to indicate a lack of power to reinstate the conduct at issue. To the contrary, they have reserved that power.

In terms of the circumstances it addressed, the decision in *ACLU of Massachusetts v. U.S. Conference of Catholic Bishops* is also off-point. That case concerned a contract between the Department of Health and Human Services ("HHS") and the U.S. Conference of Catholic Bishops ("USCCB") under which HHS and USCCB agreed that USCCB would not use funding to counsel or provide abortions or contraceptives. *See ACLU of Mass.*, 705 F.3d at 48. By its terms, the contract expired in October 2011. *See id.* After that date, "HHS had no authority to obligate additional funding under the HHS–USCCB contract[.]" *Id.* at 50. Furthermore, by the time that date came, HHS had made new contracts with other service providers, and those new contracts did not include restrictions on information about abortion and contraception. *See id.* at 50-51. Thus, any claim that USCCB would expend taxpayer funds in a program that refused to discuss abortion and contraception had quite literally become hypothetical and speculative: USCCB was not authorizing any such expenditures, and the expenditures that it was authorizing did not raise the concern. *See id.* at 54. Here, in marked contrast, the Defendants have expressly reserved the possibility of returning to the conduct complained of. And, while both the timing and severity of a second (or later) wave of infections are unknown, the possibility of a severe recurrence is far from hypothetical or speculative—as demonstrated by the fact that both Executive Order No. 591 and COVID-19 Order No. 13 remain in effect.

Defendants emphasize (pp. 13-14) that in *ACLU of Massachusetts* the contract at issue had "expired according to its terms," and they try to analogize that case to the facts present here.

Of course, the very premise of Defendant's "expired by its terms" argument is wrong because, as discussed previously, Order No. 13 has *not* expired. Instead, Governor Baker has continued it in force for the duration of the state of emergency. But setting that aside, the real problem with Defendant's argument is that it seeks to analogize things that are not actually comparable. *Cf. Ragsdale v. Turnock*, 841 F.2d 1358, 1370 (7th Cir. 1988) ("It is as much a vice to treat abortion similarly to dissimilar procedures as it is to treat it differently from analogous procedures.").

The government action at issue in *ACLU of Massachusetts* was the execution of public contracts to provide support to victims of human trafficking. *See ACLU of Mass.*, 705 F.3d at 49-50. The plaintiff's grievance was that, in the making of one such contract, the government had "violate[d] the Establishment Clause of the First Amendment by permitting USCCB to impose a religiously based restriction on the use of taxpayer funds." *Id.* at 51 (quoting complaint). From the outset, that contract was set to expire, and it did in fact expire during the pendency of the case—to be replaced with other contracts that did not allow for religiously based restrictions. *See id.* at 50-51.

Here, in contrast, the action at issue is Governor Baker's order directing the closure of non-"essential" services. The Plaintiffs' grievance is that, in making this decision, Governor Baker impermissibly failed to include firearms and ammunition retailers and shooting ranges in the list of services that the Commonwealth must allow to remain open. While Order No. 13 has not expired, even if it had, it would have been because Governor Baker had chosen to discontinue it. And just the same, it is Governor Baker who has the power to alleviate the Plaintiffs' injuries by (for example) adding retailers and ranges to the list of essential services—an action he has thus far declined to take. Thus, unlike in *ACLU of Massachusetts*, this case does not present a situation where "cessation of the challenged activity occurs because of reasons

unrelated to the litigation." *ACLU of Mass.*, 705 F.3d at 55 (quotation and citations omitted). The Plaintiffs here do not assert injuries that arise tangentially from a contract that expired pursuant to its own terms, where the defendant "did nothing to hasten its expiration," but instead merely carried out provisions which had been "built into the contract's terms before th[e] litigation began." *See id.* at 55. Rather, the Plaintiffs' injuries arise directly from the government action at issue, and that action has not changed. To the extend cases addressing lapsed government plans are pertinent, the decision in *Conservation Law Foundation v. Evans*, 360 F.3d 21 (1st Cir. 2004), is more on-point, for that case concerned a management plan that was largely a continuation of prior plans, *see id.* at 25.

Defendants also rely (pp. 13-14) on *United States v. Reid*, 369 F.3d 619 (1st Cir. 2004), and (pp. 10, 14) *New England Regional Council of Carpenters v. Kinton*, 284 F.3d 9 (1st Cir. 2002), but neither of these cases supports Defendants on the circumstances presented here. *Reid* concerned restrictions on the printed material that a criminal defendant could receive while in pretrial detention in Massachusetts. *See Reid*, 369 F.3d at 622-23. During the pendency of the case, the plaintiff was convicted and transferred to a prison in Colorado, and as well, the orders authorizing the interception of his mail in Massachusetts expired. *See id.* at 623-24. The case was moot "because the factual and legal circumstances surrounding Reid's case have changed so dramatically that Reid no longer asserts an injury that is 'likely to be redressed by a favorable judicial decision' in this proceeding." *Id.* at 624 (*quoting Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (internal quotation omitted)). Here, in contrast, the factual and legal circumstances have not changed. Instead, Defendants have simply moved to Phase I and added retailers and ranges to the list of Phase I services. Their determination that those retailers and ranges are not essential has not changed.

