# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL MCCARTHY; WILLIAM R. BIEWENGA; LAURIE WARNER; TIMOTHY GALLIGAN; JIM SIMMONS; DAVID LANTAGNE; THOMAS LEIGHTON; TROY CITY TACTICAL LLC; WORCESTER PISTOL AND RIFLE CLUB, INC.; SHOOTING SUPPLY LLC; FIREARMS POLICY COALITION, INC.; COMMONWEALTH SECOND AMENDMENT, INC.; and SECOND AMENDMENT FOUNDATION, INC., | CIVIL ACTION NO. 1:20-cv-10701-DPW |
| Plaintiffs, | |
| -against- | |
| CHARLES D. BAKER, in his Official Capacity as Governor of the Commonwealth of Massachusetts and in his Individual Capacity; MONICA BHAREL MD, MPH, in her Official Capacity as Commissioner of the Massachusetts Department of Public Health and in her Individual Capacity; and JAMISON GAGNON, in his Official Capacity as Commissioner of the Department of Criminal Justice Information Services and in his Individual Capacity, | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I)      INTRODUCTION.................................................................................................1

II)     A LIVE CASE OR CONTROVERSY CONTINUES TO EXIST ....................................1

III)    THE ESSENTIAL FACTS....................................................................................3

IV)     THE SECOND AMENDMENT PROTECTS THE RIGHT TO ACCESS
        RETAILERS OF GUNS AND AMMUNITION, AS WELL AS TO
        ACCESS ANCILLARIES LIKE RANGES AND TRAINING .......................................4

V)      THE THREATENED RE-CLOSURE OF RETAILERS AND RANGES
        UNJUSTIFIABLY BURDENS THE PLAINTIFFS' RIGHTS .....................................12

VI)     INJUNCTIVE RELIEF IS STILL APPROPRIATE......................................................14

VII)    CONCLUSION................................................................................................16

# **TABLE OF AUTHORITIES**

## **Cases**

*A.C.L.U. of N.J. v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471 (3d Cir. 1996) ..............14

*Andrews v. State*, 50 Tenn. (3 Heisk.) 165 (1871)..................................................................7

*Caetano v. Massachusetts*, 577 U.S. ___, 136 S. Ct. 1027 (2016)..........................................4

*Carey v. Population Services Int'l*, 431 U.S. 678 (1977) .........................................................4

*District of Columbia v. Heller*, 554 U.S. 570 (2008)...............................................................4

*Drummond v. Township of Robinson*, 784 Fed. Appx. 82 (3d Cir. 2019) ...................................8

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)......................................................14

*Esso Standard Oil Co. v. López-Freytes*, 522 F.3d 136 (1st Cir. 2008) ....................................14

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ("*Ezell I*") ......................................5, 9-12

*Ezell v. City of Chicago*, 846 F.3d 888 (7th Cir. 2017) ("*Ezell II*") .....................................10-11

*Gould v. O'Leary*, 907 F.3d 659 (1st Cir. 2019) ..............................................................11-12

*Haile v. State*, 38 Ark. 564 (1882)........................................................................................8

*Hill v. State*, 53 Ga. 472 (1874)...........................................................................................7

*Jackson v. City & County of San Francisco*, 746 F.3d 953 (9th Cir. 2014) ................................9

*Mangual v. Rotger-Sabat*, 317 F.3d 45 (1st Cir. 2003) ...........................................................1

*Matthews v. State*, 148 N.E.2d 334, 237 Ind. 677 (1958) .......................................................8

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ...............................................................5

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*,
   460 U.S. 575 (1983)........................................................................................................4

*Moore v. Gallup*, 45 N.Y.S.2d 63, 267 App. Div. 64 (App. Div. 1943), *aff'd*,
   59 N.E.2d 439, 293 N.Y. 846 (1944)..................................................................................8

*N.Y. State Rifle & Pistol Ass'n v. City of New York*, 883 F.3d 45 (2d Cir. 2018),
   *vacated* 590 U.S. ___, 140 S. Ct. 1525 (2020)...................................................................9

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
   700 F.3d 185 (5th Cir. 2012) ..........................................................................................12

