UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICHAEL MCCARTHY, et al.,

      *Plaintiffs*,

      v.

CHARLES D. BAKER, in his Official Capacity as
Governor of the Commonwealth of Massachusetts, et al.,

      *Defendants*.

CIVIL ACTION
NO. 1:20-cv-10701-DPW

**MEMORANDUM IN SUPPORT OF
DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

MAURA HEALEY
ATTORNEY GENERAL

Julia Kobick, BBO # 680194
Assistant Attorney General
Gary Klein, BBO # 560769
Special Assistant Attorney General
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2559
julia.kobick@mass.gov
gary.klein@state.ma.us

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 2

    I.  The Governor's Orders Temporarily Closing
        Non-Essential Businesses ......................................................................... 2

    II. Procedural Background ............................................................................. 4

    III. The Phased Reopening of the Massachusetts Economy ............................ 5

ARGUMENT ...................................................................................................... 6

    I.  Plaintiffs' Claims Challenging the Long Since Rescinded
        COVID-19 Orders Continue to Be Moot ...................................................... 6

    II. The Orders Temporarily Closing Gun Retailers and Shooting
        Ranges During the Most Acute Period of COVID-19
        Infection in Massachusetts Comported with the Second
        Amendment ............................................................................................... 8

        A. Plaintiffs' Claims Fail at the Outset Because the Rescinded
           Orders Had a Real and Substantial Relation to the
           Protection of Public Health in a Pandemic ........................................... 8

        B. The Rescinded COVID-19 Orders Comported
           with the Second Amendment Under a Traditional
           Constitutional Analysis ...................................................................... 10

            1. Even If the Rescinded COVID-19 Orders Implicated
               the Second Amendment, They Must Be Evaluated
               Under Intermediate Scrutiny ..................................................... 11

            2. The Rescinded COVID-19 Orders, as Applied to
               Gun Retailers and Shooting Ranges, Were
               Substantially Related to the Governor's Goal of
               Curbing the Spread of COVID-19 .......................................... 13

               a. The Governor's Goal of Curbing the Spread
                   of COVID-19 Through the Rescinded
                   Essential Services Orders Was Important .................... 14

       b.   The Rescinded COVID-19 Orders Were
           Substantially Related to the Governmental
           Interest in Curbing the Spread of COVID-19 ..............17

III. Plaintiffs Have Waived Any Claim for Damages......................................20

CONCLUSION........................................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*Altman v. Cnty. of Santa Clara*,
    --- F. Supp. 3d ---, 2020 WL 2850291 (N.D. Cal. June 2, 2020).................7, 10, 13, 14, 19

*Calvary Chapel of Bangor v. Mills*,
    2020 WL 2310913 (D. Me. 2020) .......................................................................9

*Clark v. Jeter*,
    486 U.S. 456 (1988)................................................................................... 13-14

*Dark Storm Indus. LLC v. Cuomo*,
    --- F. Supp. 3d ---, 2020 WL 3833107 (N.D.N.Y. July 8, 2020) ..........................13, 14, 19

*District of Columbia v. Heller*,
    554 U.S. 570 (2008).........................................................................................11

*Elim Romanian Pentecostal Church v. Pritzker*,
    962 F.3d 341 (7th Cir. 2020) .............................................................................15

*Florida Bar v. Went for It, Inc.*,
    515 U.S. 618 (1995).........................................................................................14

*Gould v. Morgan*,
    907 F.3d 659 (1st Cir. 2018) ...................................................... 10-11, 14, 19, 20

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)...........................................................................................20

*In re SEG Properties, LLC v. Northam*,
    CL20-2818 (Va. Cir. Ct. June 10, 2020)...........................................................13

*Jacobson v. Massachusetts*,
    197 U.S. 11 (1905).....................................................................................8, 9, 10

*Kelly v. Riverside Partners, LLC*,
    964 F.3d 107 (1st Cir. 2020) .............................................................................20

*League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*,
    2020 WL 3468281 (6th Cir. 2020) (unpublished) ..............................................9

*Lebanon Valley Auto Racing Corp. v. Cuomo*,
    2020 WL 4596921 (N.D.N.Y. Aug. 11, 2020) ..................................................9

*Luke's Catering Serv., LLC v. Cuomo*,
    2020 WL 5425008 (W.D.N.Y. Sept. 10, 2020) ...................................................9

*Marshall v. United States*,
    414 U.S. 417 (1974)...................................................9

*McDougall v. Cnty. of Ventura*,
    2020 WL 2078246 (C.D. Cal. April 1, 2020) ...................................................13, 14

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, &*
    *Explosives*,
    700 F.3d 185 (5th Cir. 2012) ...................................................13

*Prince v. Massachusetts*,
    321 U.S. 158 (1944)...................................................9

*Rubin v. Coors Brewing Co.*,
    514 U.S. 475 (1995)...................................................14

*Silvester v. Harris*,
    843 F.3d 816 (9th Cir. 2016) ...................................................13

*South Bay United Pentecostal Church v. Newsom*,
    140 S. Ct. 1613 (2020)...................................................9, 10, 15, 20

*Teixeira v. Cty. of Alameda*,
    873 F.3d 670 (9th Cir. 2017) (en banc) ...................................................20

*United States v. Chafin*,
    423 Fed. App'x 342 (4th Cir. 2011) ...................................................20

*World Gym, Inc. v. Baker*,
    --- F. Supp. 3d ---, 2020 WL 4274557 (D. Mass. July 24, 2020) ...................................................7, 20

*Worman v. Healey*,
    922 F.3d 26 (1st Cir. 2019) ...................................................10, 11

## Constitutional Provision and Statutes

U.S. Const., Amend. I ...................................................9, 15

U.S. Const., Amend. II ................................................... *passim*

M.G.L. c. 140, § 128A ...................................................12

M.G.L. c. 140, § 128B ...................................................12

M.G.L. c. 140, § 129B ...............................................................................12

M.G.L. c. 140, § 129B(3)..........................................................................12

M.G.L. c. 140, § 131 .................................................................................12

M.G.L. c. 140, § 131(e) .............................................................................12

**<u>Miscellaneous</u>**

Charles D. Baker, Governor's Declaration of Emergency
(March 10, 2020) .........................................................................................2

Charles D. Baker, Order Temporarily Closing All Public and Private
Elementary and Secondary Schools (March 15, 2020).........................................2

