UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| |  |
|---|---|
| MICHAEL MCCARTHY, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>CHARLES D. BAKER, in his Official Capacity as Governor of the Commonwealth of Massachusetts, et al.,<br><br>*Defendants*. | CIVIL ACTION<br>NO. 1:20-cv-10701-DPW |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED**

Defendants, by and through their undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, hereby submit this statement of undisputed facts in support of their Cross-Motion for Summary Judgment.

**I.   Introduction.**

1.   On March 10, 2020, Governor Baker declared a State of Emergency in Massachusetts due to the spread of the SARS-CoV-2 coronavirus, which causes the disease known as COVID-19. [Charles D. Baker, Governor's Declaration of Emergency (March 10, 2020), https://www.mass.gov/executive-orders/no-591-declaration-of-a-state-of-emergency-to-respond-to-covid-19 (Kobick Affidavit Exhibit A).]

2.   When the Governor issued the emergency declaration, Massachusetts had 91 confirmed COVID-19 cases and no confirmed deaths. [*Id.* at 1.]

3.   By June 10, 2020, merely three months later, 104,156 Massachusetts residents had been confirmed infected with COVID-19 and at least 7,454 Massachusetts residents had died

from the disease. [Massachusetts Dep't of Public Health, COVID-19 Dashboard (June 10, 2020), https://www.mass.gov/doc/covid-19-dashboard-june-10-2020/download (Kobick Affidavit Exhibit B).]

4.      As of October 18, 2020, 140,647 Massachusetts cases of COVID-19 have been confirmed and 9,517 Massachusetts residents have been confirmed to have died from the disease. [Massachusetts Dep't of Public Health, COVID-19 Dashboard (October 18, 2020), https://www.mass.gov/doc/covid-19-dashboard-october-18-2020/download (Kobick Affidavit Exhibit L).]

## II.     **Background on COVID-19.**

**Note: Because this case challenges the Governor's exercise of discretion from late-March to mid-May of 2020, this section will provide data and information about COVID-19 that reflects the state of knowledge available in that time period unless otherwise noted.**

5.      COVID-19 is caused by SARS-CoV-2, a coronavirus that, until recently, had not infected humans. [Center for Disease Control, Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19) (as revised through April 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html#Asymptomatic (Kobick Affidavit Exhibit BB).]

6.      SARS-CoV-2 is a novel and highly contagious strain of coronavirus that aggressively spreads by person-to-person transmission. It is commonly spread through respiratory droplets. [Affidavit of Monica Bharel, MD ¶ 10 (Kobick Affidavit Exhibit Z).]

7.      In 81% of victims, COVID-19 causes symptoms such as fever, cough, fatigue, and shortness of breath. [Center for Disease Control, Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19) (as revised through April 3, 2020),

https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html#Asymptomatic (Kobick Affidavit Exhibit BB).]

8. About 14% of patients with COVID-19 have severe cases, in which the infection has spread to over 50% of the lungs and patients experience pneumonia, labored breathing, and inadequate oxygen supply. [*Id.*]

9. Approximately 5% of patients with COVID-19 have critical cases, which can involve "respiratory failure, in shock, or multiorgan system dysfunction." [*Id.*]

10. Overall, 19% of patients with COVID-19 are hospitalized and 6% are admitted to the intensive care unit. [*Id.*] Between 3% and 17% of individuals infected with COVID-19 develop acute respiratory distress syndrome. [*Id.*]

11. COVID-19 poses more risk to older individuals and people with co-morbidities like heart disease, diabetes, and asthma. [*Id*.] Scientists studying COVID-19 have also learned that a significant percentage of people who are infected never develop symptoms. [*Id*.] These asymptomatic individuals nevertheless may spread the disease. [*Id*.] In addition, because the incubation period for the virus is up to 14 days, many pre-symptomatic people who are infected do not realize they have COVID-19 during the period when they may be infectious. [*Id*.]

