# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL MCCARTHY; WILLIAM R. BIEWENGA; LAURIE WARNER; TIMOTHY GALLIGAN; JIM SIMMONS; DAVID LANTAGNE; THOMAS LEIGHTON; TROY CITY TACTICAL LLC; WORCESTER PISTOL AND RIFLE CLUB, INC.; SHOOTING SUPPLY LLC; FIREARMS POLICY COALITION, INC.; COMMONWEALTH SECOND AMENDMENT, INC.; and SECOND AMENDMENT FOUNDATION, INC., | CIVIL ACTION NO. 1:20-cv-10701-DPW |
| Plaintiffs, | |
| -against- | |
| CHARLES D. BAKER, in his Official Capacity as Governor of the Commonwealth of Massachusetts and in his Individual Capacity; MONICA BHAREL MD, MPH, in her Official Capacity as Commissioner of the Massachusetts Department of Public Health and in her Individual Capacity; and JAMISON GAGNON, in his Official Capacity as Commissioner of the Department of Criminal Justice Information Services and in his Individual Capacity, | |
| Defendants. | |

## PLAINTIFFS' OPPOSITION AND REPLY MEMORANDUM

## TABLE OF CONTENTS

I)      INTRODUCTION..................................................................................................1

II)     A LIVE CASE OR CONTROVERSY CONTINUES TO EXIST .....................................2

III)    THE EXISTENCE OF A PUBLIC HEALTH EMERGENCY IS
        NOT DISPOSITIVE.............................................................................................3

IV)     THE CLOSURE OF GUN AND AMMUNITION RETAILERS AND
        SHOOTING RANGES IMPOSES A SUBSTANTIAL BURDEN ON
        THE RIGHT OF ARMED SELF-DEFENSE.................................................................6

V)      DEFENDANTS HAVE NOT JUSTIFIED THEIR DECISION TO
        REMOVE GUN AND AMMUNITION RETAILERS AND RANGES
        FROM THE ESSENTIAL SERVICES LIST.................................................................13

VI)     CONCLUSION..................................................................................................20

# **TABLE OF AUTHORITIES**

## **Cases**

*ACA Int'l v. Healey*, No. 20-10767, 2020 WL 5647480
    (D. Mass. May 6, 2020) (Stearns, J.) .......................................................4

*Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913 (6th Cir. 2020)......................................3, 4

*Altman v. County of Santa Clara*, No. 20-cv-02180, 2020 WL 2850291
    (N.D. Cal. Jun. 2, 2020) ............................................................... 3, 17

*Bailey's Campground Inc. v. Mills*, No. 2:20-cv-00176, 2020 WL 2791797
    (D. Me. May 29, 2020)..................................................................4

*Baptiste v. Kennealy*, No. 1:20-cv-11335, 2020 WL 5751572
    (D. Mass. Sept. 25, 2020) (Wolf, J.) .....................................................4

*Brown v. Plata*, 563 U.S. 493 (2011).......................................................18

*Cantwell v. Connecticut*, 310 U.S. 296 (1940)...............................................4

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) .......................... 6, 17, 19

*Dark Storm Industries LLC v. Cuomo*, No. 1:20-cv-0360, 2020 WL 3833107
    (N.D.N.Y. Jul. 8, 2020) .............................................................. 12, 13

*District of Columbia v. Heller*, 554 U.S. 570 (2008)..........................................4

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013)..................................................18

*Employment Division v. Smith*, 494 U.S. 872 (1990) ...........................................19

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ("*Ezell I*") ...........................11

*Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2019)............................................ 11, 18

*Grutter v. Bollinger*, 539 U.S. 306 (2003) ..................................................18

*Horsley v. Trame*, 808 F.3d 1126 (7th Cir. 2015) ............................................20

*Ill. Republican Party v. Pritzker*, No. 20-2175, 2020 WL 5246656
    (7th Cir. Sept. 3, 2020)...............................................................3

*Illinois ex rel. McCollum v. Board of Educ.*, 333 U.S. 203 (1948)...............................4

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905) ...................................... 1, 3-4, 6

*KG Urban Enters., LLC v. Patrick*, 969 F. Supp. 2d 52 (D. Mass. 2013) ...................................2

*League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, No. 20-1581,
    2020 WL 3468281 (6th Cir. Jun. 24, 2020) ................................................5

*Luke's Catering Serv., LLC v. Cuomo*, No. 20-CV-10865, 2020 WL 5425008
    (W.D.N.Y. Sept. 10, 2020)..............................................................5

*Lynchburg Range & Training, LLC v. Northam*, No. CL20-333
    (Va. Cir. Ct., City of Lynchburg Apr. 27, 2020) ........................................10

*Mangual v. Rotger-Sabat*, 317 F.3d 45 (1st Cir. 2003) .......................................2-3

*Minn. Voters Alliance v. Mansky*, 585 U.S. ___, 138 S. Ct. 1876 (2018) ................................... 19

*N.Y. State Rifle & Pistol Ass'n v. City of New York*, 883 F.3d 45 (2d Cir. 2018), *vacated* 140 S. Ct. 1525 (2020) ........................................................................................ 20

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185 (5th Cir. 2012) ..................................................................................... 11-12

*Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931) ............................................................. 4

*Phillips v. City of New York*, 775 F.3d 538 (2d Cir. 2015) ......................................................... 4

*Robinson v. Attorney General*, 957 F.3d 1171 (11th Cir. 2020) ................................................ 4

*SEG Properties, LLC v. Northam*, No. CL20-2818 (Va. Cir. Ct. Jun. 10, 2020) ........................ 10

*Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016) ..................................................................... 12

*South Bay United Pentecostal Church v. Newsom*, 590 U.S. ___, 140 S. Ct. 1613 (2020) .................................................................................................. *passim*

*Town of Portsmouth v. Lewis*, 813 F.3d 54 (1st Cir. 2016) ........................................................ 2

