UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHAEL MCCARTHY, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> CHARLES D. BAKER, in his Official Capacity as Governor of the Commonwealth of Massachusetts, et al., <br><br> *Defendants*. | CIVIL ACTION <br> NO. 1:20-cv-10701-DPW |

**THIRD NOTICE OF SUPPLEMENTAL AUTHORITY**

Defendants, Governor Baker, Commissioner Gagnon, and Commissioner Bharel, submit the attached decision as supplemental authority relevant to the defendants' pending Motion to Dismiss (Doc. Nos. 104-105) and Cross-Motion for Summary Judgment (Doc. Nos. 126-127).

In *Bayley's Campground, Inc. v. Mills*, --- F.3d ---, 2021 WL 164973 (1st Cir. Jan. 19, 2021), the First Circuit upheld under strict scrutiny a COVID-19-related executive order issued by the Governor of Maine requiring most people traveling to Maine to quarantine for 14 days upon arrival into the state. *Bayley's Campground* is relevant to this matter in two respects. First, the First Circuit concluded that the Maine Governor's rescission of the executive order did not render the plaintiffs' claims moot. *Bayley's Campground*, 2021 WL 164973, at *2-3. The court reasoned that the voluntary cessation doctrine applied and the claims therefore were not moot where the Governor of Maine had rescinded the order at issue and had "not denied that a spike in the spread of the virus in Maine could lead her to impose a self-quarantine requirement just as strict" as that in the order at a later time. *Id.* *3. The First Circuit decision in *Bayley's Campground* did not, however, address the argument made by the Commonwealth of Massachusetts based on the

different facts in this case—namely, that when a government action has "expired according to its terms" and the government defendant has done "nothing to hasten its expiration, much less … to terminate litigation," the voluntary cessation exception simply is "not invoked." *Am. Civil Liberties Union of Mass. v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 55 (1st Cir. 2013) ("This, in our view, is not a case of voluntary cessation so as to invoke the exception."). Unlike the executive order in *Bayley's Campground*, which terminated by way of the Governor's affirmative act of rescission, the challenged COVID-19 orders in this case terminated by expiring in accordance with the deadlines set by their own terms. Nevertheless, because *Bayley's Campground* bears on the defendants' mootness defense, in candor to the Court the defendants wish to provide notice of the First Circuit's holding on mootness.

Second, *Bayley's Campground* articulates several principles for reviewing COVID-19-related executive orders under *strict scrutiny*, a more rigorous standard of review than the intermediate scrutiny applicable to plaintiffs' Second Amendment claims in this case. In conducting the "less restrictive alternatives" analysis required by strict scrutiny—an inquiry that is not part of an intermediate scrutiny analysis—the court explained that COVID-19 is "easily transmittable and unusually deadly"; that it was a "critical strategy in combatting the COVID-19 virus … to slow its spread by limiting the extent to which persons come in contact with one another"; that "no known treatment or cure nor any easy means of detecting the virus existed" in April and May of 2020; that COVID-19 "could be spread by persons who were asymptomatic but infected with it"; and that "it had an incubation period of up to two weeks." *Bayley's Campground*, 2021 WL 164973, at *5-6. The court also explained that, in light of these considerations, the Governor's choice to err on the side of caution in requiring a 14-day quarantine did not render the order overinclusive, because a precautionary approach can be appropriate when decisionmakers

confront limited evidence about the true extent of a known risk. *Id.* at \*6. Furthermore, the First Circuit explained, courts must judge governmental action "based on what was known at the time and not in hindsight." *Id.* at \*8. Finally, the court emphasized that "Maine was attempting to solve a common problem by means of a familiar solution. This virus, by its nature, thrives on human contact, and no less central an authority than the U.S. Centers for Disease Control and Prevention has recommended that persons distance themselves from others and avoid unnecessary travel." *Id.*

Respectfully submitted,

CHARLES BAKER, Governor of the Commonwealth of Massachusetts; MONICA BHAREL, Commissioner of the Department of Public Health; and JAMISON GAGNON, Commissioner of the Department of Criminal Justice Information Services,

By their attorney,

MAURA HEALEY
ATTORNEY GENERAL

/s/ Julia E. Kobick
Julia E. Kobick (BBO No. 680194)
Assistant Attorney General
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2559

Dated: January 25, 2021       Julia.Kobick@mass.gov

## **CERTIFICATE OF SERVICE**

I certify that, on January 25, 2021, this document, filed through the Court's ECF system, will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Julia E. Kobick
Julia E. Kobick
Assistant Attorney General

**2021 WL 164973**
Only the Westlaw citation is currently available.
United States Court of Appeals, First Circuit.

BAYLEY'S CAMPGROUND, INC., d/b/a Bayley's Camping Resort; FKT Resort Management, LLC; FKT Bayley Limited Partnership; Curtis Bonnell, Dolores Humiston, and James Boisvert, Plaintiffs, Appellants
v.
Janet T. MILLS, in her official capacity as the Governor of the State of Maine, Defendant, Appellee.