Also unavailing is the decision in *New England Regional Council*, which concerned a policy that prohibited leafletting at certain locations owned by the Massachusetts Port Authority. *See New England Reg'l Council*, 284 F.3d at 13. During the litigation, the port authority adopted new regulations that allowed the leafletting at one of the locations to take place. *See id.* The court explained that "it would be pointless either to enjoin the enforcement of a regulation that is no longer in effect or to declare its constitutional status." *Id.* at 18 (*citing D.H.L. Assocs., Inc. v. O'Gorman*, 199 F.3d 50, 54-55 (1st Cir. 1999)). The court distinguished *City of Mesquite* by explaining that "there is simply no basis for suggesting that the original permit policy will be reinstated following the conclusion of the litigation." *Id.* The situation here is much different. Other issues aside, the Defendants here have not taken any action to place retailers and ranges among the services that the Commonwealth will permit to remain open during an essential services lockdown. The question is not whether a prior policy will be "reinstated" because the Defendants here have never disavowed their policy in the first place.[18]

**II) And as to the Issues of Damages and Attorney's Fees . . .**

The Plaintiffs do not dispute that, under governing authorities such as *Eves v. LePage*, 927 F.3d 575 (1st Cir. 2019) (en banc), the qualified immunity doctrine bars claims for damages against public officials unless the law is "'sufficiently clear that every reasonable official would understand that what he is doing' is unlawful," *id.* at 583 (*quoting District of Columbia v. Wesby*, 583 U.S. ___, 138 S. Ct. 577, 589 (2018) (internal quotations omitted)). Because the issues

---

[18] Defendants also (pp. 14-15) cite *Beers v. Barr*, ___ U.S. ___ (No. 19-864), which the Court recently (on May 18, 2020) remanded as moot. But there, the issue arose because of a federal agency's final regulatory determination. *See* Brief for the Federal Respondents in Opposition at pp. 6-7, *Beers v. Barr*, ___ U.S. ___ (No. 19-864) (Apr. 10, 2020). The case did not concern a situation where there had been no policy change. Moreover, the case is qualitatively different because there it was the plaintiff, rather than the defendant, who had acted to make the matter moot (by seeking relief from the federal disability at issue in the case). *See id.*

presented here are likely not "beyond debate," *see Castagna v. Jean*, 955 F.3d 211, 219 (1st Cir. 2020), the qualified immunity appears to bar them. However, the Supreme Court has expressed some interest in revisiting the qualified immunity doctrine.[19] Accordingly, to avoid any issue with waiver should the issue become relevant in the future, Plaintiffs oppose Defendants' qualified immunity motion in order to reserve their rights in the event the doctrine changes.

The issue of attorney's fees also requires only brief discussion. While the Plaintiffs consider it clear that this matter has not become moot, even if the Court were to find that it has, the Plaintiffs would still be entitled to attorney's fees because this Court's preliminary injunction was a judicial sanctioned change in the parties' relationship. *See Tri-City Cmty. Action Program, Inc. v. City of Malden*, 680 F. Supp. 2d 306, 312-15 (D. Mass. 2010); *see also, e.g., Kan. Judicial Watch v. Stout*, 653 F.3d 1230, 1235-38 (10th Cir. 2011); *People Against Police Violence v. Pittsburgh*, 520 F.3d 226, 236 (3d Cir. 2008); *Vacchio v. Ashcroft*, 404 F.3d 663, 674 (2d Cir. 2005); *Select Milk Producers, Inc. v. Johanns*, 400 F.3d 939, 945 (D.C. Cir. 2005); *Young v. City of Chicago*, 202 F.3d 1000, 1000-01 (7th Cir. 2000). Thus, in the event the Court finds this matter moot, the Plaintiffs respectfully request a period of 30 days in which to submit a motion for attorney's fees

## CONCLUSION

Reasonable minds can differ on the question of whether a second wave of COVID-19 infections will occur, and if so, of how severe that wave (or waves) will be. The issue for the Court isn't to resolve these issues, and indeed, it is impossible for either the parties or the Court

---

[19] The Court has relisted a number of certiorari petitions that raise qualified immunity issues for multiple conferences, including the conference held yesterday. *See, e.g.,* Petitions for Writs of Certiorari in *Brennan v. Dawson*, ___ U.S. ___ (No. 18-913) (Jan. 11, 2019), *Baxter v. Bracey*, ___ U.S. ___ (No. 18-1287) (Apr. 8, 2019), and *Corbitt v. Vickers*, ___ U.S. ___ (No. 19-679) (Nov. 22, 2019).

to predict the future. What matters, instead, is that a serious risk exists. There is a serious and credible possibility that another surge will occur, as Governor Baker and his office themselves acknowledge. And if this takes place, and the Commonwealth returns to an essential services lockdown, then as things stand now nothing but this Court's intervention will prevent the injuries that the Plaintiffs have raised in this case. Because the Defendants have not shown that there is no reasonable possibility of a recurrence—but have, to the contrary, expressly reserved the possibility that they will return to their prior practices—there is no choice but to deny their motion.

Dated: June 5, 2020

Respectfully submitted,
THE PLAINTIFFS,
By their attorneys,

 /s/ David D. Jensen
David D. Jensen, Esq.
Admitted *Pro Hac Vice*
David Jensen & Associates
33 Henry Street
Beacon, New York 12508
Tel: 212.380.6615
Fax: 917.591.1318
david@djensenpllc.com

J. Steven Foley
BBO # 685741
Law Office of J. Steven Foley
100 Pleasant Street #100
Worcester, MA 01609
Tel: 508.754.1041
Fax: 508.739.4051
JSteven@attorneyfoley.com

Jason A. Guida
BBO # 667252
Principe & Strasnick, P.C.
17 Lark Avenue
Saugus, MA 01960
Tel: 617.383.4652
Fax: 781.233.9192
jason@lawguida.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on June 5, 2020.

 /s/ David D. Jensen
David D. Jensen, Esq.