*Planned Parenthood v. Casey*, 505 U.S. 833 (1992)..............................................................4

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) .................................................4

*State v. Dawson*, 159 S.E.2d 1, 272 N.C. 535 (1968)............................................................8

*State v. Kerner*, 107 S.E. 222, 181 N.C. 574 (1921) .............................................................8

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) (en banc)....................................9

*United States v. Miller*, 307 U.S. 174 (1939)........................................................................6

*Wesson v. Town of Salisbury*, 13 F. Supp. 3d 171 (D. Mass. 2014)..............................................8

**Statutes**

M.G.L. c. 106, § 2-104..............................................................................................................3

M.G.L. c. 106, § 2-314..............................................................................................................3

M.G.L. c. 93A, § 2A ...............................................................................................................3

**Other Authorities**

Benjamin Vaughn Abbott, *Judge and Jury: A Popular Explanation of the
Leading Topics in the Law of the Land* (1880)........................................................7

Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an
Anglo-American Right* (1994) ...................................................................................6

Samuel Johnson, *Dictionary of the English Language* (4th ed. 1773) (reprinted 1978) ...............6

Thomas Cooley, *Treatise on Constitutional Limitations* (1868)....................................................7

William Brigham, *The Compact with the Charter and Laws of the Colony of
New Plymouth* (1836)..................................................................................................6

William Rawle, *A View of the Constitution of the United States of America* (1825)....................6

**Regulations**

940 C.M.R. 16.03-.07 ...................................................................................................................3

**English Authorities**

1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1689)............................................................6

**I)      INTRODUCTION**

Now that discovery is over, we have learned that the supposed concern with gun stores being particularly small and cramped had nothing to do with Defendant Governor Baker's decision to exclude them from the essential services list. Rather, the reasons Governor Baker articulated at the time were the general desire to curb person-to-person contact where possible— and a claimed need to ban access to guns to prevent domestic violence. Notably (among other things) is that Governor Baker supplies no competent evidence whatsoever to support this claimed need to preclude gun access on account of domestic violence.

Plaintiffs have already briefed much of the pertinent law and facts, and so we address most issues somewhat briefly here. After recounting the basic facts and the nature of the present controversy, Plaintiffs take time to explain that the Second Amendment's protection includes things that meaningfully advance the keeping and bearing of arms, like training and practice at ranges. Plaintiffs then review the evidence provided by Defendants and the manner in which the equitable factors have changed. Defendants have wholly failed to justify their restrictions, and accordingly, the Court should convert the preliminary injunction to a permanent one, and one that protects the right to attain proficiency at a range.

**II)      A LIVE CASE OR CONTROVERSY CONTINUES TO EXIST**

While no Executive Order currently mandates the closure of gun stores and ranges, the Defendants have done nothing to rule out or disclaim that they will resort to a renewed order directing the closure of gun stores and ranges in the future if and when Covid-19 infections again surge. Thus, it is not a situation where it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," *Mangual v. Rotger-Sabat*, 317 F.3d 45, 60 (1st Cir. 2003) (quotations omitted), and accordingly, this continues to present a live case or controversy.

Plaintiffs refer the Court to their brief in opposition to the Commonwealth's pending motion to dismiss for further legal citation. *See* Plf. Opp. Br. (Doc. No. 109) pp. 7-14.

Since Plaintiffs submitted that opposition brief, the Commonwealth has moved from "Phase II" to "Phase III" of reopening, and Governor Baker has formally rescinded COVID-19 Order No. 13, which had imposed the "essential" services lockdown in the first place. But it is still a situation where the threat of a return to previous infection levels, and previous restrictions, looms large. Indeed, Governor Baker has repeatedly (and appropriately) cautioned that it may be necessary to return to previous restrictions.