Charles D. Baker, Order Temporarily Closing All Child Care Programs
and Authorizing the Temporary Creation and Operation of
Emergency Child Care Programs (March 18, 2020) ...........................................2

Charles D. Baker, COVID-19 Order No. 13, Order Assuring Continued
Operation of Essential Services in the Commonwealth, Closing
Certain Workplaces, and Prohibiting Gatherings of More Than 10
People (March 23, 2020)............................................................................ *passim*

Charles D. Baker, COVID-19 Order No. 21, Order Extending the Closing
of Certain Workplaces and the Prohibition on Gatherings of More
Than 10 People (March 31, 2020) ............................................................. *passim*

Charles D. Baker, COVID-19 Order No. 27, Order Extending the
Temporary Closing of All Non-Emergency Child Care Programs
(April 21, 2020) ..........................................................................................4

Charles D. Baker, COVID-19 Order No. 28, Order Extending the
Temporary Closure of All Public and Private Elementary and
Secondary Schools (April 21, 2020) ...................................................................4

Charles D. Baker, COVID-19 Order No. 30, Order Further Extending the
Closing of Certain Workplaces and the Prohibition on Gatherings
of More than 10 People (April 28, 2020)................................................... *passim*

Charles D. Baker, COVID-19 Order No. 33, Order Implementing a Phased
Reopening of Workplaces and Imposing Workplace Safety
Measures to Address COVID-19 (May 18, 2020) .............................................5

Charles D. Baker, COVID-19 Order No. 37, Order Authorizing the
Reopening of Phase II Enterprises (June 6, 2020) ........................................................... 5-6

Charles D. Baker, COVID-19 Order No. 40, Order Further Advancing the
Re-Opening of Phase II Enterprises (June 19, 2020) ........................................................ 6

Charles D. Baker, COVID-19 Order No. 43, Order Authorizing the
Reopening of Phase III Enterprises (July 2, 2020) .......................................................... 6

Charles D. Baker, COVID-19 Order No. 51, Order Further Advancing
Phase III Re-Openings in Municipalities with Reduced Incidence
of COVID-19 Infection (September 29, 2020) ................................................................... 6

# INTRODUCTION

During the most acute phase of the COVID-19 pandemic in Massachusetts, when the number of new cases of and deaths from the disease was surging, defendant Charles D. Baker, the Governor of Massachusetts, issued a number of orders to protect residents from the novel coronavirus and to stem its transmission in Massachusetts. Three of those orders, COVID-19 Order Nos. 13, 21, and 30, required all non-essential businesses in Massachusetts to close for less than two months, when there existed the greatest risk that Massachusetts healthcare facilities would be overwhelmed by COVID-19 patients. Due in large part to the social distancing measures implemented in March, April, and May and the vigilance of Massachusetts residents, the number of new COVID-19 cases and deaths steadily decreased. Thus, when the final of the three orders expired on May 18, 2020, the Governor announced a phased plan for reopening the Massachusetts economy. He also issued several new orders that govern operation of workplaces in Massachusetts, and he rescinded the orders requiring non-essential services to close temporarily.

The plaintiffs in this case filed suit to challenge application of COVID-19 Order Nos. 13, 21, and 30 to gun retailers and shooting ranges, which were not designated essential services under the orders. When the complaint was filed, the challenged orders were in effect and temporarily prevented gun retailers and shooting ranges from operating. Today, more than six months later, all three challenged orders are long expired and since rescinded. For five months, gun retailers and shooting ranges have been open to the public in Massachusetts, subject to generally applicable social distancing and safety measures. Thus, there is no longer a live dispute between the parties in this case. But if this Court were to nevertheless reach the merits of the plaintiffs' Second Amendment claim, the claim fails on the merits. The Governor's short-term closure of gun retailers and shooting ranges, during the most acute phase of the crisis in Massachusetts, did not heavily

burden the right protected by the Second Amendment, but did serve the Commonwealth's objective of preventing the spread of COVID-19. Given the substantial fit between the temporary orders and the government's compelling public health objectives, and the deference owed to the Governor's policy judgments during a pandemic, this Court should enter judgment in favor of the defendants.

**BACKGROUND**

**The Governor's Orders Temporarily Closing Non-Essential Businesses**

On March 10, 2020, Governor Baker declared a State of Emergency in Massachusetts due to the spread of the novel coronavirus.[1] When the Governor issued the emergency declaration, Massachusetts had 91 confirmed COVID-19 cases and no confirmed deaths.[2] By June 10, 2020, a mere three months later, over 104,000 Massachusetts residents had been confirmed infected with the coronavirus and more than 7,400 had died from the disease.[3]

To slow the spread of the virus and prevent healthcare facilities from becoming overwhelmed with COVID-19 patients, government officials temporarily closed forums in which people gather together during the height of the pandemic. In Massachusetts, Governor Baker ordered a host of measures to promote social distancing. For example, on March 15, when Massachusetts had 164 confirmed COVID-19 cases, the Governor ordered all K-12 schools temporarily closed, because the proximity of people in schools would spur more infection.[4] And on March 18, he ordered all non-emergency childcare programs temporarily closed as well.[5]

By March 23, when Massachusetts had 646 confirmed COVID-19 cases and five deaths,

---

[1] *See* Kobick Aff. Ex. A; Defts.' Statement of Material Facts ¶ 1.
[2] *See* Kobick Aff. Ex. A; Defts.' Statement of Material Facts ¶ 2.
[3] *See* Kobick Aff. Ex. B; Defts.' Statement of Material Facts ¶ 3.
[4] *See* Kobick Aff. Ex. C; Defts.' Statement of Material Facts ¶ 15.
[5] *See* Kobick Aff. Ex. D; Defts.' Statement of Material Facts ¶ 15.