12. To prevent further transmission of the coronavirus, for which humans have no natural immunity, people must engage in social distancing—that is, deliberately maintaining at least six feet of physical distance from other people. [Affidavit of Monica Bharel, MD ¶¶ 10, 14 (Kobick Affidavit Exhibit Z).] The Commissioner of the Massachusetts Department of Public Health stresses that it "is imperative that individuals in the Commonwealth—until the crisis is over—practice social distancing measures where possible and avoid congregating in larger groups in confined spaces." [*Id.* ¶ 14.] According to the Centers for Disease Control and

Prevention, social distancing is "the best way to reduce the spread of" COVID-19. [Centers for Disease Control, Coronavirus Disease 2019, Social Distancing Quarantine and Isolation Coronavirus Disease 2019 (COVID-19) (April 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (Kobick Affidavit Exhibit AA).]

13. Epidemiological projections of the death toll from COVID-19 are lower with social distancing measures than without social distancing measures. [Britta Jewell and Nicholas P. Jewell, *The Huge Cost of Waiting to Contain the Pandemic*, NEW YORK TIMES (April 16, 2020) (Kobick Affidavit Exhibit DD).]

14. Public health leaders are clear that, to keep people healthy and prevent healthcare facilities from becoming overwhelmed with COVID-19 patients, government officials should close forums in which people gather together during the surges of COVID-19 infection. [Affidavit of Monica Bharel, MD ¶¶ 10, 12-14 (Kobick Affidavit Exhibit Z).]

### III. COVID-19 Orders Closing Various Businesses and Institutions, Including Gun Retailers and Shooting Ranges.

15. At the height of the pandemic, government officials temporarily closed many forums in which people gather. In Massachusetts, Governor Baker issued various orders to prevent gatherings and to promote social distancing. For example, on March 15, when Massachusetts had 164 confirmed COVID-19 cases, the Governor ordered all K-12 schools closed. [Charles D. Baker, Order Temporarily Closing All Public and Private Elementary and Secondary Schools (March 15, 2020), https://www.mass.gov/doc/march-16-2020-k-12-school-closing-order/download (Kobick Affidavit Exhibit C).] And on March 18, Governor Baker ordered all non-emergency childcare programs temporarily closed as well. [Charles D. Baker,

Order Temporarily Closing All Child Care Programs and Authorizing the Temporary Creation and Operation of Emergency Child Care Programs (March 18, 2020), https://www.mass.gov/doc/march-18-2020-early-education-and-care-order/download (Kobick Affidavit Exhibit D).]

16. On March 23, 2020, when Massachusetts had 646 confirmed COVID-19 cases and five deaths, Governor Baker issued COVID-19 Order No. 13. That Order authorized essential services—like those involved in distribution of food, provision of medical care, and law enforcement—to continue operating, but required all other businesses to close temporarily until April 7. [Charles D. Baker, COVID-19 Order No. 13, Order Assuring Continued Operation of Essential Services in the Commonwealth, Closing Certain Workplaces, and Prohibiting Gatherings of More Than 10 People (March 23, 2020) and Exhibit A, https://www.mass.gov/doc/march-23-2020-essential-services-and-revised-gatherings-order/download (Kobick Affidavit Exhibit E).] Exhibit A to this Order did not include gun dealers and shooting ranges among the essential services. [*Id.* (Exhibit A).] The purpose of the Order was "to limit activities outside of the home … [in order] to limit the spread of this highly contagious and potentially deadly virus." [*Id.* at 1.]

17. Gun retailers and shooting ranges were not singled out for closure. Businesses spanning diverse sectors of the economy, including bookstores, barbershops, gyms and clothing stores were also not included among the list of essential services. [*Id.* (Exhibit A).] COVID-19 Order No. 13 also temporarily prohibited gatherings of more than 10 people anywhere in the Commonwealth, including in houses of worship and for community, civic, personal, or other events. [*Id.* at 3.]

18. In the week following COVID-19 Order No. 13, the number of COVID-19 cases and deaths in Massachusetts increased rapidly. As of March 30, 2020, 5,272 cases were confirmed and 56 had resulted in death. [Charles D. Baker, COVID-19 Order No. 21, Order Extending the Closing of Certain Workplaces and the Prohibition on Gatherings of More Than 10 People (March 31, 2020) and Exhibit A, https://www.mass.gov/doc/march-31-2020-essential-services-extension-order/download (Kobick Affidavit Exhibit F).]