*United States v. Griffin*, 525 F.2d 710 (1st Cir. 1975) .............................................................. 14

*Ward v. Rock Against Racism*, 491 U.S 781 (1989) .................................................................. 18

*World Gym, Inc. v. Baker*, No. 20-cv-11162, 2020 WL 4274557 (D. Mass. Jul. 24, 2020) (Casper, J.) ................................................................................... 3

*Zucht v. King*, 260 U.S. 174 (1922) ............................................................................................ 3

## **Statutes**

321 C.M.R. 3.01 ........................................................................................................................... 9

940 C.M.R. 16.03 ......................................................................................................................... 7

940 C.M.R. 16.04 ......................................................................................................................... 7

940 C.M.R. 16.05 ......................................................................................................................... 7

940 C.M.R. 16.06 ......................................................................................................................... 7

940 C.M.R. 16.07 ......................................................................................................................... 7

Cal. Elec. Code Ann. § 319.5 ..................................................................................................... 19

M.G.L. c. 106, § 2-314 .................................................................................................................. 7

M.G.L. c. 140, § 122B .................................................................................................................. 6

M.G.L. c. 93A, § 2A ...................................................................................................................... 7

Tex. Elec. Code Ann. § 61.010 .................................................................................................. 19

Va. Code § 44-146.15 ................................................................................................................ 10

## **Other Authorities**

*Covid-19 Live Updates: Lockdowns Return to Oregon and New Mexico*, N.Y. Times
(Nov. 13, 2020, 4:24 p.m.) ................................................................................2

COVID-19 Order No. 54........................................................................................3

N.Y. Exec. Order 202.8.......................................................................................13

## **Rules**

Fed. R. Evid. 701 .................................................................................................9

Fed. R. Evid. 702 .................................................................................................7

Fed. R. Evid. 807 ...............................................................................................14

Fed. R. Evid. 902 .........................................................................................10, 14

**I)      INTRODUCTION**

As COVID-19 cases continue to increase exponentially, it is by no means clear that COVID-19 shutdowns are a thing of the past. Rather, restrictions continue to return, and a renewed essential services lockdown is a distinct and substantial possibility over the next few weeks and months. Thus, recent developments make it far from "absolutely clear" that the behavior could not be expected to recur—and even more so in light of the Defendants' refusal to disclaim a future closure of gun and ammunition retailers and ranges.

Contrary to Defendants' claim, the Supreme Court's decision in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), does not provide the standard of review for deprivations of constitutional rights—as the Supreme Court and multiple other courts have made clear. Rather, the Defendants need to justify their decision to exclude gun stores and ranges using established standards of review. This they cannot do.

First, the burdens they have imposed are substantial. No one can purchase ammunition without access to a licensed retailer, meaning that the shutdown orders stand as a bar to obtaining ammunition. Ammunition aside, the shutdown orders impose a significant and substantial burden on an individual's ability to acquire a firearm for self-defense, as private sales are plainly inferior, especially for novice gun buyers. Finally, the shutdown orders—if re-imposed—would have no clear end date, potentially lasting for many months. They are not analogous to short, fixed-duration waiting periods or age restrictions.

Against this, the Defendants have offered no justifications that are actually valid. They attempt to erase the considerations that were actually before Defendant Governor Baker—politics and a vague concern with domestic violence—in favor of considerations that were not developed until after the Plaintiffs filed suit. These post hac rationalizations are inadequate, and in any event, they do not sufficiently "fit" the burdens that Defendants have imposed.

**II)      A LIVE CASE OR CONTROVERY CONTINUES TO EXIST**

No one disputes that there was a live case and controversy both when the Plaintiffs

commenced this action, as well as when the Court issued its preliminary injunction. Thus, as

Plaintiffs have repeatedly shown, Defendants' voluntary cessation of the challenged practices

does *not* make this matter moot unless it is "absolutely clear that the allegedly wrongful behavior

could not reasonably be expected to recur." *Mangual v. Rotger-Sabat*, 317 F.3d 45, 60 (1st Cir.

2003) (quotations omitted); *see* Plf. Br. (Doc. No. 121) pp. 1-2, Plf. Opp. Br. (Doc. No. 109) pp.

7-14. And there is no such absolute clarity here. First, the Defendants have not taken any

affirmative action to indicate that they will not close gun retailers and ranges again during a

future essential services lockdown. *See* Plf. Opp. Br. pp. 8-9 (*citing Town of Portsmouth v.*

*Lewis*, 813 F.3d 54, 59 (1st Cir. 2016); *KG Urban Enters., LLC v. Patrick*, 969 F. Supp. 2d 52,

58 (D. Mass. 2013)). And second, the ongoing dynamics of the COVID-19 pandemic make

another lockdown significantly more than a mere theoretical possibility. *See* Plf. Br. p. 2.

Defendants don't identify any affirmative action (like a statute) that would take a future

shutdown off the table. Rather, they assert that any return to an essential services lockdown is

"speculative." *See* Deft. Br. (Doc. No. 127) pp. 6-7. Certainly, it is true that no one knows the

future. But, other issues aside, their position is remarkable in light of ongoing developments.

Since Plaintiffs moved for summary judgment in September, COVID-19 infection rates have

skyrocketed both in Massachusetts and across the country. *See Covid-19 Live Updates:*

*Lockdowns Return to Oregon and New Mexico*, N.Y. Times (Nov. 13, 2020, 4:24 p.m.), Ex. 1 to

Dec. of David Jensen (submitted herewith). The Governors of both New Mexico and Oregon

have now ordered a return to lockdown conditions, and the City of New York is making plans to

close its schools. *See id.* Two weeks ago, Defendant Governor Baker issued an executive order

reducing the permissible size of social gatherings and requiring venues to close by 9:30 p.m. *See*

COVID-19 Order No. 54 at ¶¶ 3-4, Ex. 2 to Jensen Dec. The situation is one that is is far from being "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Mangual*, 317 F.3d at 60.