No. 20-1559
|
January 19, 2021

**Synopsis**
**Background:** Individuals who intended to travel from New Hampshire to Maine and certain businesses reliant on out-of-state customers filed suit against Maine's Governor, who had issued executive order, in response to pandemic, requiring persons traveling to that state to self-quarantine upon their arrival for a period of 14 days before venturing out in public. Individuals and businesses sought preliminary injunction, prohibiting enforcement of Governor's executive order. The United States District Court for the District of Maine, Lance E. Walker, J., 463 F.Supp.3d 22, denied preliminary injunction, and individuals and businesses appealed.

**Holdings:** The Court of Appeals, Barron, Circuit Judge, held that:

[1] individuals' and businesses' request for injunctive relief from self-quarantine requirement in Maine Governor's executive order was not moot, even though Governor's executive order had been rescinded, and

[2] individuals and businesses failed to establish likelihood of success on merits of their claim that Maine Governor's executive order violated their federal constitutional "right to travel" for purposes of determining their entitlement to preliminary injunctive relief.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Preliminary Injunction.

West Headnotes (11)

[1]  **Federal Courts** Rights and interests at stake
**Federal Courts** Inception and duration of dispute; recurrence; "capable of repetition yet evading review"

Case is moot, for purposes of Article III's "case or controversy" requirement, when the issues presented are no longer live or the parties lack legally cognizable interest in the outcome. U.S. Const. art. 3, § 2, cl. 1.

[2]  **Federal Courts** Available and effective relief

Case is moot, for purposes of Article III's "case or controversy" requirement, when the court cannot give any effectual relief to the potentially prevailing party. U.S. Const. art. 3, § 2, cl. 1.

[3]  **Injunction** Mootness and ripeness; ineffectual remedy
**Injunction** Health

Out-of-state individuals' and in-state businesses' request for injunctive relief from self-quarantine requirement in Maine Governor's initial executive order, requiring persons traveling to that state to self-quarantine upon their arrival for 14 days, was not moot, even though Governor's initial executive order had been rescinded and superseded by Governor's subsequent executive order, exempting from the requirement to self-quarantine all persons who had received negative test for COVID-19; Governor could unilaterally reimpose the strict self-quarantine requirement from her initial order, and Governor did not deny that spike in spread of the virus in Maine could lead her to impose a self-quarantine requirement just as strict as in her initial order, and thus, Governor did not show that it was absolutely

clear that the allegedly wrongful behavior could not reasonably be expected to recur. U.S. Const. art. 3, § 2, cl. 1.

### [4] Federal Courts  Preliminary injunction; temporary restraining order

Court of Appeals reviews district court's decision declining to issue a preliminary injunction for abuse of discretion, with conclusions of law reviewed de novo and findings of fact for clear error.

### [5] Injunction  Grounds in general; multiple factors

When considering whether to grant or deny preliminary injunction, court must gauge the movant's likelihood of success on the merits, evaluate whether and to what extent the movant will suffer irreparable harm if injunctive relief is withheld, calibrate the balance of hardships as between the parties, and consider the effect, if any, that issuance of injunction (or the withholding of one) will have on the public interest.

### [6] Injunction  Health

Fact that out-of-state individuals and in-state businesses were seeking preliminary injunction against a self-quarantine requirement set forth in Maine Governor's executive order, that was issued and then rescinded in response to a dynamic public health crisis involving COVID-19, bore on whether individuals and businesses could make the requisite showing under both the "irreparable harm" and "public interest" prongs of the test for issuance of preliminary injunction.

### [7] Injunction  Likelihood of success on merits

Plaintiffs' failure to satisfy "likelihood-of-success-on-the-merits" prong of test for preliminary injunction is itself preclusive of the requested relief.

### [8] Civil Rights  Preliminary Injunction

Out-of-state individuals and in-state businesses failed to establish likelihood of success on merits of their claim that Maine Governor's executive order, requiring persons traveling to that state to self-quarantine upon their arrival for 14 days, violated their federal constitutional "right to travel" for purposes of determining their entitlement to preliminary injunctive relief, prohibiting enforcement of self-quarantine requirement; Governor provided adequate support for the conclusion that no less restrictive, but equally effective, alternative was available to her during the time period at issue since COVID-19 virus was both easily transmissible and unusually deadly, virus had incubation period of up to 14 days, there was no vaccine or broadly effective treatment for virus in place, and it was critical strategy in combatting the virus to slow its spread by limiting extent to which persons came in contact with one another.

### [9] Federal Courts  Preliminary injunction; temporary restraining order

Injunction  Actions and Proceedings

"Likelihood-of-success-on-the-merits" prong of the test for preliminary injunction presents question of law, which is reviewed de novo on appeal.

### [10] Constitutional Law  Freedom of Travel and Movement

Textual source of the federal constitutional "right to travel" is elusive, but, whatever its origin, the right to migrate is firmly established.

### [11] Constitutional Law  Freedom of Travel and Movement

The federal constitutional "right to travel" includes at least three distinct components: [1] the right of a citizen of one State to enter and to leave another State; [2] the right to be treated as

a welcome visitor, rather than an unfriendly alien when temporarily present in the second State; and [3] for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE, [Hon. Lance E. Walker, U.S. District Judge]

**Attorneys and Law Firms**

Tyler J. Smith, with whom Gene R. Libby, Kennebunk, ME, and Libby O'Brien Kingsley & Champion, LLC, were on brief, for appellants.