At this point, it is likely within judicial notice that we are living in a pandemic, that the future course of that pandemic is unknown, and that it has the potential to spread and infect rapidly, particularly with the changing of seasons in different climates. Nonetheless, we provide basic details about the current state of affairs to bolster the obvious conclusion that Covid-19 risks remain ever-present. Information from the Commonwealth indicates that the number of hospitalized Covid-19 patients in Massachusetts has increased 21% over the past 30 days, which does not represent a surge back to April and May, but does reflect a not insubstantial increase. Elsewhere in the United States, Arizona, California and Florida surged earlier in the summer, while some areas in the Great Plains are surging now. And notably, Covid-19 infections have risen substantially in Europe in recent weeks, leading to the re-imposition of restrictions in many countries, including Germany, Norway, Spain and the United Kingdom. Probably most importantly, many experts and public health officials continue to warn of a probable "second wave" in North America during the winter and fall. No one *knows* what will happen, but it is far from being "absolutely clear" that an "essential services" lockdown will not occur again.

### III)    THE ESSENTIAL FACTS

Having already briefed and argued most of the essential facts relating to the individual Plaintiffs, we keep much of this discussion brief. While they were in effect, the essential services lockdown orders prevented the individual Plaintiffs from purchasing guns and ammunition from licensed retailers and from making use of shooting ranges. If similar essential services orders are re-imposed in the future, then (but for the intervention of this Court) the essential services orders will again do just that. A future shutdown order would (among other things) harm the members of the organizational Plaintiffs, prevent the members of Worcester Pistol and Rifle Club from using club facilities, and prevent all firearms retailers from doing business.

The alternatives to gun and ammunition retailers are substantially inferior, especially for relatively inexperienced gun owners. At retail establishments, individuals can choose from a number of alternatives and work with a knowledgeable salesperson who can help them find a gun, or ammunition, or accessories that meets their needs. Gun stores are much more likely to have ammunition that is suitable and appropriate for personal defense. Gun stores are also much more likely to have useful or necessary accessories, like holsters and magazines. When individuals purchase guns from gun stores, those guns come with a warranty of merchantability, which does not happen when the seller is not a "merchant." *See* M.G.L. c. 106, § 2-314(1); *see also id.* § 2-104(1). Furthermore, handguns sold by Massachusetts retailers meet consumer safety requirements set forth in M.G.L. c. 93A, § 2A and 940 C.M.R. 16.03-.07. *See* Plaintiffs' Supp. Submission as to Retail Sales (Doc. No. 81) for further explanation of the additional requirements that apply. Shooting ranges and training are also very important in the effective exercise of armed self-defense. Not many people live on properties that are at least 500 feet from their neighbors, so they are not free to practice shooting at their homes, and instead need access to shooting ranges.

**IV)   THE SECOND AMENDMENT PROTECTS THE RIGHT TO ACCESS RETAILERS OF GUNS AND AMMUNITION, AS WELL AS TO ACCESS ANCILLARIES LIKE RANGES AND TRAINING**

The Second Amendment guarantees "the right of the people to keep and bear Arms," U.S. Const. amend. II, the terms of which secure "the individual right to possess and carry weapons," *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582 (citations omitted); *accord Caetano v. Massachusetts*, 577 U.S. ___, 136 S. Ct. 1027, 1030 (2016) (stun guns).

It is also well established that "certain unarticulated rights are implicit in enumerated guarantees." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 579-80 (1980). For example, the First Amendment's protection against "law[s] . . . abridging the freedom of speech, or of the press," U.S. Const. amend. I, protects newspaper publishers from taxes that single out ink and paper, *see Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585 (1983). The right to make family planning choices protects not just the bare legal ability to use contraceptives, or to terminate pregnancies, in *some* manner that does not raise the specter of criminal punishment—but also, and in application quite more importantly, to obtain appropriate and safe contraceptives and abortion services without being subjected to burdens that are undue. *See Planned Parenthood v. Casey*, 505 U.S. 833, 874 (1992); *Carey v. Population Services Int'l*, 431 U.S. 678, 689 (1977). "[T]he restriction of distribution channels to a small fraction of the total number of possible retail outlets" makes protected products and services "considerably less accessible to the public, reduces the opportunity for privacy of selection and purchase, and

lessens the possibility of price competition," even if they fall short of a "ban." *See Carey*, 431 U.S. at 689 (footnotes omitted).