Governor Baker issued COVID-19 Order No. 13, the first order challenged in this case.[6] The Order authorized essential services—like those involved in distribution of food, provision of medical care, and law enforcement—to continue operating, but required all other businesses to close temporarily until April 7.[7] Businesses spanning diverse sectors of the economy, from bookstores, to barbershops, to clothing stores, and, as relevant here, gun retailers and shooting ranges, were not included among the list of essential services.[8] The Order also temporarily prohibited gatherings of more than 10 people anywhere in the Commonwealth, including in houses of worship and for community, civic, personal, or other events.[9]

In the week following COVID-19 Order No. 13, the number of COVID-19 cases and deaths in Massachusetts increased precipitously.[10] Thus, on March 31, Governor Baker issued COVID-19 Order No. 21, which extended until May 4 the closure of businesses that do not provide essential services and the prohibition on gatherings of more than 10 people.[11] Attached to the Order was an updated version of Exhibit A, which identified COVID-19 Essential Services.[12] As before, gun retailers and shooting ranges were not listed on Exhibit A.[13]

During the month of April and the early weeks of May 2020, the Commonwealth was in the middle of the surge of COVID-19 infections. Between April 8 and May 13, there were 100 or more deaths from COVID-19 every day.[14] Reflecting the ongoing existence of the surge of COVID-19 infections, Governor Baker ordered on April 21 that all K-12 schools in the

---

[6] *See* Kobick Aff. Ex. E; Defts.' Statement of Material Facts ¶ 16.
[7] *Id.*
[8] *See* Kobick Aff. Ex. E; Defts.' Statement of Material Facts ¶ 17.
[9] *Id.*
[10] *See* Kobick Aff. Ex. F; Defts.' Statement of Material Facts ¶ 18.
[11] *See* Kobick Aff. Ex. F; Defts.' Statement of Material Facts ¶ 19.
[12] *See* Kobick Aff. Ex. F.
[13] *Id.*; Defts.' Statement of Material Facts ¶ 19.
[14] *See* Kobick Aff. Ex. G, p. 9; Defts.' Statement of Material Facts ¶ 20.

Commonwealth remain closed for the duration of the school year and that all non-emergency childcare centers remain closed until June 29.[15] And on April 28, Governor Baker issued COVID-19 Order No. 30, which further extended the temporary closure of non-essential businesses and the prohibition on gatherings of more than 10 people for two additional weeks, until May 18.[16] The list of Essential Services on Exhibit A remained unchanged.[17]

**Procedural Background**

The plaintiffs in this matter—several gun retailers, individuals ("individual plaintiffs"), and gun advocacy organizations—filed suit to challenge COVID-19 Order Nos. 13, 21, and 30, as applied to gun retailers, on April 9, 2020. *See* Amended Complaint (ECF Doc. No. 6) ¶¶ 8-20. The plaintiffs alleged that the temporary closure of gun stores violated the Second Amendment of the U.S. Constitution. *See id.* ¶¶ 21-23, 28-33, 73-77. On April 14, the plaintiffs moved for a preliminary injunction. *See* ECF Doc. Nos. 8-9.

Following briefing, this Court held hearings on the plaintiffs' motion on May 4 and May 7. And on May 7, this Court granted the plaintiffs' motion in part and ordered that licensed firearms and ammunition retailers be permitted to open as of May 9, by appointment only and with no more than four appointments per hour. *See* ECF Doc. No. 92. The Court's Order also set forth a number of social distancing, sanitation, and hygiene requirements. *See id.* On May 15, the plaintiffs filed a Second Amended Complaint, which removed some plaintiffs, added new plaintiffs, and expanded their Second Amendment claim to also challenge to the temporary closure of shooting ranges. *See* ECF Doc. No. 99. The defendants filed an answer to that complaint on May 21 and a motion to dismiss, which remains pending, on May 28. *See* ECF Doc. Nos. 101, 104-05.

---

[15] *See* Kobick Aff. Exs. H and I; Defts.' Statement of Material Facts ¶ 21.
[16] *See* Kobick Aff. Ex. J; Defts.' Statement of Material Facts ¶ 22.
[17] *Id.*

**The Phased Reopening of the Massachusetts Economy**

By the middle of May, due in large part to the social distancing measures implemented statewide, the number of new daily coronavirus infections and deaths had plateaued and then begun steadily decreasing.[18] Since May 8, the Commonwealth has not recorded a day with more than 1,500 new COVID-19 cases.[19] And since May 16, the Commonwealth has not seen a day with more than 100 new COVID-19 deaths.[20] Thus, on May 18, in accordance with the expiration date of COVID-19 Order No. 30, Governor Baker announced a new slate of measures to reopen the Massachusetts economy.[21] Under the approach, sectors of the Massachusetts economy have reopened in phases, with the timeline of the reopening guided by key public health metrics.[22]

COVID-19 Order No. 33, issued on May 18, governed the first phase of reopening for a range of businesses, including some brick-and-mortar workplaces.[23] Under Section 1 of the order, certain additional businesses and organizations, including manufacturing, construction operations, houses of worship, and, as relevant here, firearms retailers and shooting ranges, were authorized to open to the public, subject to the workplace safety rules set forth in Section 2 of the order.[24] The safety rules included social distancing, hygiene, staffing, and disinfecting requirements applicable to all brick-and-mortar businesses now operating.[25] Unlike the Court's May 7 Order, COVID-19 Order No. 33 did not require appointments before customers could visit gun retailers.[26]

On June 6, 2020, Governor Baker issued COVID-19 Order No. 37, which authorized the

---

[18] *See* Kobick Aff. Ex. B, p. 5; Defts.' Statement of Material Facts ¶ 25.
[19] *See* Kobick Aff. Ex. B, p. 5; Ex. K, p. 5; Ex. L, p. 5; Defts.' Statement of Material Facts ¶ 25.
[20] *See* Kobick Aff. Ex. B, p. 12; Ex. K, p. 12; Ex. L, p. 12; Defts.' Statement of Material Facts ¶ 25.
[21] *See* Kobick Aff. Ex. M; Defts.' Statement of Material Facts ¶ 26.
[22] *See id.*
[23] *See* Kobick Aff. Ex. N; Defts.' Statement of Material Facts ¶¶ 26-27.
[24] *See* Kobick Aff. Ex. N; Defts.' Statement of Material Facts ¶ 28.
[25] *See id.*
[26] *See* Kobick Aff. Ex. N; Defts.' Statement of Material Facts ¶ 29.

first group of phase 2 organizations, listed on Schedule A to the order, to reopen.[27] The order noted

that the "sustained trend of improvement in public health data permit[ted] a continued, carefully

phased relaxation of certain restrictions on businesses and organizations," and it formally

rescinded COVID-19 Order No. 13, the essential services order.[28] On June 19, COVID-19 Order

No. 40 authorized the second group of phase 2 entities to reopen.[29] On July 2, COVID-19 Order

No. 43 authorized the first group of phase 3 entities to reopen, and on September 29, 2020,

COVID-19 Order No. 51 authorized the second group of phase 3 entities to reopen in communities

with low rates of COVID-19 infection.[30] During the entire phased reopening process—the five

months spanning May 18 to the present—gun dealers and shooting ranges have been open.