19. On March 31, Governor Baker issued COVID-19 Order No. 21, which extended the closure of businesses that do not provide essential services until May 4, 2020. [*Id.*] When it became effective on April 1, 2020 at 12pm, Exhibit A to this Order did not include gun dealers and shooting ranges among essential services. [*Id.*]

20. During the month of April and the early weeks of May 2020, the Commonwealth was in the middle of the surge of COVID-19 infections. Between April 8 and May 13, there were 100 or more deaths from COVID-19 every day. [Massachusetts Dep't of Public Health, COVID-19 Dashboard, at 9 (May 24, 2020), https://www.mass.gov/doc/covid-19-dashboard-may-24-2020/download (Kobick Affidavit Exhibit G).]

21. In light of the ongoing surge of COVID-19 infections, Governor Baker ordered on April 21, 2020 that all K-12 schools in the Commonwealth remain closed for the duration of the school year. [Charles D. Baker, COVID-19 Order No. 28, Order Extending the Temporary Closure of All Public and Private Elementary and Secondary Schools (April 21, 2020), https://www.mass.gov/doc/april-21-2020-school-closure-extension-order/download (Kobick Affidavit Exhibit H).] On April 21, 2020, Governor Baker also ordered that all non-emergency childcare centers remain closed until June 29. [Charles D. Baker, COVID-19 Order No. 27, Order Extending the Temporary Closing of All Non-Emergency Child Care Programs (April 21,

2020), https://www.mass.gov/doc/april-21-2020-childcare-programs-closure-extension/download (Kobick Affidavit Exhibit I).]

22. On April 28, 2020, Governor Baker issued COVID-19 Order No. 30, which further extended the temporary closure of non-essential businesses and the prohibition on gatherings of more than 10 people for two additional weeks, until May 18. The list of Essential Services on Exhibit A remained unchanged. [Charles D. Baker, COVID-19 Order No. 30, Order Further Extending the Closing of Certain Workplaces and the Prohibition on Gatherings of More than 10 People (April 28, 2020), https://www.mass.gov/doc/signed-second-extension-of-essential-services-order/download (Kobick Affidavit Exhibit J).]

23. During the surge of COVID-19 cases in Massachusetts from April into early May 2020, there was potential for the Commonwealth's health care facilities, including its hospitals, to become seriously strained and possibly overburdened by the needs of sick COVID-19 patients. [Affidavit of Monica Bharel, MD ¶ 13 (Kobick Affidavit Exhibit Z).]

24. On May 7, 2020, this Court entered an Amended Preliminary Injunction order allowing gun retailers to reopen on an appointment-only basis as of May 9, 2020, with a variety of restrictions designed to mandate social distancing. [ECF Doc. No. 92]. The Amended Preliminary Injunction was not the injunction that Plaintiffs had requested, because it contained restrictions beyond those applicable to other businesses then operating, including the requirement that gun retailers could operate by appointment only and have no more than four appointments per hour. [ECF Doc. No. 80.]

25. By the middle of May, the number of new daily coronavirus infections and deaths had plateaued and then had begun to steadily decrease. As of May 8, the Commonwealth had not recorded a day with more than 1,500 new COVID-19 cases. And as of May 16, the

Commonwealth had not seen an additional day with more than 100 new COVID-19 deaths. [Massachusetts Dep't of Public Health, COVID-19 Dashboard, pp. 5 and 12 (June 10, 2020), https://www.mass.gov/doc/covid-19-dashboard-june-10-2020/download (Kobick Affidavit Exhibit B); Massachusetts Dep't of Public Health, COVID-19 Dashboard, pp. 5 and 12 (August 15, 2020), https://www.mass.gov/doc/covid-19-dashboard-august-15-2020/download (Kobick Affidavit Exhibit K); Massachusetts Dep't of Public Health, COVID-19 Dashboard, pp. 5 and 12 (October 18, 2020), https://www.mass.gov/doc/covid-19-dashboard-october-18-2020/download (Kobick Affidavit Exhibit L).]