In the two cases that Defendants cite (p.7) to support their mootness argument, the defendant officials' policy changes did not come *after* the courts had issued injunctions. Rather, the defendants changed the policies at issue before the courts ever ruled. *See World Gym, Inc. v. Baker*, No. 20-cv-11162, 2020 WL 4274557, at *3-4 (D. Mass. Jul. 24, 2020) (Casper, J.); *Altman v. County of Santa Clara*, No. 20-cv-02180, 2020 WL 2850291, *8 (N.D. Cal. Jun. 2, 2020). If there is no longer an order that causes injury to a plaintiff, then ipso facto, a motion to enjoin that order is moot. But that does not mean there is no longer a controversy—particularly where, as here, there's no evidence that the Defendants would have taken the same action in the absence of the Court's ruling.

## III)   THE EXISTENCE OF A PUBLIC HEALTH EMERGENCY IS NOT DISPOSITIVE

The Supreme Court's decision in *Jacobson* does not, as Defendants would have it (p. 8), mandate dismissal so long as there was a "real or substantial relation to the protection of the public health." Deft. Br. p. 8 (*quoting Jacobson*, 197 U.S. at 31). Rather, the decision in *Jacobson* "settled that it is within the police power of a State to provide for compulsory vaccination." *Zucht v. King*, 260 U.S. 174, 176 (1922). "*Jacobson* takes off the table any general challenge to [an emergency order] based on the Fourteenth Amendment's protection of liberty." *Ill. Republican Party v. Pritzker*, No. 20-2175, 2020 WL 5246656, *7 (7th Cir. Sept. 3, 2020). However, the circumstances of *Jacobson* are "a far cry from" those presented where, as here, an emergency order precludes conduct that is protected. *See Adams & Boyle, P.C. v. Slatery*, 956 F.3d 913, 925 (6th Cir. 2020). Indeed, the Court in *Jacobson* itself noted that its reasoning would

-3-

not justify "a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, 197

U.S. at 31 (citations omitted). And it is important to remember that, at the time the Supreme

Court decided *Jacobson*, many of the rights that are now protected as fundamental had not yet

been recognized. *See Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015) (*citing

Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)); *see also District of Columbia v. Heller*, 554

U.S. 570, 625-26 (2008) ("This Court first  held a law to violate the First Amendment's

guarantee of freedom of speech in 1931, almost 150 years after the Amendment was ratified, and

it was not until after World War II that we held a law invalid under the Establishment Clause."

(*citing Illinois ex rel. McCollum v. Board of Educ.*, 333 U.S. 203 (1948); *Near v. Minnesota ex

rel. Olson*, 283 U.S. 697 (1931))).

      Certainly, *Jacobson* supports the proposition that "states and the federal government have

wide latitude in issuing emergency orders to protect public safety or health"—but that does not

mean that they "have *carte blanche* to impose any measure without justification or judicial

review." *See Robinson v. Attorney General*, 957 F.3d 1171, 1179 (11th Cir. 2020). *Jacobson*

"does not provide the standard of review" for a constitutional deprivation, and instead, the Court

should rely primarily on jurisprudence that addresses the standard of review applicable to the

right at issue. *See Bailey's Campground Inc. v. Mills*, No. 2:20-cv-00176, 2020 WL 2791797,

*17 (D. Me. May 29, 2020); *see also Baptiste v. Kennealy*, No. 1:20-cv-11335, 2020 WL

5751572, *14-16 (D. Mass. Sept. 25, 2020) (Wolf, J.); *ACA Int'l v. Healey*, No. 20-10767, 2020

WL 5647480, *10-13 (D. Mass. May 6, 2020) (Stearns, J.). Indeed, when the Sixth Circuit

evaluated a COVID-19 restriction on abortion, the court's conclusion was that *Jacobson* "does

not substantially alter our reasoning." *Adams & Boyle*, 956 F.3d at 926. As indicated in many of

the cases that Defendants rely upon (p. 9), *Jacobson* becomes a controlling consideration when

the issue is mere economic regulation that does not stand as a substantial burden on protected conduct. *See League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, No. 20-1581, 2020 WL 3468281, *2 (6th Cir. Jun. 24, 2020); *Luke's Catering Serv., LLC v. Cuomo*, No. 20-CV-10865, 2020 WL 5425008, *11-12 (W.D.N.Y. Sept. 10, 2020).

For a demonstration of the standards governing a constitutional deprivation, one need look no further than the opinions surrounding the Supreme Court's denial of an injunction pending appeal in *South Bay United Pentecostal Church v. Newsom*, 590 U.S. ___, 140 S. Ct. 1613 (2020). Chief Justice Roberts issued a concurring opinion that (after articulating the particularly stringent standard that governs an injunction pending appeal) concluded that the restrictions at issue—limiting the number of people who could be present in churches—"appear consistent with the Free Exercise Clause of the First Amendment." *See id.* at 1613 (Roberts, C.J., concurring). Significantly, Justice Roberts found that "[s]imilar or more severe restrictions apply to comparable secular gatherings, including lectures, concerts, movie showings, spectator sports, and theatrical performances, where large groups of people gather in close proximity for extended periods of time." *Id.* (Roberts, C.J., concurring). On the other hand, activities "such as operating grocery stores, banks, and laundromats, in which people neither congregate in large groups nor remain in close proximity for extended periods" were "dissimilar" from religious congregations. *See id.* (Roberts, C.J., concurring). Justice Kavanaugh, joined by Justices Gorsuch and Thomas, dissented. *See id.* at 1614 (Kavanaugh, J., dissenting). Their view was that things like factories, supermarkets and shopping malls were "comparable secular businesses," and that because California's 25% occupancy limit applied to churches, but not to those "comparable" businesses, there was "discriminatory treatment" that California needed to justify. *See id.* at 1614-15 (Kavanaugh, J., dissenting). This required proof that the occupancy limit was "narrowly tailored"

to serve a "compelling governmental interest." *Id.* at 1614 (Kavanaugh, J., dissenting) (*quoting*

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 531-32 (1993)).