Christopher C. Taub, Deputy Attorney General, Chief, Litigation Division, with whom Aaron M. Frey, Attorney General, and Kimberly L. Patwardhan, Assistant Attorney General, were on brief, for appellee.

Before Howard, Chief Judge, Selya and Barron, Circuit Judges.

**Opinion**

BARRON, Circuit Judge.

**\*1** In the spring of 2020, as the United States confronted the COVID-19 pandemic, the Governor of Maine issued an executive order that, with few exceptions, required persons traveling to that state to self-quarantine upon their arrival for a period of fourteen days before venturing out in public. The plaintiffs here -- three individuals who intended to travel from New Hampshire to Maine and certain businesses reliant on out-of-state customers -- filed suit in response. They alleged that the self-quarantine requirement violated their federal constitutional right to interstate travel as well as their federal constitutional right to procedural due process, and they sought a preliminary injunction prohibiting the requirement's enforcement. The District Court rejected the request to issue the preliminary injunction because it determined that the plaintiffs had not met their burden to show that they had a likelihood of success on the merits of their federal constitutional claims. The plaintiffs now appeal the portion of that ruling that concerns the right-to-travel claim, which we affirm, after concluding that the fact that the Governor rescinded the executive order that contains the self-quarantine requirement that is at issue here during the pendency of this appeal and replaced that order with one that imposed a less restrictive self-quarantine requirement does not moot the case.

**I.**

On April 3, 2020, the Governor issued Executive Order 34 ("EO 34"). Titled "An Order Establishing Quarantine Restrictions on Travelers Arriving in Maine," EO 34 required, with limited exceptions, all persons, "resident or non-resident," who were "traveling into Maine" to "immediately self-quarantine for 14 days" upon their arrival in the state. EO 34 also directed all lodging operations in Maine, including campgrounds, to cease providing services aside from "[h]ousing vulnerable populations," "[p]roviding accommodations for health care workers," furnishing "self-quarantine or self-isolation facilities," or offering additional services pursuant to "verifiable extenuating circumstances." EO 34 provided that it would "be enforced by law enforcement" and that a violation of its terms could "be charged as a Class E crime subject to a penalty of up to six months in jail and a $1,000 fine."

The individual plaintiffs are two New Hampshire residents, Curtis Bonnell and Dolores Humiston, and one Maine resident, James Boisvert. The corporate plaintiffs -- Bayley's Campground, Inc., d/b/a Bayley's Camping Resort; FKT Resort Management, LLC; FKT Bayley Limited Partnership; and DMJ Parks, LLC d/b/a Little Ossipee Campground [1] -- operate campgrounds and related businesses in Maine. Both Bonnell and Humiston are consistent, seasonal patrons of Bayley's Campground.

[1] DMJ Parks, LLC d/b/a Little Ossipee Campground is not a party to this appeal, as it voluntarily dismissed its appeal under Fed. R. App. P. 42(b).

The plaintiffs filed suit in the federal court for the District of Maine on May 15, 2020, in which they sought declaratory and injunctive relief from EO 34 on right-to-travel and proceduraldue-process grounds. The plaintiffs concurrently moved for a preliminary injunction.[2] The complaint alleged, among other things, that the self-quarantine requirement that EO 34 imposed "practically" prevented the three individual plaintiffs from traveling between Maine and New Hampshire "to recreate, associate with friends, visit businesses, and simply take trips." The complaint also alleged that the

requirement caused "economic injury" to the corporate plaintiffs due to "a substantial number of cancellations by out-of-state campers who [we]re unable or unwilling to self-quarantine for 14[ ] days upon their arrival to Maine."

2   Before the District Court, the plaintiffs also sought preliminary injunctive relief from EO 34's prohibition against "the Campground plaintiffs ... opening to out-of-state visitors until those visitors have completed a 14-day quarantine," but their appeal concerns only their request to preliminarily enjoin the self-quarantine requirement imposed on individual travelers to Maine.

**\*2** The Governor filed an opposition to the preliminary injunction motion on May 25, 2020, and, on May 29, the District Court denied the motion. See Bayley's Campground, Inc. v. Mills, 463 F. Supp. 3d 22, 38 (D. Me. 2020). In so ruling, the District Court agreed with the plaintiffs that EO 34's self-quarantine requirement implicated the federal constitutional right to interstate travel and was subject to strict scrutiny in consequence. Id. at 31-35. But, "at this early stage," the District Court concluded, in light of what the record showed about the Governor's basis for concluding that the self-quarantine requirement would slow the spread of the virus in Maine and protect the state's health care system from being overwhelmed by patients infected with the disease, the plaintiffs had failed to show that their right-to-travel claim regarding the requirement had a likelihood of success on the merits. Id. at 35. On that basis, the District Court denied the requested preliminary relief on that claim. 3   Id. at 38.

3   The District Court also held that the plaintiffs were unlikely to succeed on their procedural due process claim, a decision which the plaintiffs do not challenge on appeal.