Just the same, the Second Amendment protects not just the ability to possess or use guns in *some* manner without fear of criminal prosecution—but also the ability to effectively exercise the right by accessing retailers in arms, ammunition and accessories, as well as to access ranges and training.

As Plaintiffs have explained, both *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), found that D.C. and Chicago laws prohibiting the acquisition of handguns were flatly unconstitutional—that is, without regard to any standard of scrutiny—even though those laws allowed people to keep handguns they already owned. *See* Plf. Moving Br. (Doc. No. 9) pp. 9-10. Laws that flatly prohibit the commercial sale of firearms are unconstitutional. *See* Plf. Moving Br. pp. 10-11. The right to keep and bear arms also encompasses the ability to purchase ammunition. *See* Plf. Moving Br. pp. 11-12. The core purpose of the Second Amendment (at least in the context of personal firearms use) is self-defense. *See id.* pp. 11-12. Rather than repeat these arguments, Plaintiffs refer the Court to this prior briefing, and instead focus here on the Second Amendment's protection of ancillary activities that serve to meaningfully facilitate the right's core purpose.

In this connection, the starting point is that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them[.]" *Heller*, 554 U.S. at 634-35. The scope of the Second Amendment's protection turns on "a textual and historical inquiry into original meaning." *Ezell v. City of Chicago*, 651 F.3d 684, 701 (7th Cir. 2011) ("*Ezell I*"). The Second Amendment's historical background is pertinent "because it has always been widely

understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right." *Heller*, 554 U.S. at 592 (emphasis in source).

The historical genesis of the *right* to keep and bear arms was the *obligation* that English law imposed on its subjects to take up arms in defense of their country and communities. *See* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 1-2, 117-18 (1994). As in England, this obligation existed in the overseas colonies that would become the United States. One of the earliest laws in the Colony of New Plymouth, enacted in 1633, made "all and every person within the colony . . . subject to such military order for trayning and exercise" per the Governor's orders, and seven years later the Colony required that all those "fitt and able to beare arms be trayned at least six times in the yeare." *See* William Brigham, *The Compact with the Charter and Laws of the Colony of New Plymouth* 33, 68 (1836). When Parliament enacted Declaration of Rights 1689, one of the rights it enumerated (after Catholic King James II had sought to disarm them) was that "Protestants may have arms for their defence suitable to their conditions and as allowed by law." 1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1689); *see also Heller*, 554 U.S. at 593 (citing Malcolm, *supra*, at 103-06). It was 100 years later that the newly formed United States ratified the Constitution, and two years after that, the Bill of Rights and its Second Amendment.

At the time of the country's founding, individuals reporting for militia service "were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *United States v. Miller*, 307 U.S. 174, 179 (1939); *accord Heller*, 554 U.S. at 624; *see also* Brigham, *supra*, at 76 (setting fines for those "defective in their armes"). Indeed, the Second Amendment's invocation of "A well regulated Militia" as "being necessary to the security of a free State" reflects the need for training and practice in that a "well regulated" militia, in the

English of 1791, was one that reflected "proper discipline and training." *See Heller*, 554 U.S. at 597 (*citing* Samuel Johnson, *Dictionary of the English Language* 1619 (4th ed. 1773) (reprinted 1978); William Rawle, *A View of the Constitution of the United States of America* 121-22 (1825)) (other citation omitted).

Authorities from the Nineteenth Century reflect the historically grounded understanding that the right to keep and bear arms intrinsically includes the right to become proficient and to maintain proficiency. In *Heller*, the Court relied in part on Nineteenth Century treatises and caselaw addressing state constitutional provisions to provide guidance on the scope and understanding of the right to keep and bear arms at the time of the Second Amendment's ratification. *See id.* at 610-19. One source *Heller* considered more than once was Thomas Cooley's "massively popular" 1868 treatise on constitutional law, which recognized that "'to bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use. . . .'" *Id.* at 617-18 (*quoting* Thomas Cooley, *Treatise on Constitutional Limitations* 271 (1868)); *see also id.* at 619 ("No doubt, a citizen who keeps a gun or pistol under judicious precautions, practices in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right." (*quoting* Benjamin Vaughn Abbott, *Judge and Jury: A Popular Explanation of the Leading Topics in the Law of the Land* 333 (1880))).