## ARGUMENT

### I. Plaintiffs' Claims Challenging the Long Since Rescinded COVID-19 Orders Continue to Be Moot.

This Court has lacked jurisdiction over this case since May 18, when the plaintiffs'

challenge to COVID-19 Order Nos. 13, 21, and 30 became moot because the orders expired on

their own terms. The memorandum in support of defendants' motion to dismiss, filed on May 28,

explains why the plaintiffs' claims for injunctive and declaratory relief are moot and not saved by

the capable of repetition, yet evading review or voluntary cessation exceptions to mootness. *See*

ECF Doc. No. 105, at 8-15. Rather than repeat those arguments in this brief, the defendants

incorporate them by reference, but add three additional points.

First, the basis for mootness has become even stronger since the filing of the motion to

---

[27] *See* Kobick Aff. Ex. O; Defts.' Statement of Material Facts ¶ 32.
[28] Kobick Aff. Ex. O, at 2, 7. Prior to COVID-19 Order No. 37, all of the orders extending COVID-19 Order No. 13 had already been rescinded. *See* Kobick Aff. Ex. P, at 3, 12-13. *See* Defts.' Statement of Material Facts ¶ 32.
[29] *See* Kobick Aff. Ex. Q; Defts.' Statement of Material Facts ¶ 33.
[30] *See* Kobick Aff. Exs. R, S; Defts.' Statement of Material Facts ¶ 33.

dismiss, because the essential services orders—including COVID-19 Order No. 13, the first operative order—have all been rescinded, and Massachusetts is now five months into its phased reopening process. *See supra*, at 5-6. Second, the speculative nature of the plaintiffs' claims at this point is made manifest by their summary judgment brief. The plaintiffs speculate, for example, that "*if similar* essential services orders are re-imposed in the future," such orders would harm individuals who wish to purchase guns. ECF Doc. No. 121, at 3 (emphasis added). Such reasoning—based on pure conjecture about the future course of a novel coronavirus that scientists are still studying and the scope of an order that may never be re-imposed—reflects the absence of a present controversy between the parties. And the plaintiffs' speculation is undercut by the reality that Massachusetts now has "exponentially more knowledge and more tools available to fight COVID-19 than we did early on. …From gathering limits to industry specific guidance, we now have proven protocols in place to make it possible for people to be working."[31] Thus, as the Governor recently described, Massachusetts is "a far cry from the early days when … every state had more or less two choices: open or close."[32] Third, since the defendants moved to dismiss, other courts have concluded that claims challenging the temporary closure of gun retailers became moot when those orders terminated. *See Altman v. Cnty. of Santa Clara*, --- F. Supp. 3d ---, 2020 WL 2850291, at *5 (N.D. Cal. June 2, 2020) (claims challenging three counties' orders temporarily closing gun dealers to prevent spread of COVID-19 became moot when the orders were replaced with orders that allowed in-store sales); *see also World Gym, Inc. v. Baker*, --- F. Supp. 3d ---, 2020 WL 4274557, at *2 (D. Mass. July 24, 2020) (Casper, J.) (claims for injunctive relief against the essential services orders are moot). This Court should, accordingly, grant judgment to the

---

[31] Defts.' Statement of Material Facts ¶ 58.
[32] *Id.*

defendants because the plaintiffs' challenges to COVID-19 Order Nos. 13, 21, and 30 are moot.

**II.    The Orders Temporarily Closing Gun Retailers and Shooting Ranges During the Most Acute Period of COVID-19 Infection in Massachusetts Comported with the Second Amendment.**

Should this Court nevertheless reach the merits of the plaintiffs' Second Amendment challenge to the rescinded COVID-19 Orders, it should reject their claim. Emergency measures to forestall epidemics are afforded broad deference, but even without application of deference, the challenged orders readily survive scrutiny under the settled framework for review of Second Amendment claims. Gun retailers and shooting ranges were closed in Massachusetts for less than two months, and during that time some ammunition stores remained open and the plaintiffs could, and indeed did, purchase firearms in private transactions. Courts nationwide have upheld against Second Amendment challenges orders closing gun stores in order to prevent the spread of COVID-19, even in jurisdictions where it was *not* possible for individuals to purchase new guns and ammunition. The short-term restriction on the plaintiffs' ability to purchase guns in their preferred way does not come close to an unconstitutional infringement on Second Amendment rights.

**A.    Plaintiffs' Claims Fail at the Outset Because the Rescinded Orders Had a Real and Substantial Relation to the Protection of Public Health in a Pandemic.**

The Supreme Court has long recognized that a "community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Jacobson v. Massachusetts*, 197 U.S. 11, 27 (1905) (internal quotation marks omitted). The "liberty secured by the Constitution … does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint," particularly during a pandemic when cooperative action is necessary for the common good. *Id.* at 26; *see also id.* at 29. State action, *Jacobson* instructs, should thus be upheld unless it lacks a "real or substantial relation to the protection of the public health" or represents "a plain, palpable invasion of rights secured by the fundamental

law." *Id.* at 31; *see also Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944) (no "liberty to expose the community … to communicable disease").

Courts reviewing emergency challenges to COVID-19-related orders have consistently applied *Jacobson* when considering constitutional challenges to government actions taken to stem COVID-19 transmission. Most significantly, the Supreme Court upheld the denial of a request to enjoin California's capacity limitations on places of worship, with Chief Justice Roberts explaining that, under *Jacobson*, government officials' latitude "must be especially broad" to safeguard the "safety and health of the people" from COVID-19. *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) ("*South Bay*") (Roberts, C.J., concurring) (quoting *Jacobson*, 197 U.S. at 38, and *Marshall v. United States*, 414 U.S. 417, 427 (1974)). Other courts have echoed this deferential standard. *See, e.g.*, *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 2020 WL 3468281, at *2 (6th Cir. 2020) (unpublished) (collecting cases); *Luke's Catering Serv., LLC v. Cuomo*, 2020 WL 5425008, at *7-10 (W.D.N.Y. Sept. 10, 2020) (applying *Jacobson* to constitutional challenges to Governor's limitation on size of gatherings); *Lebanon Valley Auto Racing Corp. v. Cuomo*, 2020 WL 4596921, at *5 (N.D.N.Y. Aug. 11, 2020) (in case raising First Amendment challenge to COVID-19 orders, explaining that "*Jacobson* requires courts to afford politically accountable officials significant discretion in striking the appropriate balance during pandemics"); *Calvary Chapel of Bangor v. Mills*, 2020 WL 2310913, at *7 (D. Me. 2020), *appeal pending*, No. 20-1507 (1st Cir.) (while "an epidemic is ongoing, the traditional tiers of constitutional scrutiny do not apply" (citing *Jacobson*, 197 U.S. at 27)).