26. In light of this data, on May 18, when COVID-19 Order No. 30 expired, Governor Baker announced a new slate of measures that began the process of reopening the Massachusetts economy. [Press Release, *Reopening Massachusetts: Baker-Polito Administration Initiates Transition to First Phase of Four-Phase Approach* (May 18, 2020), https://www.mass.gov/news/reopening-massachusetts-baker-polito-administration-initiates-transition-to-first-phase-of (Kobick Affidavit Exhibit M); Report, Reopening Massachusetts (May 18, 2020), https://www.mass.gov/doc/reopening-massachusetts-may-18-2020/download]

27. COVID-19 Order No. 33, effective May 18, 2020, governed the first phase of the reopening process for a variety of businesses, including some brick-and-mortar workplaces. [Charles D. Baker, COVID-19 Order No. 33, Order Implementing a Phased Reopening of Workplaces and Imposing Workplace Safety Measures to Address COVID-19 (May 18, 2020), https://www.mass.gov/doc/may-18-2020-re-opening-massachusetts-order/download (Kobick Affidavit Exhibit N).]

28. Under Section 1 of COVID-19 Order No. 33, firearms retailers and shooting ranges were allowed to reopen, subject to the general workplace safety rules set forth in Section

2 of that Order. [*Id.*] These safety rules include social distancing, hygiene, staffing, and disinfecting requirements applicable to all brick-and-mortar businesses now operating. [*Id.*] Unlike the Preliminary Injunction entered in this matter, COVID-19 Order No. 33 did not include a requirement that gun retailers operate on an appointment-only basis. [*See supra*, ¶ 25.]

29. Under COVID-19 Order No. 33, no government approval was required before a gun retailer or shooting range could open to the public; gun retailers and shooting ranges needed to only self-certify that they were in compliance with all general and specific rules and make the self-certification available for inspection on request. And customers were not required to make an appointment before they could visit a gun retailer. [Charles D. Baker, COVID-19 Order No. 33, Order Implementing a Phased Reopening of Workplaces and Imposing Workplace Safety Measures to Address COVID-19 (May 18, 2020), https://www.mass.gov/doc/may-18-2020-re-opening-massachusetts-order/download (Kobick Affidavit Exhibit N).]

30. All told, gun retailers and shooting ranges were closed by the Governor's Orders for the 56 days from March 23, 2020 until May 18, 2020—that is, less than two months. [*See supra*, ¶¶ 17, 28-29.] However, gun retailers were open for nine of those days, from May 10 to May 18, 2020, subject to the appointment-only and other restrictions. [*See supra*, ¶ 25.]

31. Applications for firearms licenses may take up to 60 days and the entire gun acquisition process may take up to 90 days. [Declaration of Michaela Dunne (dated April 21, 2020) ¶¶ 16-18 (Kobick Affidavit Exhibit U).] During that period, a person interested in first acquiring a gun is not able to do so. [*Id.*]

32. On June 6, 2020, Governor Baker issued COVID-19 Order No. 37, which authorized the first group of phase 2 organizations, listed on Schedule A to the order, to reopen. The order formally rescinded COVID-19 Order No. 13, the essential services order. Prior to COVID-19 Order No. 37, all of the orders extending COVID-19 Order No. 13 had already been

rescinded. [Charles D. Baker, COVID-19 Order No. 37, Order Authorizing the Reopening of Phase II Enterprises (June 6, 2020), https://www.mass.gov/doc/june-6-2020-phase-ii-reopening/download (Kobick Affidavit Exhibit O); COVID-19 State of Emergency: Emergency Orders and Guidance Associated with the COVID-19 State of Emergency, https://www.mass.gov/info-details/covid-19-state-of-emergency (Kobick Affidavit Exhibit P).]