The essential takeaway is that the Court—or, at least, these four Justices of the Court—

did not use the rationale of *Jacobson* to decide the matter. Rather, they applied the sorts of

review standards that would normally apply to claims under the Free Exercise Clause. It is well

established that laws that infringe or restrict on the basis of religious motivation require narrow

tailoring to serve compelling governmental interests. *See Church of the Lukumi*, 508 U.S. at 533.

The point of disagreement between the Justices was whether things like churches and

supermarkets were, in fact, "comparable"—not whether Free Exercise Clause jurisprudence

applied. *Jacobson* did not control the Court's resolution.

### IV)   THE CLOSURE OF GUN AND AMMUNITION RETAILERS AND SHOOTING RANGES IMPOSES A SUBSTANTIAL BURDEN ON THE RIGHT OF ARMED SELF-DEFENSE

Plaintiffs showings in their moving papers that the shutdown caused a substantial burden

on those seeking to exercise their right to keep and bear arms, and particularly on those seeking

to acquire effective modern arms for the first time:

- The only place that a person can buy ammunition—a necessary component of a gun used for self-defense—is from a licensed retailer. *See* Plf. FRCP 56.1 (Doc. No. 122) at ¶ 18; *see also* M.G.L. c. 140, § 122B; Plf. Br. at p. 3.

- While Walmart stores were open during the shutdown, and at least some had ammunition available, Walmart does not stock handgun ammunition, except for. 22 rimfire ammunition, and .22 rimfire ammunition is generally regarded as unsuitable and inappropriate for self-defense. The other ammunition that Walmart stocks (*i.e.* for rifles and shotguns) is generally not suitable for self-defense because it is normally not of a hollow-point or expanding-tip variety. Plf. FRCP 56.1 at ¶¶ 30-31.

- A licensed individual without access to a gun store can buy a gun from another licensed individual, but most of the individual plaintiffs did not know of anywhere to buy a gun other than a gun store, and further, they did not feel comfortable buying a gun from a stranger. *See* Plf. FRCP 56.1 at ¶¶ 19-20.

- Gun stores offer substantial advantages over gun transactions arranged between private individuals, especially for inexperienced gun purchasers. In particular, gun stores provide knowledge and information that unlicensed private sellers generally cannot. Furthermore, gun stores offer the ability to handle and try different kinds of guns, and they also may offer hands-on instruction. And, gun stores carry safety equipment and other necessary accessories. Plf. FRCP 56.1 at ¶¶ 28-29, 32, 34.

- Gun stores also after substantial legal advantages over private gun transactions. A person purchasing a gun from a licensed gun retailer has a stronger assurance that the gun is legal in Massachusetts and that pertinent legal requirements have been followed. In addition, the individual purchasing from a store receives a better warranty and better assurances that a gun is not defective in that Massachusetts consumer protection regulations apply to licensed retailers, but not to private individuals. *See* Plf. FRCP 56.1 at ¶¶ 33, 35; Plf. Br. p. 3; *see also* M.G.L. c. 93A, § 2A; M.G.L. c. 106, § 2-314(1); 940 C.M.R. 16.03-.07.

Defendants do little to dispute the substance of these assertions. For example, they point out that one of the plaintiffs was able to buy a gun from a relative. *See* Deft. FRCP 56.1 Response (Doc. No. 130) at ¶ 19-20; *see also* Dec. of Thomas Leighton (Doc. No. 122-07) at ¶¶ 4-6. But this doesn't change the fact that the other Plaintiffs were either unable to do so, or uncomfortable with doing so, nor does it change the fact that a licensed retailer with an inventory of guns and ammunition offers substantial advantages over a private seller attempting to offload a single firearm. Defendants also question the basis for self-defense expert Massad Ayoob's opinions regarding the ammunition available at Walmart and its suitability for self-defense, contending that there is no evidence in the record that supports his conclusions. Deft. FRCP 56.1 Response at ¶¶ 30-31. However, Mr. Ayoob's opinion states the basis for his conclusions, and as we all know, expert witnesses may rely on facts and data that are not themselves in evidence or admissible as evidence. *See* Fed. R. Evid. 702. Moreover, Plaintiffs submitted abundant evidence of the ammunition stock available at Walmart at the time of the preliminary injunction hearing. *See* Dec. of Charles Brewer (Doc. No. 067-01); Dec. of Christopher Caetano (Doc. No. 067-02); Dec. of Frank DeBaggis (Doc. No. 067-03); Dec. of John Frye (Doc. No. 067-04); Dec. of Mark Horn (Doc. No. 067-05); Dec. of David Lantange (Doc. No. 067-06); Dec. of Kenneth Michaud

(Doc. No. 067-07); Dec. of Connor O'Brien (Doc. No. 067-08); Dec. of William Turano (Doc. No. 067-09); Dec. of Massad Ayoob (Doc. No. 067-10); Dec. of Mark Bouchard (Doc. No. 067-11); Dec. of Toby Leary (Doc. No. 067-12); Dec. of Michael Skidmore (Doc. No. 067-13).[1]

Rather than doing anything to substantially challenge Plaintiffs' showing, Defendants instead attempt to recast the issue. In Defendants' narrative, the question isn't whether the shutdowns imparted a substantial burden on the right to acquire suitable arms and ammunition for self-defense. Instead, the question is merely one of whether it was theoretically possible to buy both a "handgun" and ammunition for it somewhere in the Commonwealth. Defendants point to a (single) advertisement for a used .22 rimfire revolver and conclude that, because .22 rimfire ammunition was available at Walmart, there is really no constitutional burden at all.