The plaintiffs filed this interlocutory appeal on June 1, 2020, in which they challenged that ruling, and they also moved at that time for an injunction against the self-quarantine requirement pending appeal. On June 25, 2020, a panel of this Court denied the plaintiffs' motion. An expedited briefing schedule was set.

Shortly after the plaintiffs filed their notice of appeal, on June 9, 2020, the Governor rescinded EO 34 in its entirety and replaced it with Executive Order 57 ("EO 57"). The new executive order contained a 14-day self-quarantine requirement that was identical to EO 34's save for additional exceptions that restricted its scope. As relevant here, EO 57, unlike EO 34, exempted from the requirement to self-quarantine all persons who (1) "[r]eceive[d] a recent negative test for COVID-19 in accordance with standards established by" the Maine Center for Disease Control and Prevention ("Maine CDC"), or (2) were "residents of New Hampshire and Vermont, or ... Maine residents returning from travel to New Hampshire and Vermont." EO 57 also permitted lodging operations, including campgrounds, to offer normal services to persons in compliance with EO 57 -- but tasked such operations with collecting "a complete certificate stating compliance with this Order from each individual subject to [the self-quarantine] requirement as a prerequisite to check-in."

In the wake of EO 57, the parties addressed in their briefing to us whether the plaintiffs' request for a preliminary injunction to prohibit the enforcement of EO 34's self-quarantine requirement on right-to-travel grounds is moot. We begin our analysis with this threshold jurisdictional question, which concerns whether the parties' dispute over the plaintiffs' request for injunctive relief from the now-rescinded requirement from EO 34 presents a "case or controversy" within the meaning of Article III of the federal Constitution. See U.S. Const. Art. III § 2 cl. 1; Redfern v. Napolitano, 727 F.3d 77, 82 (1st Cir. 2013).

## II.

**[1]** **[2]** "[A] case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome. Another way of putting this is that a case is moot when the court cannot give any effectual relief to the potentially prevailing party." Town of Portsmouth v. Lewis, 813 F.3d 54, 58 (1st Cir. 2016) (quoting Am. C.L. Union of Mass. ("ACLUM") v. U.S. Conf. of Cath. Bishops, 705 F.3d 44, 52 (1st Cir. 2013)).

**[3]** The plaintiffs contend that, even though EO 34 has been superseded by EO 57, their request for injunctive relief from the self-quarantine requirement is not moot because it pertains to an executive action that the Governor voluntarily rescinded and could unilaterally reimpose. See Roman Cath. Diocese of Brooklyn v. Cuomo, ––– U.S. ––––, 141 S. Ct. 63, 68, ––– L.Ed.2d –––– (2020) (per curiam); City of Mesquite

v. Aladdin's Castle, 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982). We agree.

**\*3** To be sure, nothing in the record suggests that the Governor rescinded EO 34 for litigation-related reasons rather than to account for changing conditions owing to the course of the virus itself. Cf. Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 661-62, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993) (explaining that rescinding executive action for litigation reasons does not necessarily moot a challenge to it). Indeed, any decision by the Governor to issue an executive order that imposes the same requirement to self-quarantine that EO 34 imposed would most likely be predicated on at least somewhat different facts and considerations. The dynamic nature of both the virus that has given rise to this pandemic and the public health response to it all but ensures that would be so, just as the dynamic nature of both the virus and the response appears to explain why EO 34 was rescinded in favor of EO 57.

**[4]** Against this background, there is a question whether the issues presented by the plaintiffs' request for relief from EO 34's self-quarantine requirement -- given that it has been rescinded -- could recur. See Trinity Lutheran Church of Columbia, Inc. v. Comer, ––– U.S. ––––, 137 S. Ct. 2012, 2019 n.1, 198 L.Ed.2d 551 (2017); Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). But, the Governor has not denied that a spike in the spread of the virus in Maine could lead her to impose a self-quarantine requirement just as strict as EO 34's. Thus, we cannot say that the Governor has carried "the formidable burden" that she bears "of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." ACLUM, 705 F.3d at 55 (quoting Friends of the Earth, 528 U.S. at 190, 120 S.Ct. 693); see also Trinity Lutheran, 137 S. Ct. at 2019 n.1; Ne. Fla. Chapter, 508 U.S. at 662, 113 S.Ct. 2297. A contrary ruling, moreover, would run the risk of effectively insulating from judicial review an allegedly overly broad executive emergency response, so long as it is iteratively imposed for only relatively brief periods of time. Accordingly, we conclude that the plaintiffs' request for injunctive relief from EO 34's self-quarantine requirement is not moot, see Roman Cath. Diocese, 141 S. Ct. at 68;

Elim Romanian Pentecostal Church v. Pritzker, 962 F.3d 341, 344-45 (7th Cir. 2020), and so we turn to the merits. [4] We review the District Court's decision declining to issue a preliminary injunction "for an abuse of discretion, with conclusions of law reviewed de novo and findings of fact for clear error." Trafon Grp., Inc. v. Butterball, LLC, 820 F.3d 490, 493 (1st Cir. 2016).