Nineteenth Century caselaw on state constitutional provisions also reflects the understanding that the right to keep and bear arms includes the right to acquire and maintain proficiency. In 1871, the Tennessee Supreme Court recognized that not only did the right to keep and bear arms "necessarily involve[] the right to purchase and use them in such a way as is usual," but also "*the right to practice their use*." *Andrews v. State*, 50 Tenn. (3 Heisk.) 165, 178

(1871) (emphasis added). Similarly, the Supreme Court of Georgia found in 1874 that the right to keep and bear arms "guaranteed to the people, not only the right to have and keep arms, but the right so to use them as to become familiar with that use. . . ." *Hill v. State*, 53 Ga. 472, 479 (1874). The right to "'bear arms' must include the right to load them and shoot them and use them as such things are ordinarily used." *Id.* at 480. In 1882, the Arkansas Supreme Court described the "essential objects" of the right to keep and bear arms to be that the "citizen may keep arms in readiness upon his place, may render himself skillful in their use by practice, and carry them upon a journey without let or hindrance. . . ." *Haile v. State*, 38 Ark. 564, 567 (1882). During the Twentieth Century, state courts continued to recognize that state constitutional provisions guaranteeing the right to keep and bear arms served "to preserve to the people the right to acquire and retain a practical knowledge of the use of fire-arms." *State v. Kerner*, 107 S.E. 222, 225, 181 N.C. 574, 578 (1921) (citation omitted); *accord State v. Dawson*, 159 S.E.2d 1, 10, 272 N.C. 535, 546 (1968); *see also Matthews v. State*, 148 N.E.2d 334, 342, 237 Ind. 677, 694 (1958) (Emmert, C.J., concurring in part and dissenting in part) ("It may well be that the man who survives near the target area will be the one who has prepared to bear arms for his defense."); *Moore v. Gallup*, 45 N.Y.S.2d 63, 68, 267 App. Div. 64, 71 (App. Div. 1943) (Hill, P.J., dissenting) ("The need of the citizens to become proficient in the use of firearms is now brought strikingly to our attention."), *aff'd*, 59 N.E.2d 439, 293 N.Y. 846 (1944).

So, not surprisingly, courts addressing the issue in the wake of *Heller* have generally found that the Second Amendment's right to keep and bear arms necessarily includes the right to acquire and maintain proficiency. For example, the Third Circuit concluded not long ago that the Second Amendment's scope of protection included "acquiring firearms and maintaining proficiency in their use" and reversed a district court decision that had ruled to the contrary. *See*

*Drummond v. Township of Robinson*, 784 Fed. Appx. 82, 84 (3d Cir. 2019). In this District,

Judge Stearns has found that, other issues aside, the Second Amendment secures the "right to

possess firearms in [the plaintiffs'] home for purposes of self-defense and the right to maintain

proficiency in their use." *Wesson v. Town of Salisbury*, 13 F. Supp. 3d 171, 178 (D. Mass. 2014).

Judge Stearns ordered the defendants to permit the plaintiffs "to transport [guns] to lawful

locations for purposes of practice shooting," subject to "reasonable restrictions. *See id.* The en

banc Ninth Circuit, in the course of ruling that a gun dealer could not assert a Second

Amendment claim for regulations that did not prevent other dealers from selling guns, re-

affirmed what it had previously "held[,] that the Second Amendment protects ancillary rights

necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v.*

*County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) (*citing Jackson v. City &*

*County of San Francisco*, 746 F.3d 953 (9th Cir. 2014)). The court agreed with the Seventh

Circuit that "the right to maintain proficiency in firearms use[ is] an important corollary to the

meaningful exercise of the core right to possess firearms for self-defense." *Id.* (*quoting Ezell I*,

651 F.3d at 708). Even the Second Circuit, in upholding a restriction on taking guns *outside* the

City of New York, had to concede that "the ability to obtain firearms training and engage in

firearm practice is sufficiently close to core Second Amendment concerns that regulations that

sharply restrict that ability to obtain such training could impose substantial burdens on core

Second Amendment rights." *N.Y. State Rifle & Pistol Ass'n v. City of New York*, 883 F.3d 45, 58

(2d Cir. 2018), *vacated* 590 U.S. ___, 140 S. Ct. 1525 (2020).