*Jacobson*'s deferential standard is easily met here. Simply put, there was a "real [and] substantial relation" between COVID-19 Order Nos. 13, 21, and 30—which required the temporary closure of a wide swath of businesses and organizations in order to prevent transmission

of the novel coronavirus—and the "protection of the public health." *Jacobson*, 197 U.S. at 31. COVID-19 is a global pandemic and national public health emergency that has affected every Massachusetts resident. As of May 18, 2020, when the challenged orders expired, Massachusetts had over 87,000 confirmed cases and over 5,800 confirmed deaths attributable to COVID-19.[33] The coronavirus is highly contagious, has no known cure or vaccine, and spreads from person to person via respiratory droplets. *See South Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring); Defts.' Statement of Material Facts ¶¶ 5-14. By limiting in-person gatherings in non-essential locations, the orders were, indeed, successful in reversing the springtime surge of in-state infection. *See supra*, at 5. Under the deference required by *Jacobson* and *South Bay* alone, the rescinded COVID-19 Orders should be upheld against the plaintiffs' Second Amendment claim. *See Altman*, 2020 WL 2850291, at *12 (orders that temporarily prohibited in-store sales of firearms and ammunition to prevent spread of COVID-19 did "not effect a 'plain, palpable invasion' of Plaintiffs' Second Amendment rights" (quoting *Jacobson*, 197 U.S. at 31)).

### B. The Rescinded COVID-19 Orders Comported with the Second Amendment Under a Traditional Constitutional Analysis.

Even under a traditional constitutional analysis, however, the challenged COVID-19 Orders, as applied to temporarily require closure of gun dealers and shooting ranges, were entirely consistent with the Second Amendment. To assess Second Amendment claims under a traditional analysis, a court must "first ask whether the challenged [government action] burdens conduct that is protected by the Second Amendment," and if it does, the court "then must determine what level of scrutiny is appropriate and must proceed to decide whether the challenged law survives that level of scrutiny." *Worman v. Healey*, 922 F.3d 26, 33 (1st Cir. 2019), *cert. denied*, 2020 WL 3146687 (2020); *see also Gould v. Morgan*, 907 F.3d 659, 668-69 (1st Cir. 2018), *cert. denied*,

---

[33] *See* Kobick Aff. Ex. T, at 1.

2020 WL 3146683 (2020). In applying the framework, the First Circuit often assumes, without deciding, that the challenged restriction burdens constitutionally protected conduct and, therefore, must be tested under some level of constitutional scrutiny. *See Worman*, 922 F.3d at 36; *Gould*, 907 F.3d at 670. If this Court were to apply this framework, it should likewise assume, without deciding, that the challenged COVID-19 Orders implicated Second Amendment rights, and it should then uphold the orders under intermediate scrutiny.[34]

      1.      <u>Even If the Rescinded COVID-19 Orders Implicated the Second Amendment, They Must Be Evaluated Under Intermediate Scrutiny.</u>

In *Gould*, the First Circuit held that "the appropriate level of scrutiny must turn on how closely a particular law or policy approaches the core of the Second Amendment right and how heavily it burdens that right." 907 F.3d at 670-71. This Court has previously indicated that the challenged orders should be reviewed under intermediate, rather than strict, scrutiny because they did not heavily burden the "core" Second Amendment right—that is, "'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" *Id.* at 672 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)); *see* Tr. of 5/7/20, at 39. Should this Court again apply a traditional analysis, it should again review the orders under, at most, intermediate scrutiny.

The rescinded COVID-19 Orders did not heavily burden the right of law-abiding, responsible individuals to *use* arms in defense of hearth and home. The orders never prohibited any category of individuals from using or possessing guns. Nor did they heavily burden the right of law-abiding, responsible citizens who did not own guns to *acquire* a gun for self-defense. At most, they postponed in-store sales of firearms for less than two months, while the public health

---

[34] The plaintiffs' summary judgment brief argues at length about the original meaning of the Second Amendment. *See* ECF Doc. No. 121, at 5-12. If this Court again assumes that the rescinded COVID-19 Orders implicated the Second Amendment, the plaintiffs' historical argument is largely irrelevant. That argument bears on the first step of the Second Amendment analysis, but not the application of heightened scrutiny to the challenged government restriction. *See Gould*, 907 F.3d at 668-69.

imperative to maintain social distancing was most acute. And while in-store gun sales were not permissible, any licensed Massachusetts resident[35] who wished to obtain a gun for self-defense immediately could do so through a private sale, as authorized by state law.[36] This was certainly a viable option: one of the individual plaintiffs in this case *did* acquire a gun through a private sale while the challenged COVID-19 Orders were in effect,[37] and during the month of April 2020 alone, there were 2,179 private gun transactions by licensed individuals in Massachusetts.[38]

The rescinded orders also did not heavily burden the ability of gun owners in Massachusetts to acquire ammunition for their guns. Gun owners could use ammunition previously purchased and retained in their homes. And during the short time the orders were in effect, at least 11 Walmart stores in Massachusetts with licenses to sell ammunition remained open (due to sales of food and pharmacy products), and were selling ammunition.[39] These stores, which spanned the state, sold ammunition for long guns, including rifles and shotguns, as well as ammunition for any handgun that accepts .22 caliber rimfire bullets.[40] Nor did the rescinded orders heavily burden the ability of

---

[35] Unlicensed Massachusetts residents must apply for a license to carry or FID card with their local licensing authorities. *See* M.G.L. c. 140, §§ 129B, 131. The licensing authority has 40 days to approve or disapprove of the application. *See* M.G.L. c. 140, §§ 129B(3); 131(e). The entire process of obtaining a license to carry or FID card, and then acquiring a firearm, rifle, or shotgun, can take up to 90 days. *See* Defts.' Statement of Material Facts ¶ 31; Kobick Aff. Ex. U (Decl. of Michaela Dunne) ¶ 17.