33. On June 19, COVID-19 Order No. 40 authorized the second group of phase 2 entities to reopen. [Charles D. Baker, COVID-19 Order No. 40, Order Further Advancing the Re-Opening of Phase II Enterprises (June 19, 2020), https://www.mass.gov/doc/reopening-phase-2-step-2-order/download (Kobick Affidavit Exhibit Q).] On July 2, COVID-19 Order No. 43 authorized the first group of phase 3 entities to reopen, and on September 29, 2020, COVID-19 Order No. 51 authorized the second group of phase 3 entities to reopen in communities with low rates of COVID-19 infection. [Charles D. Baker, COVID-19 Order No. 43, Order Authorizing the Reopening of Phase III Enterprises (July 2, 2020), https://www.mass.gov/doc/phase-3-order-july-2-2020/download (Kobick Affidavit Exhibit R); Charles D. Baker, COVID-19 Order No. 51, Order Further Advancing Phase III Re-Openings in Municipalities with Reduced Incidence of COVID-19 Infection (September 29, 2020), https://www.mass.gov/doc/governors-covid-19-order-51/download (Kobick Affidavit Exhibit S).]

### IV. Availability of Ammunition, Guns, and Training Opportunities While COVID-19 Order Nos. 13, 21, and 30 Were in Effect.

34. During the period when gun retailers were temporarily closed, guns and ammunition could be lawfully purchased in Massachusetts from other sources by those licensed to do so. [Declaration of Michaela Dunne ¶ 20 (dated April 21, 2020) (Kobick Affidavit Exhibit

U); Supplemental Declaration of Michaela Dunne ¶¶ 3-8 (dated May 2, 2020) (Kobick Affidavit Exhibit V); Affidavit of Marlee Greer ¶¶ 3-6 (dated April 18, 2020) (Kobick Affidavit Exhibit W); ECF Doc. No. 122-1 ¶ 5 (Ayoob email).]

35. If any licensed Massachusetts resident wished to obtain a gun for self-defense during the period that gun retailers were required to be closed, that person could have acquired one through a private purchase. [Declaration of Michaela Dunne ¶ 20 (dated April 21, 2020) (Kobick Affidavit Exhibit U); Supplemental Declaration of Michaela Dunne ¶¶ 3-8 (dated May 2, 2020) (Kobick Affidavit Exhibit V).] In such transactions, gun buyers simply must report the transaction on the online Massachusetts Gun Transaction Portal. [*Id.*] *See also* G.L. c. 128B. As described below, at least one of the Plaintiffs availed himself of this option. [*See infra*, ¶ 43.]

36. If any licensed Massachusetts resident wished to purchase certain types of ammunition, including rifle ammunition, shotgun shells, and .22 caliber rimfire rounds, such ammunition was available for sale at retail businesses that were permitted to remain open because they sold other essential items such as groceries. [Declaration of Michaela Dunne ¶ 21 (dated April 21, 2020) (Kobick Affidavit Exhibit U); ECF Doc. No. 122-1 ¶ 5 (Ayoob email).] At least 11 Massachusetts Walmart stores were selling ammunition of various types during the period when gun retail businesses were required to be closed. [Affidavit of Marlee Greer ¶¶ 3-6 (dated April 18, 2020) (Kobick Affidavit Exhibit W).]

37. Individuals without ammunition wishing to acquire a means of self-defense during the period when gun retailers were closed could therefore have bought a gun in a private sale during that period that was capable of firing the types and calibers of ammunition that remained available from open retail businesses such as Walmart. [*See id.*]

38. Guns available for private sale in Massachusetts were commonly advertised on the internet, including during the period when gun retailers were closed. [Supplemental Declaration of Michaela Dunne ¶¶ 5-6 (dated May 2, 2020) (Kobick Affidavit Exhibit V).]

39. Based on transaction information that the Commonwealth's Department of Criminal Justices Information Services maintains in its database, there were at least 2,179 private sales of weapons in Massachusetts during the month of April 2020, while the Emergency Orders were in effect. [Supplemental Declaration of Michaela Dunne ¶ 7 (dated May 2, 2020) (Kobick Affidavit Exhibit V).] Also based on transaction information that DCJIS maintains in its database, there were at least 985 registrations of firearms in Massachusetts during the month of April 2020. [*Id.* ¶ 8.] This number reflects the registration of firearms by a Massachusetts licensed individual for reasons such as a firearm purchased out of state or recently built firearms. [*Id.*]

40. Nothing prevented residents of Massachusetts interested in obtaining or retaining proficiency with a weapon from shooting in any outdoor area where use of guns is allowed during the period when shooting ranges were closed, or from taking online courses in firearms use and safety, reading books, and accessing other internet sources, including videos.