The position is absurd. Suppose, for example, that the Defendants ordered the closure of every church in Massachusetts except for one—could they credibly contend that they had imposed *no* burden on the right of free exercise because the one church remained? Or, suppose they prohibited abortion unless an individual obtained authorizations from two physicians and traveled to one designated location in the Commonwealth—could they credibly say this was *not* a substantial burden, since at least a few people would presumably be able to obtain the two physician authorizations and travel to the designated location? Of course not.

Similarly faulted is Defendants' response to Plaintiffs' showing about the need for practice and training at shooting ranges. Plaintiffs' moving papers established two propositions that are (or ought to be) relatively uncontroversial. The first is that people need practice to gain and maintain proficiency with firearms, and that this is especially true with new shooters. Plf.

---

[1] Plaintiffs' summary judgment motion (Doc. No. 120) cited "all pleadings and other submissions in this case, and all other evidence that has been or may be submitted to the Court."

FRCP 56.1 at ¶ 24. The second is that most people use shooting ranges, as (most significantly) they don't have enough private land to discharge firearms on their own property. *See id.* at ¶ 25. Defendants respond by contending that evidence about the prevalence of ranges is inadmissible hearsay. *See* Deft. FRCP 56.1 Response at ¶ 25. But how so? Albert Bonofiglio is the President of a club that operates a shooting range and provides testimony based on his own "experience," including his observations at the range and his interactions with members. *See* Dec. of Albert Bonofiglio (Doc. No. 122-02). Pertinently, one of those observations is that Mr. Bonofiglio is "not aware of any members who own enough land to shoot on their own property." *Id.* at ¶ 13. And, Thomas Leighton is one of the members of this club. *See* Dec. of Thomas Leighton (Doc. No. 122-07) at ¶¶ 11-15. His testimony is that, during the shutdown, he did not have enough land on which he could shoot, nor did he know anyone who had land on which he could shoot, so lacking any practice, he was not able to use his newly acquired gun for the purpose of self-defense. *See id.* at ¶¶ 8-10, 17-19, 21-22. A non-expert witness can provide testimony about opinions that are (pertinently) "rationally based on the witness's perception." Fed. R. Evid. 701(a).

     Aside from their evidentiary objection, the Defendants attempt to dispute the extent of the burden by asserting that "there are many open areas in the Commonwealth where hunting and target shooting are permitted." Deft. FRCP 56.1 Response at ¶ 25. This, however, does not really stand up to scrutiny. While many public lands are open for hunting, they are *not* open for target shooting. Regulations from the Division of Fisheries and Wildlife provide that "[n]o person shall engage in target practicing or target shooting within any wildlife management area without written permission from the Director or his designated agent." 321 C.M.R. 3.01(1)(*l*).

In this respect, one decision the Defendants cite is noteworthy. In *SEG Properties, LLC v. Northam*, No. CL20-2818 (Va. Cir. Ct. Jun. 10, 2020),[2] the court upheld the closure of *indoor* shooting ranges, notwithstanding the Virginia Constitution's protection of the right to keep and bear arms, on the essential rationale that *outdoor* shooting ranges remained available, *see id.* at *7. The court observed that people could train "by reading books, accessing internet resources, and viewing videos," but it did not uphold the closure of indoor ranges solely for this reason. *See id.* at *7-8. Rather, the court reasoned that "to the extent physical training with a firearm is necessary, individuals were, nonetheless, permitted to engage in such training as a permissible 'outdoor activity.'" *Id.* at *7. And notably, the court found that the state constitution's protection of the right to keep and bear arms "implies a right to train to arms." *Id.* at *6. Another Virginia circuit court ruling is also pertinent. In *Lynchburg Range & Training, LLC v. Northam*, No. CL20-333 (Va. Cir. Ct., City of Lynchburg Apr. 27, 2020),[3] the court overturned the ban on indoor shooting ranges on the essential rationale that Virginia statutory law prohibits the governor from "in any way limit[ing] or prohibit[ing] the rights of the people to keep and bear arms as guaranteed by . . . the Constitution of Virginia or the Second Amendment[.]" *See id.* at *2-4 (*quoting* Va. Code § 44-146.15(3)). Significantly, that court also agreed that the right to "'bear arms' includes loading and shooting at a gun range." *Id.* at *3.

The essential problem with the Defendants' arguments about the availability of private transfers and open lands is that they confuse the question of whether there is a substantial and unjustified burden with the question of whether conduct remains theoretically possible. There is no doubt that, during the shutdown, *some* people were able to buy guns in private transactions,

---

[2] Exhibit EE to Dec. of Julia Kobick (Doc. No. 128-31).
[3] Exhibit 1 hereto, attached as a self-authenticating public document under Fed. R. Evid. 902.

and *some* people would have been able to discharge guns on large parcels of private land—so this conduct was theoretically possible, at least for some people, even though it was either impossible or impractical for many others. The Second Amendment secures a right of "the people," not a right of a smaller subset of fortunate individuals. Indeed, the Supreme Court gave no pause to the fact that the handgun bans in Chicago and Washington, D.C. exempted individuals who had registered guns before they went into effect, characterizing them as "bans" nonetheless. *See* Plf. Prelim. Inj. Br. (Doc. No. 9) at pp. 9-10 & n.17.

Under *Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2019), "the appropriate level of scrutiny must turn on how closely a particular law or policy approaches the core of the Second Amendment right and how heavily it burdens that right." *Id.* at 670 (*citing Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 195 (5th Cir. 2012); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*Ezell I*")). "A law or policy that burdens conduct falling within the core of the Second Amendment requires a correspondingly strict level of scrutiny, whereas a law or policy that burdens conduct falling outside the core of the Second Amendment logically requires a less demanding level of scrutiny." *Id.* Unless a burden is categorically outside the scope of protection, the Court must undertake an "inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Ezell I*, 651 F.3d at 703. Thus, the fact that some people have been able to get around the burden may be material to this analysis, but it certainly is not dispositive.