[4] There is no problem with our reaching the merits based on any concern about a lack of Article III standing on the part of the plaintiffs, because the individual plaintiffs plainly have suffered an injury-in-fact. See Massachusetts v. EPA, 549 U.S. 497, 518, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) ("Only one of the petitioners needs to have standing to permit us to consider the [merits]."); Bowsher v. Synar, 478 U.S. 714, 721, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (similar).

### III.

**[5]** "The framework for considering whether to grant or deny a preliminary injunction" is well settled:

> An inquiring court must gauge the movant's likelihood of success on the merits; must evaluate whether and to what extent the movant will suffer irreparable harm if injunctive relief is withheld; must calibrate the balance of hardships as between the parties; and must consider the effect, if any, that the issuance of an injunction (or the withholding of one) will have on the public interest.

Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 92 (1st Cir. 2020). We review the District Court's decision declining to issue a preliminary injunction "for an abuse of discretion, with conclusions of law reviewed de novo and findings of fact for clear error." Trafon Grp., Inc. v. Butterball, LLC, 820 F.3d 490, 493 (1st Cir. 2016).

**[6] [7] [8] [9]** The fact that the plaintiffs are seeking a preliminary injunction against a self-quarantine requirement set forth in an executive order that was issued and then rescinded in response to a dynamic public health crisis bears on whether the plaintiffs can make the requisite showing under both the irreparable harm and public interest prongs of the test just described. But, rather than address those prongs of that test, we begin and end our analysis with the likelihood-of-success-on-the-merits prong, as we agree with the District Court that the plaintiffs failed to meet their burden to satisfy it, see Bayley's Campground, 463 F. Supp. 3d at 33-34, and a failure to do so is itself preclusive of the requested relief, see New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002); see also Akebia Therapeutics, 976 F.3d at 92 ("If the movant fails to demonstrate a likelihood of success on the merits, the remaining elements are of little consequence."). Because the likelihood of success issue presents a question of law in this case, our review of the District Court's decision on that question is de novo. See Akebia Therapeutics, 976 F.3d at 92.

### A.

**\*4 [10] [11]** "The textual source of the constitutional right to travel ... has proved elusive," but, "[w]hatever its origin, the right to migrate is firmly established." Att'y Gen. of N.Y. v. Soto-Lopez, 476 U.S. 898, 902-03, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986) (plurality opinion); see also Saenz v. Roe, 526 U.S. 489, 498, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999). This federal constitutional right includes at least three distinct components:

> [1] the right of a citizen of one State to enter and to leave another State, [2] the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, [3] for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State.

Saenz, 526 U.S. at 500, 119 S.Ct. 1518.

The Governor argues that EO 34's self-quarantine requirement does not "burden[ ]" or "implicate[ ]" the right, because it "imposes no barrier to entry ... and treats residents and non-residents precisely the same." For that reason, she contends, the requirement is not subject to the strict scrutiny that the plaintiffs argue applies and thus the requirement need not constitute the least restrictive means of serving a compelling governmental interest. [5]

[5] Some courts have suggested that intermediate scrutiny may be appropriate if a challenged regulation burdening the right to travel is akin to a "time, place and manner restriction[ ]," Lutz v. City of York, 899 F.2d 255, 269 (3d Cir. 1990); see also Johnson v. City of Cincinnati, 310 F.3d 484, 502 n.9 (6th Cir. 2002), but no party suggests that intermediate scrutiny may on that basis be appropriate here.

We may assume, however, that the District Court was correct to rule both that the requirement does burden the federal constitutional right to interstate travel and that the requirement is subject to strict scrutiny in consequence. See Bayley's Campground, 463 F. Supp. 3d at 31-35. For, as we will explain, even on those assumptions, the District Court was right to hold that the plaintiffs failed to meet their burden to show that they have a likelihood of success on the merits.

### B.

The Governor contends that -- assuming strict scrutiny does apply -- the interests in "protecting Maine's population from further spread of the COVID-19 virus and preventing Maine's health care system from being overwhelmed" by those infected with it are "compelling state interests." The plaintiffs do not argue otherwise on appeal, nor do we see how they could do so successfully. See Roman Cath. Diocese, 141 S. Ct. at 67 ("Stemming the spread of COVID-19 is unquestionably a compelling interest."); see also Zemel v. Rusk, 381 U.S. 1, 15–16, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965) ("The right to travel within the United States is of course ... constitutionally protected. But that freedom does not mean that areas ravaged by ... pestilence cannot be quarantined when it can be demonstrated that unlimited travel to the area would directly and materially interfere with the safety and welfare of the area or the Nation as a

whole." (citation omitted)); Edwards v. California, 314 U.S. 160, 184, 62 S.Ct. 164, 86 L.Ed. 119 (1941) (Jackson, J., concurring) (explaining that "[t]he right of the citizen to migrate from state to state ... is not ... an unlimited one," and that certainly a citizen may not "endanger others by carrying contagion about"); R.R. Co. v. Husen, 95 U.S. 465, 472, 24 L.Ed. 527 (1877) ("[W]e unhesitatingly admit that a State may pass sanitary laws, and ... for the purpose of self-protection it may establish quarantine, ... [although a State] may not interfere with transportation into or through the State, beyond what is absolutely necessary for its self-protection."); Smith v. Turner, 48 U.S. (7 How.) 283, 414, 12 L.Ed. 702 (1849) (opinion of Wayne, J.) ("[T]he States of this Union may, in the exercise of their police powers, pass quarantine and health laws, interdicting vessels coming from ... ports within the United States, from landing passengers and goods, prescribe the places and time for vessels to quarantine, and impose penalties upon persons for violating the same.").