      The Seventh Circuit's decisions in the *Ezell* litigation provide the most in-depth treatment

of the issue in modern times. *Ezell I* concerned zoning regulations in the City of Chicago that

prohibited private citizens and organizations (but not the government or private security firms)

from operating firing ranges. *See Ezell I*, 651 F.3d at 692-93. While the district court had denied

a preliminary injunction on its finding that the Second Amendment "has not yet been expanded

to [a] breadth" that would likely include firing ranges, the Seventh Circuit reversed. *See id.* at

694. Rather, the court explained, "[t]he right to possess firearms for protection implies a

corresponding right to acquire and maintain proficiency in their use; the core right wouldn't

mean much without the training and practice that make it effective." *Id.* at 704. Furthermore, the

court rejected appeals to rational basis review or to an "undue burden" test, instead explaining

that "*some* heightened standard of judicial review" was necessary. *See id.* at 706 (emphasis in

source). After examining (most notably) First Amendment and election law cases, the court

concluded that "a severe burden on the core Second Amendment right of armed self-defense will

require an extremely strong public-interest justification and a close fit between the government's

means and its end," while "laws restricting activity lying closer to the margins . . . may be more

easily justified. How much more easily depends on the relative severity of the burden and its

proximity to the core of the right." *Id.* at 708. And in this connection, the firing range ban was "a

serious encroachment on the right to maintain proficiency in firearm use, an important corollary

to the meaningful exercise of the core right to possess firearms for self-defense." *Id.* Chicago

needed to "establish a close fit between the range ban and the actual public interests it serves,

and also that the public's interests are strong enough to justify so substantial an encumbrance on

individual Second Amendment rights." *Id.* at 708-09. But it had failed to do this, as it had

"presented no data or expert opinion to support the range ban." *Id.* at 709. "[T]he City produced

no empirical evidence whatsoever and rested its entire defense of the range ban on speculation

about accidents and theft." *Id.* The Seventh Circuit remanded with instructions to issue a

preliminary injunction. *Id.* at 711.

*Ezell II* addressed the zoning regulations that the City of Chicago subsequently adopted. *See Ezell v. City of Chicago*, 846 F.3d 888, 890 (7th Cir. 2017) ("*Ezell II*"). The court reiterated, twice, that it had "held that the range ban was incompatible with the Second Amendment" in *Ezell I*. *See id.* (citing *Ezell I*, 651 F.3d at 710-11). The two zoning regulations at issue limited ranges to only one zoning district and imposed "buffer" requirements from residential areas, churches and other ranges (among other things). *See id.* Operating together, the result was that "only 2.2% of the city's total acreage [was] even theoretically available" for the operation of shooting ranges, which even then, still required the issuance of a special use permit. *See id.*

The court in *Ezell II* again rejected the city's appeal to rational basis and "substantial burden" standards of review. *See id.* at 893. Rather, the Seventh Circuit reiterated what it "said in *Ezell I*: If the challenged law regulates activity protected by the Second Amendment, the government 'bears the burden of justifying its action[s] under *some* heightened standard of judicial review.'" *Id.* (*quoting Ezell I*, 651 F.3d at 706) (alteration and emphasis in source). And, while the zoning restrictions were "not an outright ban," still, they "severely limit[ed] where shooting ranges may locate" and so, they "severely restrict the right of Chicagoans to train in firearm use at a range." *See id.* at 893-94. Thus, it was incumbent on the city to "to establish a close fit between the challenged zoning regulations and the actual public benefits they serve— and to do so with actual evidence, not just assertions." *Id.* at 894. But, the evidence actually showed that other jurisdictions allowed shooting ranges to operate in many more locations, and indeed, Chicago itself allowed ranges run by law enforcement agencies and private security firms to operate in many more locations. *See id.* at 894, 896. Ultimately, and as in *Ezell I*, the city's countervailing evidence ultimately consisted of "speculation about accidents and theft." *Id.* at