[36] *See* Defts.' Statement of Material Facts ¶ 35; Kobick Aff. Ex. U (Decl. of Michaela Dunne) ¶ 20; Kobick Aff. Ex. V (Supp. Decl. of Michaela Dunne) ¶¶ 3-8. In such transactions, both the transferor and transferee are required to have a license to carry or FID card; not fall into any category of individuals disqualified from licensure by M.G.L. c. 140, §§ 129B and 131; and report the transaction on the online Massachusetts Gun Transaction Portal. *See* M.G.L. c. 140, §§ 128A and 128B.

[37] *See* Defts.' Statement of Material Facts ¶¶ 35, 43.

[38] *See* Defts.' Statement of Material Facts ¶ 39; Kobick Aff. Ex. V (Supp. Decl. of Michaela Dunne) ¶ 7. It is easy to find advertisements of gun available for private sale in Massachusetts, through websites like Armslist Marketplace, Northeast Shooters Classified Ads, and GunBroker.com. Kobick Aff. Ex. V (Supp. Decl. of Michaela Dunne) ¶¶ 5-6 & Exhibit; Defts.' Statement of Material Facts ¶ 38.

[39] *See* Defts.' Statement of Material Facts ¶ 36; Kobick Aff. Ex. U (Decl. of Michaela Dunne) ¶ 21; Kobick Aff. Ex. W (Aff. of Marlee Greer) ¶¶ 3-5.

[40] *See* Defts.' Statement of Material Facts ¶ 36; Kobick Aff. Ex. W (Aff. of Marlee Greer) ¶¶ 5-6; ECF Doc. No. 122-1 ¶ 5 (Ayoob email) (Walmarts sell .22 caliber rimfire ammunition and some handguns accept those bullets).

gun owners to maintain proficiency with their weapons. Although gun owners temporarily lacked access to shooting ranges, they could have maintained proficiency by, for example, taking online courses in firearms use and safety, reading books, or accessing internet sources. *See In re SEG Props., LLC v. Northam*, CL20-2818, at 7 (Va. Cir. Ct. June 10, 2020) (Kobick Aff. Ex. EE) (order temporarily closing shooting ranges "did not limit an individual's right to possess firearms, let alone to train with them. … [Plaintiff] could have continued to train through multiple other mediums (for example by reading books, accessing internet resources, and viewing videos).")

COVID-19 Order Nos. 13, 21, and 30 were, at most, akin to other temporary burdens on Second Amendment rights that have been subject to intermediate scrutiny. *See Silvester v. Harris*, 843 F.3d 816, 827 (9th Cir. 2016) (intermediate scrutiny applied to law that mandated waiting period between purchase and acquisition of a firearm, because the law did "not place a substantial burden on Second Amendment rights"); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 206-07 (5th Cir. 2012) (intermediate scrutiny applied to law that delayed ability of persons under 21 to purchase a gun, because "[t]he temporary nature of the burden reduces its severity"). If this Court conducts a traditional analysis, it should—like every other court to subject an order temporarily closing gun dealers to heightened scrutiny—again apply intermediate scrutiny. *See, e.g.*, *Dark Storm Indus. LLC v. Cuomo*, --- F. Supp. 3d ---, 2020 WL 3833107, at *9-11 (N.D.N.Y. July 8, 2020); *Altman*, 2020 WL 2850291, at *13-15; *McDougall v. Cnty. of Ventura*, 2020 WL 2078246, at *2 (C.D. Cal. April 1, 2020).

    2.    <u>The Rescinded COVID-19 Orders, as Applied to Gun Retailers and Shooting Ranges, Were Substantially Related to the Governor's Goal of Curbing the Spread of COVID-19.</u>

In applying intermediate scrutiny, a court must ask whether the challenged enactment is "substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461

(1988). The test requires "substantial deference to the predictive judgments" of the governmental actor, and the fit between the enactment and the government's interest need not be "perfect." *Gould*, 907 F.3d at 673-74. The government can justify the fit "by reference to studies and anecdotes . . . or even . . . based solely on history, consensus, and simple common sense." *Florida Bar v. Went for It, Inc.*, 515 U.S. 618, 628 (1995) (internal quotation marks and citations omitted).

      a.   <u>The Governor's Goal of Curbing the Spread of COVID-19 Through the Rescinded Essential Services Orders Was Important.</u>

The purpose of the original essential services order and its extensions—"to limit activities outside of the home … [in order] to limit the spread of this highly contagious and potentially deadly virus"—was stated plainly in the text of COVID-19 Order No. 13 itself.[41] The governmental interest advanced by the orders—the protection of the public health from a highly contagious and fatal disease that has caused a global pandemic of unprecedented scale—is unquestionably important. *See, e.g.*, *Rubin v. Coors Brewing Co.*, 514 U.S. 475, 485 (1995) (the government "has a significant interest in protecting the health, safety, and welfare of its citizens"). Indeed, every court to consider an order that temporarily required closure of gun and ammunition dealers during the pandemic has concluded that the orders were issued to prevent the spread of COVID-19, and that such an objective is important. *See Dark Storm Indus.*, 2020 WL 3833107, at *11; *Altman*, 2020 WL 2850291, at *15; *McDougall*, 2020 WL 2078246, at *2.

The plaintiffs' summary judgment brief attempts to question whether the Governor really intended to prevent the spread of COVID-19 when he issued COVID-19 Order Nos. 13, 21, and 30, which did not include gun dealers and shooting ranges on the list of essential organizations. *See* ECF Doc. No. 121, at 12-15. But the plaintiffs focus on the wrong inquiry. When a facially neutral government action, like the rescinded COVID-19 Orders, implicates constitutional rights,

---

[41] Kobick Aff. Ex. E, at 1; *see* Defts.' Statement of Material Facts ¶ 16.

a court must look to the objective animating the facially neutral action; it does not examine whether the government actor articulated a particularized objective with respect to the asserted rights. In *South Bay*, for example, a church brought a First Amendment challenge to the California Governor's order limiting the number of people that could gather together in one place. 140 S. Ct. at 1613 (Roberts, C.J., concurring). In explaining the Supreme Court's denial of the church's application for injunctive relief, Chief Justice Roberts noted that "[a]lthough California's guidelines place restrictions on places of worship, those restrictions appear consistent with the Free Exercise Clause … [because] [s]imilar or more severe restrictions appl[ied] to comparable secular gatherings … where large groups of people gather in close proximity for extended periods of time." *Id.* The Chief Justice did *not* examine whether the California Governor had a specific rationale or purpose for subjecting churches, in particular, to the restrictions; rather, he accepted that the obvious purpose of the Governor's orders was to "to limit the spread of COVID-19," and then noted that the orders subjected a range of organizations, churches included, to comparable restrictions. *Id.*; *see also, e.g.*, *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 342 (7th Cir. 2020) (rejecting free exercise challenge to Governor's order limiting the size of gatherings and noting that the order was issued "to reduce transmission of the coronavirus … which causes the disease COVID-19," without inquiring why the order applied, in particular, to churches).