### V. The Plaintiffs and Their Gun Purchases.

41. One or more of the individual plaintiffs purchased one or more firearms (or received possession of firearms that they had previously purchased) shortly after gun retailers reopened in May 2020. [*See* Stipulation on Factual Issues Related to the Plaintiffs' Gun Ownership in *McCarthy v. Baker*, No. 1:20-cv-10701-DPW, ¶ 1 (Kobick Affidavit Exhibit FF).]

42. One or more of the individual plaintiffs had not purchased and did not own any firearm as of the date that their discovery responses were served in July 2020. [*See* Stipulation on Factual Issues Related to the Plaintiffs' Gun Ownership in *McCarthy v. Baker*, No. 1:20-cv-10701-DPW, ¶ 2 (Kobick Affidavit Exhibit FF).]

43. One of the individual plaintiffs acquired a handgun by private sale on April 16, 2020, during the period when gun retailers were closed. That plaintiff acquired ammunition for that weapon at the time of the transaction. [*See* Stipulation on Factual Issues Related to the Plaintiffs' Gun Ownership in *McCarthy v. Baker*, No. 1:20-cv-10701-DPW, ¶ 3 (Kobick Affidavit Exhibit FF).]

44. One of the individual plaintiffs acknowledges reviewing advertisements for private firearm sales at some point or points between March 24 and May 9, 2020. The other plaintiffs did not do so. [*See* Stipulation on Factual Issues Related to the Plaintiffs' Gun Ownership in *McCarthy v. Baker*, No. 1:20-cv-10701-DPW, ¶ 4 (Kobick Affidavit Exhibit FF).]

## VI. Physical Characteristics of Gun Retailers and Shooting Ranges.

45. Gun retailers typically have many customers that pass through their doors each day. [*See* Declaration of Michaela Dunne ¶¶ 12-13 (dated April 21, 2020) (Kobick Affidavit Exhibit U).] Even small gun stores sell multiple guns a day, and "for every visit to a gun store that results in a sale, there are many other customer visits" that take place. [*Id.*]

46. Massachusetts law (G.L. c. 140, § 123) requires gun purchasers to physically present their gun licenses to the gun seller in person. Declaration of Michaela Dunne ¶ 14 (dated April 21, 2020) (Kobick Affidavit Exhibit U).

47. Under G.L. c. 140, § 123, gun stores must conduct all transactions at their permanent place of business (or at a "regular meeting of an incorporated collectors club or at a gun show open to the general public"). This precludes completing transactional paperwork or delivering guns at a customer's residence or completing transactional work in the gun store's parking lot or on the sidewalk. It would also be illegal for a gun store to deliver guns to customers in their cars. [Declaration of Michaela Dunne ¶ 15 (dated April 21, 2020) (Kobick Affidavit Exhibit U).]

48. Gun retailers in Massachusetts typically have "cramped retail spaces, regardless of the overall size of the building." [Declaration of Zorran Atanasovski ¶ 6 (dated April 23, 2020) (Kobick Affidavit Exhibit CC); *see also* Declaration of Michaela Dunne ¶ 11 (dated April 21, 2020) (Kobick Affidavit Exhibit U) (gun stores in Massachusetts are "often quite crowded").]

49. State officials who visit gun retailers report that "[i]n many cases, close contact" between customers and employees is "unavoidable due to the size of the store." [Declaration of Michaela Dunne ¶ 11 (dated April 21, 2020) (Kobick Affidavit Exhibit U).] "[D]isplay racks [a]re often placed in close proximity to each other, which constrict[s] the walkable space, making aisles and walkways quite narrow." [Declaration of Zorran Atanasovski ¶ 6 (dated April 23, 2020) (Kobick Affidavit Exhibit CC).]

50. Shooting booths at shooting ranges in Massachusetts can be as little as four feet apart. [Affidavit of Dennis Mahoney, Ayer Gun and Sportsman Club, Attachment 1 (*Cedrone v. Baker*, C.A. No. 20-cv-40041, Doc. No. 38-4).]