Finally, Defendants' characterization (pp. 11-13) of the shutdown orders as mere "temporary burdens" that "postponed in-store gun sales" in a manner similar to waiting periods and age restrictions is unavailing. Waiting periods apply for a short, defined time—and even so,

they require justification from the government. In *Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016), which Defendants cite, the Ninth Circuit upheld a 10-day waiting period using an intermediate scrutiny analysis. *See id.* at 827-28. The fact that the "actual effect" of the 10-day wait was (in the court's view) "very small" was pertinent, but it did not excuse the defendant from justifying that burden. *See id.* at 827. And, in upholding a 21-year age restriction on the purchase of handguns, the Fifth Circuit indicated that it was inclined to conclude that the burden was wholly outside the scope of constitutional protection. *See Nat'l Rifle Ass'n*, 700 F.3d at 204. Ultimately, the court found that it would pass muster under intermediate scrutiny, on the essential rationale that 18-20 year old individuals are particularly dangerous relatively to the rest of the population. *See id.* at 208-10.

Neither of these are analogous to the case at bar. Unlike a waiting period, the shutdown orders did not definitively expire after a short period of time. Rather, their duration was unknown until they ended—first due to this Court's order, and then due to Governor Baker's placement of gun stores and ranges in "Phase I" of the reopening plan—and there is still a significant possibility shutdowns will return in the future. Moreover, the shutdown orders did not (like age restrictions) apply to only a subset of the adult population, and one that had been found to be particularly dangerous. Rather, they applied to all, and they particularly burdened those who did not already have arms and ammunition—that is, those who would have the most acute need for defensive arms. As the Plaintiffs have repeatedly shown, the core purpose of the Second Amendment is personal self-protection. *See* Plf. Prelim. Inj. Br. at pp. 11-12; Plf Br. at pp. 5, 9-10.

Defendants rely substantially on *Dark Storm Industries LLC v. Cuomo*, No. 1:20-cv-0360, 2020 WL 3833107 (N.D.N.Y. Jul. 8, 2020), but significantly, that case concerned a burden

that was markedly less than the one at issue here. In New York, "box" stores like Walmart and Runnings remained open, and both (unlike in Massachusetts) sell firearms (incuding, in the case of Runnings, handguns). *See id.* at *6, *20-21, *21 n.10. Moreover, although not explicitly mentioned in the decision, New York's essential services list exempted all single employee businesses, which left hundreds of bona fide gun stores open. *See* N.Y. Exec. Order 202.8. Thus, the court observed that "other retailers that sold firearms, such as Walmart and Runnings, were classified as essential and remained open for business with the general public across New York State." *Dark Storm*, 2020 WL 3833107 at *6. It is in this context that the court concluded that there was "no dispute that alternatives remained for Plaintiffs and others like them in New York to acquire firearms for self-defense." *Id.* at *20. The case does not support closure under circumstances where it amounts to a prohibition on acquiring guns from a licensed dealer, nor where it amounts to a prohibition on acquiring ammunition for handguns.

## V)   DEFENDANTS HAVE NOT JUSTIFIED THEIR DECISION TO REMOVE GUN AND AMMUNITION RETAILERS AND RANGES FROM THE ESSENTIAL SERVICES LIST

Plaintiffs' moving papers showed that it was *political* considerations, not public health ones, that surrounded Defendant Governor Baker's decision to exclude gun and ammunition retailers and shooting ranges from the list of essential services. Specifically:

- In determining the essential services that would remain open during the lockdown, Defendant Governor Baker relied on the federal government's list of recommended essential services. Governor Baker *added* to the federal government's list of essential services, but he did not (until the afternoon of March 31, 2020) *remove* anything from that list. *See* Plf. FRCP 56.1 at ¶¶ 4, 7.

- On March 28, 2020, the federal government issued updated guidance that, pertinently, included "firearms or ammunition . . . retailers . . . and shooting ranges" as essential services. When Governor Baker next updated the list of essential services at approximately 2:00 p.m. on March 31, 2020, he included the same language designating firearm and ammunition retailers and shooting ranges as essential. *See* Plf FRCP 56.1 at ¶¶ 6, 8.

- Nearly three hours later, at approximately 4:45 p.m. on March 31, 2020, Governor Baker updated the list of essential services to exclude "firearms or ammunition . . . retailers . . . and shooting ranges." Plf. FRCP 56.1 at ¶ 9.

- At the time Governor Baker was reversing course on gun stores and ranges, the press reported that House Speaker Tom DeLeo contacted him to express his disapproval of the decision to include them as essential services. Plf. FRCP 56.1 at ¶ 58.

- Shortly after Governor Baker reversed course, Attorney General Maura Healey publicly stated that "Gun shops and shooting ranges are NOT essential businesses during a public health emergency. We cannot undermine the safety of our police officers, first responders, and domestic violence victims." Plf. FRCP 56.1 at ¶ 57.

- When Governor Baker justified the decision to exclude gun stores and ranges one week later, on April 7, 2020, he identified two considerations. The first was the general interest in "substantially reduc[ing] out-of-home activities and associated contacts." The second consideration was that "experts and advocates working in the field of domestic violence had expressed strong concerns about the potential for an increase in incidents of domestic violence due to stress and mental health problems resulting from the pandemic generally and due to the effect of substantially curtailing opportunities to leave the home specifically." Plf. FRCP 56.1 at ¶ 49.

- Defendant Public Health Commissioner Monica Bharel MD, MPH was not involved in Govenor Baker's decision to close gun and ammunition retailers and shooting ranges until after this lawsuit was filed. Plf. FRCP 56.1 at ¶ 53.