**\*5** Thus, the key question on appeal concerns the strength of the support in the record for the Governor's further assertion that "there were no other effective less-restrictive alternative[ ]" means of serving Maine's compelling interests at the time that EO 34's self-quarantine requirement was in place. Given our assumption that strict scrutiny applies, the plaintiffs contend that the burden is on the Governor to show that this assertion about the absence of equally effective but less restrictive means is correct, because if she cannot make that showing, they contend that they necessarily will have met the burden that they bear to show that they have a likelihood of succeeding on the merits of their right-to-interstate-travel claim.

We may assume that the plaintiffs have properly framed the nature of the inquiry. For, even so framed, we agree with the District Court that, on this record, the Governor has provided adequate support for the conclusion that no less restrictive but equally effective alternative was available to her during the time period at issue. See Bayley's Campground, 463 F. Supp. 3d at 27-28, 35. The Governor's evidentiary case on this score included, most prominently, a declaration from the Maine CDC Director, Dr. Nirav Shah. He was a member of the state's Coronavirus Response Team that the Governor convened on March 2, 2020, prior to issuing EO 34 and whose advice she sought in issuing that order. The District Court relied on Dr. Shah's declaration, as well as other evidence in the record, to find as follows.[6]

6   The plaintiffs do not challenge the District Court's factual determinations on appeal, nor do we perceive any basis for setting them aside as clearly erroneous.

First, the District Court supportably found that the virus was understood during the period that EO 34 was in effect -- as it remains (tragically) to this day -- to be both easily transmissible and unusually deadly. See id. at 27. Indeed, the record demonstrated that, as of May 25, the virus had already killed nearly 100,000 people across the country, though less than 80 in Maine itself. Id.

Second, the District Court found, supportably, that it was understood at the relevant time that the virus had an incubation period of up to fourteen days and that it was common for a person infected with it to be highly contagious but asymptomatic. Id.; see also id. ("Approximately 40% of all COVID-19 transmission can occur while individuals are asymptomatic and approximately 35% of all COVID-19 patients do not have symptoms at all."). The District Court supportably found, however, that at that early stage of the pandemic, there was no vaccine or broadly effective treatment for COVID-19 in place. Id. Nor, the record showed, were there at that time "sufficient quantities" of test kits in the state to permit effective testing of the population, thereby making contact tracing of those who had come into contact with an infected person all but impossible. Id. at 28.

The District Court then also supportably found -- based on the predicate findings just described -- that it was a "critical strategy in combatting the COVID-19 virus ... to slow its spread by limiting the extent to which persons come in contact with one another." Id. at 27. And, the District Court supportably found, Maine had special reason to implement this strategy that spring, based on the influx of travelers that it could expect in due course. In the summer of 2019, Maine experienced "roughly 22 million people travel[ing] to Maine for purposes of temporary recreation" -- a number that dwarfed the state's "year-round population of 1.3 million." Id. Such an influx would be concerning to Maine in the face of the pandemic, moreover, because, as the District Court found, as of May 25, 2020, Maine had a total of only "391 critical care hospital beds and 318 conventional ventilators," many of which were already occupied. Id.

**\*6** We thus see no merit in the plaintiffs' contention that the Governor failed to put forward "an affirmative, competent evidentiary showing" that could suffice to establish the need for the self-quarantine requirement, if they mean to suggest by that contention that <u>no</u> evidence in the record supported the conclusion that the requirement constituted a means of serving Maine's compelling interests in managing the fallout from the pandemic. As we have just explained, the record supportably showed that, as the District Court found, the COVID-19 virus was deadly, highly contagious, and spreading rapidly in other parts of the country; there was not then evidence of similar widespread infection in Maine itself; no known treatment or cure nor any easy means of detecting the virus existed in Maine at the relevant time; it could be spread by persons who were asymptomatic but infected with it; it had an incubation period of up to two weeks; and Maine could reasonably expect an increase in its population as large as 2,000% over the coming summer months, while its critical care capacity in its health system was already half full. With those findings in place, the District Court had a strong foundation from which to find -- as it did -- that EO 34's self-quarantine requirement would make it "unlikely that [the travelers subject to it would be] infected with the virus" when they interacted with others in Maine. Id. Additionally, the District Court had a strong foundation to find -- as it did -- that, through EO 34, Maine would permit travel to the state while "both reduc[ing] the spread of the COVID-19 virus in Maine and reduc[ing] and/or prevent[ing] an undue strain on Maine's health care system." Id.