896 (*quoting Ezell I*, 651 F.3d at 709). This was "not nearly enough to satisfy its burden," and the court accordingly found the restrictions unconstitutional. *Id.*

**V)     THE THREATENED RE-CLOSURE OF RETAILERS AND RANGES UNJUSTIFIABLY BURDENS THE PLAINTIFFS' RIGHTS**

The Court has indicated its intent to look to *Gould v. O'Leary*, 907 F.3d 659 (1st Cir. 2019), and its intermediate scrutiny standard as a primary source of guidance for the standard of review. *Gould* provides that "the appropriate level of scrutiny must turn on how closely a particular law or policy approaches the core of the Second Amendment right and how heavily it burdens that right." *Id.* at 670 (*citing Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 195 (5th Cir. 2012); *Ezell I*, 651 F.3d at 702). "A law or policy that burdens conduct falling within the core of the Second Amendment requires a correspondingly strict level of scrutiny, whereas a law or policy that burdens conduct falling outside the core of the Second Amendment logically requires a less demanding level of scrutiny." *Id.*

When it granted Plaintiffs' motion for a preliminary injunction, the Court found that "there's an impingement here, a burdening of constitutional rights." Transcript (Doc. No. 93) at 51:17-18. The Court focused substantially on the fact that, while it was "clear" that a "choice was made to exclude[,] . . . Why it was made to exclude is not clear. What the justification is not clear." Transcript (Doc. No. 93) at 52:22-24.

Now, having completed discovery, any *proper* basis for the decision to exclude remains that much more unclear. Neither Governor Baker, nor any of the other Defendants, relied on any studies or research in arriving at the decision to exclude gun and ammunition retailers and shooting ranges from the list of services they deemed essential. And, while the Commonwealth's defense at the preliminary injunction hearing was that gun stores are "very small," "cramped"

and "crowded," *see* Aff. of Michaela Dunne (Doc. No. 61-3) at ¶¶ 9-13; Aff. of Zorran

Atanasovski (Doc. No. 61-4) at ¶¶ 5-6, there is nothing in the records of any Defendant that

reflect that any consideration whatsoever related to the physical characteristics of guns stores or

shooting ranges versus those of other business (like liquor stores). Rather, around the time

Governor Backer actually made the decision to exclude, he articulated two justifications, neither

of which reflected a concern about gun stores being inordinately small. Rather, when he

explained the matter to the Republic leadership on April 7, 2020, the first concern he articulated

was "to substantially reduce out-of-home activities and associated contacts," which is (of course)

the same rationale that applies to *all* Covid-19 restrictions. And the second articulated concern?

Preventing domestic violence:

> [E]xperts and advocates working in the field of domestic violence
> had expressed strong concerns about the potential for an increase
> in incidents of domestic violence due to stress and mental health
> problems resulting from the pandemic generally and due to the
> effect of substantially curtailing opportunities to leave the home
> specifically. He explained that a pause on immediate access to
> firearm purchases from gun retailers could mitigate at least some
> part of this risk.

Governor Baker's notes from this meeting likewise begin with "domestic violence comm.

pushback" and "increase stress; mental health + domestic violence," but express no concern with

gun stores being particularly crowded.

This is, of course, tantamount to saying that Covid-19 lockdown conditions would justify

bans on speech on the rationale that people living under lockdown conditions are more likely to

be stressed, have mental illness and get into violent arguments. And, moreover, here this was

done without even having studies or research to in any way justify the proposition.

Moving beyond that, while Governor Baker referenced a campaign undertaken by

"domestic violence advocates," no such campaign appears in the records he disclosed. Rather,

the Governor received 25 emails supporting the closure of gun activities, 23 of which were

wholly verbatim, stating:

> Allowing gun stores to reopen during the COVID-19 pandemic is a
> threat to public health and safety with increased risk of death from
> domestic violence homicides, suicides, and unintentional
> shootings. We support your decision to keep gun stores closed.

The only organization any of these emails identifies is "Stop Handgun Violence." Certainly, it is

no secret that Governor Baker faced political pressure from other Massachusetts politicians to

keep gun-related items off the "essential" list, unless they served to benefit the government.