But even taking the plaintiffs' argument here on its own terms, the plaintiffs are simply wrong to claim that Governor Baker did not rely on "studies or research in arriving at the decision to exclude gun and ammunition retailers [sic] and shooting ranges from the list of services … deemed essential." ECF Doc. No. 121, at 12. COVID-19 Order No. 13 explained that the Governor looked to the March 19, 2020 "Federal Cybersecurity and Infrastructure Security Agency … guidance" in deciding which "services and functions [were] essential to maintain in order to

support a strong response to the COVID-19 pandemic."[42] That federal guidance did *not* include

gun retailers, ammunition retailers, or shooting ranges on its list of essential organizations.[43] And

although the federal agency subsequently added firearms retailers and shooting ranges to its list,[44]

the Governor could certainly rely on the initial federal guidance in choosing not to include gun

firearms retailers and shooting ranges on Massachusetts' list of essential services, because people

could congregate in such businesses and spread the coronavirus.

The plaintiffs also contend that a call held between the Governor and Republican leadership

of the Legislature on April 7, 2020, has some bearing on the Governor's objective when he issued

COVID-19 Order No. 13 on March 23 and its extension on March 31. *See* ECF Doc. No. 121, at

13-14. Even if this call, which post-dated the orders, were somehow relevant, the Governor

expressed on the call that the goal of the essential services order was to "substantially reduce out-

of-home activities and associated contacts" in order to "slow or prevent transmission of the

COVID-19 virus." ECF Doc. No. 122-9, at 4. He separately noted that "experts and advocates …

had expressed strong concerns about the potential for an increase in incidents of domestic violence

due to stress and mental health problems resulting from the pandemic generally and due to the

effect of substantially curtailing opportunities to leave the home specifically." *Id.* But that

observation does not change the fact that the objective of COVID-19 Order Nos. 13, 21, and 30

was to prevent the spread of the coronavirus; it simply notes a secondary reason why it was

reasonable for Massachusetts to temporarily require closure of gun retailers.[45]

---

[42] Kobick Aff. Ex. E, at 1.

[43] *See* Kobick Aff. Ex. X; *see* Defts.' Statement of Material Facts ¶ 51.

[44] *See* Kobick Aff. Ex. Y; *see* Defts.' Statement of Material Facts ¶ 52.

[45] The plaintiffs also argue that several emails received by the Office of the Governor in April and May of 2020 influenced the Governor's decision on March 23 and March 31 to exclude gun retailers and shooting ranges from the essential services list. *See* ECF Doc. No. 121, at 13-14. That argument is entirely non-sensical; all of the emails that address the risk of guns in domestic violence situations are dated April 20 or

b.  <u>The Rescinded COVID-19 Orders Were Substantially Related to the
Governmental Interest in Curbing the Spread of COVID-19.</u>

COVID-19 Order Nos. 13, 21, and 30, under which gun retailers and shooting ranges were
closed for less than two months, were substantially related to the government's interest in
preventing the spread of COVID-19. The coronavirus that causes COVID-19, a "highly contagious
strain of coronavirus that aggressively spreads by person-to-person transmission," is commonly
spread through respiratory droplets.[46] Because of this manner of transmission, public health
experts stress that it "is imperative that individuals in the Commonwealth—until the crisis is
over—practice social distancing measures where possible and avoid congregating in larger groups
in confined spaces."[47] As the Centers for Disease Control and Prevention has explained, social
distancing is "the best way to reduce the spread of" COVID-19.[48] Social distancing requires that
people "[o]nly leav[e] home for essential errands such as going to the grocery store or pharmacy"
and "[m]aintai[n] a distance at all times of 6 feet or more from others when [they] have to leave
… home for essential trips."[49] Remaining apart from other individuals, even those who appear
healthy, is vital because people infected with the coronavirus may be pre-symptomatic or
asymptomatic, but still spread the virus to others.[50]

Operation of non-essential businesses, like gun retailers and shooting ranges, was not
consistent with the imperative to minimize transactions requiring close contact in order to stem the
spread of COVID-19 during the surge of virus transmission in Massachusetts. Gun retailers, like
the bookstores, clothing stores, hair salons, and other businesses affected by the COVID-19

---

later, and obviously could not have influenced the Governor's March 23 and 31 issuance of the essential
services list. *See* ECF Doc. No. 123-10, at 1-29.

[46] Kobick Aff. Ex. Z (Aff. of Monica Bharel) ¶ 10; Defts.' Statement of Material Facts ¶ 6.

[47] Kobick Aff. Ex. Z (Aff. of Monica Bharel) ¶ 14; Defts.' Statement of Material Facts ¶ 12.

[48] Kobick Aff., Ex. AA; Defts.' Statement of Material Facts ¶ 12.

[49] Kobick Aff. Ex. Z (Aff. of Monica Bharel) ¶ 14; Defts.' Statement of Material Facts ¶ 12.

[50] Kobick Aff. Ex. BB; Defts.' Statement of Material Facts ¶ 11.

Orders, typically have many customers that pass through their doors each day.[51] Even small gun stores sell multiple guns a day, and "for every visit to a gun store that results in a sale, there are many other customer visits" that take place.[52] In addition, gun stores in Massachusetts "typically" have "cramped retail spaces, regardless of the overall size of the building."[53] State officials who visit gun retailers reported that "[i]n many cases, close contact" between customers and employees is "unavoidable due to the size of the store."[54] In addition, the "display racks [a]re often placed in close proximity to each other, which constrict[s] the walkable space, making aisles and walkways quite narrow."[55] Shooting ranges, for their part, can have shooting booths that are less than four feet apart, making it difficult to practice proper social distancing.[56] Due to the legal requirements involved in purchasing a gun,[57] a visit to a gun retailer to purchase a gun necessarily takes some time, as does a visit to a shooting range to practice firing weapons.