## VII. Additional Relevant Facts.

51. The federal guidance on essential services issued by the Cybersecurity & Infrastructure Security Agency on March 19, 2020, did not include gun retailers, ammunition retailers, or shooting ranges on its list of essential organizations. [U.S. Dep't of Homeland Security, Cybersecurity & Infrastructure Security Agency, Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response (March 19, 2020) (Kobick Affidavit Exhibit X).]

52. The federal guidance on essential services issued by the Cybersecurity & Infrastructure Security Agency on March 28, 2020, added gun retailers, ammunition retailers, and shooting ranges to its list of essential organizations. [U.S. Dep't of Homeland Security, Cybersecurity & Infrastructure Security Agency, Advisory Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response (March 28, 2020) (Kobick Affidavit Exhibit Y).]

53. Between March 29, 2020 and April 29, 2020, some of the gun retailer Plaintiffs sold guns even though they were ostensibly closed. [Supplemental Declaration of Michaela Dunne ¶ 9 (dated May 2, 2020) (Kobick Affidavit Exhibit V).] In that period, three current or former Plaintiffs in this case—Precision Point Firearms LLC, Shooting Supply LLC, And Downrange Inc. D/B/A Cape Cod Gun Works—collectively engaged in 189 firearm transfer transactions. [*Id.* ¶ 10.]

54. During the period when gun retailers and shooting ranges were closed, other businesses deemed non-essential (where work-at-home was not possible) including hair salons, restaurants, bars, gyms, health clubs, construction businesses, and most manufacturing

businesses were also closed. [*See supra*, ¶¶ 16-19.] Gatherings of more than 10 people were also prohibited, precluding sports and sporting events. [*Id.*]

55. On April 22, 2020, the Firearms Licensing Unit of the Massachusetts State Police authorized and sent out guidelines for the Basic Firearms Safety course to be conducted virtually in Massachusetts. [*See* Kobick Affidavit Exhibit GG.] Dozens of instructors in Massachusetts were approved to hold these virtual trainings during the months of April and May 2020. [*See* FINAL BFS Instructors Approved for Virtual Training, April 15, 2020 – May 23, 2020, https://www.mass.gov/doc/final-approved-virtual-training-bfs-instructors-41520-thru-5232020/download (Kobick Affidavit Exhibit HH).]

56. Liquor stores were treated as essential businesses under the Governor's COVID-19 orders. More than 14 million Americans suffer from a diagnosed or undiagnosed condition known as Alcohol Use Disorder, often referred to colloquially as "addiction to alcohol" or alcoholism. ["Alcohol Facts and Statistics," National Institute on Alcohol Abuse and Alcoholism (February, 2020), https://www.niaaa.nih.gov/publications/brochures-and-fact-sheets/alcohol-facts-and-statistics.]

57. Commentators have noted that for people with Alcohol Use Disorder, withdrawal from alcohol is "dangerous, and can result in tremors, hallucinations, and seizures that can progress to requiring admission to the ICU, and may ultimately lead to death. … As hospitals become strained from the surging number of COVID-19 patients, preventing and mitigating the risk of additional ICU admissions is paramount." [Max Jordan Nguemeni Tiako, and Kelsey C. Priest, "Yes, Liquor Stores are Essential Businesses," SCIENTIFIC AMERICAN (April 7, 2020). https://blogs.scientificamerican.com/observations/yes-liquor-stores-are-essential-businesses/. *See also* "Alcohol Withdrawal," HARVARD HEALTH PUBLISHING, HARVARD MEDICAL SCHOOL (April

16

2019), https://www.health.harvard.edu/a_to_z/alcohol-withdrawal-a-to-z ("In delirium tremens, … [t]he body's vital signs such as your heart rate or blood pressure can change dramatically or unpredictably, creating a risk of heart attack, stroke or death.").]