Defendants' response is somewhat bizarre. First, Defendants assert that Speaker DeLeo's call to Governor Baker is not in evidence because the Lowell Sun article is inadmissible. *See* Deft. FRCP 56.1 Response at ¶ 58. However, newspapers are self-authenticating. *See* Fed. R. Evid. 902(6). Thus, the article is admissible for, at least, the purpose of showing that the press reported political pressure on Governor Baker to change course, even if the truth of the matter asserted (that Speaker DeLeo called and said to change course) is not admissible. *See United States v. Griffin*, 525 F.2d 710, 713 (1st Cir. 1975). Beyond this, the "residual" hearsay exception ought to apply here because, in the "totality of circumstances," the article has "sufficient guarantees of trustworthiness" and it is "more probative . . . than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a). The only way to get direct evidence would be to take testimony from Governor Baker and Speaker DeLeo. And

-14-

notably, while Plaintiffs have been citing this article for months, Defendants have never done anything to counter or dispute it. Defendant Governor Baker did not, for example, provide an affidavit that asserted that the conversation did not happen.

Having attempted to disclaim the truly contemporaneous evidence, Defendants then object to consideration of the justifications that Governor Baker offered one week later on April 7 on the ground that this statement "post-dated the orders" and is of questionable relevance. *See* Deft. Br. p. 16. But how could the Governor's own statement of the basis for his decision be of questionable relevance? Moreover, if Defendants are correct in their objection to evidence of Speaker DeLeo's March 31 call, then this statement by Governor Baker is the closest thing to contemporaneous evidence that exists.

Quite remarkably, given their argument against consideration of the April 7 justifications as being after-the-fact, Defendants attempt to rely on evidence that is even *more* after-the-fact. Specifically, they cite Commissioner Bharel's affidavit, even though Commissioner Bharel was not consulted until after the Plaintiffs had commenced this suit. And in any event, while Commissioner Bharel's affidavit provides basic details about COVID-19 and the need for social distancing, it does not address gun or ammunition retailers or shooting ranges at all. *See* Dec. of Monica Bharel (Doc. No. 128-26). Next, the Defendants provide affidavits from two Massachusetts firearms regulators, both of which post-date the filing of this lawsuit and assert, in substance, that gun stores are often "cramped." *See* Dec. of Michaela Dunne (Doc No. 128-21) at ¶¶ 9-11 ("several" stores have "very small retail spaces" and stores are "often crowded"); Dec. of Zorran Atanasovski (Doc. No. 128-29) at ¶ 6 (stores are "typically cramped retail spaces" with "display racks . . . in close proximity" and "narrow" walkways). But significantly, neither of these affidavits so much as suggest (much less assert) that the witnesses were consulted in

connection with Governor Baker's decision, nor that the considerations articulated in their affidavits were considered at any time prior to the commencement of this case. *See id.*

And what of the basis that Governor Baker actually did identify—that of preventing domestic violence? Defendants provide no affidavits, no studies and no other evidence of any other nature that would provide a basis for the Governor's conclusion. Indeed, while Governor Baker's April 7 remarks indicated that unnamed "experts and advocates working in the field of domestic violence had expressed strong concerns," none of the communications that Defendants produced in discovery had anything to do with this. Specifically, *all* of the 30 communications that the Defendants produced came *after* Governor Baker had already included and then excluded retailers and ranges from the essential services list on March 31. *See* Plf. FRCP 56.1 at ¶ 51. Most of these communications (25) are verbatim or near-verbatim email messages first received on April 20, 2020—three weeks *after* Governor Baker had made his decision, and well after this suit was underway. *See id.* at ¶ 51(b)-(c). Moreover, none of these reflect an association with "the field of domestic violence," although one reflects an association with a gun control organization. *See id.* at ¶ 51(d); *see also* Plf. Br. pp. 13-14. Thus, while Defendants attempt to ignore the justifications that Governor Baker actually provided, the evidence indicates that their alternative narrative did not come into being until well after-the-fact—indeed, after the Plaintiffs had filed suit.

Perhaps recognizing the awkward inconsistency of these positions, Defendants attempt (pp. 13-14) to characterize the shutdown orders as "a facially neutral government action" and assert that there is no reason to "examine whether the government actor articulated a particularized objective." Defendants ground this position in Chief Justice Roberts's concurring opinion in *South Bay United Pentecostal Church v. Newsom*, 590 U.S. ___, 140 S. Ct. 1613

(2020), arguing that Justice Roberts "did *not* examine whether the California Governor had a specific rationale or purpose" (emphasis in source). This, however, assumes quite a bit too much. First, the circumstances in *South Bay* were not the same as those presented here because the State of California had not placed protected conduct in one category and then moved it, alone, to a different and more restrictive category. Rather, the Chief Justice and the three dissenting Justices disagreed about whether the restriction should be considered neutral based on how it compared to other restrictions. *See South Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring); *id.* at 1614-15 (Kavanaugh, J., dissenting). There was no disagreement that a restriction that targeted protected conduct would require more rigorous review, nor that it would likely be unconstitutional. *See generally Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 533 (1993) (heightened scrutiny applies to laws that infringe or restrict religious practices based on their religious motivation). Here, in contrast, the record shows that Governor Baker singled out gun stores and ranges for disparate treatment. Specifically, while Governor Baker had accepted the federal government's essential services guidance wholesale, he then acted to take gun and ammunition stores and ranges—and only gun and ammunition stores and ranges—off the list. Moreover, in doing so he cited considerations that have now been abandoned, in favor of other considerations that did not come into existence until weeks later.