The plaintiffs separately argue, however, that the Governor's showing still comes up short, by pointing to what they contend are various less restrictive alternative approaches to addressing the virus that were available to the Governor at the time EO 34 was in place. They contend that the record fails to show that these alternative approaches would not have been at least as effective in responding to the virus as the self-quarantine requirement. But, here, too, we are not persuaded.

In pressing this aspect of their case, the plaintiffs first posit that the Governor could have merely recommended rather than mandated travelers to self-quarantine upon their arrival. After all, they contend, the Governor has failed to show why such a recommendation would not have been at least as effective as the requirement she imposed. But, the plaintiffs put forth no evidence -- nor cite to any authority -- that would support the conclusion that the Governor could not at that early stage of the pandemic rely on the common sense understanding that legal mandates induce greater compliance than do precatory requests. Cf. Van Hollen, Jr. v. Fed. Election Comm'n, 811 F.3d 486, 497 (D.C. Cir. 2016) ("[There is] no[ ] require[ment] to hold a hearing to prove what common sense shows." (quoting San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n, 789 F.2d 26, 44 (D.C. Cir. 1986))); cf. also Mapp v. Ohio, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) ("[W]ithout the [exclusionary sanction,] the assurance against unreasonable federal searches and seizures would be 'a form of words' [and] valueless.").

Nor does the fact that Dr. Shah stated that EO 34 was designed to "err[ ] on the side of caution" demonstrate that the self-quarantine requirement was, as the plaintiffs claim, "intentionally overbroad" and thus, necessarily, more restrictive than necessary. That statement just suggests that Dr. Shah and the Governor were of the view that the risk of taking a less cautious approach than the one reflected in EO 34 was not acceptable when so little was then known about the novel virus. See Competitive Enter. Inst. v. U.S. Dep't of Transp., 863 F.3d 911, 917 (D.C. Cir. 2017) (recognizing that a "precautionary approach" can be appropriate when decisionmakers confront "limited evidence" about the true extent of known risks).[7]

[7] The plaintiffs also assert in passing that EO 34 is somehow "underinclusive," but "appellate arguments advanced in a perfunctory manner, unaccompanied by citations to relevant authority, are deemed waived," Ahmed v. Holder, 611 F.3d 90, 98 (1st Cir. 2010). In consequence, we do not have a contention before us like those that have been made in cases challenging various restrictions meant to slow the spread of the virus on free exercise grounds. See, e.g., Roman Cath. Diocese, 141 S. Ct. at 66-67; Agudath Israel of Am. v. Cuomo, 983 F.3d 620, 624 (2d Cir. 2020).

The plaintiffs next suggest that EO 34's self-quarantine requirement could have been just as effective if it had been limited to apply only when "reasonable cause [existed] to believe that the person has been exposed to [or infected with] COVID-19." But, the plaintiffs do not explain how such a "reasonable cause" standard would have been practicably administrable in Maine in early 2020, given the lack of testing

capacity in the state at that time, the significant uncertainty regarding the strength and duration of any immunity to the virus, and the fact of asymptomatic transmission.

**\*7** Indeed, Dr. Shah explained in his unchallenged declaration that limiting the self-quarantine requirement to only persons exhibiting symptoms (or relying solely on contact tracing) would have been a significantly less effective alternative, given that asymptomatic spread of COVID-19 was common. Dr. Shah further explained that while, "[i]n the future, it might be possible to exempt from the 14-day requirement those individuals who can document that they already had, and recovered from, COVID-19," at the time there was "significant scientific uncertainty about whether individuals who have previously been infected with COVID-19 develop sufficient immunity to prevent them from transmitting the virus." And, Dr. Shah added, implementing a test-based exception was similarly impracticable at the time due to "an inadequate national supply of the test kits needed" to test for the virus. [8]

[8] Dr. Shah also represented that "[a]s the supply of test kits increases, ... [Maine CDC] will continue to evaluate the use of the tests as a substitute for, or an addition to, the existing quarantine requirement." In light of his affidavit, this is not a case where, as the plaintiffs contend, "[t]he record is silent as to the comparative effectiveness of the [proposed] alternatives." United States v. Playboy Ent. Grp., 529 U.S. 803, 826, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (emphasis added).

The plaintiffs' failure to account for concerns about administrability also undermines their related contention that the Governor did not meet her burden to show that a self-quarantine requirement that allowed those subject to it to comply with it immediately before traveling to Maine would not have been just as effective as the self-quarantine requirement that EO 34 imposed. The declarations submitted by the Governor explained that it would be nearly impossible for Maine officials to verify the compliance of those claiming to have self-quarantined outside of Maine, while such verification would be appreciably easier if the requirement to self-quarantine had to be met by travelers once they arrived in Maine. [9]

[9] We also note that, absent the travelers self-quarantining at the border just before entering Maine, it is hard to see how the plaintiffs' proposal would be equally effective at preventing potentially infected individuals from interacting with others inside Maine. After all, any quarantine undertaken before entering Maine would be rendered ineffective if a traveler interacts with other individuals while en route -- and before arriving -- to Maine's borders.