In any event, citing emails from gun control proponents to justify a restriction on gun

rights is literally like trying to justify a substantial burden on the ability to obtain an abortion by

citing to the fact that opponents of abortion are in favor of it.

There was no apparent justification when the Court granted relief on May 7, 2020. And,

now there is an apparent justification, but it is a wholly improper one. The Defendants have

failed manifestly in their burden to provide justification for their restrictions.

## VI)   INJUNCTIVE RELIEF IS STILL APPROPRIATE

A permanent injunction issues when:

1.   The Plaintiffs "ha[ve] suffered an irreparable injury;"

2.   the "remedies available at law, such as monetary damages, are inadequate to
     compensate for that injury;"

3.   "considering the balance of the hardships . . . , a remedy in equity is
     warranted;" and

4.   "the public interest will not be disserved by a permanent injunction."

*Esso Standard Oil Co. v. López-Freytes*, 522 F.3d 136, 148 (1st Cir. 2008) (*quoting eBay Inc. v.*

*MercExchange, L.L.C.*, 547 U.S. 388, 390 (2006)). The only real difference between the

standards governing preliminary and permanent injunctions is that permanent injunctions do not

depend not on an assessment of the likelihood of success, but instead on the facts ultimately before the Court. *See, e.g., A.C.L.U. of N.J. v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1477 (3d Cir. 1996). The Plaintiffs have already briefed the application of these factors at length, and in the interest of brevity, we refer the Court to those briefings. *See* Plf. Moving Br. at pp. 17-20. In sum, the Plaintiffs readily meet the first two requirements—that of an "irreparable" injury, and one for which money damages are inadequate—because the Plaintiffs (and indeed, all people) are entitled to enjoy their fundamental constitutional rights in fact, not through the fiction of a money damages judgment. *See* Plf. Moving Br. at pp. 17-18. Public interest, the fourth factor, still favors relief because the vindication of constitutional rights is axiomatically in the pubic interest, *see* Plf. Moving Br. at p. 20, but both it and the third factor, the balance of equities, merit a little additional discussion.

It is still true that there is no "harm" because relief only inures in favor of those whom the Commonwealth has already licensed to purchase and possess guns, and it is still true that public health regulations can mitigate against the risk of Covid-19 spread through various measures. *See* Plf. Moving Br. at pp. 18-20. But two things have changed. The first is that—for the time being, at least—there is no executive order that directs the closure of retailers and ranges. And the second is that businesses (including gun stores) have substantially re-opened, implementing recommended practices and regulatory requirements—practices and requirements that have themselves evolved. The public interest favors protecting constitutional rights, but it also favors combating the spread of pandemic illnesses—meaning that it favors letting appropriate public health authorities determine what practices are currently appropriate for "essential" businesses, even if it is courts that make the determination that certain businesses are "essential" in the constitutional framework.

## VII)   CONCLUSION

The Court should replace its preliminary injunction with a permanent one, but one that leaves the applicable public health restrictions in the hands of public health officials, subject to the oversight of the Court.

Dated:  September 23, 2020

<div style="margin-left: 40%;">

Respectfully submitted,

THE PLAINTIFFS,

By their attorneys,


 /s/ David D. Jensen
David D. Jensen, Esq.
Admitted *Pro Hac Vice*
David Jensen & Associates
33 Henry Street
Beacon, New York 12508
Tel: 212.380.6615
Fax: 917.591.1318
david@djensenpllc.com

J. Steven Foley
BBO # 685741
Law Office of J. Steven Foley
100 Pleasant Street #100
Worcester, MA 01609
Tel: 508.754.1041
Fax: 508.739.4051
JSteven@attorneyfoley.com

Jason A. Guida
BBO # 667252
Principe & Strasnick, P.C.
17 Lark Avenue
Saugus, MA 01960
Tel: 617.383.4652
Fax: 781.233.9192
jason@lawguida.com

</div>

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on September 23,

2020.

<div style="text-align:right">

/s/ David D. Jensen
David D. Jensen

</div>