The rescinded COVID-19 Orders did not uniquely burden gun retailers and shooting ranges. Businesses across the economic spectrum, as well as K-12 schools and non-emergency childcare centers, were all temporarily closed in order to reduce the spread of COVID-19. And while the Court previously expressed some skepticism about whether the orders would be temporary, they were just that. The orders were in effect for less than two months, during the worst period of infection in Massachusetts, and Massachusetts is now five months into its phased reopening process. *See supra*, at 2-6. But during the surge, "there [wa]s potential for the Commonwealth's health care facilities, including its hospitals, to become seriously strained and

---

[51] Defts.' Statement of Material Facts ¶ 45; Kobick Aff. Ex. U (Decl. of Michaela Dunne) ¶¶ 12-13.
[52] *Id.*
[53] Defts.' Statement of Material Facts ¶ 48; Kobick Aff. Ex. CC (Decl. of Zorran Atanasovski) ¶ 6.
[54] Kobick Aff. Ex. U (Decl. of Michaela Dunne) ¶ 11; Defts.' Statement of Material Facts ¶ 49.
[55] Kobick Aff. Ex. CC (Decl. of Zorran Atanasovski) ¶ 6; Defts.' Statement of Material Facts ¶ 49.
[56] *See* Defts.' Statement of Material Facts ¶ 50.
[57] *See* Defts.' Statement of Material Facts ¶ 46-47.

possibly overburdened by the needs of sick COVID-19 patients."[58] The Commonwealth's interest in maintaining public health and welfare—including the health and welfare of healthcare workers and others operating essential services—was substantially related to the temporary closure of businesses, like gun retailers and shooting ranges, that could have spurred ongoing COVID-19 transmission. *See Dark Storm Indus.*, 2020 WL 3833107, at *15 (court will not "ignore the evidence that the more businesses open and, thus, the more opportunities to interact, the greater the risk of spread of the disease"); *Altman*, 2020 WL 2850291, at *17 ("any decrease in human contact and in-person interaction helps slow the virus's spread").

Moreover, when applying intermediate scrutiny, it is irrelevant whether less restrictive alternatives to the Governor's action existed or whether the COVID-19 Orders were narrowly tailored. *See Gould*, 907 F.3d at 674. The First Circuit has made clear that, in cases involving Second Amendment claims analyzed under intermediate scrutiny, the government's "chosen means need not be narrowly tailored to achieve its ends: the fit between the asserted governmental interests and the means chosen … to advance them need only be substantial in order to withstand intermediate scrutiny." *Id.* Indeed, multiple courts considering Second Amendment challenges to the short-term closure of gun retailers have explained that application of intermediate scrutiny does not permit consideration of narrow tailoring or less restrictive alternatives. *See, e.g.*, *Dark Storm Indus.*, 2020 WL 3833107, at *15 (rejecting the plaintiffs' attempt to question why gun retailers were not considered essential, but realtors and auto dealers were, because the plaintiffs "misapprehend[ed] the intermediate scrutiny analysis"); *Altman*, 2020 WL 2850291, at *16 (rejecting plaintiffs' argument that the government did not consider less restrictive alternatives to temporarily closing gun stores because the "Ninth Circuit … does not require narrow tailoring for

---

[58] Kobick Aff. Ex. Z (Aff. of Monica Bharel) ¶ 13; Defts.' Statement of Material Facts ¶ 23.

firearm regulations subject to intermediate scrutiny").

The aforementioned evidence establishes the substantial fit between the government's interest in preventing transmission of COVID-19 and the temporary closure of gun retailers and shooting ranges. But to the extent any doubt remains, since the preliminary injunction was issued, the Supreme Court has made clear that, in this pandemic, deference to the government's decisions about how to best promote public health is particularly warranted. *See South Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring); *see also Gould*, 907 F.3d at 676 (when applying intermediate scrutiny to Second Amendment claims, "courts must defer to [the government's] choices among reasonable alternatives"). Indeed, "[t]he public interest here is great," and issuance of a permanent injunction, as the plaintiffs request—despite any particularity whatsoever in their request—would "effectively disregar[d] the balance of powers established by our federal system." *World Gym, Inc.*, 2020 WL 4274557, at *5 (internal quotation marks omitted). Especially when addressing "fraught issues," like management of a novel virus that has sickened and killed tens of thousands of Massachusetts residents, "'respect for the Government's conclusions is appropriate.'" *Gould*, 907 F.3d at 676 (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010)).

## III.    Plaintiffs Have Waived Any Claim for Damages.

Finally, the plaintiffs' summary judgment brief does not address, much less develop an argument about, their purported claims for damages against the defendants. Those claims are, accordingly, waived. *See, e.g.*, *Kelly v. Riverside Partners, LLC*, 964 F.3d 107, 117 (1st Cir. 2020). To the extent this Court disagrees, however, the defendants incorporate by reference the argument in their motion to dismiss that the defendants are entitled to qualified immunity on any damages claims. *See* ECF Doc. No. 104, at 2; ECF Doc. No. 105, at 23-25.

## CONCLUSION

For the foregoing reasons, this Court should deny the plaintiffs' motion for summary judgment, grant the defendants' cross-motion for summary judgment, and enter judgment in favor of the defendants.

Respectfully submitted,

CHARLES BAKER, Governor of the Commonwealth of Massachusetts; MONICA BHAREL, Commissioner of the Department of Public Health; and JAMISON GAGNON, Commissioner of the Department of Criminal Justice Information Services,

By their attorney,

MAURA HEALEY
ATTORNEY GENERAL

/s/ Julia E. Kobick
Julia E. Kobick (BBO No. 680194)
Assistant Attorney General
Gary Klein (BBO No. 560769)
Special Assistant Attorney General
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2559
Julia.Kobick@mass.gov
Dated: October 19, 2020          Gary.Klein@state.ma.us

## CERTIFICATE OF SERVICE

I certify that, on October 19, 2020, this document, filed through the Court's ECF system, will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Julia E. Kobick
Julia E. Kobick
Assistant Attorney General