58. At a press conference on October 13, 2020, Governor Baker stated the following (from 5:05 to 6:24, and from 16:37 to 20:32):

> In April, the number of COVID patients being treated in the ICU reached a maximum of 1,085. Today there are around 80 patients in ICUs—a 90% reduction.
>
> Last spring, we saw a peak of about 4,000 patients being treated in our hospitals for COVID. Today, we have about 500 patients in our hospitals who have either tested positive for COVID—or are suspected of testing positive—but the actual COVID patient census across Massachusetts hospital these days is less than 300. That also represents a reduction of more than 90% from last spring's peak.
>
> When we reopened hospitals and ambulatory health care service providers, hospital systems had to attest to meeting strict capacity guidelines to make sure they were always prepared for new cases. Today, hospital occupancy statewide stands at 68%, and ICU occupancy stands at 52%.
>
> Hospitals deployed surge plans in the spring and have spent the past months refining those. The Commonwealth is now in a position to quickly expand capacity to care for more COVID patients if hospitalizations dramatically rise.

\*\*\*

> As I mentioned briefly before, we've learned a lot about COVID since last spring. And early on, we put in place a wide range of orders and guidance to keep people safe. In May, we started requiring folks to wear face coverings if they couldn't socially distance. We've launched several public messaging campaigns to remind people to socially distance, practice good hygiene, and stay home if they're sick. We issued strict travel guidance for people to quarantine for 14 days or get a test upon arrival. Hundreds of thousands of travelers have filled out the Mass. travel form before they came here. Working with the Reopening Advisory Board, we issued guidance for every sector of the economy to open business and resume activities while fighting the virus. And we executed a gradual, strategic approach to re-open nearly all sectors of the economy starting in late May.
>
> Now, almost six months later, our economy continues to run, hundreds of thousands of people have gone back to work, with the constant respect for the

17

threat of the virus. From gathering limits to industry specific guidance, we now have proven protocols in place to make it possible for people to be working. It's a far cry from the early days when every nation and every state had more or less two choices: open or close. These rules only work because of individuals' choices, and how residents have changed their daily routines to adjust to the pandemic. Today it's routine to grab your mask on the way out the door or to use hand sanitizer immediately after being in a public space like a grocery store.

That said, there is no question this has been tough on everyone. Not seeing family members, grandparents in person or canceling or dramatically altering special ceremonies like weddings or graduation parties is rough stuff. Many people have lost loved ones to this virus. And maybe never had the chance to say good-bye. But we have today exponentially more knowledge and more tools available to fight COVID-19 than we did early on. And that knowledge makes it possible for us to identify cases and close contacts, help people quarantine and isolate, and work with our healthcare providers to make sure that they have the resources and the gear that they need to take care of the people who do get sick. It gives us the data and the infrastructure that we need to work with our senior and long-term care providers to make sure our nursing homes are safe and that their staffs and residents are safe, as well. It gives us daily updates on our colleges and universities, as well as constant updates on our schools and childcare providers. It also gives our employer community the information and the tools that they need to keep their employees and their customers safe.

There is no question that there will be more cases this fall. That prediction was made last spring by researchers and public health experts. We needed to be prepared to identify those cases early, keep our health system strong, and protect the most vulnerable among us from the uptick. We've done the work. We're prepared to respond to this virus like never before. But our preparations are of little use without the people of Massachusetts continuing to do their part. What we need from you is continued vigilance as we head into the ninth month of fighting this virus. Face coverings, distance, and hygiene are all part of the plan, and in formal, work, and public settings, you have been delivering every single day.

[Governor Baker, COVID-19 Update: Fall Preparedness Strategy (October 13, 2020), https://www.youtube.com/watch?v=XMvjf3cKofw.]

Respectfully submitted,

CHARLES BAKER, Governor of the Commonwealth of Massachusetts; MONICA BHAREL, Commissioner of the Department of Public Health; and JAMISON GAGNON, Commissioner of the Department of Criminal Justice Information Services,

By their attorney,

MAURA HEALEY
ATTORNEY GENERAL

/s/ Julia E. Kobick
Julia E. Kobick (BBO No. 680194)
Assistant Attorney General
Gary Klein (BBO No. 560769)
Special Assistant Attorney General
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2559
Julia.Kobick@mass.gov
Gary.Klein@state.ma.us

Dated: October 19, 2020

## CERTIFICATE OF SERVICE

I certify that, on October 19, 2020, this document, filed through the Court's ECF system, will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Julia E. Kobick
Julia E. Kobick
Assistant Attorney General