Defendants place significant reliance in *Altman v. County of Santa Clara*, No. 20-cv-02180, 2020 WL 2850291 (N.D. Cal. Jun. 2, 2020), but it's not clear how analogous this case actually is. We don't know what the evidence before that court indicated about the extent of the burden and, unlike here, the defendant officials had not singled out arms-related services. In any event, the decision's core turned on the court's conclusion that because narrow tailoring was not required, the court did not need to consider why restrictions on other retail settings should not

also apply in the context of firearms. *See id.* at *27. This is, at best, a questionable proposition, as all of the Justices in *South Bay* used the basic framework of comparing the restrictions at issue with restrictions imposed on different types of businesses. *See South Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring); *id.* at 1614-15 (Kavanaugh, J., dissenting).

Defendants argue (p. 19) that because the First Circuit disclaimed narrow tailoring in *Gould*, "it is irrelevant whether less restrictive alternatives to the Governor's action existed." This goes too far. Preliminarily, the notion of "narrow tailoring" applies differently in different contexts. *Compare Brown v. Plata*, 563 U.S. 493, 531 (2011) (court remedial orders), *with Grutter v. Bollinger*, 539 U.S. 306, 341 (2003) (race-conscious school admission programs), *with Ward v. Rock Against Racism*, 491 U.S 781, 798-99 (1989) (content-neutral time, place and manner restrictions). In *Gould*, the First Circuit discussed "narrow tailoring" as follows:

> We caution, however, that deference should not be confused with blind allegiance. There must be a fit between the asserted governmental interests and the means chosen by the legislature to advance those interests. In assessing this fit, a perfect match is not required. Put another way, a legislature's chosen means need not be narrowly tailored to achieve its ends: the fit between the asserted governmental interests and the means chosen by the legislature to advance them need only be substantial in order to withstand intermediate scrutiny. Courts have described this requirement in various ways. A typical formulation—with which we agree—describes it as "a reasonable fit . . . such that the law does not burden more conduct than is reasonably necessary."

*Gould*, 907 F.3d at 673-74 (*quoting Drake v. Filko*, 724 F.3d 426, 436 (3d Cir. 2013)) (other quotations and citations omitted). Thus, when the First Circuit disclaimed "narrow tailoring," it was in the context of providing an alternate explanation for the proposition that "a perfect match is not required." The court was still clear that a burden is impermissible if it "burden[s] more conduct than is necessary."

Indeed, the fact that a standard of review does not include a separate step addressed to narrow tailoring does not mean that alternative regulatory approaches are irrelevant. For

example, Chief Justice Roberts's concurring opinion in *South Bay* focused on the restrictions imposed on secular businesses and whether those restrictions were "comparable." *See South Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring). But, under *Employment Division v. Smith*, 494 U.S. 872 (1990), laws of general application that incidentally burden religious practices are constitutional, so long as burdening religious practices is not an object of the law, *see id.* at 878-80. Narrow tailoring is not part of this analysis. *See id.* Rather, narrow tailoring comes into play when a law is *not* facially neutral, but instead targets religion—which is the approaching the three dissenting Justices proposed to take. *See South Bay*, 140 S. Ct. at 1614 (Kavanaugh, J., dissenting) (*quoting Church of Lukumi*, 508 U.S. at 531-32). The fact that narrow tailoring was not a formal step in the analysis did not prevent Chief Justice Roberts from looking towards regulatory alternatives.

This is also true in the case of speech restrictions in nonpublic forums. Although the applicable standard of review does not include a "requirement of narrow tailoring . . . , the State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Minn. Voters Alliance v. Mansky*, 585 U.S. ___, 138 S. Ct. 1876, 1888 (2018). When the Court considered, and rejected, a state law that prohibited any "political badge, political button, or other political insignia" at a polling site, it looked to hypothetical applications of the law, *see id.* at 1888-91—and it also looked at approaches taken in other states, *see id.* at 1891 (*citing* Cal. Elec. Code Ann. § 319.5; Tex. Elec. Code Ann. § 61.010(a)).

Even if there is no requirement that a restriction be narrowly tailored to serve a compelling interest, a restriction must still have a substantial degree of "fit" with an important governmental interests—and it is difficult or impossible to consider the "fit" question without looking to other options that the government could have taken. For example, no one seriously

disputes that intermediate scrutiny requires that a regulation leave open adequate alternative channels. *See, e.g., N.Y. State Rifle & Pistol Ass'n v. City of New York*, 883 F.3d 45, 57 (2d Cir. 2018), *vacated* 140 S. Ct. 1525 (2020); *Horsley v. Trame*, 808 F.3d 1126, 1132 (7th Cir. 2015). In other words, even if narrow tailoring is not a dispositive consideration, the fact that other regulations have a substantially better degree of fit remains highly pertinent.

## VI)   CONCLUSION

The Court should issue a declaratory judgment establishing that the grounds the Defendants have asserted do not justify a shutdown of access to gun and ammunition retailers and shooting ranges. Furthermore, depending on the state of affirs at the time the Court issues its ruling, the Court should also issue a permanent injunction that, to the extent necessary, directs Defendants not to close gun and ammunition retailers and ranges, but leaves the applicable public health restrictions in the hands of public health officials, subject to the oversight of the Court.

Dated: November 16, 2020

Respectfully submitted,

THE PLAINTIFFS,

By their attorneys,

 /s/ David D. Jensen
David D. Jensen, Esq.
Admitted *Pro Hac Vice*
David Jensen & Associates
33 Henry Street
Beacon, New York 12508
Tel: 212.380.6615
Fax: 917.591.1318
david@djensenpllc.com

J. Steven Foley
BBO # 685741
Law Office of J. Steven Foley
100 Pleasant Street #100
Worcester, MA 01609
Tel: 508.754.1041
Fax: 508.739.4051
JSteven@attorneyfoley.com

Jason A. Guida
BBO # 667252
Principe & Strasnick, P.C.
17 Lark Avenue
Saugus, MA 01960
Tel: 617.383.4652
Fax: 781.233.9192
jason@lawguida.com

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on Nov. 16, 2020.

/s/ David D. Jensen
David D. Jensen