The plaintiffs do invoke Supreme Court of New Hampshire v. Piper, 470 U.S. 274, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985), to argue that the Governor's response on this score necessarily rests on the constitutionally impermissible assumption that non-Mainers are "less likely to comply with the law" than Mainers are. See id. at 285, 105 S.Ct. 1272. But, we do not agree that Piper provides any support for that contention.

Piper concerned a Privileges and Immunities Clause challenge to a requirement that one had to be a New Hampshire resident to be admitted to that state's bar. Id. at 275, 105 S.Ct. 1272. The United States Supreme Court explained that a requirement that non-residents attend classes in New Hampshire on New Hampshire law would be a less restrictive means of ensuring their knowledge of the local law remained fresh and, on that basis, struck down the discriminatory residency requirement for admission to the state's bar as "markedly overinclusive," while noting that the state could not properly justify that requirement on the ground that out-of-staters would be less willing to comply with a requirement to remain familiar with local rules and procedures than would New Hampshirites. See id. at 285, & n.19, 105 S.Ct. 1272.

Here, however, the less restrictive alternative that the plaintiffs propose would not permit Maine to monitor the in-state behavior of those coming from elsewhere, as the less restrictive alternative identified in Piper would have permitted New Hampshire to have done. Rather, the plaintiffs' proposed alternative contemplates travelers self-quarantining outside of Maine altogether. Thus, the Governor's explanation of the problem with that alternative does not rest on any assumption about travelers into Maine being less law-abiding than those who never leave Maine.

**\*8** The plaintiffs next point to the fact that the positivity rates of infection of those tested for the virus in certain states with

less stringent requirements to self-quarantine were "either similar to or better than Maine." They contend that the stricter self-quarantine requirement that EO 34 imposed was no more effective than the less stringent ones that these other states implemented, thereby demonstrating that less restrictive but equally effective (or, at least, equally ineffective) means of slowing the spread of the virus were available.

But, even if a comparison of the positivity rates in test results across states is itself apples-to-apples, [10] the plaintiffs do not address the distinctions between those states and Maine in terms of health care system capacity and population surges from tourism. They fail as well to explain why later outcomes in test results suffice to show what is relevant here -- namely, that earlier responses were undertaken when it was evident (as opposed to sharply disputed) that less restrictive ones would prove to be as efficacious. A city that calls out extra snow removal crews to respond to a blizzard has not overreacted if the ensuing storm overwhelms its extraordinary response just because the neighboring town that gambled the storm would never come and so made no special effort to combat it was overwhelmed by the snowfall as well. We must judge the response based on what was known at the time and not in hindsight. See Cooper v. Harris, ––– U.S. ––––, 137 S. Ct. 1455, 1464, 197 L.Ed.2d 837 (2017) (explaining that governmental action does not fail a narrow tailoring requirement simply because certain measures "may prove, in perfect hindsight, not to have been needed").

[10]   The plaintiffs are comparing the percentage of COVID-19 tests that are coming back positive in a given jurisdiction over a particular time period (usually a seven-day average). These rates can vary widely not only over time, as a pandemic runs its course, but also due to factors such as, for example, the accuracy and availability of testing and whether asymptomatic persons (or only overtly ill ones) are frequently tested.

In a final effort to demonstrate a likelihood of success on the merits, the plaintiffs try to paint EO 34's self-quarantine requirement as an impermissible attempt by Maine "to effectively isolate itself from the rest of the Nation" and to "shift[ ] the burden of dealing with United States citizens afflicted with COVID-19 to other states." The plaintiffs here rely on City of Philadelphia v. New Jersey, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), in which the Supreme Court invalidated New Jersey's ban on importing waste that originated in other states as an "impermissible ... effort[ ] by one State to isolate itself in the stream of interstate commerce from a problem shared by all." Id. at 618, 629, 98 S.Ct. 2531; see also Edwards, 314 U.S. at 173-74, 62 S.Ct. 164 ("The Constitution was framed ... upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division" (quoting Baldwin v. Seelig, 294 U.S. 511, 523, 55 S.Ct. 497, 79 L.Ed. 1032 (1935))).

But, rather than suggesting that Maine was trying to "isolate" itself from a "problem shared by all," City of Philadelphia, 437 U.S. at 629, 98 S.Ct. 2531, the record suffices to demonstrate that Maine was attempting to solve a common problem by means of a familiar solution. This virus, by its nature, thrives on human contact, and no less central an authority than the U.S. Centers for Disease Control and Prevention has recommended that persons distance themselves from others and avoid unnecessary travel. See Domestic Travel During the COVID-19 Pandemic, U.S. CDC, https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-during-covid19.html (last visited Jan. 15, 2021). Tellingly, City of Philadelphia itself noted that "quarantine laws," as a special category, are "repeatedly upheld even though they appear to single out interstate [activity] for special treatment" -- explaining that, in cases of viral outbreak, the very act of "movement [can] risk[ ] contagion and other evils." 437 U.S. at 628-29, 98 S.Ct. 2531.

## IV.

**\*9** The District Court correctly held that the plaintiffs failed to demonstrate a likelihood of success on the merits of their right-to-travel claim. We thus **affirm** the District Court's refusal to enter the requested preliminary injunction.

**All Citations**

--- F.3d ----, 2021 WL 164973